INDEX

Exhibit A   Transcript of Proceeding of July 1, 2009 in Magistrate Court

Exhibit B   Search Warrant Affidavit

Exhibit C    Photographs of Items Recovered in Search

# EXHIBIT A

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2                WESTERN DIVISION

3    UNITED STATES OF AMERICA,      )      Docket No. 09 CR 50031
                                    )
4                    Plaintiff,     )      Rockford, Illinois
                                    )      Wednesday, July 1, 2009
5              v.                   )      11:15 o'clock a.m.
                                    )
6    DANIEL MAHON,                  )
                                    )
7                  Defendant.       )

8                 TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE P. MICHAEL MAHONEY
9

    APPEARANCES:
10

    For the Government:        HON. PATRICK J. FITZGERALD
11                             United States Attorney
                               (308 West State Street,
12                              Rockford, IL  61101) by
                               MR. JOHN G. McKENZIE
13                             Assistant U.S. Attorney

14   For the Defendant:        MR. DENNIS J. RYAN
                               (4414 West Regent,
15                              Madison, WI  53705)

16   Also Present:             MR. TRISTAN MORELAND
                               Special Agent, ATF
17

     Court Reporter:           Mary T. Lindbloom
18                             211 South Court Street
                               Rockford, Illinois  61101
19                             (815) 987-4486

20

21

22

23

24

25

```
 1              THE COURT:  All right, counsels.  We're going to take

 2        up at this time 09 CR 50031, United States of America v. Daniel

 3        Mahon.  I would ask all counsel, starting with counsel on behalf

 4        of the United States, to please identify themselves for the

 5        court record.

 6              MR. MC KENZIE:  John McKenzie on behalf of the United

 7        States, your Honor.

 8              THE COURT:  Good morning, counsel.

 9              MR. MC KENZIE:  Good morning, your Honor.

10              MR. RYAN:  Good morning, your Honor, counsel, agent.

11        I'm Attorney Dennis Ryan.  I appear here with the defendant

12        Daniel Mahon.

13              THE COURT:  Counsels, this matter is set for two

14        matters.  One is the identity hearing in regard to the

15        indictment and warrant which has been issued by the District

16        Court in Arizona, and two is the detention hearing or bond

17        hearing in regard to the defendant.  The court will take the

18        identity hearing first.  United States ready to proceed?

19              MR. MC KENZIE:  Your Honor, we are; although, my

20        understanding is that defense counsel will be agreeing and

21        stipulating to identity.

22              THE COURT:  Counsel?

23              MR. RYAN:  That is true, sir.

24              THE COURT:  All right.  The court finds at this time

25        that the defendant that appears in front of the court is, in
```

1  fact, the person named in the indictment and the person named in

2  the warrant.

3        In regard to detention in regard to Daniel, I would ask

4  if counsel's had an opportunity to go over the pretrial service

5  officer's report with your client and if there are any factual

6  corrections at this time.

7        MR. RYAN:  On behalf of the defense, we have reviewed

8  it together.  We have no substantive factual corrections to

9  offer.

10        THE COURT:  All right.  Let me tell you what I've

11  written down before I give you ample time to do whatever proffer

12  or testimony that you want to.  Daniel's been in this area

13  21 months.  He has family in the area.  He has a mother who has

14  particular needs that he's been taking care of, a father who's

15  88 years old that he's been helping.  He has assets which would

16  be available to post as bond and no previous arrest and no

17  criminal record.

18        On the side of detention, he's unemployed; although, I

19  think that's balanced out by the SSI, to tell you the truth.  He

20  has few assets.

21        In my opinion, counsel, subject to argument of

22  counsels, there has been a presumption triggered by the

23  indictment that's been returned.  What's the position of defense

24  counsel in regard to that?

25        MR. RYAN:  We would move for release, sir.

4

1          THE COURT:  Okay.  Do you agree that the presumption's

2     been triggered?

3          MR. RYAN:  Yes.

4          THE COURT:  All right.  With the 844(i), I believe the

5     presumption's been triggered.  Is that the position of the

6     United States?

7          MR. MC KENZIE:  That's correct, your Honor.  We believe

8     that.

9          THE COURT:  All right.  Proffer or testimony on behalf

10     of the United States.

11          MR. MC KENZIE:  Thank you, your Honor.  Can I have just

12     literally 30 seconds?  I'm still going through the pretrial

13     services report.

14          THE COURT:  Sorry, counsel.  I thought you were ready

15     to go.

16          MR. MC KENZIE:  Thank you, your Honor.

17       (Brief pause.)

18          MR. MC KENZIE:  Your Honor, I previously provided

19     defense counsel with copies of what would be our detention

20     exhibits 1 through 20.  I'm going to also refer to the affidavit

21     in support of application for search warrant filed in 09 M 0007,

22     which we'll also be referring to and adopting.  I've provided

23     defense counsel with a copy of that, as well.

24          Your Honor, may I approach and provide the court with a

25     copy of my exhibits?

1           THE COURT:  Yes, you may, counsel.  Defense counsel

2     have a copy?

3           MR. RYAN:  I've just received one, sir, yes.

4           THE COURT:  All right.

5           MR. MC KENZIE:  And, your Honor, does the court wish to

6     have a copy of the search warrant affidavit in support of its

7     application?

8           THE COURT:  I'm going to need one, counsel, because I

9     didn't bring one up.  I understand there's one in the court

10    file, but if you have one, I'll take one.

11          MR. MC KENZIE:  I have an extra one.

12          THE COURT:  Because I assume you're going to refer to

13    it.

14          MR. MC KENZIE:  Briefly, your Honor.  And for the

15    record, I'd be handing the court copies of Government's Exhibits

16    Detention 1 through 20.

17          THE COURT:  Okay.

18          MR. MC KENZIE:  And a copy of the application and

19    affidavit for search warrant.

