# EXHIBIT B

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

In the Matter of the Search of

5794 North Blackwood Road,
Davis Junction, Illinois

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: 09 M 0007

I, TRISTAN MORELAND, being duly sworn depose and say:

I am a SPECIAL AGENT WITH THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES and have reason to believe that on the property or premises known as 5794 North Blackwood Road, Davis Junction, Illinois, further described in Attachment A, "Premises To Be Searched," which is incorporated herein by reference, in the Northern District of Illinois, Western Division, there are now concealed those items described in Attachment B, "Items To Be Seized," which is incorporated herein by reference, concerning violations of Title 18, United States Code, Sections 844(i), 844(n), and 842(p). The facts to support a finding of Probable Cause are as set forth in the attached "Affidavit," which is incorporated herein.

# FILED

JUN 23 2009

**MAGISTRATE JUDGE P. MICHAEL MAHONEY
United States District Court**

Signature of Affiant
TRISTAN MORELAND, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me and subscribed in my presence,

June 23, 2009
Date

at

ROCKFORD, ILLINOIS
City and State

P. MICHAEL MAHONEY, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Tristan Moreland, being duly sworn on oath state:

1.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have worked as an ATF SA since February 1989. My duties with ATF include investigating violations of Title 18, United States Code, Section 844(i), using an explosive to damage a facility used in interstate commerce; Title 18, United States Code, Section 844(n), conspiracy to use an explosive to damage a facility used in interstate commerce and conspiracy to teach or distribute material related to an explosive device with the intent that the teaching or material will be used to commit a federal crime of violence; and Title 18, United States Code, Section 842(p), teaching or distributing material related to an explosive device with the intent that the teaching or material will be used to commit a federal crime of violence. I have been an ATF SA since February 1989. I received training in the enforcement of federal firearms, explosives, and other crimes, and have conducted or participated in hundreds of investigations involving violations of federal firearm and explosive laws. I have been the lead agent on many of these investigations and have instructed other federal, state, local and even international officers on the techniques and methods used to conduct such investigations. Additionally, I have been certified by ATF as a Certified Explosive Specialist as a result of receiving hundreds of hours of advanced training in the identification, handling, and investigation of explosive and explosive related crimes. I have investigated numerous explosive related crimes, including bombings and the illegal possession of explosives and destructive devices.

2.     This affidavit is submitted in support of the attached application for a search warrant of the premises located at 5794 North Blackwood Road, Davis Junction, Illinois, as described more fully in Attachment A, "Premises to be Searched," which is incorporated herein. I have personally viewed these premises during this investigation. The Premises to be Searched include the residence of Dennis Mahon and Daniel Mahon for items constituting evidence of violations of 18 U.S.C. § 844(i), using an explosive to damage a facility used in interstate commerce; 18 U.S.C. § 844(n), conspiracy to use an explosive to damage a facility used in interstate commerce and conspiracy to teach or distribute material related to an explosive device with the intent that the teaching or material will be used to commit a federal crime of violence; and 18 U.S.C. § 842(p), teaching or distributing material related to an explosive device with the intent that the teaching or material will be used to commit a federal crime of violence. Those items are set forth in Attachment B, "Items to be Seized," which is incorporated herein. This affidavit does not contain all of the information concerning this investigation that is known to me, but sets forth only those relevant facts necessary to establish probable cause for issuance of a search warrant for the Premises to be Searched.

3.     Other federal, state, and local law enforcement officers have participated in this investigation. I have discussed the results of the investigation into these matters with other ATF SAs as well as with state and local law enforcement officers. This affidavit is based in part upon those discussions as well as my own investigation and observations.

4.     On February 26, 2004, a bomb, disguised in a cardboard box made to appear

2

as a parcel package, exploded at the Scottsdale Office of Diversity and Dialogue, located at 7575 E. Main Street in Scottsdale, Arizona. I responded to the scene of the bombing. The investigation determined that the box containing the bomb was addressed to Donald Logan, a black male employee who was at that time in charge of the Diversity and Dialogue Office for the City of Scottsdale. When Donald Logan opened the box, the bomb exploded injuring Logan, his assistant, Renita Linyard, and his co-worker, Jacque Bell. In addition, the explosion damaged the surrounding area, destroyed office equipment, and caused the closing of the building. Forensic analysis revealed that "flattened ball double based smokeless powder," an explosive powder, was used in the bomb.

