Barbara Hull, State Bar No. 011890
637 North Third Avenue, Suite Three
Phoenix, Arizona  85003
Telephone:  (623)465-1705
Facsimile:  (623)465-1706
blhull@q.com
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.: CR09-0712-02-PHX-DGC |
| | ) |
| Plaintiff, | ) |
| | ) **DEFENDANT DANIEL MAHON'S** |
| vs. | ) **REPLY IN SUPPORT OF MOTION FOR** |
| | ) **RELEASE –** |
| | ) **EVIDENTIARY HEARING REQUESTED** |
| DANIEL MAHON, | ) **(Assigned to The Honorable David G.** |
| | ) **Campbell)** |
| Defendant. | ) |
| | ) |

Defendant Daniel Mahon, by and through undersigned counsel, hereby submits his Reply in support of his Motion for Release.

As an initial matter, Defendant notes the government has reverted again to shifting blame onto the defense for the failures of the government.   "The continuance length, however, is primarily a result of the defendants' request. . . . The defendants' request is the primary reason for the delay in this case."  Dct. #959, page 5. This is clearly incorrect.   The reason for this latest delay in trial is because the government saw fit to neglect for 18 months its duty to disclose 10,000 pages of discovery.  This was absolutely *not* Daniel Mahon's fault, yet he is forced to remain detained for yet another year, suffering additional pretrial punishment for no other reason than the government's negligence.

Pursuant to 18 U.S.C. §3142(f)(2), "The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

The Court relied heavily, if not entirely, on the proffers of the government and the search warrant affidavit of Tristan Moreland as the bases for the Court's Order detaining Daniel nearly two years ago [Dct. #44]. The government's response two years later asserts that "There is no change in the evidence warranting the Defendant's release." [Dct. #959, page 4, lines 13-14.] It would seem that candor with this Court warrants a more forthcoming response, unlike the government continuing at this late date to proffer the same allegations it knows to be unfounded. This is particularly so in light of the fact that, in those two years, the defense has had an opportunity to investigate the veracity of those proffers.

In justifying its Order [Dct. #44], this Court stated at page 5 that, "The Government has proffered tape recordings and affidavits from confidential informants capturing Daniel and his brother acknowledging their bomb making activities and communicating with others about the conspiracy discussed above," and "Daniel reported to a confidential informant that he and his brother do more than just talk about violent activities. He described his participation in drive-by shootings and blowing up cars and buildings. He said that on one occasion he blew a desk through a second floor roof." No affidavit from any confidential informant has been provided the defense. Additionally, no tape recordings exist of Daniel making any of the above statements.

The Court should be made aware that the majority of the statements attributed to Daniel Mahon, which the Court cited in its Order including those contained in the

previous paragraph, supposedly took place in a matter of minutes during an unrecorded conversation on January 29, 2005.[1]

Defendant will highlight here just some of the government proffers -- clearly relied upon by this Court -- that are now known by the defense to be incorrect. The fact that these matters were not known by the defense at the time of the previous Order, coupled with their material bearing upon the Court's ruling, the hearing on this matter should be re-opened.

Misrepresentation Number One:
What the Government Now Calls An "Armed Standoff"

Just because the government uses buzz words to describe a series of events as an "armed standoff" does not make it so.

The Court wrote [Dct. #44, page 6, lines 10-16] that "Defendants initially refused to leave the premises" and "Defendants made phone calls and conferred with each other." There have been no disclosures supporting either of these assertions.

Contrary to the government's Response [Dct. #959, page two], the Court *never* noted that there was any "armed standoff."  Tristan Moreland has always known there was no armed standoff, as he in fact thanked Dennis Mahon on tape for *not* engaging in that type of conduct.  [Dct. #537-2, page 8.]  Agent Moreland explained to Dennis Mahon that the agents sought to prevent any such problems by sending the Ogle County Sheriffs to contact Dennis.  In fact, reports evidence that while staging outside the Mahons' farm that day, snipers watched as both Dennis and Daniel Mahon walked in and out of the house several times, never once noting that either was in possession of any kind of weapon.  [Ogle County Sheriff departmental report; ROI #307, batestamps 4727-28, attached hereto as Exhibit One.]  Not once during the arrest was either Dennis Mahon or Daniel Mahon ever seen with a weapon.  In fact, the Ogle County Sheriff's Department stated that within minutes of initial contact and after a brief conversation, the Mahons

---

[1] Dct. #44, lines 4 through 10, for example, describe statements from this purported conversation.  Dct. #44, page 4, lines 3 through 25, page 5, lines 20-24, describe conduct discovery indicates is attributable to Dennis Mahon, and

agreed to surrender peacefully and were taken into custody "without incident." [Exhibit One.]

