DENNIS K. BURKE
United States Attorney
District of Arizona

MICHAEL T. MORRISSEY
Assistant U.S. Attorney
Arizona State Bar No. 012531
JOHN BOYLE
Assistant U.S. Attorney
Arizona State Bar No. 015640
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
mike.morrissey@usdoj.gov
john.boyle@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>Daniel Mahon,<br><br>　　　　Defendant. | CR-09-00712-002-PHX-DGC<br><br>**SURREPLY TO MOTION FOR RELEASE** |

The government hereby submits a surreply regarding Defendant's Motion for Release. This response is supported by the attached Memorandum of Points and Authorities.

Respectfully submitted this 10th day of June, 2011.

　　　　　　　　　　　　　　　　　　DENNIS K. BURKE
　　　　　　　　　　　　　　　　　　United States Attorney
　　　　　　　　　　　　　　　　　　District of Arizona


　　　　　　　　　　　　　　　　　　s/ *John Boyle*
　　　　　　　　　　　　　　　　　　JOHN BOYLE
　　　　　　　　　　　　　　　　　　Assistant U.S. Attorney

MEMORANDUM OF POINTS AND AUTHORITIES

**I. Defendant's Armed Standoff.**

Defendant's Reply incorrectly claims "[t]he Court wrote that 'Defendants initially refused to leave the premises' and 'Defendant made phone calls and conferred with each other.' There have been no disclosures supporting either of these assertions." (Defendant's Reply, Page 3, Lines 11-13.)

The record proves defendants refused to leave the house for 30 minutes. Defendant's Exhibit One contains a copy of the report expressly stating that both Defendants failed to surrender to police.

> The deputies requested Dennis MAHON exit the residence to talk to them. MAHON told the Deputies that he was not coming out unless they had a warrant. **The deputies told MAHON that they did have a warrant and explained to Dennis MAHON that they needed him and his brother to come outside.** MAHON closed the door explaining to Lt. Kunce that he had to go get his brother. At this same time, snipers from the Illinois State Police observed movement in the upstairs window above the Ogle County deputies. As a result, the deputies retreated from the residence to a safe location. **For the next 30 minutes or so**, several calls were made to the phones of the MAHONs with no answer until approximately 0645 hours when Dennis MAHON answered his phone and agreed to come out of the residence and surrender. It should be noted that during this roughly 30 minute period, Dennis and Daniel MAHON were observed by snipers walking in and out of the residence prior to answering their phones and surrendering to the deputies.

(Defendant's Exhibit One, Paragraph 2.)(Emphasis added.)

Defendant incorrectly claims there is no evidence "[d]efendants made phone calls and conferred with each other." Dennis Mahon called the confidential informant during the standoff and left the following message:

> Yeah Becka this is Dennis its about a Thursday five in the morning your time I think. Yeah I've just been visited by a county sheriff, a deputy and a couple of guys in unmarked cars they want to talk. They have a warrant for my arrest evidently, somebody's stunt trying to get me in trouble here. So I don't know if I should just go ahead and allow myself to be arrested and take my chances. They'll probably put me in jail for the rest of my life because they are afraid of me, so I don't know what's going to happen here. I've had a pretty good life, but they know the situation with me taking care of mom here so I'll kill the bastards. I should actually kill them because they know I'm taking care of my mother here and who's going to take care of her when I'm gone, so, the dirty bastards, they deserve to be killed.

2

1  Dennis Mahon did more than make a phone call, he made a phone call where he contemplated
2  the murder of police officers.
3      After the arrest, Daniel Mahon told Dennis Mahon that he called "Steve" and "Marie"
4  during the standoff.

5      DANIEL MAHON:        I-called Marie up, too, said I've been arrested.
    DENNIS MAHON:        You called Marie up?
6      DANIEL MAHON:        Mmm-hmm, it's a message. And Steve too.

7  (Van Transcript, Page 41.)  This statement by Daniel shows that he made phone calls.
8  Defendant's statement acknowledges he was being arrested, and refutes the claim that Daniel
9  "had no way to knowing the Sheriff's at the door wanted his attention." (Reply, Page 4, line 6.)
10 Defendant is also incorrect when claiming that the assault rifle "was not loaded according to
11 scene photographs provided the defense." (Reply, Page 4, Line 11.) The photographs Defendant
12 refers to (disclosed January 20, 2010) clearly show two taped-together, loaded, assault rifle
13 magazines. (See Attachment A.)
14     The record demonstrates this Court was correct when it concluded that "(a)t one point, a
15 blind was opened on an upstairs window and law enforcement retreated for their safety.
16 Defendants eventually agreed to surrender. When officers searched the home they found an
17 AK-47 assault rifle with loaded clips on a table in the room where defendants had been located."
18 (Docket #44, Page 6, Lines 12-16.) The evidence shows that Defendants collectively refused
19 to surrender to police for 30 minutes, there was a loaded AK-47 in the room on a table, police
20 were in fear for their safety, and Defendants at some point considered shooting at the police
21 rather than surrendering. It is fair argument to call this incident an armed standoff.

