**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR09-0712-02-PHX-DGC |
|---|---|
| Plaintiff, | **ORDER** |
| vs. | |
| Daniel Mahon (2), | |
| Defendant. | |

On August 11, 2009, the Court entered a ten-page order finding that Defendant Daniel Mahon should be detained pending trial. Doc. 44. The order found by clear and convincing evidence that Daniel Mahon is a danger to the community and by a preponderance of the evidence that Daniel Mahon is a flight risk. *Id*. at 8-9.

On April 5, 2011, Daniel Mahon filed a motion asking the Court to revisit this issue. The motion argued that the government has produced no evidence that Daniel ever had a connection with the White Arian Resistance "WAR," no evidence that Daniel was involved with the bomb delivered to victim Donald Logan, and no evidence that Daniel taught anyone to commit violent acts on behalf of WAR. *Id.* at 3. The motion also complained that the government had failed to produce DNA evidence, and that the government's generally untimely disclosure of evidence in this case had resulted in a one-year delay of the trial. *Id*. at 3-5.

The government responded on April 28, 2011. Doc. 959. The government quoted transcripts of conversations in which Daniel suggested that a small company should be burned for "laying off white guys" and "hiring Mexicans." *Id*. at 3. The response quoted

other conversations in which Daniel asserted that he and his brother Dennis should "start getting violent." *Id*. at 4.  The response explained why the government has been unable to submit partial DNA evidence recovered from the bomb to an indexing system as requested by Defendants, and stated that prosecutors had explained this fact to defense counsel on several occasions.  *Id*. at 4.  The government also noted that Defendants, not the government, had requested a one-year extension of the trial date until January 2012.  *Id*. at 5.

In his reply memorandum, Daniel sets forth an entirely new argument.  Doc. 1017.  He enumerates eight specific misrepresentations made by the government in connection with the original detention hearing.  *Id*. at 3-12.  Because of this new argument, the Court permitted the government to file a sur-reply.  The sur-reply was filed on June 10, 2011, and addresses each of the alleged misrepresentations.  Doc. 1035.  Upon receiving the sur-reply, Daniel filed a request for an evidentiary hearing.  Doc. 1036.  The request asserts that Daniel's obligation in this motion was only to present "examples" of new information warranting release.  He argues that "[i]t is not incumbent upon Defendant to now refute each assertion in the sur-reply.  That is the purpose of the hearing."  *Id*. at 1.

The Court will address each of the misrepresentations set forth in Daniel's reply memorandum.  For reasons explained below, the Court finds that Daniel has not presented material new evidence warranting a reopening of the detention hearing.

**I.   Legal Standards.**

Daniel seeks to reopen the detention hearing under 18 U.S.C. § 3142(f)(2).  Doc. 1036.  That section provides that a detention hearing "may be reopened before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

Reopening of a detention hearing "is permissible under this section only when

there is new information that would materially influence the judgment about whether there are conditions of release which will reasonably assure that the defendant will not flee and will not harm any other person or the community." *United States v. Cisneros*, 358 F.3d 610, 614 (10th Cir. 2003). Reopening of a detention hearing is discretionary. *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989). If a court finds that the information presented in support of reopening is not sufficiently material to the issues of dangerousness or flight risk, the Court may deny the request. *Id*. at 799.

**II.    Analysis.**

The Court will not restate all of the analysis contained in its original detention order. Doc. 44. The Court instead will address the misrepresentations identified in Daniel's reply, as well as the other arguments contained in his original motion.

**A.    Armed Standoff.**

Defendants were arrested at their parents' farmhouse in Illinois on June 25, 2009. The Court's prior order included this description of the arrest:

> Defendants initially refused to leave the premises. For some 30 minutes law enforcement waited outside while Defendants made phone calls and conferred with each other. At one point, a blind was opened on an upstairs window and law enforcement retreated for their safety. Defendants eventually agreed to surrender. When officers searched the home they found an AK-47 assault rifle with loaded clips on a table in the room where Defendants had been located.

Doc. 44 at 6.

Daniel's reply memorandum asserts that there is no evidence that he initially refused to leave the premises or made phone calls and conferred with his brother. Doc. 1007 at 3. Daniel further asserts that he and Dennis walked in and out of the residence several times during the 30-minute interval, that neither possessed a weapon, and that they ultimately surrendered without incident. Daniel notes that the farmhouse is located in a rural area where weapons are common, and argues that officers approached the house and disclosed only the potential of an arrest warrant for Dennis. *Id*. at 4.