20          THE COURT:  Thank you, counsel.

21          MR. MC KENZIE:  Thank you, your Honor.

22          THE COURT:  Counsel, you may proceed.

23          MR. MC KENZIE:  Thank you, Judge.

24          First of all, your Honor, the United States proceeds by

25    proffer.  This would be the information supplied by Tristan

1    Moreland, special agent with the Bureau of Alcohol, Tobacco,

2    Firearms & Explosives, commonly referred to as ATF.

3    　　　　The United States first adopts for its proffer all of

4    the allegations set forth in the affidavit in support of the

5    application for search warrant.  That affidavit was signed by

6    Tristan Moreland.  It also includes reference and adoption of a

7    secondary affidavit, that being an affidavit of John Richardson,

8    Attachment C to the affidavit of Tristan Moreland.  We adopt

9    that, as well, as part of our proffer.

10    　　　　Your Honor, I would like to advise the court of several

11    devices and materials that were found inside the defendant's

12    premises pursuant to this search warrant that was executed.

13    First of all, your Honor, as shown by Government's Exhibit

14    Number 10 -- it's a photograph.  It's a photograph of a plastic

15    bag containing what are improvised explosive devices, and I'll

16    refer to those as IEDs, two of them.  These were found in the

17    bedroom of the residence believed to be Dennis Mahon's

18    residence -- pardon me -- bedroom.

19    　　　　Each of these devices consist of what are called M

20    devices, and that's usually a reference to either an M-80, an

21    M-100, an M-60.  It's a common firearm.  They have not

22    determined the exact type of M device used in this.  These

23    M-80s, I'll refer to them as, taped together and also have

24    affixed to them large steel bearings.  The bearings are used to

25    increase the lethal nature of an IED.  There was a discussion by

1    Dennis Mahon to use the IEDs by throwing them into an

2    immigration rally.

3         THE COURT:  When was that discussion, counsel?  Do you

4    have a date for me?

5         MR. MC KENZIE:  I'll supply that in just a moment, your

6    Honor.

7         THE COURT:  Okay.

8         MR. MC KENZIE:  I'll come back to that on that.

9         THE COURT:  Didn't mean to interrupt.

10        MR. MC KENZIE:  No, your Honor.

11        In addition, there were also bomb-making materials and

12   instructions within the residence.  As reflected in Government's

13   Exhibit Number 20, this is a printout from the Internet.  It's

14   dated on the lower right-hand corner as April 15th, 2009, and

15   that would normally be the access date of Internet.  So, as of

16   at least only months ago, there was an access to an Internet and

17   a printout by the defendants of these materials.

18        These were only some of the materials.  They include

19   how to avoid being successfully investigated, such as hiding

20   fingerprints, avoiding your DNA, how to conduct assassinations,

21   how to manufacture various types of explosives, including

22   homemade C4 and potassium chlorate, how to make mail bombs and

23   pipe bombs, how to obtain and use long range timers to use as

24   fuses for bombs.

25        In addition, within the premises or the scope of the

1    search warrant, there was found what's called an Anarchist

2    Cookbook.  This also discusses how to make IEDs, fuses, booby

3    traps, weapons.  There was further another book on making booby

4    traps that was found.

5         Within the residence and outbuildings, there was a

6    number of firearms that were found.  First, as reflected in

7    Government's Exhibit 5, there was a Ruger Mini 14 .223 caliber

8    semiautomatic assault rifle in a bedroom that is believed to be

9    by the United States, based upon information throughout the

10   investigation and during the search, the bedroom of this

11   defendant, Daniel Mahon.

12        In one of the outbuildings, as reflected in

13   Government's Exhibit Number 1, there were 20 rounds of

14   .223 caliber marked ammo piercing -- I'm sorry -- armor

15   piercing.  Your Honor, under Illinois law possession of that

16   would be a Class 3 felony.

17        As reflected in Government's Exhibit 4, there was a

18   nine millimeter pistol and four loaded magazines found in a car.

19   This was found in the trunk of a white Malibu.  According to

20   information received from the ATF, that Malibu is registered to

21   this defendant.

22        There was also, as reflected in Government's Exhibit 6,

23   a semiautomatic pistol on a bed stand in the bedroom.

24   Government's Exhibits 7 and 8 show two shotguns found in the

25   bedroom.  Also recovered from the search was a .357 magnum

1    revolver, two rifles, a .45 caliber pistol, two .25 caliber

2    semiautomatic pistols.  I'll reference the court to Government's

3    Exhibit Number 14, which shows one of the pistols, along with, I

4    believe, three additional loaded magazines for them.

5          In addition, in Government's Exhibit Number 9 there is

6    what is referred to as an assault rifle, often referred to as an

7    AK-47 style or an AK Sportster assault rifle with two loaded

8    magazines found on the downstairs dining room table.

9    Government's Exhibits 11 and 15 show extra clips for this

10   assault rifle that were located in Dennis Mahon's room.  This

11   assault rifle was the same as observed in February of 2009 by an

12   undercover ATF special agent -- that would be Special Agent

13   Moreland -- in Dennis' room.  It appears to have been brought

14   downstairs and immediately accessible from the entrance that was

15   used by the sheriff when they approached the Mahons on the day

16   of the search and their arrest.

17         Government's Exhibit 13 also discloses numerous other

18   rounds of ammunition.  Government's Exhibit 12 has a rifle with

19   scope that was found in Dennis' bedroom.  Government's

20   Exhibits 16 and 18 are additional photographs of the shotguns

21   that were found.  In addition, Government's Exhibits 1, 2, and 3

22   reflect several ballistic or bulletproof vests that were found

23   both in the house and one outbuilding.

24         Found within the house, as reflected in Government's

25   Exhibit 1, was -- or pardon me -- within the premises was a

White Aryan Resistance, also known as WAR, materials in a

three-ring binder, a VHS tape marked CNBC with Tom Metzger.