5.     Over the course of ATF's investigation, I have been able to identify brothers Dennis and Daniel Mahon as suspects in the February 2004 (or Logan) Bombing. For the past 20 years, the Mahon brothers have been closely associated with the white supremacist group known as the "White Aryan Resistance" ("WAR"), which recently became known as "The Insurgent," and its leader, Tom Metzger. WAR/The Insurgent, like many other racist groups, does not appear to have an official roster or published hierarchy. To the best of my knowledge, there are no specific membership charters, no required dues, and no regular meetings or gatherings of this group. WAR has a website where individuals can read and listen to Tom Metzger. The WAR website also publishes racist materials, sells and distributes books, videos, and other merchandise, recruits donations, and has links to other sites. WAR advocates the use of "Lone Wolf" style tactics that encourage individuals to

3

commit violent acts independently on behalf of the movement to avoid exposing the overall group. On September 26, 2003, five months prior to the Logan Bombing, Dennis Mahon called the Scottsdale Office of Diversity and Dialogue, claimed to be with WAR, and left a threatening message.

6.    In January of 2005, ATF initiated an undercover investigation of the Mahon brothers and others, and the investigation began using a cooperating individual ("CI"). I recruited this CI to assist in the investigation and the CI has been paid a monthly subsistence for the assistance. The CI has no known criminal history and no history of providing false information in this case or in any prior instance. I believe the CI to be reliable and note that the vast majority of all contacts by the CI and suspects in this investigation have been recorded and or corroborated by other undercover agents. During the course of this undercover operation, the CI has successfully elicited numerous admissions of involvement in the February 2004 bombing from Dennis Mahon and numerous admissions of involvement in other bombings from both Mahon brothers.

7.    On June 16, 2009, a federal grand jury in the District of Arizona returned an indictment against Dennis Mahon and Daniel Mahon charging them in connection with the Logan Bombing. Both Mahons were charged with conspiring to damage a building and property by means of an explosive, in violation of 18 U.S.C. §§ 844(i) and 844(n). Dennis Mahon was also charged with maliciously damaging a building by means of an explosive in

4

violation of 18 U.S.C. § 844(i), and with distributing information relating to explosives in violation of 18 U.S.C. § 842(p)(2)(A).

8.    On January 29, 2005, an ATF SA acting in an undercover capacity ("UC") and the CI met with Daniel Mahon in a trailer in Catoosa, Oklahoma. Some of this meeting was not recorded due to the audio and videotape equipment running out of tape. However, the live audio and video from the trailer could be seen and heard by myself and other ATF agents who were monitoring the conversations nearby. ATF SA Larry Bettendorf documented the conversation, as referenced in the following quotations, and I have discussed the conversation with him. Daniel Mahon discussed how Dennis Mahon had been identified as a suspect in the 1995 Oklahoma City bombing and the Mahon brothers' history of fighting for the cause. The CI asked Daniel Mahon if they did more than just talk about taking action for their cause, referring to their white supremacist beliefs. Daniel Mahon said, "We do more than just talk about it, if I knew you better and the statute of limitations was up." Daniel Mahon talked about his participation in drive-by shootings, and blowing up cars and buildings. Daniel Mahon said that on one occasion, he blew a desk through a second floor roof. Daniel Mahon did not provide any specifics as far as location and time period for these acts. Daniel Mahon said, "Dennis did not do much of that stuff. We thought we were doing the right thing. We were just trying to send a message." Daniel said, "When I would take someone's car out, it wasn't anger. It was a sense of duty. It is like a military operation. You plan for it, equip for it." Daniel Mahon explained the need to plan on how to dress for

the operation, including camouflage and disguises, and how to approach and depart your target area. Daniel Mahon detailed one method of blowing up a car to the UC and the CI. Daniel Mahon said that he would take a phosphorus compound and place it in a condom, then place the condom in the gas tank of the target vehicle. Daniel Mahon said that the gas would eat through the condom and release the phosphorus, which would then ignite the gasoline. Daniel Mahon said that this method of blowing up a car was not traceable.