First of all, this is a rural area where weapons are common, and anyone appearing at the door in the early morning hours should expect to face a precarious welcome. It's why many people keep legal weapons in their home and a constitutional amendment exists to protect that right. Furthermore, Daniel did not engage in anything like an armed standoff, especially since he had no way of knowing the Sheriffs at the door wanted his attention. As can been seen in Exhibit One, the Sheriffs noted they spoke only to Dennis and only about an *arrest* warrant *for Dennis*. There was no contact at all with Daniel. Neither Dennis nor Daniel were ever seen with a gun, despite Dennis answering the door and both being seen going in and out of the house unarmed. Reports indicate the gun found near the front door belonged to Dennis, but was not loaded according to scene photographs provided the defense. Daniel came out as soon as the Sheriff phoned Dennis, and the search warrant was not shown to either Mahons until approximately 10 minutes after Dennis and Daniel surrendered. [Exhibit One.]

One could argue, perhaps, that the government calling this series of events an "armed standoff" was merely an exercise in artistic license.

Misrepresentation Number Two:
Daniel Mahon Acted on Behalf of WAR

The Court stated at Dct. #44, page 6: ". . . Daniel is alleged to have actively participated with Dennis in the White Aryan Resistance. Daniel described himself to a confidential informant as a 'domestic terrorist.[2]' Dkt. #13-3 at 21." To the contrary, in his grand jury testimony on June 19, 2009, Tristan Moreland was asked whether either of the Mahons had ever claimed association with WAR:

Q. At any point did the Mahons claim to be former members of WAR?

---

page 6, lines 21-28, describe items discovery indicates were found in Dennis' bedroom.
[2] See infra.

A. Yeah, on one occasion Dennis --and it was early on he introduced or just told her [the CI] that he was a former member of WAR, that he had left four years ago.

Grand Jury Transcript, June 19, 2009, page 40.

Not once in the years of recordings does Daniel ever claim to be a member or former member of WAR.

Perhaps the government can assist in providing the Court the recording, upon which they have based this factual and compelling assertion, where Daniel claimed association with WAR.

Misrepresentation Number Three:
Items Found at Farm Evidence Daniel is Violent

The Court found relevant that the government had alleged that a "number of weapons were also found in the house, including semi-automatic assault rifles, armor-piercing ammunition, and bulletproof vests.  Dkt. ##13, 13-2."  Dct. #44, page 5, lines 23-24.

Reports indicate the listed M-80's [referenced in Dct. #44, page 5, lines 21-22] were found in Dennis Mahon's bedroom.  But even grand jurors questioned how M-80's, that are typically used by children, can be evidence of anything.[3]  Responding to that inquiry, AUSA Boyle questioned Tristan Moreland, grasping for a link:

Q. Is the possession of those devices consistent with violent activity?
A. Typically, yes.
Grand Jury transcript, 8/11/10, page 90.

The farm where Defendants were arrested has been owned by the Mahon family for over 40 years, and Mahon siblings have lived there on and off during that time.  Not one of the weapons found was illegal according to the Sheriffs who collected them. [Exhibit One.]  Everything seized has either been stored or returned, and they were taken

---

[3] "Grand Juror:  When I was a kid, we had fireworks stands, 45 to a box."  GJ transcript, 8/11/10, page 91.

only because, after Dennis and Daniel were arrested, no one left in the house could legally possess the weapons.

Possession of legal weapons is not evidence of a violent nature.  If ammunition was found that is now illegal[4], there is no evidence of who owned it, when it was purchased, if it was legal when purchased, or if it can even still be used, or was ever used in any weapon found.  There is no evidence of when the AK-47 was put in the kitchen other than that Agent Moreland claims to have seen it in Dennis' room months earlier.

Finally, there is no evidence whatever connecting Daniel Mahon to any of the M-80's or ammunition found.

Misrepresentation Number Four:
Daniel Mahon Told CI How to Dress to Avoid Detection

Contrary to Dct. #44, page 4, starting at line 9, Daniel never planned the trip to the gun show, let alone for the stated purpose.  Relying on government proffers, the Court recounted Daniel's instruction to the CI about how to dress to avoid detection at the gun show:

> Defendants allegedly discussed measures to avoid detection at the gun show, including traveling separately, wearing hats and sunglasses, and avoiding being seen together. *Id*

Dct. #44, page 4, lines 19-20.

We now know, however, from the testimony of the CI and disclosures since, Daniel did not make these statements.  In fact, when asked September 22, 2010 if Daniel Mahon ever instructed her on how to avoid detection, the CI answered in the negative:

> Q And he never told you anything about how to avoid detection at the gun show? Daniel.
> A I don't believe he specifically was giving me suggestions, no.

---

[4] Reports suggest the subject ammunition has not always been illegal.

Transcript of CI, September 22, 2010.