22 **II.  Daniel Mahon and WAR**

23     The Court did not write that Daniel claimed membership in WAR, and that was not the
24 Court's finding. The Court wrote that "...Daniel is alleged to have actively participated with
25 Dennis in the White Aryan Resistance." (Docket #44, Page 6, Line 5.) That is exactly what the
26 indictment alleges.
27
28
                                3

1  Defendant next quotes the Court regarding "domestic terrorist." The response to this issue
2  is contained in Defendant's Argument VII.

### III. Daniel Mahon and weapons found at the farm.

The Court correctly found that assault rifles, armor piercing ammunition, and bulletproof vests were found in Defendant's home. Defendant does not contest this finding. Defendant asserts "there is no evidence whatsoever" connecting Daniel Mahon to the "M-80's or ammunition found." (Reply at 6, Line 7.) The Court specifically found that the M-80 explosive devices were found in Dennis Mahon's bedroom. (Docket #44, Page 6, Line 21.) Regarding ammunition, Daniel Mahon admitted to possessing ammunition that was found by law enforcement.

```
DENNIS MAHON:   I should have taken all that ammo boxes out…
DANIEL MAHON:   Yeah. (PAUSE) We haven't got that much ammo here
                anymore, maybe…maybe three hundred (300) rounds, four hundred
                (400) rounds.
DENNIS MAHON:   We sold a lot of it.
```

(Van Transcript, Page 49.)

```
DENNIS MAHON:   Yeah, they checked out the horse trailer, right?
DANIEL MAHON:   Yep-yep…
DENNIS MAHON:   There's a big'ole…big'ole pile of horse shit in there.
DANIEL MAHON:   My ammo cans back there.
DENNIS MAHON:   Hah?
DANIEL MAHON:   Got a big ammo can back there.
DENNIS MAHON:   //What's in it? You-gotta-be-really stupid, if you got cannon fuse in
                there.
DANIEL MAHON:   UI
DENNIS MAHON:   //Your gonna go to jail, Donny. You know why? For being
                stupid. You don't think, Donny. Your judgment's been
                way off…
```

(Van Transcript, Page 50.)

Daniel Mahon possessed the M-14 .223 caliber semi-automatic assault rifle that was found within the home.

```
DENNIS MAHON:   //They do, so-… Oh, there's my-…there's yours, Donny there's your
                rifle. Yeah, there it is. //They got your M-14…
DANIEL MAHON:   //It's legal-…
```

4

(Van Transcript, Page 103.)

The armor-piercing ammunition found at the residence was .223 caliber, and the M-14 was the only weapon found that was capable of firing .223 ammunition. Although not offered at the initial hearing, Defendant made other statements related to bomb making.

| | |
|---|---|
| DENNIS MAHON: | By the way, they're looking for, uh…bomb making material. Donny, remember we got rid of that powder, Donny? |
| DANIEL MAHON: | Yeah. //Yeah… |
| DENNIS MAHON: | //We got rid of all of it, right? |
| DANIEL MAHON: | Yeah. |
| DENNIS MAHON: | Boy, that was a good thing we did, man. |

(Van Transcript, Page 27.)

## IV. Defendants discussed measures to avoid detection

The Court wrote, "Defendants allegedly discussed measures to avoid detection at the gun show, including traveling separately, wearing hats and sunglasses, and avoiding being seen together." (Docket #44, Page 4, Lines 19-20.)  The Court was correct, this is precisely what Overt Act Seven of the Original and Superseding Indictments allege.

Defendant does not deny being present when the gun show was discussed, or deny traveling to the gun show. On February 4, 2005, the recording shows that at approximately 6:27 p.m., Daniel Mahon advised the informant to plan properly and she would not be caught. At approximately 6:35 p.m., Dennis Mahon made statements related to buying powder, wearing a hat, and other details concerning the gun show. The recording spans two days and several conversations.  The government alleges, and the grand jury found, that Defendants worked together regarding plans for the gun show. The evidence does not need to show that Daniel Mahon made all of the statements, the charges allege that he knowingly participated in the plan. The government will prove at trial that Daniel Mahon knowingly participated in Overt Act Seven.