In its sur-reply, the government quotes from a relevant law enforcement report showing that Defendants refused to leave the residence for 30 minutes after it was initially approached by law enforcement officers. Doc. 1035 at 2. The report further states that officers retreated from the residence to a safe location when they observed movement in an upstairs window. *Id*. Transcripts from a recorded conversation between Dennis and Daniel after their arrest show that Daniel made at least one phone call from the house, informing others that he was being arrested. *Id.* at 3. The sur-reply also provides a photograph of the AK-47 assault rifle with loaded clips found in the house after Defendants were arrested. *Id*.

In short, the government provides evidence to support every fact set forth in the Court's findings regarding the 30-minute period during which Defendants failed to surrender. Defendant has not shown that the government misrepresented these facts to the Court.

**B.     Daniel Mahon and WAR.**

Defendant asserts that he has never been affiliated with WAR and that the government has no evidence of such an affiliation. Doc. 1007 at 4-5. In response, the government's sur-reply notes that the indictment specifically alleges that Daniel "actively participated with Dennis in the White Arian Resistance," and quotes other statements in which Dennis and Daniel Mahon characterized themselves as terrorists. Doc. 1035 at 3, 6-8. As noted above, the sur-reply also quotes a statement in which Daniel advocated violence against a local business because it was laying off white workers and hiring Hispanics. Although the evidence of Daniel's connection to WAR appears thin, he has not shown that the government engaged in misrepresentations as alleged.

**C.     Items Found at the Farm.**

The Court's detention order concluded that a "number of weapons were also found in the house, including semi-automatic assault rifles, armor piercing ammunition, and bullet proof vests." Doc. 44 at 5. Daniel's reply memorandum argues that M-80s were found at the house and that all of the other weapons were legal. Doc. 1007 at 5-6. Daniel

further asserts that there is "no evidence whatever" connecting him to the M-80s or ammunition found at the house. *Id*. at 6.

In its sur-reply, the government notes that Daniel does not contest the fact that assault rifles, armor piercing ammunition, and bullet proof vests were found in the home. The government quotes a conversation on the day of the arrest in which Daniel stated that he had a "big ammo can" in the location where officers were searching. Doc. 1035 at 4. The government also quotes conversations between Daniel and Dennis in which they expressed relief that bomb making materials had been removed before the officers arrived. *Id*. at 5. The government also quotes a conversation between Defendants concerning Daniel's M-14 rifle, which was a semi-automatic assault rifle that fired .223 caliber ammunition. The government notes that the armor piercing ammunition found at the residence was .223 caliber.

Defendant has not shown that the government misrepresented these facts at the detention hearing.

### D. Planning for the Gun Show.

The Court's order contained the following finding:

> As part of the conspiracy, Daniel and his brother are alleged to have planned a trip to a gun show in Catoosa, Oklahoma, for the purpose of purchasing periodicals and components related to bomb making, including books, gun powder, an electric match, and a fuse. Defendants allegedly discussed measures to avoid detection at the gun show, including traveling separately, wearing hats and sunglasses, and avoiding being seen together.

Doc. 44 at 4.

Daniel asserts that he never planned a trip to the gun show, let alone for the stated purpose. Daniel quotes testimony from a confidential informant that he did not specifically give her suggestions on how to avoid detection at the gun show. Doc. 1007 at 6.

In response, the government notes that Daniel, on February 4, 2005, advised the informant to plan properly for the gun show and she would not be caught. Recordings

- 5 -

reflect that Dennis made statements about buying powder, wearing a hat, and other details concerning the gun show. The government alleges, and the grand jury found, that Defendants worked together regarding plans for the gun show. Doc. 1035 at 5.

The Court's detention order did not find that Daniel specifically advised the confidential informant how to avoid detection at the gun show. Daniel does not deny that he and his brother planned to attend the gun show with the informant, that his brother advised the informant on how to avoid detection, or that he advised the informant to plan properly so that she would not be caught.

Daniel has not shown that the government misrepresented these facts at the detention hearing.

### E. Accuracy of Statements.

Daniel asserts that many of the government's allegations come from a conversation between Daniel and the confidential informant on or about January 29, 2005, that was not recorded. He notes that Agent Tristan Moreland testified before grand juries about this conversation, despite the fact that it was not recorded and the confidential informant was not debriefed concerning the conversation until March and April of 2009. Doc. 1007 at 7-8.

In response, the government quotes from a law enforcement report written on February 10, 2005 – days after the conversation in question – in which ATF agents documented the conversation between Defendant, an undercover agent, and the informant. Doc. 1035 at 6. The report recounts that Daniel said he and his brother do more than just talk about violence, and described "his participation in drive by shootings, blowing up cars, and buildings. Daniel said on one occasion, he blew a desk through the second floor roof." *Id*. The same report quotes Daniel as saying that "when I would take someone's car out, it wasn't anger, it was a sense of duty. It is like a military operation, you plan for it, equip for it." *Id*.