Metzger is the self-reported founder of WAR, describes himself

as a white racial separatist.  Also a National Socialist

Bulletin, along with a Nazi armband.

Government's Exhibit 19 was found inside the residence.

It reflects that Dennis Mahon, the brother, is a former imperial

dragon.  The letter is addressed To Whom It May Concern, and

it's dated just two days after the bombing.  In this letter he

states that he was a former leader of the White Knights of the

Ku Klux Klan.  He also describes his brother as being his

bodyguard and as being a paid videotaper and also providing

small amounts of money.

Also within the house is Government's Exhibit 17, which

is DVDs including WAR and white supremacist groups' meetings

called Hammerfest.  Special Agent Moreland would testify that

Hammerfest is a common meeting or an annual meeting of various

organizations within kind of the overall umbrella of the white

supremacist movement.

Also found were other VHS tapes on Aryan Fest, an

Inside Edition on Klan recruiting, photographic albums showing

various Aryan Fests in the 1980s, a three-ring binder of the

National Socialist Brotherhood with a stated purpose therein of

destroying the Jewish World Order.

There were newspaper clippings on the 9/11 bombing of

1    the World Trade Center and a newspaper photo of Osama Bin Laden

2    with handwriting below it that states, "Our Hero."

3         Your Honor, at 6:00 o'clock in the morning on the day

4    of their arrest, Ogle County Sheriff's Department approached the

5    door to the premises.  One of the lieutenants took the lead.

6    Several other deputies fanned out.  The lieutenant went to the

7    door and knocked for awhile.  Finally, Dennis Mahon came to the

8    door.  Dennis Mahon stated he was not coming out unless there

9    was a warrant.  The lieutenant advised him that there were

10   warrants.  Dennis Mahon said that he was going to have to talk

11   to his brother.

12        At that point or shortly thereafter, a shade on a

13   second floor window went up, and the deputies were removed to a

14   safer area.  The lieutenant then began trying to contact Dennis

15   Mahon by calling his cell phones.  For awhile there was no

16   answer.  During this time delay and at approximately 6:19 a.m.,

17   Dennis Mahon calls an individual and left a message on that

18   individual's answering machine.  The message stated that the

19   cops were there to arrest them, and he was thinking of shooting

20   it out or shooting them.

21        The lieutenant used a different cell phone to dial the

22   defendants so that the caller ID would show a different number

23   was coming in.  Defendant Dennis Mahon answered the phone and

24   agreed to surrender.  At approximately 6:45 the defendants came

25   out of their residence.  They were placed in a transport vehicle

1    at that time without incident.

2         While in the transport vehicles, the defendants

3    discussed between themselves and without the presence of law

4    enforcement officers getting rid of the explosive powder.  They

5    described it as a good thing that they got rid of it.  One

6    defendant stated, "We should have had a shootout."  The

7    defendant agreed.  One stated that had a different vehicle shown

8    up there that day, there would have been a firefight.  One of

9    the defendants stated, "I wanted to have a shootout here."

10        During this time there was a discussion of flight.

11   Daniel, this defendant, stated, "I knew this was going to come."

12   His brother Dennis stated, "I thought it would come a long time

13   ago."  This defendant, Daniel, stated, "After the DNA thing,

14   maybe it's a good time to -- of course, they would have found

15   us, anyway."

16        I would report to the court as part of my proffer after

17   the DNA search warrant on May of 2008 for the DNA samples for

18   Dennis and Daniel Mahon, these two discussed taking off to a

19   retreat, a reference to a property located in Missouri.  Prior

20   to the discussion in the car, Special Agent Moreland had

21   informed Daniel Mahon that the Missouri property was being

22   raided at that very moment.

23        As far as a discussion of guilt, they both discussed

24   that when the bombing took place -- they both discussed when the

25   bombing took place and stated that they could no longer be

1   prosecuted as the statute of limitations had expired.   In

2   another conversation, part of the conversation, Dennis said, "I

3   never told her," referring to an individual cooperating with the

4   government, "what I really did."   Daniel Mahon said, "I never

5   told her anything."   Dennis Mahon said, "I kept telling her that

6   the cops did this to a guy."   In reference to DNA being found on

7   the bomb, Dennis Mahon stated, "I'm not stupid enough to do

8   something like that."   Daniel then replied, "There's no way they

9   got our DNA on that thing.   There's no way."

10          As far as the continued conversation about shooting it

11  out with the ATF, at approximately 9:00 a.m. Special Agent

12  Moreland brought Dennis out in front of the house.   There they

13  discussed procedurally what was going to happen later that day

14  as far as appearing before a court.   Special Agent Moreland

15  stated, "I want to thank you for not shooting it out."   Dennis

16  Mahon said, "I came real close.   Had they hit me at 3:00 a.m.,

17  there would have been a lot of body bags."   Dennis then

18  discussed how it was good that the ATF had used the Ogle County

19  Sheriff's Office rather than the ATF to approach.

20          As far as discussion of retaliation, there was a

21  discussion between Dennis or Daniel that Tom Metzger had stated

22  for them to plead not guilty and to bring the swine in to make

23  them pay.   The United States would believe that this is a

24  reference to attempting to expose informants who had been

25  cooperating against them, that there is a common thread in the

1  white supremacist organization to identify traitors -- as they

2  put it, racial traitors or traitors to the white race.

3      During a recorded conversation on January 5th, 2009 --

4  and this is set forth more fully in the affidavit in support of

5  the search warrant -- there was a discussion about the May 2008

6  DNA search warrant in which Dennis stated, "If you're going to

7  come after, then come after me, uh, because I've got my AK-47,

8  and I'm not going to rot in jail, and neither is Dan.  But so

9  far it's been four months now, and it seems to me they would

10  have arrested us by now."