9.    In a series of recorded meetings between the CI and Dennis Mahon in February 2005, Dennis Mahon and the CI were discussing bombs disguised as packages. When the CI asked Dennis Mahon if he had ever had any success with using such a bomb, Dennis Mahon leaned in toward the CI and whispered, "In Tempe, Arizona, God damn diversity officer, Scottsdale Police Department, had his fingers blown off." He then partially recanted the statement saying that he did not commit the bombing, but had helped in the bombing by advising "white cops how to do it." On May 3, 2006, while specifically discussing the February 2004 bombing with the CI, Dennis Mahon stated, "I just wanted, just wanted to teach the motherfucker a lesson the first time." In another recorded meeting with the CI during May 2007, on the subject of the February 2004 bombing, Dennis Mahon said, "I didn't plant the bomb, I helped make it." DNA testing has been done on material obtained from two locations inside of the February 2004 Bomb. One location was located in the adhesive used to secure the switch. The other location was on the adhesive located on the switch itself. The results obtained from each test determined that both were mixture samples

6

with at least one of the contributing profiles being male. A comparison of the two samples revealed that no determination could be made as to the same person contributing to both samples. A DNA comparison was conducted of all law enforcement and lab personnel who had a part in the Logan Bombing investigation to the profiles identified on the adhesives. A preliminary report identified a United States Postal Inspection Service forensic employee as a possible contributor to the DNA located on the adhesive on top of the switch. On May 21, 2008, in Cause Numbers 08 M 0009 and 0010, *In re: Daniel Mahon* and *In re: Dennis Mahon*, this court issued search warrants for saliva and blood samples of Daniel and Dennis Mahon. The affidavits supporting the applications are substantially the same, and attached hereto as Attachment C is a copy of the affidavit in 08 M 0010, which I have discussed with the affiant, ATF SA John D. Richardson, and which I adopt and incorporate herein as if fully set forth. The samples were collected and the partial DNA profile recovered from what is believed to be part of the adhesive on the February 2004 bomb, was determined not to be that of either of the Mahons. I have discussed the DNA finding with ATF National Laboratory DNA Technical Leader Todd Bille. Mr. Bille has done a considerable amount of research and experimentation with similar evidence and has examined the DNA work done in this case. It is Bille's opinion that due to the very sensitive process used to recover the DNA in this case, it is possible that the DNA recovered was contaminant DNA that originated from the blast scene, the recovery and handling of the evidence, and/or any of the persons or environments that the evidence was exposed to. Additionally, in counseling the CI how to

make a bomb and not get caught, Dennis Mahon told the CI to always wear gloves when handling the components and that even though gloves could not be worn when purchasing components at the store, that the CI should make sure to wipe the components down with a wet cloth when the CI returned home after purchasing the bomb components.

10.    On February 5, 2005, during a meeting with Dennis Mahon in a trailer in Catoosa, Oklahoma, the CI described a fictitious problem the CI was having with a child molester in California. The CI said that the CI was considering bombing the child molester. Although Dennis Mahon at times suggested to the CI that there were other ways the CI could handle the situation, while in the trailer, Dennis Mahon sorted through bomb components shown to him by the CI and explained how to make a bomb that would target the fictitious child molester. On February 5, 2005, Dennis Mahon and his brother, Daniel Mahon, took the CI to a gun show in Tulsa, Oklahoma to look for igniters or electric matches. The Mahons' search for an igniter is significant. It is my opinion that although not recovered in the debris of the February 2004 bombing, a similar igniter for a hobby rocket motor was the likely initiator in that bomb.

11.    In January of 2008, when the CI visited the Mahons' residence at 5794 North Blackwood Road, Davis Junction, Illinois (the Premises to be Searched), Dennis Mahon took the CI into one of several outbuildings located on the multi-acre farm. Dennis Mahon indicated to the CI that this building was a location the Mahons used to make bombs. This outbuilding has a wood exterior that is painted barn red, and has a gray fiberglass shingle

8

roof. The CI was only in the building for a few seconds when Dennis Mahon appeared to become nervous and led the CI out of the building. The CI described the environment in this building as similar to a two-car style garage with items stored on shelves all over the walls and room. The CI saw various containers on the shelves that the CI believed were containers of gun powders. During this January 2008 visit, the CI also observed an assault-type weapon with numerous loaded magazines in the upstairs of the main residence. The CI described this firearm as similar to an AK-type assault weapon that had been custom or hand painted camouflage. The CI also saw a computer in Daniel Mahon's room in the upstairs of the main residence. The Mahons have told the CI that they grew up in the residence at 5794 North Blackwood Road and have lived there on and off for their entire lives. As recently as June 2009, Dennis Mahon indicated to the CI that Dennis and Daniel Mahon were currently residing at that address.