Misrepresentation Number Five:
Accuracy of Statements

In both his June, 2009 and August, 2010 grand jury appearances, grand jurors questioned Tristan Moreland about the accuracy of his representations regarding the audio recordings played for them, as the grand jurors clearly had difficulty hearing what was claimed to have been said in those recordings. Agent Moreland swore under oath that the CI was immediately debriefed regarding inaudible conversations:

> GRAND JUROR. And, and so your only back up for that is to the extent with the enhancement and cannot be heard, your back up for that is the testimony of the CI who is briefed immediately afterwards? WITNESS [Tristan Moreland]:  Correct.

Grand Jury Transcript, August 11, 2010, Page 91.

The government has repeatedly referred to a purported, and unrecorded, conversation between Daniel Mahon and the CI that occurred in Catoosa on or about January 29, 2005, which conversation lasted only a matter of minutes.[5]  In fact, the majority of the statements this Court attributed to Daniel in Dct. #44 are from that brief, unrecorded conversation.  Many government excuses have been offered in affidavits, in grand jury testimony, and in reports for the failures of the recording devices in and outside that trailer to pick up any of this conversation.

On June 16, 2009 and on August 11, 2010, Tristan Moreland testified before two separate grand juries in this case.  On both dates, he recounted the details of the January 29, 2005 conversation, avowing that Daniel Mahon said many things during this unrecorded conversation, including statements about drive-by shootings, how to blow up a vehicle,  that these things were done "out of a sense of

---

[5] See also Dct. #13-A, page 14.

duty," a reference to a statute of limitations, etc.  Agent Moreland explained that, while the recording devices did not pick up any of this conversation, agents were in another trailer, monitoring through a microwave feed, with "white noise" including the nearby highway, etc.  Despite all of this, Moreland claimed those agents were able to take detailed and contemporaneous notes of this conversation, quoting entire sentences.

However, for the alleged conversation between the CI and Daniel on January 29, 2005, there was no tape recording with which the CI could be debriefed.  In fact, she was not debriefed on this unrecorded conversation until over four years later in March and April of 2009.  [ROI #283, Batestamp 4554-4587.]  Even that inexcusably delayed debriefing of the conversation was incorrect according to the CI's sworn testimony in September of 2010.  (See below.)

Furthermore, as what was used for this purpose was only notes by agents in a faraway van with "white noise" unearthed four years later, the fact is that these agents could not have known who was talking when the notes were taken, as those agents had no experience at that time distinguishing the voices of Dennis and Daniel Mahon.

Disclosure evidences that, despite a five and one half year investigation which included wiretaps, surveillance video and audio, the majority of the statements attributed to Daniel in Dct. #44 are alleged to have occurred during this unrecorded, 55-minute time span, and not reviewed with the CI for over four years. No other reports have been provided about the details of that conversation other than one ROI summarizing the purportedly contemporaneous notes.

Misrepresentation Number Six:
Daniel told CI how to Blow Up Vehicle

Relying on the government's version of this same unrecorded conversation, the Court stated:

> The conspiracy is alleged to have included instructions to other individuals on how to engage in criminal activity, dress to avoid detection by law enforcement, and blow-up vehicles. *Id*. at 3

Dct. #44 at page 4. In fact, throughout its Order, the court repeatedly refers to this one unrecorded conversation; e.g., "As noted above, Daniel reported to a confidential informant that Daniel had engaged in drive-by shootings and had destroyed automobiles and buildings with explosive devices." Dct. #44, page 7. All of this is claimed to have been stated by Daniel in this unrecorded conversation.

However, in her September 22, 2010 sworn testimony, the CI was asked quite specifically whether Daniel Mahon ever made any such statement about how to blow up a vehicle:

> Q And he didn't tell you how to blow up a vehicle?
> A No.

Transcript of CI, September 22, 2010, page 61.

Misrepresentation Number Seven:
Daniel Mahon Described Himself as a "Domestic Terrorist"

The Response states at Dct. #959, page two: "*The Court noted* that Daniel Mahon described himself as a "domestic terrorist" and that he participated in a 30-minute, armed standoff[6] prior to being arrested in July 2009. (Docket #44, Page 6, Lines 7-20.)" The reason the "Court noted" the first part of this is because, in his Search Warrant Affidavit, Dct. #13-2 at paragraph 24, Tristan Moreland avowed that "Both

---

[6] See ante.

Dennis Mahon and Daniel Mahon have told the CI that they are bombers[7] and described themselves as 'domestic terrorists.'"

The AUSAs have presumably read their own disclosures. *Daniel Mahon never made any claim to being a domestic terrorist*. Despite years of recorded conversations, not once did Daniel Mahon describe himself as a domestic terrorist.

To justify its proffer, perhaps the government can assist in providing the Court a recording where Daniel Mahon described himself as a domestic terrorist.