//

**V.   The government correctly represented statements made by Daniel Mahon.**

Defendant asserts that the government misrepresented evidence concerning "drive-by shootings, how to blow up a vehicle, that these things were done 'out of a sense of duty,' a reference to statute of limitations, etc.'" (Defendant's Reply, Page 7, Lines 23-24.)  In a report written February 10, 2005, ATF agents documented a conversation on January 29, 2005 between Defendant, an undercover agent, and the informant.

> At approximately 1544 hours, Daniel MAHON arrives at the undercover trailer and meets with SA Kaufman and the CI. Daniel engages in general conversation for some time. At 1820 hours, Daniel said that he did not think that he and Dennis would live to age 45, with the bomb thing (Oklahoma City Bombing) and the Carol Howe thing (ATF CI). At approximately 1822 hours, the CI asked Daniel if they do more than just talk about taking action for their cause, referring to their white supremacist beliefs. Daniel said "we do more than just talk about it, in knew you better and the statute of/imitations was up". Daniel went on to talk about his participation in drive by shootings, blowing up cars, and buildings. Daniel said on one occasion, he blew a desk through the second floor roof. Daniel did not provide any specifics on these acts. Daniel said that "Dennis did not do much of that stuff, we thought we were doing the right thing, we were just trying to send a message."

(ROI 44, Paragraph 3.)

The same ROI documents additional statements of Defendant.

> At approximately 1852 hours, Daniel MAHON said that "when I would take someone's car out it wasn't anger, it was a sense of duty. It is like a military operation, you plan for it, equip for it." Daniel went on to explain the need to plan on how to dress for the operation including camouflage and disguises, and how to approach and depart your target area. Daniel detailed one method of blowing up a car to SA Kaufman and the CI. Daniel said that he would take a phosphorus compound and place it in a condom, then place the condom in the gas tank of the target vehicle. Daniel said that the gas would eat through the condom and release the phosphorus, which would then ignite the gasoline. Daniel said that this method of blowing up a car was not traceable.

(ROI 44, Paragraph 5.) (Attachment B.)  Defendant should have directed this Court to this critical ROI.  This ROI documents Defendant's statements and was written 12 days after the event.

6

**VI. Daniel Mahon stated he knew how to blow up a vehicle.**

As noted in Argument V, agents documented Daniel Mahon's statement describing how to blow up a vehicle. "Daniel detailed one method of blowing up a car to SA Kaufman and the CI. Daniel said that he would take a phosphorus compound and place it in a condom, then place the condom in the gas tank of the target vehicle." (ROI 44, Paragraph 5.) The government did not misrepresent that statement to the Court in August of 2009.

**VII. Defendants described themselves as terrorists in word and action.**

Defendants used the words terrorist and domestic terrorist during recorded conversations. Defendants both considered themselves terrorists when describing their prior violent acts. In a recorded call on July 30, 2005, Dennis Mahon told the informant that a friend named Charles Kountze wanted Dennis Mahon to shoot a silenced weapon in his presence. Dennis Mahon stated that Kountze was trying to make a name for himself by turning in the "biggest domestic terrorist in the country." (ROI 54, Paragraph 9.) On November 14, 2007, the informant spoke with Daniel Mahon in a recorded call. Daniel Mahon stated, "you know, we're in the last days, white's got to start fighting back and, I am at the age now where I don't have the testosterone to do that shit anymore, but uh, if they drive me, you know (UI) into a situation that, they can say, look at this, two white terrorist (sic) we just took down in the act. I don't want to play their game, and I don't want them to play their game on me." (ROI 110, Paragraph 1.)

The recordings in this case contain other examples of Defendants using the terms terrorist and domestic terrorist. See ROI 283, Page 11 ("At 28 minutes and 9 seconds into section 2 Dennis Mahon states, "I'm the only person in the White Resistance who has the qualifications, military and civilian, to be a terrorist, to be a real good terrorist with explosives and so forth." Daniel Mahon then goes on to say, "we move around the country a lot" and Dennis Mahon responds, "every place we go bombs go off."). See also Wiretap call 1848 (ROI 236)(On May 24, 2008, Daniel Mahon stated to his father that politicians want to "bust a couple of guys they think are like domestic terrorists.") and Wiretap call 2147 (On May 23, 2008, Dennis Mahon

7

called Tom Metzger's radio hotline and left a message stating "Oh, the federal government, uh, yeah, the Mahon brothers are, uh, the worst, uh, terrorists they can think of.").

As noted in Argument V, Daniel Mahon described how Defendants "do more than just talk about taking action for their cause...." (ROI 44, Paragraph 5.)  In a recorded conversation from January 31, 2005, Defendants described prior terrorism.  "[Dennis Mahon], in the presence of the CI and [Daniel Mahon] told the CI how they did a lot of bombings in the early 1980's, but never killed anyone. [Daniel Mahon] stated that they did blow up a lot of buildings though. [Daniel Mahon] then said, "We made sure the buildings were empty, I always called ahead." (ROI 297, Paragraph 9; Exhibit E-21.)