The February 10 report supports the content of the conversation on January 29, 2005. Defendant has not shown that the government misrepresented the facts.

**F.    Telling the Informant How to Blow up a Vehicle.**

The Court's original detention order noted that "[t]he conspiracy is alleged to have included instructions to other individuals on how to engage in criminal activity, dress to avoid detection by law enforcement, and blow-up vehicles." Doc. 44 at 4. Daniel notes that these assertions are based on the unrecorded January 29, 2005 conversation. Daniel further notes that in her September 22, 2010 sworn testimony, the informant testified that Daniel did not tell her how to blow-up a vehicle. *Id*. at 9.

In response, the government quotes from the report concerning the January 29, 2005 conversation: "Daniel detailed one method of blowing up a car to SA Kaufman and the [informant]. Daniel said he would take a phosphorus compound and place it in a condom, then place the condom in the gas tank of the target vehicle." *Id.* at 7. This report supports assertions made by the government at the detention hearing. Defendant has not shown a misrepresentation by the government.

**G.    Domestic Terrorists.**

Defendant asserts that the government has no evidence that Defendants ever described themselves as domestic terrorists. Doc. 1007 at 9-10. In response, the government quotes a statement from Daniel in which he stated that whites are starting to fight back, that he is at an age where he does not engage in violence any more, but that if the government pushes him "into a situation" they will be able to say "look at this, two white terrorists [sic] we just took down in the act." Doc. 1035 at 7. The government quotes a conversation in which Daniel said "we move around the country a lot" and Dennis said "every place we go bombs go off." *Id*. Daniel told his father that the politicians want to "bust a couple of guys they think are domestic terrorists." *Id*. The government further quotes statements in which Daniel stated that he and his brother "did blow up a lot of buildings," but first made sure "the buildings were empty[.]" *Id*. at 8.

Daniel has not shown that the government made misrepresentations about these matters at the prior detention hearing.

### H. We Should Have Had a Shootout.

The Court's original detention order included this paragraph:

> Following the arrest, Dennis stated that if law enforcement officers had arrived at 3:00 a.m. instead of 6:00 a.m. there would have been a shootout and "body bags." *Id*. While Daniel and Dennis were waiting in a car after their arrest, Dennis said, [w]e should have had a shootout." Doc. #13-2 at 14. Daniel agreed. *Id*.

Doc. 44 at 6.

Daniel's reply memorandum quotes from the taped conversation that occurred in a van after Defendants were arrested and asserts that neither Dennis nor Daniel ever suggested that they should have had a shootout. Doc. 1007 at 11. In response, the government quotes a statement in which Dennis tells Agent Moreland that "it came very close to a shootout." Doc. 1035 at 8. During the van conversation, Dennis states that if law enforcement officers would have shown up with a "machine'er" "I'd open fire on 'em. They want to kill. Well you're going to get killed yourself." *Id*. at 9. Daniel responds: "Wait 'til they shit faced first." *Id*. The government also quotes from another conversation in which Dennis states that he "will not go out quietly, that's for sure," and Daniel says, "[m]ight as well go out with a bang if you're going to go out." *Id*.

Although the wording of the statements quoted by the government differs somewhat from their assertions at the detention hearing, the Court does not find the differences material. Clearly, Defendants talked with Agent Moreland and among themselves about the fact that there could have been a shootout at the time of the arrests, and would have been had the officers shown more force. At other times, Defendants discussed going out with a bang.

### I. Other Assertions in the Motion.

In the original motion, Daniel argued that the government had refused to produce DNA evidence. The government's response explained why the database comparison sought by Defendants cannot be run. Defendant does not address this response in his reply memorandum.

- 8 -

Defendant's motion complains that the government's delay in production has postponed the trial by one year. As previous orders of the Court have recognized, the government did fail to discover relevant evidence that should have been produced to Defendants earlier in this litigation. When the evidence was produced, the Court thought trial would be delayed by three or four months. After extensive hearings and strenuous arguments by Defendants, however, the Court agreed to postpone the trial for one year to allow Defendants to complete their preparation of a thorough defense that addresses all evidence. The Court cannot conclude that the government's failure to produce evidence was the result of bad faith, nor that the delay occasioned by the failure warrants releasing Defendants who have otherwise been found to be a flight risk and a danger to the community.

**III.  Conclusion.**

Daniel Mahon has not shown that the government engaged in material or intentional misrepresentations during the original detention hearing. Nor has Daniel identified material new evidence that warrants reopening of the detention hearing.

**IT IS ORDERED** that Defendant Daniel Mahon's motion for release (Doc. 902) and motion for hearing (Doc. 1036) are **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to commence on April 5, 2011 for a total of 80 days.

Dated this 23rd day of June, 2011.

_____
David G. Campbell
United States District Judge