11      January 29th, 2005, in a conversation between Daniel

12  and the CI -- pardon me -- the confidential informant or CI,

13  when the informant asked if they did more than just talk about

14  taking action for their cause, referring to the white

15  supremacist beliefs, this defendant, Daniel, said, "We do more

16  than just talk about it.  If I knew you better and the statute

17  of limitations was up."

18      Daniel Mahon then talked about his participation in

19  drive-by shootings, blowing up cars and buildings.  He said,

20  "Dennis did not do much of that stuff.  We thought we were doing

21  the right thing.  We were just trying to send a message."

22  Daniel stated, "When I would take someone's car out, it wasn't

23  anger.  It was a sense of duty.  It was like a military

24  operation.  You plan for it, equip for it."

25      On May 3rd, 2006, during a conversation regarding --

1    excuse me, your Honor.

2         (Brief pause.)

3         MR. MC KENZIE:   (Continuing) -- a conversation with an

4    individual cooperating, Dennis Mahon stated, "I just wanted,

5    just wanted to teach the" -- pardon my language, your Honor --

6    "the motherfucker a lesson the first time."

7         In another recorded conversation during May 2007 on the

8    same subject of the February 2004 bombing, Dennis Mahon stated,

9    "I didn't plant the bomb.  I helped make it."

10        In January 2008 Dennis Mahon took a person who was

11   cooperating to one of the several outbuildings located on the

12   residence.  At that time he indicated that particular building

13   was a location where the Mahons had used to make bombs.

14        On February 7th, 2009, Special Agent Moreland was with

15   Dennis Mahon and others.  Upon approaching the same building,

16   Dennis Mahon again said, "This is where I make my bombs."  He

17   then pointed to the side of the barn and jokingly said, "This is

18   where I keep my warheads."

19        Mahon then became serious and stated, "I had to get rid

20   of some of my powder," which Special Agent Tristan believes was

21   a reference to the explosive gunpowder, "because the cops came

22   here.  Dan was working on his car here.  They had a warrant for

23   a swab."  Special Agent Tristan believes that this is a

24   reference to a search warrant for Daniel Mahon's DNA in May

25   2008.

1     Dennis Mahon also stated they had four cans of black

2     powder here and his BBs.  I would note to the court that

3     although they -- after the conversation in the back of the car

4     while awaiting transport they indicated they had gotten rid of

5     the powder, no powder was found in cans or in BBs inside this

6     particular outbuilding.

7     I would also state, your Honor, on March 29th, 2009,

8     Dennis left a message on a telephone answering machine or a

9     voice mail of an individual cooperating regarding their future

10    intentions.  He stated as follows.  "We're taking care of mom

11    here, and I'm mailing out my propaganda, and, uh, once mom

12    passes away and we go -- and I go back to my radical

13    bomb-throwing, sniper-shooting realm.  But until mom passes

14    away, I really can't do much.  But when she does, look out ZOG,"

15    which is reference to a Zionist occupation government, your

16    Honor.  "Look out because I've got nothing to lose,

17    motherfuckers.  I will shut the country down on electrical

18    power.  Yeah, I know how to do it.  I got the weaponry, I got

19    the high-powered rifles to shoot down the high power tower power

20    accelerators.  So, my friends, yes, yes, unintelligible, America

21    turn the lights out, but maybe not me, but my friends do that,

22    so -- but I can't do that, not while mother's alive.  I should

23    take care, the Aryan thing to do, honey, take care of my mother

24    and father, but they pass away, look out.  Here I come, my

25    friend.  We'll, unintelligible, America out of power, and then

1    we will deal with our enemies, unintelligible, and their bro's,

2    unintelligible, and whites, yes, and nonwhites, unintelligible,

3    and nonwhites shall destroy each other as, unintelligible,

4    liberal, stupid, weak whites.  Take care.  Remember.  Learn,

5    learn, get high power weaponry to take out the high power

6    towers.  Take out electrical power.  Understand that.  There's

7    explosives, high powered rifles, shoot at the insulators.  We

8    need to do this when the time comes.  Time is coming this way

9    close.  Take care, darling.  Remember the electrical power grid

10   is the Achilles heel of America.  So, unintelligible, white

11   proud, white people can't handle it.  Shut it down,

12   unintelligible, the power grid, unintelligible, power grid.

13   High powered weaponry, explosives, no problem.  Got that?  Keep

14   up the good work.  Bye."

15           Thank you, your Honor.  That concludes the proffer.

16           THE COURT:  Any further proffer or testimony on behalf

17   of the United States?

18           MR. MC KENZIE:  No, your Honor.

19           THE COURT:  Proffer or testimony on behalf of the

20   defendant?

21           MR. RYAN:  I want to ask for an adjournment of this,

22   and I'll tell you why, Judge.  I appreciate the courtesy of

23   getting these materials.  It would have been --

24           THE COURT:  Just tell me why, counsel.

25           MR. RYAN:  I want to read this stuff.

```
 1              THE COURT:  Okay.
 2              MR. RYAN:  I came in here thinking we would just deal
 3      with the criminal complaint.
 4              THE COURT:  Slow down.  How much time do you want?
 5              MR. RYAN:  I need an hour.
 6              THE COURT:  What about if we reconvene at 2:30?  That
 7      would be after my 1:30 call.
 8              MR. RYAN:  That would be fine.
 9              THE COURT:  Does that fit for the United States?
10              MR. MC KENZIE:  I'm sorry, your Honor?
11              THE COURT:  Counsel's asked for time to go ever the
12      material.  Particularly he's going to want some time to go over
13      the affidavit in connection with the search warrant, which I
14      know is substantial, particularly if you bring in the other
15      affidavit which you have.  I've suggested to counsel that we
16      reconvene this matter at 2:30 this afternoon after my 1:30 call.
17              MR. MC KENZIE:  That would be fine for the United
18      States.
19              THE COURT:  All right.
20              MR. MC KENZIE:  Your Honor, the court had a question
21      about when the conversation was.
22              THE COURT:  Yes, I did.
23              MR. MC KENZIE:  It was in 2007 and possibly in 2008.
24              THE COURT:  And --
25              MR. MC KENZIE:  That was in reference to throwing
```

1    the --

2            THE COURT:  No, no.  I remember what it was in

3    reference to, but where did the -- was it a conversation with

4    the CI?