12.    Through a series of interviews a Tempe Police Detective, a Postal Service employee, and I conducted, I have learned that the Mahons occupied a space in a trailer park in Tempe, Arizona at the time of the bombing and during the months preceding the bombing. With the exception of the work space of Daniel Mahon at the site of his employer, Alaska Airlines, law enforcement has identified no other storage area, garage, or facility as having been under the control of the Mahons during that time period around the time of the February 2004 bombing. With the consent of Alaska Airlines security personnel, I later searched and examined Daniel Mahon's work place at Alaska Airlines. As a result of that search and

examined, I have eliminated this area as the location where the bomb used in the February 2004 bombing was constructed or packaged and as the location for the origin of the note and label used in and on the bomb. The Alaska Airlines work place was occupied virtually 24 hours a day by other mechanics and is under tight security with respect to entering and exiting the area.

13. On February 7, 2009, while acting in an undercover capacity, I visited Dennis Mahon at his residence located at the premises to be searched, 5794 North Blackwood Road, Davis Junction, IL. I was accompanied by the CI and by another ATF undercover SA. Upon arriving at the residence, Dennis Mahon greeted us at one of the outbuildings on the property. The CI advised me that this was the same building Mahon had told the CI in January 2008 that they (the Mahons) had used to make bombs. See paragraph 11, *supra*. Upon approaching this building, Dennis Mahon told the group, "This is where I make my bombs." Mahon's tone was casual and at first appeared to be joking. He then pointed to one side of the barn and jokingly said, "This is where I keep my warheads." Mahon then became serious and said, "I had to get rid of some of my powder (which I believe to be a reference to explosive gun powder) because the cops came here. Dan (Mahon) was working on his car here...they had a warrant for a swab you know." I believe that Dennis Mahon was referring to the search warrant served on Daniel Mahon for DNA back in May 2008 at that same residence. Dennis Mahon stated that he had 4 cans of black powder here and his "BBs." From my experience and training, I know that BBs are commonly used in improvised

explosive devices to increase the lethal nature of the device. From the context of the conversation, I believe that Dennis Mahon was referring to the BBs as being used in making improvised explosive devices. Dennis Mahon said, "We had to hide it," referring to the powder. Mahon began a sentence by stating, "You could make a bomb (pause), I got a lot of plumbing parts too. This house is a hundred years old." I pointed to a piece of PVC pipe laying on the floor near the area where Mahon said he had the powder stored at the time of the DNA warrant and said, "You could make a bomb out of that PVC pipe if you want." Mahon giggled and said, "Yeah, I'm doing a lot of plumbing with it right now." During my visit at the premises to be searched on February 7, 2009, I observed a desktop personal computer and monitor inside a bedroom in the house. Dennis Mahon referred to this room as Daniel Mahon's bedroom.

14.    After spending the day with Dennis Mahon, in parting Mahon said, "I never have killed anybody, I never really bombed anybody." The CI interrupted Mahon by saying, "Sure you have," to which Mahon replied, "Sometimes it's good to have a reputation." This comment was unsolicited and out of context, but appeared to be some sort of disclaimer or protective statement. Mahon then advised us about the type of activity to get involved in. Mahon said, when referring to doing something for the movement, "Don't put a swastika on a Synagogue. Bomb the son of a bitch if you want to do it."

15.    On March 29, 2009, Dennis Mahon called the CI and left a voicemail. During the voicemail Mahon stated, "We're taking care of mom here and I'm mailing out my

propaganda and, uh, once mom passes away and we go, and I go back to my radical bomb throwing, sniper shooting realm, but until mom passes away I really can't do much, but when she does, look out ZOG (Zionist Occupation Government), look out, because I've got nothing to lose, motherfuckers. I will shut the country down on electrical power, yeah, I know how to do it. I got the weaponry. I got the high powered rifles to shoot down the high tower power accelerators. So, my friends, yes, yes (unintelligible) America, turn the lights out, maybe not me, but my friends do that, so, but I can't do that, not while mother's alive. I should take care, the Aryan thing to do honey, take care of my mother and father but they pass away, look out, here I come my friend, will (unintelligible) America out of power and then we will deal with our enemies (unintelligible) and their bros. (Unintelligible) and whites, yes, and non-whites (unintelligible), and non whites shall destroy each other as (unintelligible) liberal, stupid weak whites. Take care, remember, learn, learn, get high power weaponry to take out the high power towers. Take out electrical power, understand that, there's explosives, high powered rifles, shoot the insulators, we need to do this when the time comes. The time is coming this way close. Take care darling. Remember, the electrical power grid is the Achilles heel of America, so (unintelligible) white, proud white people can't handle it. Shut it down. (Unintelligible) the power grid (unintelligible) power grid. High powered weaponry, explosives, no problem. Got that? Keep up the good work, bye."