<u>Misrepresentation Number Eight:</u>
<u>Daniel Agreed They Should Have Had a Shootout</u>

The government has avowed that both Dennis and Daniel Mahon stated in a conversation recorded while they were inside a van after arrest, that "they" should have had a "shootout." On several occasions in its Order [Dct. #44] the Court reiterated Daniel's joinder in the purported van statement: (1) page 9, ". . . *Daniel agreed* following his arrest that the brothers should have had a shootout with police;" (2) page 6, "While Daniel and Dennis were waiting in a car after their arrest, Dennis said "[w]e should have had a shootout." Dkt. #13-2 at 14. *Daniel agreed. Id*;" (3) page 7, lines 18-20, "*Defendants* considered shooting the law enforcement officers who appeared to arrest them;" (4) page 8, lines 16-17, "Following their arrest, *Daniel agreed* that there should have been a shootout with police;" (5) page 9, "Following their surrender, *both Defendants* said they should have had a shootout with police," and (6) page 9, "*Daniel agreed* following his arrest that the brothers should have had a shootout with police."

The government included this proffer in the detention hearing held in Illinois on July 1, 2009. [Dct. #13-A, page 12, lines 5-7.]

Since the date of this Order, Defendant has had an opportunity, and one might assume so has the AUSA, to review the audio of the conversation between the brothers inside the van subsequent to arrest. Contrary to the government's assertion, Daniel *never made any such agreement*. In fact, Daniel's response was "***No***:"

---

[7] See ante.

> DENNIS MAHON:  Maybe we should have had a shoot out.
> (PAUSE)
> DANIEL MAHON:  Yeah…you willing to die for this stupid race?
> DENNIS MAHON:  No, but take-take out some of the bastards that
> are doing it to us.
> DANIEL MAHON:  *No*, these guys just the soldiers, Denny.

Transcript of van *provided by government*, Exhibit Two, van transcript, page 32.[8]  In fact, after both had been in the van quite a while and right after an officer informed them that this event was about a bombing in Scottsdale, and that officer then left the van, the brothers acknowledged they had only heard of the bombing:

> DENNIS MAHON:  I said, yeah, I read about, that was big news.
> DANIEL MAHON:  …April ninth (9th), to, uh…
> DENNIS MAHON:  …about some, uh, some human relations officer
> got…
> DANIEL MAHON:  …about May…two thousand-four (2004)…
> DENNIS MAHON:  … bom-…got bombed…yeah, heard about that. I
> got nothing to do with it, nothing what-so-ever to do with it.

Exhibit Two, van transcript, page 67.

In order to justify the repeated assertions to this Court, perhaps the government can assist in providing the Court a statement from the 242-page transcript where Daniel Mahon agreed they should have had a shootout.

Pursuant to 18 U.S.C. §3142(f)(2), the detention hearing must be re-opened. While the Court stated [Dct. #44, page 5, line 1], "The evidence in this case appears to be substantial," the evidence regarding Daniel is miniscule at best.  The government cannot prove by clear and convincing evidence that Daniel Mahon is a danger to the community.  18 U.S.C. §3142(f).  The government cannot prove by a preponderance of the evidence that Daniel Mahon is a flight risk.  United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).  The proffers the Court found most

---

[8] The videotape and transcript of this conversation will be submitted in digital format with Court permission.

compelling to warrant detention are unfounded.   The rebuttable presumption of detention has been overcome by an overwhelming lack of evidence against Daniel at all, let alone in support of detention.   This argument strengthens exponentially when one considers the amount of pretrial detention Daniel Mahon is forced to endure under the circumstances.

There exist conditions that will reasonably assure the safety of the community and Daniel Mahon's appearance at trial.  18 U.S.C. §3142(e).  These means offer a reasonable and justified alternative to the prolonged detention occasioned by government failures.

Defendant Daniel Mahon therefore asks that he be released from detention on those conditions this Court deems appropriate pursuant to 18 U.S.C. §3142(b) or (c).

RESPECTFULLY SUBMITTED this 24th day of May, 2011.


__/s/ Barbara L. Hull_____
Barbara L. Hull, Attorney for Daniel Mahon

Original filed electronically this date.

Courtesy copy of the foregoing sent
electronically this date to:

The Honorable David G. Campbell
United States District Court
401 West Washington Street
Phoenix, Arizona  85003
at:  Campbell_chambers@azd.uscourts.gov

Deborah Williams, Esq.
Milagros Cisneros, Esq.
Assistant Federal Public Defenders
District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona 85007-2730
Attorneys for Dennis Mahon
at:  Deborah_Williams@fd.org

Michael Morrissey, Esq.
John Boyle, Esq.
Assistant United States Attorney
Two Renaissance Square, Suite 1200
40 North Central Avenue
Phoenix, Arizona 85003-4408
at:  John.Boyle@usdoj.gov


___/s/ Barbara L. Hull_____