Dennis Mahon referred to both Defendants as domestic terrorists, and Daniel Mahon referred to the Mahons as terrorists.  There can be no meaningful distinction between referring to oneself as a "terrorist" and as a "domestic terrorist."  The Court correctly found that Defendants considered themselves domestic terrorists.

**VIII.  Statements regarding a shootout.**

Daniel Mahon initially agreed with Dennis Mahon that Defendants should have had a shootout.  After considering whether he was prepared to die for the white race, Daniel Mahon told Dennis Mahon that shooting "just soldiers" would not be worth dying for.  There are additional statements by Defendants documenting the Court's finding that "Defendants considered shooting the law enforcement officers who appeared to arrest them." (Docket #44, Page 7, Line 18.)

```
S/A MORELAND:    I know that, uhm…I want to thank you for…not
                 choosing to have a shoot out here today. I was
                 concerned about it.
DENNIS MAHON:    (EXHALES) I've…I think that…uh…it came very close.
S/A MORELAND:    I know you did. //Uhm…and-and I was…
DENNIS MAHON:    //But…at least…if-if you would have hurt me three (3:00) o'clock
                 in the morning, there would have been a lot body bags, including
                 myself.
```

(Dennis Mahon, Post-Arrest Interview, Page 8.)

8

| | | |
|---|---|---|
| DENNIS MAHON: | | (CHUCKLES)…they're sacred, look at this, look at this. This guy-…guy's got a bunch of god-damn, tie wraps. |
| DANIEL MAHON: | | Se-se-seven-three…checking seventy-three of 'em.. |
| DENNIS MAHON: | | Mmm…? |
| (PAUSE) | | |
| DANIEL MAHON: | | And Sparks sticker in the back. |
| DENNIS MAHON: | | Reason they're scared is, we-had-we-had-we had warning, Donny. You know, we had four (4), five (5) minute warning, that got 'em upset, see. |
| DANIEL MAHON: | | Mmm… |
| DENNIS MAHON: | | Oh, if they would have show-up with that fucking machine'er…it-would-uh…I-I'd-I'd open fire on 'em. They want to kill. Well, you're going to get killed yourself. |
| DANIEL MAHON: | | Wait 'til they shit face first. |

(Van Transcript, Pages 44 and 45.)

| | | |
|---|---|---|
| DENNIS MAHON: | | I'll wait until the next god damn big Mexican rally and I'll massacre them. |
| DANIEL MAHON: | | I might win the lottery tonight. |
| INFORMANT: | | I remember you told me, you said if you were going go out that you weren't going to go out by yourself quietly. |
| DENNIS MAHON: | | No, I'm not going to go out quietly, that's for sure. |
| DANIEL MAHON: | | Might as well go out with a bang if you're going to go out. |

(April 14, 2009; ROI 126, Page 2.)

## IX. Defendant's Motion fails to contest numerous other findings of the Court.

Defendant does not contest the serious nature of the charges or the evidence that Defendant's home contained bomb-making manuals, Defendant possessed armor-piercing ammunition, Defendant was aware of past crimes and claimed involvement in them, Defendant advocated violence, Defendant was an encouraging confident of Dennis Mahon(who openly advocated violence and murder against non-whites), and how Defendant suggested someone should shoot victim Donald Logan. Defendant does not address these findings by the Court:

> In an April 2008 recorded telephone call, Daniel related to Dennis how Daniel had urged another person to attack "a small company that's laying off all the white guys here and hiring Mexicans," saying "you need to get up there, get some good ol' boy together, get some, get some alcohol, some, some, some uh vodka, throw it throw it through a window and light the place up and burn it right to the ground." Dkt. #13 at 5. In a December 2007 recorded call, Daniel complained to Dennis about the hiring of Hispanics at a local laundry and said "[t]hat's why we've got to start getting violent." Id. at 6. During a May 2007 recorded call, Daniel said that he wanted to "pop a cap" in a fellow, apparently referring to Donald Logan, the victim of the February 26, 2004 bombing. Id.

9

(Docket #44, Page 5, Pages 11-19.)

**X. Conclusion.**

The government requests the defendant continue to be detained as flight risk and a danger to the community pending trial.

Respectfully submitted this 10th day of June, 2011.

DENNIS K. BURKE
United States Attorney
District of Arizona

s/ *John Boyle*
JOHN BOYLE
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Barbara L. Hull, Attorney for defendant