5            MR. MC KENZIE:  Your Honor, I'll bring that at 2:30

6    then.

7            THE COURT:  Okay.  Counsel, I'm going to continue the

8    matter 'til 2:30.  I'll check with the United States on the one

9    matter and get an update as far as where we stand in regard to

10    the question the court has.

11            MR. RYAN:  Very good.

12            THE COURT:  It will give you time to go over that

13    material with your client, and then at that point in time I'll

14    take a proffer or testimony on behalf of defense counsel in

15    regard to this matter.

16            MR. RYAN:  Thank you, sir.

17            THE COURT:  Court will stand adjourned.

18        (Whereupon, the within hearing was recessed to 2:30 o'clock

19        p.m. of the same day.)

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      WESTERN DIVISION

 3    UNITED STATES OF AMERICA,    )    Docket No. 09 CR 50031
                                   )
 4                   Plaintiff,    )    Rockford, Illinois
                                   )    Wednesday, July 1, 2009
 5              v.                 )    2:30 o'clock p.m.
                                   )
 6    DANIEL MAHON,                )
                                   )
 7                   Defendant.    )

 8                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE P. MICHAEL MAHONEY
 9
      APPEARANCES:
10
      For the Government:        HON. PATRICK J. FITZGERALD
11                               United States Attorney
                                 (308 West State Street,
12                                Rockford, IL  61101) by
                                 MR. JOHN G. McKENZIE
13                               Assistant U.S. Attorney

14    For the Defendant:        MR. DENNIS J. RYAN
                                 (4414 West Regent,
15                                Madison, WI  53705)

16    Also Present:             MR. TRISTAN MORELAND
                                 Special Agent, ATF
17
      Court Reporter:           Mary T. Lindbloom
18                              211 South Court Street
                                Rockford, Illinois  61101
19                              (815) 987-4486