16.   On April 2, 2009, the CI received a phone call from Dennis Mahon.  In this conversation, Dennis Mahon told the CI about a conversation that Dennis Mahon had with Charles Kountze.  Based upon the investigation, including recorded conversations with Dennis Mahon, the CI and/or myself, it is believed that Kountze is both a white supremacist and a friend of Dennis Mahon.  Kountze provided Mahon with a vehicle and minimal financial assistance in the past.  According to Mahon, Kountze said he has been searching Arizona newspapers for proof of the CI's activities near the Arizona border.  Kountze said he could find nothing in the papers regarding the CI's activities near the border.  Mahon said that the CI has done much more than Kountze.  Mahon said to Kountze, "You don't know how many pipe bombs I've lit off.  You don't know how many transformers I've destroyed and put people out of power in the early 80's, from 1982 – 1987, before I got outed."  Mahon often uses the term "outed" when he refers to having become known by name and face to the media and law enforcement as an activist.  Mahon claims that most of his violence to include bombings and shooting occurred when he was "underground" during the period of 1982 to 1987.

17.   As a result of my previous experience and training, I know that evidence including explosive powder residues, pipe components, "how to" books, news articles, tools, glue, tape, or other similar type evidence of bombings and bomb manufacturing have been recovered years after a location was used to produce a bomb.  I know that searching and even vacuuming the premises may result in finding trace amounts of explosive power residues,

even though the explosive powder had previously been removed. The specific date the Mahons left Arizona is still unknown to me, but management at the trailer park in Tempe, Arizona where the Mahons resided in the their at the time of the Logan Bombing, advised law enforcement that the Mahons departed the trailer park unexpectedly approximately two weeks after the bombing, in late February of 2004 and discontinued employment in the Phoenix area on or before April 15, 2004.

18.    In February 2004, I supervised the search of the Logan Bombing scene. The bomb evidence from the scene has since been examined and photographed. As a result, I have identified unique characteristics in the bomb's construction that reflect a particular pattern or workmanship. Some examples of this are the method by which the bomb maker soldered wire connections, the use of "shrink wrap" to seal and insulate a wire connection, and the use of a particular type of cold application glue often associated with the hobby of model airplane and car building. From the investigation, I know that the Mahons are avionic mechanics by trade, and that they build and sell model airplanes and tanks as a hobby and for a side business they call "Antique Toys for Antique Boys." Over the course of the investigation, the Mahons have often discussed with the CI working on and repairing cars as well as constructing models at their residence at 5794 North Blackwood Road (the Premises to be Searched). From my experience and training, I know that the type of work and repairs being made by the Mahons would often require soldering, stripping and connecting wires, and gluing. Examination of repaired items or constructed models located

14

at the Premises to be Searched will both reveal the specific methods and patterns the Mahons use and the particular glue they use, possibly resulting in evidence against them.

19.    In addition to the bomb-related evidence discussed above, the package bomb used in the February 2004 bombing had affixed to it a mailing or address label generated by an inkjet style printer. Additionally, a note was found concealed in the bomb apparently intended for the victim or law enforcement to find; that note also used an inkjet style printing. The note, however, had a somewhat unique characteristic in the printed letters. The bottom or "tails" of the letters which extend below the print line were cutoff on every other line. Dennis Mahon told the CI that when constructing a bomb it is important to buy components and use printers more than 50 miles from your residence and to pay with cash while wearing a disguise. Mahon also told the CI in February 2005, when discussing making a label for a bomb package, that he has his own label maker. Although Mahon advised the CI to take these types of preventative measures, he does not follow all of these measures as reflected by his caution to the CI that the CI not talk to others about the CI's illegal activities. Additionally, I know from my training and experience that bombers often retain items they use to make and deliver bombs believing that these things cannot be traced to them. An example of a mistake commonly made by suspects during investigations is to discard a gun, but forget to discard previous shell casings or ammunition used in the gun or fired by the same gun that can be matched to other shell casings. The fact that a certain printer may have been used a distance away, or used and then discarded does not eliminate the possibility or

tendency for persons to retain other documents created on the same printer during the same time period that can now be forensically matched to the note and address label on this bomb.