20

21

22

23

24

25
```

1          THE COURT:  All right, counsels.  Back on record.

2     09 CR 50031, United States of America v. Daniel Mahon.  I would

3     ask counsels again to please identify themselves briefly,

4     starting with the United States.

5          MR. MC KENZIE:  John McKenzie for the United States,

6     your Honor.

7          MR. RYAN:  Good afternoon, your Honor, counsel, agent.

8     I'm Attorney Dennis Ryan.  I appear with Daniel Mahon,

9     M-a-h-o-n.

10          THE COURT:  All right.  First I'll turn to the United

11     States.  I asked for some clarifications about some statements.

12     I didn't know if at this point in time if, in fact, the United

13     States had any clarifications.

14          MR. MC KENZIE:  We have, your Honor.  To supplement our

15     previous proffer, I would state the following.  The court had

16     asked about my statement of a discussion by Dennis Mahon to use

17     IEDs by throwing them into an immigration rally.  The United

18     States would proffer as follows.

19          On May 1st, 2007, Dennis Mahon advised an individual

20     cooperating with the government to tell Charles Kuntze that this

21     individual had stopped Mahon from going to an immigration rally

22     and throwing a bomb into the crowd.  Charles Kuntze is an

23     associate of the Mahons who has provided them with financial

24     assistance in the past because -- for the reason that Dennis

25     Mahon has committed terrorist acts on behalf of white

1    supremacist movements.

2            On the same day, May 1st, 2007, Dennis Mahon told an

3    undercover agent that Dennis Mahon was going to go to the

4    immigration rally, toss a few grenades, and then open up on

5    them.  The agent interpreted open up as opening fire, firing

6    upon them with a gun.  But that the big boss, a reference the

7    agent believes is to Metzger, told Dennis Mahon not to do it

8    because a few people would feel sorry for the victims of the

9    incidents.

10           On April 5th, 2008, Metzger asked if Dennis Mahon was

11   ready for the May 1st, 2008, marches by Hispanics in connection

12   with Cinco de Mayo and stated that there is always "hope with a

13   scope," a common reference by white supremacists.  Dennis Mahon

14   replied that "You wouldn't need that.  You would only need to

15   get on a building and drop a few M-80s down there."  The agent

16   would testify that the IEDs found in Dennis Mahon's bedroom are

17   the functional homemade -- are functionally equivalent to

18   homemade hand grenades.

19           THE COURT:  All right.  Thank you, counsel.  I assume

20   that concludes now the proffer and any testimony the United

21   States desires to offer in regard to the detention hearing.

22           MR. MC KENZIE:  It does.

23           THE COURT:  Counsel on behalf of the defendant, do you

24   desire to make a proffer at this time or offer any testimony?

25           MR. RYAN:  Desire to make a proffer, sir.

1          THE COURT:  Go ahead.

2          MR. RYAN:  Thank you, Judge.  I am grateful for the

3     opportunity of being able to review the affidavits tendered by

4     the government.  It was important that I read them, and once I

5     got through them, I realized how important it was.

6          The main crux of the danger component, danger to the

7     public, by the government's case is contained in both of these

8     affidavits.  I don't know if the court has a copy, if it was

9     given.

10         Essentially, we have a confidential informant, a

11    confidential informant who is paid by the government to, in the

12    affidavit's opening paragraph, paragraph six on Page 4, which

13    introduces the CI, to elicit statements from Daniel Mahon and

14    Dennis.  I will try and restrict my comments to Daniel because

15    I'm his lawyer, not Dennis'.

16         Whatever statements were made by Daniel that I see were

17    in direct response to leading questions presented by the CI.

18         THE COURT:  Counsel, I understand that if you want to

19    make argument, and I may give you a chance to do that.

20         MR. RYAN:  Okay.

21         THE COURT:  But move on and get to your proffer.

22         MR. RYAN:  Thank you.

23         Our basic proffer is that Daniel does not present a

24    risk of harm.  We find nothing on the record and certainly

25    nothing in his that presents a danger to the public, even though

1    he has only been back here --

2         THE COURT:  21 months.

3         MR. RYAN:  Yes.

4         THE COURT:  Then I'll ask you, counsel, if you want.  I

5    have two troubling areas.

6         MR. RYAN:  Sure.

7         THE COURT:  One is the material that was found at the

8    residence.  And you can sit down.

9         MR. RYAN:  All right.  Thanks.

10        THE COURT:  One is the material that was found at the

11   residence where my understanding is your client resides and,

12   two, various statements that the defendant has made.  That along

13   with the triggering of the presumption are the three things you

14   have to overcome.  But, counsel, one, I'll let you argue these

15   things, but do you have any proffer or evidence you want to

16   present?

17        MR. RYAN:  No, no.  Just argument, sir.  Thank you.

18        THE COURT:  All right.  Let's go into the argument.

19   How do I get around the material?  Let's assume for a second

20   that we can set aside the issue of the appearance of your

21   client.  It seems to me that with his connection with his

22   parents at this time and probably some type of monetary amount

23   being put up by the father, it's hard for to me imagine that

24   Daniel would not be available, as things are concerned.  So, the

25   main component here is safety of the community.  How do you get

1    around the material that was found at the residence and the

2    various statements that your client made?

3           MR. RYAN:  It's better if I stand.  Is that all right?

4           THE COURT:  If it makes you comfortable, counsel.

5           MR. RYAN:  It does.  It does.

6           To get to their house, you go down Route 72.  Either

7    side, farms.  To get to the Ogle County Jail, I take 72 to 2.

8    Either side are farms.  I would wager that you go into any

9    farmhouse where young men, husbands, sons are residing, you will

10   find weapons, period.

11          THE COURT:  Armor piercing weapons?  Armor piercing

12   material?

13          MR. RYAN:  I don't know how old those were.  At one

14   point those were legal.  I don't know how they got there, and I

15   don't even know if they're Daniel's.

16          The weapons and anything attached to that have now been

17   surrendered, I'm assuming, taken into custody by the government.

18   What is certainly troubling are the statements that he's made,

19   but those are statements.  What makes them more than troubling

20   are the affiliation that he has with his brother with the WAR

21   movement.  How deep that is, how sincere that is, how much of

22   those statements were just drunken prattle by a couple of beyond

23   middle aged men who have nothing better to do than to build

24   model airplanes and talk about minorities, I don't know.  You

25   coalesce and combine all of that together with the notoriety,

1    especially, that Dennis has, it makes a tough call.  But the

2    reality is this offense is something that happened five years

3    ago almost.

4              THE COURT:  I'm not judging your client on the offense.

5              MR. RYAN:  I know, Judge, but I'm just trying --

6              THE COURT:  And I wouldn't do that.  He's presumed

7    innocent of the indictment.  The statute says I'm to presume him

8    innocent, and I do presume him innocent.

9              MR. RYAN:  Yes.

10             THE COURT:  That's what the law is.  I follow the law.

11             MR. RYAN:  Right.

12             THE COURT:  But, counsel, that's not the issue.  It's

13   whether or not I can assure the safety of the community, or,

14   more appropriately, has the government demonstrated by clear and

15   convincing evidence that no conditions or combinations of