20.    Based upon my own knowledge, experience, and training, I know that individuals who purchase and possess components and tools used in the manufacture of explosive devices tend to keep them in their residences, vehicles and outbuildings, along with purchase records, "how to" books and diagrams, and other documentation concerning their acquisition, manufacture, and use. It is my experience that persons who possess firearms, explosive device components, and related records tend to keep these items for several years. From my training and experience, including my investigation of in excess of 50 cases involving the manufacture and or use of improvised explosive devices, I know that in the majority of cases, the explosive devices were manufactured in the residence, garages, or outbuildings associated with the bomb maker. Additionally, in the majority of cases where the bomb maker was identified and their residence searched, evidence linking them to the explosive device used has been found in multiple locations at their residence. An example of this is the finding of particular bomb components, including wiring, pipe parts, and explosive powders in the garage; recipes, diagrams and instruction books in the residence or on a personal computer in the residence; and receipts and gloves in a vehicle or an exterior trash can. Conversely, I do not recall a single instance where evidence seized pursuant to a search related to a bombing or bomb manufacturing was all found in a single location within

16

a premise. The exception to this would be cases where a bomb was discovered in a vehicle and no other searches were conducted.

21.    I know that people regularly keep documents and other records and photographs showing dominion and control of the residences in which they live. I know that people who are involved in the manufacturing, using, possessing, and the teaching and advising of others on the manufacturing and use of explosive devices, often possess items used to manufacture these devices in their residences, garages, storage areas, and vehicles. They tend to keep tools and various documents, books, computer files, diagrams and photos relating to the manufacture and use of explosives devices. People also tend to keep copies of many of the documents they create in their everyday lives, like letters to businesses, news media, and political representatives. In this particular case, I know that Dennis Mahon has frequently generated and mailed ideological propaganda to media sources and individuals in an effort to influence them or threaten them. It is common for persons to use certain printers and typewriters available to them for periods of time and to then discontinue using a certain machine as a result of updating the machine or simply moving away from a machine in the case of a work printer or one available to them at the time. However, people often tend to keep printers as a backup for several years, even when they are not in use, or as a printer for a second computer. I also know that people routinely keep receipts, emails, and other internet derived material for years. Law enforcement personnel can compare these printers and documents to the address label and note recovered from the February 2004 bombing.

22.    Over the course of this investigation, the CI, an undercover ATF SA, and I have had numerous contacts with the Mahon brothers. Both Dennis and Daniel Mahon have told the CI, the other ATF UC, and/or me that they often use personal computers at their residence and at libraries. They often buy and sell items, including their models, on eBay and other internet sites. I confirmed this during my investigation as I was able to view eBay pages the Mahons' used for this business. The Mahons provided their email address (dwm1950a@yahoo.com) to the CI on several occasions over the past four years and often talked to the CI about communicating with other movement members through email, especially with Tom Metzger. The Mahons frequently talked to the CI about using the internet for research on themselves and other movement issues as well as researching various topics on the internet. They spoke about "Googling" themselves and others on several occasions and how you can find valuable information on the internet.

23.    Over the course of this investigation and continuing into 2009, the CI, other investigators, and I have learned how Metzger, the Mahon brothers, and others in the white supremacist movement frequently and routinely use personal computers to communicate with each other as well as research and disseminate information related to their white supremacist goals and activities. Metzger and the Mahons often discuss with others, including the CI and guests on their radio program, how they communicate with each other and with so called "lone wolves" on their computers with email and other internet based forms of communication, including phone services. A review of Metzger's radio shows, Dennis

18

Mahon's conversations with the CI, and written materials published by Metzger and the Mahons shows a clear and consistent pattern throughout this investigation of these suspects using personal computers to further their illegal activities. I have previously investigated numerous persons involved in the use and manufacture of explosives, explosive devices, and even poisons and have found that the use of computers is common and consistent with the use of a computer described above by the Mahons and Tom Metzger.

24.     From early 2005 to the present, Dennis Mahon has provided the CI with "how to" books on bomb building and provided the CI with specific advice on how to make and successfully deliver bombs and explosives. One of these books, entitled the <u>Poor Man's James Bond, Volume 2</u>, was mailed to the CI by Mahon in May 2005. Dennis Mahon did this after the CI told Dennis Mahon that the CI intended to use the information to make and use explosives and bombs to target persons and facilities for bombings and arsons. In dealing with the Mahons, the CI has posed as a white supremacist willing to bomb for the white supremacist cause throughout this time period. Both Dennis Mahon and Daniel Mahon have told the CI that they are bombers and described themselves as "domestic terrorists."