16   conditions will reasonably assure the safety of the community.

17             MR. RYAN:  I don't believe they have.  I believe --

18             THE COURT:  Why not?

19             MR. RYAN:  We have no criminal history here at all.  We

20   have hateful dialogue.  We have a reputation for that.  We have

21   him and his brother as suspects.  What else is there?  If he was

22   so dangerous, how do we explain the absence of verifiable acts?

23   How do we explain, as smudged morally as it may be, the clean

24   slate that he has?  He's my age.  He's 59.  I have more of a

25   record than this guy does.  If that danger was truly something

1    akin to the powder keg that's being presented here, we would

2    have seen other things.

3         Is it helpful that weapons were there?  No.  I don't

4    think it should be determinative.  I think we are living in an

5    age of talk and dialogue by many people.  He is capable, I

6    believe, of staying at his father's house, building his model

7    airplanes, not having access to a computer, and going forward

8    through the process of this case.  I don't see how the elements

9    that you are concerned about override what has been recommended

10   by pretrial services.  I just don't.  That's all, sir.

11        THE COURT:  Thank you, counsel.  Argument on behalf of

12   the United States.

13        MR. MC KENZIE:  Yes, your Honor.  Thank you.

14        Your Honor, the court focuses upon whether the crux of

15   it is is there some sort of combination of conditions that will

16   prevent him from being a danger to the community, and it's

17   pretty clear that he represents as he sits there today a danger

18   to the community.

19        He has espoused groups that are white supremacist that

20   go and support bombings, support acts of violence against

21   others.  He has associated closely with his brother, who has

22   espoused bombings, espoused acts of violence against minorities.

23        He has admitted to one individual that they do more

24   than just talk about it, as he said, and that although he didn't

25   know this individual well enough and the statute of limitations

1    wasn't up, for those reasons he couldn't talk further about it.

2    But then he went on and said:  Look.  We do those things.  I was

3    involved in sending a message.  I was trying to do the right

4    thing.  When I took out somebody's car, it wasn't out of anger.

5    It was out of his duty, out of a warped, misguided duty toward

6    this white separatist movement.

7            So, he's clearly a danger.  He talks about -- after the

8    offense, he talks about getting rid of the evidence, trying to

9    dispose of things.  Did we get rid of things.  Let's plead not

10   guilty.  Let's go to trial and make sure we get the informant,

11   the swine that was referred to, out in the open.  Again, an

12   element of danger and risk that comes with any trial any time

13   you have an informant working with you.

14           He also talks with his brother, and they agree that

15   they should have had a shootout.  They shouldn't have gone down

16   quietly when the Ogle County deputies came for them.  They

17   should have at that point pulled out the guns and started

18   blazing, and, as his brother said, there would have been body

19   bags had it come out differently.  Those are facts.  That's what

20   he said.  That's what they intended to do.  That's what they

21   contemplated doing.  In fact, his brother even while they were

22   there inside the house called the individual and said:  Look.

23   The police are out here to get me.  I might just start shooting

24   them.

25           All of those features point to somebody that's

1    dangerous.  How do you keep a person like that from -- how do

2    you fashion conditions to combat that?  When you have a white

3    separatist organization like this, when you have access to the

4    Internet, when you have access to the phone, when you have a

5    secluded farm or a secluded area that really anyone can come and

6    visit and go, it's almost impossible to.  It's almost impossible

7    to stop this person.  We don't know what else is secreted in

8    that farm, what else could be with their friends, with their

9    associates, with their allies.

10         Certainly they're not the only members of white

11    supremacist organizations.  White supremacy organizations cover

12    the United States.  The fact is the Aryan Nation is a violent

13    organization.  The people they deal with and associate with are

14    violent people.  We don't know how far that organization with

15    them, but it certainly is a risk as far as the court trying to

16    fashion a condition or combination of conditions on how to keep

17    this individual from being a risk.

18         I might disagree with the court whether the court can

19    fashion conditions to assure their appearance, but it sounds as

20    though the court is really not looking at that.  It's really

21    focusing upon the danger to the community.  The United States

22    believes that they're dangers to the community for all the

23    reasons set forth in the United States proffer and for the

24    reasons set forth in the affidavit in support of the search

25    warrant.

1    It may be talk, as defense counsel wants to put it.

2    There's no evidence this is a drunken prattle.  There's only

3    evidence that there is clear-cut planning and discussion of

4    violent acts in the future, violent acts in the past, and the

5    ability to commit violent acts now.  Thank you.

6    THE COURT:  No proposal's been made by the defendant of

7    a third-party custodian; is that correct, counsel?

8    MR. RYAN:  No, sir.

9    THE COURT:  All right.  A little bit of the ground

10   rules.  Burden's on the United States.  The United States must

11   show, first of all, by a preponderance of the evidence in regard

12   to flight that no conditions or combinations of conditions will

13   reasonably assure the presence of the defendant.

14   As to safety, the evidentiary level is, as the court

15   said, clear and convincing.  The government must show by clear

16   and convincing evidence that no conditions or combinations of

17   conditions will reasonably assure the safety of an individual or

18   the safety of the community in general.

19   Mr. Mahon I think would show up.  I think I could

20   fashion conditions for that.  The challenge to the court in

21   regard to Daniel is whether or not there are conditions that

22   would reasonably assure the safety of the community.  And not to

23   transfer the burden to you, counsel.  I understand the burden is

24   on the government to show that there are none.

25   Daniel's never been arrested.  He's taking care of his

1    parents.  He doesn't have a criminal record.  He's on SSI.  So,

2    I can't hold unemployment against him.  He's given enough

3    evidence to overcome the presumption; although, the fact that

4    the presumption was triggered is considered by the court

5    pursuant to Seventh Circuit case law.

6            However, the court finds as to Daniel there are

7    conditions or combinations of conditions that will reasonably

8    assure the presence of this defendant and the safety of the

9    community.  They're going to be a little bit different than

10   those proposed by the pretrial service officer.  Part of this is

11   because of the relationship that's been demonstrated by Daniel

12   to his parents.

13           My understanding is the father, who is 88 years old,

14   currently has available an amount equal to almost six figures.

15   I'm not going to take all of that, but I am going to direct at

16   this time that the bond in this case is a cash bond.  It's my

17   understanding that, in fact, the father is willing to put up a

18   cash bond, counsel, in order to help out his son in order that

19   his son can reside with him and help take care of the mother.

20   I'm going to direct that the father put up a $50,000 cash bond.

21   That means -- and the father, I believe, is in the audience, is