25.     During 2005 and continuing through 2008, Dennis Mahon has asked the CI on several occasions to send him articles related to bombings and arsons that the CI claimed to have committed. Mahon also showed interest in all media related to the February 2004 bombing and regularly requested the CI send him copies of news reports from Arizona that were published relating to the February 2004 bombing investigation. Dennis Mahon has

19

repeatedly told the CI that this is how he and others communicate their actions to others in the "movement." Dennis Mahon has also personally delivered and mailed the CI numerous videos, photos, books, newspapers, and other literature that documented his and others past involvement in the movement. Dennis Mahon also mailed the CI multiple copies of WAR papers during the course of this investigation for further distribution by the CI.

26.    On one occasion in 2007, Dennis Mahon hung a noose at his residence and later from a tree by a roadway in Davis Junction, Illinois. According to Dennis Mahon, he did this as a movement action to intimidate minority races, specifically Hispanics, not to reside in the Davis Junction area. Dennis Mahon later told the CI that when he hung the noose by the highway, he took pictures of it and sent them to Tom Metzger. This is an example of how Dennis Mahon told Metzger that Dennis Mahon did something for the movement and the type of historical evidence I expect to find in relation to the February 2004 bombing. Dennis Mahon indicated to the CI that he will know what action (referring to crimes committed by the CI and others) was done based on the fact that the CI is sending him a newspaper article that reports a story on the action. From my training and experience, I know that individuals, such as the Mahons, who are self-described as part of the "movement," frequently keep articles and other media related to their past crimes as proof of action or "trophies" of past successes. They use this proof or documentation of their action to inspire others to commit acts for the movement in the future, as well as to brag about their own past accomplishments. This type of evidence can be extremely valuable in

not only corroborating past admissions by the Mahons of involvement in the February 2004 bombing and other bombings, but in showing consistent patterns and participation in racially motivated violence.

27.    On February 2, 2005, Dennis Mahon told the CI in a recorded meeting that he had recorded a meeting with the Scottsdale Police officers when he had instructed them on how to make a bomb. Mahon indicated that he did this as some sort of protection. Although I do not believe that Mahon ever met with, or recorded himself teaching any officers how to bomb Donald Logan, this does show a predisposition to record personal meetings and retain the recordings. On May 29, 2008, during a wiretap conducted pursuant to a federal court order, a call was intercepted between Dennis and Daniel Mahon. During this call, Daniel referred to a "tape," in what appeared to be a reference to a voicemail left for one of the Mahons by the CI. The voicemail concerned the reason why the Mahons' DNA had been obtained by law enforcement in connection with the Logan Bombing. This conversation followed an intercepted call between Tom Metzger and Dennis Mahon on April 8, 2008, during which the two discussed recording their telephone conversations and those of Mahon's family. Metzger advised Dennis Mahon that Mahon needed to get a "cheap tape recorder" to put on Mahon's telephone to use in recording telephone calls. Metzger stated that the device cost around $20. Mahon said that he already had a phone recorder and Metzger acknowledged this (as though Metzger was already familiar with this) and then said that Mahon needs a recorder that records all the time without having to push the button.

21

Mahon agreed to go get a telephone recorder at Radio Shack as instructed by Metzger. The calls in which the Mahons were discussing recording telephone conversations were related to informants or potential informants and/or to others trying to contact the Mahons about the movements of law enforcement.

28.    Based on the foregoing, I believe that the facts set forth above establish probable cause that on the Premises to be Searched there exists evidence of crimes in violation of 18 U.S.C. § 844(i), using an explosive to damage a facility used in interstate commerce, 18 U.S.C. § 844(n), conspiracy, and 18 U.S.C. § 842(p), teaching or distributing material related to explosive device with intent the teaching or material will be used to commit a federal crime of violence, as described in Attachment B, "Items to be Seized."

29.    I have reviewed the information contained within this affidavit and it is true and correct to the best of my knowledge and belief.

TRISTAN MORELAND
Special Agent, Bureau of Alcohol,
Tobacco, Firearms and Explosives

Subscribed to and sworn to before me this 23rd day of June, 2009.

P. MICHAEL MAHONEY
United States Magistrate Judge
Northern District of Illinois

22