22   he not?

23           MR. RYAN:  Yes, sir.

24           THE COURT:  That means, sir, if, in fact, Daniel

25   doesn't do the things and conditions that I place upon him, you

1    could lose and I suspect would lose all of that $50,000.  Okay?

2              MR. MAHON:  Yes, sir.

3              THE COURT:  Okay.  And, Daniel, I want you to

4    understand that, too.  The government will take that money from

5    your dad.

6              DEFENDANT MAHON:  I understand.

7              THE COURT:  Okay.  You're to report to the pretrial

8    service officer as directed by the pretrial service officer

9    either in the Northern District of Illinois or District of

10   Arizona.  You're to reside with your father, and you're to take

11   care of your parents during this period of time.  Travel is

12   restricted to the Northern District of Illinois and the District

13   of Arizona, and you're allowed to travel on a direct path to and

14   from those destinations either to consult with counsel or for

15   court proceedings.

16             The FOID card is to be surrendered to the pretrial

17   service officer.  There are to be no weapons, ammunition, or

18   dangerous type of weapons at the residence during this period of

19   time nor are they, Daniel, to be in your possession during this

20   period of time.

21             Any other conditions except the normal conditions being

22   requested by the United States, and do you have a date for the

23   defendant to appear to respond to the outstanding indictment in

24   the District of Arizona?

25             MR. MC KENZIE:  I don't have a date from Arizona yet,

1    your Honor.

2              THE COURT:  We'll add it to this as we move along,

3    counsel.  Okay?  It will be part of the bail bond that there

4    will be a date.  There will be a requirement of your pretrial

5    release that you appear in the district court in Arizona and

6    respond to the outstanding indictment at that time.

7              The other conditions -- counsel, I'm sorry.  Were there

8    any other conditions that's being requested by the United

9    States?

10              MR. MC KENZIE:  If I can have just a moment, your

11    Honor.

12              THE COURT:  Yes.

13         (Brief pause.)

14              MR. MC KENZIE:  Your Honor, in light of the fact that

15    materials were found that had been printed off the Internet as

16    recently as April 15th of this year and in light of the ability

17    of somebody to go out on the Internet again and search out and

18    obtain materials related to terrorist acts, the United States

19    would ask that the Internet service at the home be terminated

20    and that the defendant and his parents not establish Internet or

21    allow Internet service at the home.

22              MR. RYAN:  I would be opposed to that, Judge, simply --

23              THE COURT:  I'm not, though, counsel.  How come?  Check

24    with your client again.  I think that's a reasonable thing.  Why

25    are you opposed?

1    judge because you committed a criminal offense while on pretrial

2    release.  What we're trying to emphasize to you today, you

3    violate the conditions of release, your release can be revoked

4    and you can be incarcerated until such time as your trial

5    occurs.  Also if you violate these conditions, you may be in

6    contempt of court.

7        Lastly, it's my obligation to inform you it is an

8    offense to intimidate a witness, prospective juror, victim, or

9    court personnel or to retaliate against a witness, victim, or an

10   informant.  Now, Mr. Mahon, I'm not saying that you intend to

11   engage in that type of conduct.  I am required by the statutes

12   of the United States to give you that admonition at this time.

13       My staff then will prepare the material for the bond.

14   I will sign it.  There's a place for you to sign it.  It will

15   have all the conditions, and it will have the date when you're

16   supposed to report to the District Court of Arizona.  Once that

17   is done and the $50,000 is deposited, you'll be released from

18   custody.

19       Counsel, check with your client and see if he's got any

20   questions.

21     (Brief pause.)

22       MR. RYAN:  No questions, sir.

23       THE COURT:  Any questions by the United States?

24       MR. MC KENZIE:  Not questions, your Honor.  I do have

25   two other matters to raise with the court on bond, though.

1          MR. RYAN:  His business is on EBay.  He makes model

2    airplanes.

3          THE COURT:  Not good enough.  There's not a health

4    reason.  No Internet for your client.

5          MR. RYAN:  That's it?

6          THE COURT:  Correct.

7          MR. RYAN:  Okay.

8          THE COURT:  Anything else?

9          MR. MC KENZIE:  No, your Honor.  Thank you.

10          THE COURT:  Okay.  During the time that you're on

11    pretrial release, Mr. Mahon, you must obey all federal, state,

12    and local statutes, you must show up for all the court dates,

13    and you must abide by the travel restrictions that I've placed

14    upon you.

15          If you should fail to appear for a court date, your

16    bail could be revoked and you could be placed in jail until such

17    time as your trial occurred.  If you should fail to appear, you

18    may have committed an additional criminal offense because you

19    weren't where you were supposed to be.  Lastly, if you fail to

20    appear for a court date, a contempt warrant could issue for your

21    arrest.

22          If you commit a criminal offense while you're out on

23    pretrial release and you're found guilty in the indictment on

24    the underlying charge here, an additional consecutive sentence

25    could be and I suspect would be imposed by the district court

1    THE COURT:  Pardon me?

2    MR. MC KENZIE:  I do have two other matters to raise

3    with the court on bond when the court's ready.

4    THE COURT:  I'm ready.

5    MR. MC KENZIE:  First of all, your Honor, the United

6    States would respectfully request a Nebbia hearing for the

7    source of the $50,000.

8    THE COURT:  You're entitled to that under the statute.

9    MR. MC KENZIE:  Secondly, your Honor, the United States

10   would ask that the court stay the execution of the bond pending

11   a review by our office of what position to take.  We'll have

12   that information certainly by the Nebbia hearing if the Nebbia

13   hearing is held tomorrow.

14   THE COURT:  Counsel, when will the $50,000 be ready?

15   MR. RYAN:  Can I ask the father, sir?

16   THE COURT:  Yes.

17   (Brief pause.)

18   MR. RYAN:  Judge, I don't know if it would be possible

19   to have that hearing now or today.  Mr. Mahon, Sr. --

20   THE COURT:  Here's what I'm going to do, counsel.

21   MR. RYAN:  -- told me he's got the money with him.

22   THE COURT:  I'm going to stay the bond.  We can hold

23   the Nebbia hearing.  I'm going to stay the bond and hold the

24   Nebbia hearing on Monday morning, July 6th.  Does that fit for

25   both counsels?

1          MR. MC KENZIE:  It does for the United States, your

2    Honor.

3          MR. RYAN:  Judge, I've got a homicide hearing up in

4    Madison that morning.

5          THE COURT:  Tell me what you mean by hearing.

6          MR. RYAN:  Well, actually, it's at 1:00 o'clock.

7          THE COURT:  9:30 on the 6th here?

8          MR. RYAN:  Perfect.  Perfect.

9          THE COURT:  We'll set the Nebbia hearing for July 6th,

10   2009, at 9:30 so that everyone can prepare for that hearing.  I

11   will stay the decision of the court to release the defendant on

12   bond until 9:30 in the morning on July 6th.  That gives

13   everybody the opportunity to decide what they want to do in

14   regard to this.  I'll see you at 9:30.  I'll see counsel at 9:30

15   in regard to that case.  Anything else?

16     (No response.)

17          THE COURT:  Have a great day.

18     (Which were all the proceedings had in the above-entitled

19     cause on the day and date aforesaid.)

20     I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.

22

23

24   _____
     Mary T. Lindbloom
25   Official Court Reporter