1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4    **United States of America,**          )
                                            )
5                        Plaintiff,         )    **CR 09-00712-PHX-DGC**
                                            )
6          vs.                              )    Phoenix, Arizona
                                            )    December 15, 2011
7    **Dennis Mahon and Daniel Mahon,**     )
                                            )
8                        Defendants.        )
     _____)

9

10

11

12

13          **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15          **FINAL PRETRIAL CONFERENCE**

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RPR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

11:02:52  1                    **A P P E A R A N C E S**

          2

          3   For the Government:

          4           U.S. Attorney's Office
                      By:  **MICHAEL T. MORRISSEY**, ESQ.
11:02:52  5           By:  **JOHN Z. BOYLE**, ESQ.
                      40 North Central Ave., Ste 1200
          6           Phoenix, AZ  85004

          7

          8   For Defendant Daniel Mahon:

          9           Law Office of Barbara L. Hull
                      By:  **BARBARA L. HULL**, ESQ.
11:02:52 10           637 N. 3rd Ave., Ste 3
                      Phoenix, AZ  85003
         11

         12   For Defendant Dennis Mahon:

         13           Federal Public Defender's Office
                      By:  **DEBORAH L. WILLIAMS**, ESQ.
         14           By:  **MILAGROS A. CISNEROS**, ESQ.
                      850 W. Adams St., Ste 201
11:02:52 15           Phoenix, AZ  85007

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

**P R O C E E D I N G S**

11:02:52  1

2

3       THE COURTROOM DEPUTY:  Criminal case 2009-712, United

4  States of America versus Dennis and Daniel Mahon, on for final

13:34:03  5  pretrial conference.

6       MR. BOYLE:  Good afternoon, Your Honor.  John Boyle

7  and Michael Morrissey on behalf of the United States.

8       THE COURT:  Good afternoon.

9       MS. WILLIAMS:  Good afternoon, Your Honor.  Deborah

13:34:08  10  Williams and Milagros Cisneros on behalf of Dennis Mahon.

11       THE COURT:  Good afternoon.

12       Good afternoon, Mr. Mahon.

13       THE DEFENDANT:  Good afternoon.

14       MS. HULL:  Good afternoon, Your Honor.  Barbara Hull

13:34:17  15  with Daniel Mahon.  We're ready, sir.

16       THE COURT:  All right.  Good afternoon.

17       Good afternoon, Mr. Mahon.

18       THE DEFENDANT:  Good afternoon, sir.

19       THE COURT:  All right.  Let me organize for a moment

13:34:28  20  here.

21       What I would like to talk about first are the recent

22  motions that have been filed.  The first one I want to address

23  is Daniel Mahon's motion to dismiss or, in the alternative, to

24  preclude witness testimony or continue trial.  It's a motion

13:35:13  25  that was filed at Docket 1336.  There was a joinder from

13:35:18  1    Dennis Mahon at 1338, and a response from the government at

       2    1345.  I have read those briefs a couple of times and I've

       3    looked at relevant case law.

       4            Ms. Hull, it's your motion.  Do you have additional

13:35:40  5    points you'd like to make?

       6            MS. HULL:  Judge, I do.  The additional points I want

       7    to make are, first, that the motion at 1336 draws your

       8    attention to another case where the United States attorney

       9    complied with, without request, Local Rule 16.1 on disclosing

13:36:13 10    its list of defendant's statements it intended to use at

      11    trial.  It's not just the U.S. Attorney's Office, it's a case

      12    to which Mr. Boyle was assigned.  I think that is relevant in

      13    consideration of, in fact, the issues we raised about 16.1 and

      14    the interpretation of 16.1 local rule.

13:36:37 15            I would add, also, that there have been some

      16    significant developments since filing of this motion and we

      17    sent over last night a motion to dismiss on *Brady* because as a

      18    result of the response filed to this motion, we became aware

      19    of additional information on Mr. Scott never before disclosed.

13:37:05 20    So I -- I ask the Court be shown that motion because once we

      21    received the response, the initial response, which is at

      22    Bates --

      23            THE COURT:  1344.

      24            MS. HULL:  -- 1344, that response addressed numerous

13:37:27 25    Bates stamps.  The first response was claiming that we had

13:37:32  1  been provided those documents.  We located, and it's attached

2  to our motion, we located a letter from the government that

3  specifically withheld those documents.

4      I assume that when the government realized that it

13:37:48  5  had done that, that it amended or moved to withdraw the

6  significant part of this, Judge, and how this expands from

7  there is that after we received the response saying "we gave

8  these Bates stamps to them a year ago" and we confirmed they

9  had not, I had asked that those Bates stamps be turned over.

13:38:15 10  Because it referred to ten pages of handwritten notes, things

11  that we have never seen before.

12      So the government sent us a series of documents,

13  which are also attached to our motion to dismiss of last

14  evening.  And I would ask the Court to consider that motion in

13:38:36 15  conjunction with this because I filed this motion based on the

16  limited information that we received on December 2nd.

17      We have received considerably more information.  We

18  go into much more detail in the motion to dismiss because the

19  handwritten notes that were turned over to us last evening --

13:38:57 20  yesterday afternoon, rather, I don't remember the time, but in

21  response to my e-mail the government provided us a draft

22  report from Inspector Felton and another MOI, I believe it

23  was, it's attached as an exhibit to the motion to dismiss of

24  last evening, plus several -- ten pages, nearly ten pages, of

13:39:24 25  handwritten notes from the interview with Mr. Scott.

13:39:29 There are substantial discrepancies between the handwritten notes and the reports. And I point out in the motion that when we addressed this issue, this was item number 2 on our matrix of June of 2010. ROI 308. The government 13:39:52 responded it was not Rule 16, they did not have to disclose, and it was not *Brady* and it was not exculpatory.

That is absolutely not the case.

We have had a limited opportunity to go through those handwritten notes, compare them to the reports that we have 13:40:08 been provided. But no matter what report you refer to, there is considerable *Brady* material in those handwritten notes that is not transferred into the reports. And that is important, Judge, because I went back to the September 2, 2010, transcript of our hearing where we talked about those matrix 13:40:29 issues and the government not only stated that it was not Rule 16, the Court -- Ms. Cisneros was addressing that issue at the time. The Court never even made it to the *Brady* issue on that particular item. The government said it's not even a close call. But we have a copy of the report, and would be 13:40:51 happy to show it to you.

I cannot tell from the transcript -- the Court was going rule on the issue afterwards. The Court did invite the government to prepare or present the report to you. We don't know what report you were presented. We don't know if you 13:41:04 even felt it necessary to review the report.

13:41:07   1          I submit that it doesn't matter which report you

2      reviewed because none of the reports we have been provided

3      have the *Brady* material that is contained in these notes.

4          And I would further submit that these reports

13:41:26   5      suppress *Brady* information.  And there is considerable

6      information.  And it mischaracterizes, to the extent of a

7      *Brady* violation, the statements made by this individual.

8          So I filed the motion, I got the response, I got the

9      amended response, and the government didn't want you to

13:41:51  10      consider the contents of that, and in the motion to dismiss

11      we're asking you absolutely to consider it because these

12      matters were purposely withheld and, in all candor, Judge,

13      this is -- last year we went through this, a last-minute

14      disclosure.  A month before trial we find nine boxes of

13:42:13  15      Postal.  The government said this was a mistake, it was

16      inadvertent, we just happened to find them.

17          This is not a mistake.  This is not inadvertent.  And

18      it is an absolute *Brady* violation and it goes far beyond what

19      I have -- the information I had when I filed 1336.

13:42:35  20          So, Judge, I would ask that in conjunction with this

21      you consider the motion to dismiss filed last evening.  We

22      have about 60 pages presented to you.  It shows you exactly

23      what was presented to us on the supposed *Jencks* disclosure

24      date of December 2nd, and then another exhibit of the

13:43:00  25      information we just received yesterday.

13:43:05  1          I only basically guessed in 1336 as to the extent of

       2   the information underlying these reports, and I underestimated

       3   it grossly.

       4          The documents that we received yesterday are –– we

13:43:23  5   spent hours going through and looking at the *Brady* material

       6   that is purposely left out of the reports, mischaracterized in

       7   the reports, and, Judge, we consider this an enormous issue.

       8   This is last-minute disclosure.  It's *Brady* violation.  And I

       9   ask you to please, before –– I don't even know if it's

13:43:50 10   appropriate at this time to rule on 1336.

      11          If the Court can consider the additional motion,

      12   because there is so much more information, and quite frankly,

      13   Judge, had the government not filed 1344 by mistake, we would

      14   have never known about this.  And this is what I find so

13:44:10 15   troubling, that it took a mistake on the part of the

      16   government for us to discover this when for two and a half

      17   years they have been telling you that *Brady's* been satisfied.

      18          I ask you to consider this, Judge, because this is

      19   unfair prejudice.  Absolutely unfair surprise.  And it is an

13:44:35 20   absolute *Brady* violation.  And we've provided you the

      21   information that we have.  I can't imagine how the government

      22   could interpret that as not being *Brady* material.  And we, in

      23   the motion to dismiss filed last night, we've only given you

      24   highlights of what is contained in those.  And I reurge my

13:44:55 25   motion to sever as a result.

13:44:59  1    THE COURT:  Ms. Hull, the motion at 1336 is not based

2    on *Brady*.  It doesn't mention *Brady* at all.

3    MS. HULL:  Correct.

4    THE COURT:  The arguments you make in 1336 are

13:45:10  5    focused on the nondisclosure of Mr. Scott as a witness --

6    MS. HULL:  Yes, sir.

7    THE COURT:  -- and the arguments that you make are

8    that the government had an obligation to disclose him under

9    Local Rule 16.1.  You also argue that -- and as part of the

13:45:29  10   first argument you point out what happened in Judge Snow's

11   case.  You also argue that the use of Mr. Scott at trial would

12   be a *Crawford* and *Bruton* violation, and you argue that the

13   late disclosure has impaired your ability to be ready for

14   trial.

13:45:52  15   It seems to me on the first two of those arguments,

16   16.1 and *Crawford* and *Bruton* this additional material doesn't

17   really bear on that issue.

18   I understand how it could bear on the third, that

19   you've been prejudiced and you need time to prepare.  But it

13:46:11  20   doesn't do anything with respect to the 16.1 or the *Crawford*

21   and *Bruton* arguments, does it?

22   MS. HULL:  I believe it does, Judge.  I believe --

23   and until filing this pleading, I had honestly forgotten about

24   the notice of confessions in this other case with Mr. Boyle

13:46:29  25   that was filed just a couple of weeks before their notice of

13:46:34    1    defendant's statements.  And it -- if the Court recalls, the

2    government -- we repeatedly asked for the statements at trial

3    and the government argued that Local Rule 16.1 does not stand

4    for that proposition.

13:46:49    5         THE COURT:  You're now arguing the point, but -- and

6    you can do that, but I don't understand what the additional

7    material addressed in your *Brady* motion has to do with whether

8    or not the disclosure of Mr. Scott was required by Local Rule

9    16.1.

13:47:02    10         MS. HULL:  The statements -- they contained

11    statements of Dennis Mahon that they intend to use at trial

12    and those are statements that should have been disclosed under

13    Local Rule 16.1.

14         THE COURT:  Well, but that turns on the

13:47:14    15    interpretation of 16.1.

16         MS. HULL:  Yes.

17         THE COURT:  Right?  Okay.  And I understand your

18    argument about that and your argument from Judge Snow's case.

19         I don't understand the basis for you asserting that

13:47:34    20    statements that Mr. Daniel Mahon may have made to a cellmate,

21    Mr. Scott, are testimonial for purposes of *Crawford* or the

22    confrontation clause.  You make that assertion but you don't

23    cite authority, and I don't understand the basis for it.

24         MS. HULL:  Judge, I believe I had -- I believe --

13:47:59    25         THE COURT:  It's at the bottom of page 7.  Lines 22

13:48:02  1    and 23.

2              MS. HULL:  I'm sorry.

3              THE COURT:  I'm referring to 1336.

4              MS. HULL:  I apologize.  I was looking at the

13:48:22  5    wrong -- Your Honor, I believe that it does.  If you'd look at

6    page 7 in the *White versus Illinois* statement.  Accomplice

7    statements, which is what we're dealing with here, that shift

8    or spread blame to a criminal defendant fall outside the realm

9    of regular hearsay exceptions.

13:48:55  10             THE COURT:  But *White* predates *Crawford* --

11             MS. HULL:  Yes, sir.

12             THE COURT:  -- that limited a confrontation clause to

13    testimonial statements.  So after *Crawford*, if the

14    confrontation clause is going to be at issue, it must be a

13:49:08  15   testimonial statement.

16             MS. HULL:  Yes, sir.

17             THE COURT:  I don't understand how Mr. Daniel Mahon's

18    alleged statements to a cellmate can be considered testimonial

19    for purposes of *Crawford*.

13:49:21  20             MS. HULL:  Judge, I have read the *Crawford* articles

21    and *Crawford* authority.  I think that this somewhere -- this

22    falls somewhere in between what *Crawford* court clearly

23    described as testimonial versus nontestimonial.

24             My argument is that it is testimonial in the sense

13:49:40  25   that it is offered against -- at least I thought -- and,

13:49:46  1    again, this is in the framework of what I thought those

2    statements were based on the reports, which I now know are not

3    what he said.  Which is why I -- this rolls into this motion

4    of last evening because --

13:50:02  5        THE COURT:  Well, there's still statements from

6    Daniel Mahon to Mr. Scott as an inmate.

7        MS. HULL:  Yes, sir.

8        THE COURT:  Regardless of the content, it seems to me

9    the question is whether statements from a defendant or

13:50:15 10    codefendant to a fellow inmate are testimonial.  And that's

11    not what I'm understanding is the basis for asserting it.

12    Because *Crawford* makes clear that it has to be a statement

13    that is clearly understood to be testimonial in the sense that

14    it will be used for evidence in a criminal case, such as when

13:50:37 15    you're interrogated by a police officer or when you testify in

16    court.

17        And there's a lot of cases that have said, since

18    *Crawford*, that statements of confidential informants,

19    statements to other people in prison are not testimonial

13:50:52 20    because there is no expectation that those are going to be

21    used in evidence by the person giving the statement.

22        MS. HULL:  But I think in that context, Judge, it's a

23    different fact situation when those statements are being

24    offered under the circumstances of *Bruton* that we have here to

13:51:12 25    incriminate my client when we have *Bruton* issues raised

13:51:17  1    consistently.  So in the sense I understand that it's to a

2    jailhouse snitch, I understand it's not to an officer so it

3    doesn't fall within the clear definition of testimonial of

4    *Crawford*, but I believe under these particular circumstances,

13:51:34  5    especially when we have the *Bruton* issue raised, that it has

6    to be considered testimonial because of the nature of its

7    presentation in these circumstances.

8        THE COURT:  Okay.  All right, did you have other

9    things you wanted to say on 1336?  I understand your point

13:51:54  10   about needing to consider the other motion before complete

11   ruling on that motion is made, and I'll hear from the other

12   lawyers on that.

13       MS. HULL:  I have nothing further.  Thank you.

14       THE COURT:  How about counsel for Dennis Mahon?  Do

13:52:08  15   you have comments, since you joined that motion, you wish to

16   make?

17       MS. WILLIAMS:  We have nothing to add, Your Honor.

18       THE COURT:  Okay.

19       Mr. Morrissey or Mr. Boyle?

13:52:16  20       MR. BOYLE:  First, Judge, you referred several times

21   to the statements of Daniel Mahon, but it was Dennis Mahon's

22   interview.

23       THE COURT:  I'm sorry.  Excuse me, gentlemen.  I know

24   the difference.  I was confused.  You're right.

13:52:28  25       MR. BOYLE:  I'll stick with 1336 first and go

13:52:30    1    wherever you want to go from there.

2              THE COURT:  That's fine.

3              MR. BOYLE:  I think your first two points are clear

4    regarding *Crawford* and *Bruton*.  I think the final point I

13:52:39    5    would answer is point three where you talked about prejudice

6    to the defense, unless you have questions about the first two.

7    My answer to the prejudice to the defense is you set the

8    December 2nd deadline more than a month before trial so that

9    they would have time to prepare.  I mean the *Jencks* rule

13:52:55   10    itself says you get it after the person testifies.  You

11    decided more than a month before trial would give them time to

12    prepare.  So I don't know of a case where the defendant has

13    been given more time before trial than this, more than a month

14    before, in this case, a jailhouse informant is going to

13:53:16   15    testify and the defense gets all the *Jencks* reports.  But

16    nonetheless, having set the date of December 2nd and giving

17    them more than a month to prepare, I don't know how there can

18    be prejudice in this case.

19             THE COURT:  All right.  What is your intent with

13:53:29   20    respect to the motion filed last evening on *Brady* grounds?

21             MR. BOYLE:  My intent is despite the fact Ms. Hull

22    makes all these outrageous claims, she's absolutely wrong at

23    every turn.

24             I'm going to start with the personal allegations that

13:53:47   25    we intentionally withheld this and they would have not

13:53:50  1    discovered it but for our error.  If we were intentionally

2    withholding it, we would not have Bates stamped it and told

3    them we're withholding these pages; we would have not attached

4    it to a motion and told the Court, "listen, they've already

13:54:01  5    received these things."

6             (Ms. Tait entered the courtroom.)

7             MR. BOYLE:  I just respond to that because if

8    counsel's going to tell you we're intentionally, as counsel,

9    withholding things, then we take that very seriously.

13:54:12  10            THE COURT:  I'm going to interrupt you for just a

11    minute, Mr. Boyle.  I want to talk to Ms. Tait about a jury

12    issue we're going to take up in a minute while I've got her

13    available.  If you could just hold on a second.

14            (The Court and Ms. Tait confer.)

13:55:59  15            THE COURT:  All right, you may continue, Mr. Boyle.

16            MR. BOYLE:  Secondly, the defense has known since

17    2010 of Alan Scott.  There's an Exhibit 43, USPS Supp 43,

18    where we held the other pages of the actual report, but we

19    disclosed that Alan Scott gave a proffer in Illinois and

13:56:20  20    e-mails back and forth about his communication.  So as early

21    as last week, I think it was the 8th, Ms. Williams sent me an

22    e-mail saying we'd like these other reports of Felton and

23    Donnelly.

24            So this is all in response to the idea somehow the

13:56:39  25    government was intentionally withholding this.

13:56:42  1        You know, I don't know why counsel gets to throw

2    these allegations out without any substance and personally

3    attack, but I just wanted you to hear that response.

4        Getting to the merits of this, the first I have to

13:56:53  5    say is there is absolutely no basis to this idea that this is

6    a *Brady* violation.  What we have disclosed to them are two

7    reports -- first of all, on the 2nd we gave them ROI 308,

8    which was the report of Alan Scott by Agent Moreland.  That's

9    the report -- I don't know if the Court has the memory, but

13:57:12 10    you saw a while ago that we talked about 2010 --

11        THE COURT:  That's not on my hard drive.  I have

12    absolutely no memory of that.

13        MR. BOYLE:  The defense had asked back then, hey

14    you're withholding 308, and we said that's -- it's in the

13:57:26 15    motion.  It's not a *Brady* statement; it's an oral statement;

16    it's not going to be disclosed by the government.  It's the

17    one I said was not a close call.  And there were two other

18    reports.

19        In the motion, the defense says the reports match but

13:57:43 20    the notes, this is, I think, Ms. Hull's comments to you, that

21    the notes are just different.  She said "the notes, we've gone

22    through them for hours, are different on several levels."

23        What she's absolutely wrong about is the notes have,

24    perhaps, some discrepancies.  None of them say Dennis Mahon

13:58:00 25    didn't do the bombing.  They never say Dennis claimed someone

13:58:04    1    else did it.  There may be points in the notes where he said

2    he constructed the bomb out of materials at the house versus

3    constructing it out of a different substance.  There's nothing

4    *Brady* about the notes whatsoever.  There's some discrepancies

13:58:20    5    that would be used as impeachment.

6         So I would like the chance to put on the record and

7    file a written response so you can rule on this because this

8    is an important motion, but these are just notes of what the

9    reports say, and like any other case, when they have the notes

13:58:37    10   and they have the reports, they get a chance to impeach the

11   witness.  There is absolutely nothing exculpatory.

12        The only question is are there some discrepancies

13   between his admissions to bombing and how he bombed Don Logan.

14   That's it.

13:58:50    15        And you can see that in her *Brady* response.  Again,

16   these are detailed in a report that the notes have some

17   discrepancies.  There's no note that says Dennis Mahon said

18   someone else did the bombing.  There is nothing exculpatory in

19   the notes, and that is, perhaps, the most important point.

13:59:09    20        Finally, when she said this changes everything, it

21   changes nothing.  They have the notes.  They have them a month

22   before trial.  They have the three reports.  They have three

23   witnesses who were there with this individual, along with the

24   notes, and they have more than a month to prepare for trial.

13:59:23    25   So there so no *Brady* violation here.  And we, of course,

13:59:29  1    request permission, and I think we should be permitted, to

2    file a written response.

3            THE COURT:  Let me ask you a question just so I

4    understand your position on this.  I'm not going to rule

13:59:40  5    without giving you a chance to respond, but we need to talk

6    about timing because obviously that's an issue.

7            I read the motion quickly.  I didn't read it with

8    great care, but -- and I haven't looked at any of the

9    exhibits.  When I read it online this morning quickly, I think

13:59:54 10    there was an assertion by Ms. Hull that there are statements

11    in the notes to the effect that Dennis Mahon regretted

12    Daniel's involvement and dragged him in and he really wasn't

13    involved.

14            Am I remembering correctly that that's part of their

14:00:12 15    assertion?

16            MR. BOYLE:  That's what she wrote, yes.

17            THE COURT:  Why is that not *Brady* material for Daniel

18    Mahon?

19            MR. BOYLE:  We have to refer to the notes, but I

14:00:23 20    think she's taking statements out of context, so we'll respond

21    to that.  There are points where we just don't agree -- you

22    asked me if that's what she alleged.  That's what she alleged.

23    We don't think that's what the notes show.  We think he

24    changed the topic from the Logan bombing to the Catoosa

14:00:40 25    discussion.  It wasn't that there was a meeting that Daniel

14:00:46  1    was out and he regretted it.  There were two different

2    discussions, the notes blend, and that's the reason.

3            THE COURT:  Okay.  Well, clearly I can't rule on

4    this, on the *Brady* motion, until I review carefully what

14:01:01  5    Ms. Hull has filed and the exhibits to it and the government's

6    response.

7            And I think because that motion raises the issue of

8    late disclosure of substantial information, I can't rule on

9    the portion of 1336 that says we need more time to prepare.  I

14:01:21 10    think to rule on that I really need to understand what's in

11    all of the disclosure.

12            I do think I can rule on 16.1 and *Crawford* and

13    *Bruton*.  And I want to do it because it's in my mind and I

14    don't want to have to get it back in my mind in two weeks when

14:01:41 15    we're back together again, or whenever we can get back

16    together again.

17            But before we go there, Mr. Boyle, when is it you

18    think you'll be in a position to file your written response to

19    the *Brady* motion?  And I'm not trying to rush you, I'm just

14:02:03 20    trying to understand, because, frankly, after tomorrow, I am

21    out of pocket for ten days to two weeks.  So we can't have a

22    hearing on it next week.

23            MR. BOYLE:  I think this is such a small issue that I

24    think the response will be very short.  So if you're

14:02:24 25    telling -- well, I think you have to wait for the reply from

14:02:29    1    the defense, so I don't think even getting you it by tomorrow

            2    resolves anything, right?  So by that, I would say by next

            3    Friday.

            4              THE COURT:  Give me just a minute to look at my

14:02:38    5    calendar.

            6              Ms. Hull, I'm assuming you're going to want

            7    additional argument after I've had a chance to review all this

            8    carefully and read the government's response?

            9              MS. HULL:  Yes, and I would like an opportunity to

14:03:10   10    reply.  And I would also point out that the government

           11    indicated they gave us all the *Jencks* material.  We have noted

           12    that that is not the case.  We won't address the merits at

           13    this time, but the Court will note a couple of things that

           14    there are still some additional documents that appear to be

14:03:31   15    missing.  One is a Bates stamp USPS Supp 60, which is in their

           16    pleading of 1344, but it is not included this the disclosures.

           17              Also, you will notice at the bottom of the

           18    handwritten notes where the Bates stamp is stamped across the

           19    bottom of the notes, there's at least one line that is

14:03:57   20    significant to Daniel Mahon, and I believe when read in the

           21    entirety of that context, is exculpatory as well, and I have

           22    asked for copies without the Bates stamp so you can read

           23    those.  So I would ask to be able to submit those as well once

           24    we receive those.

14:04:20   25              Do I have anything -- one moment, Your Honor.

14:04:27 1      And I would point out the government just indicated

2    they gave us everything at the *Jencks* disclosure.  They did

3    not.  Again, we received however many pages are included in

4    the disclosures of yesterday.  We are still missing more.  We

14:04:42 5    have asked for the balance of other reports that are

6    referenced in those disclosures.  We also don't have any of

7    the *Giglio* on Mr. Scott.  None of that has been provided.  I

8    just note that for the record.

9         THE COURT:  All right.  I won't do anything with that

14:04:57 10    issue.  Obviously, there's no motion on that issue that's been

11    made.  That is, on whether *Jencks* disclosures are complete.

12    If you wish to raise it again, you can do so.  Sounds like

13    you've been communicating about what you think is missing?

14         MS. HULL:  Yes, sir.

14:05:13 15         THE COURT:  Okay.

16         I think what we're going to have to do is have a

17    hearing on the *Brady* issue on January 3rd, which is a Tuesday,

18    in the afternoon.  That would allow -- if you get your

19    response in, Mr. Boyle, by Friday, that would allow you until,

14:05:36 20    say, Friday the 30th to file a reply.

21         Does that work for you, Ms. Hull?  I hate to have you

22    do it during that week, but --

23         MS. HULL:  I'm going to be working on this anyway,

24    Judge.  That's fine.

14:05:48 25         THE COURT:  Okay.  Let's plan, then, at 2 o'clock --

14:05:51  1    wait a minute.  Yeah, that works.  We've got a morning

2    hearing.  2 o'clock January 3rd to have a hearing on that

3    motion.

4         Coming back to 1336, I do want to, while it's fresh

14:06:04  5    in my mind, rule on the other portions that I think are not

6    affected by the *Brady* issues.  The first argument in 1336 is

7    that the government was required to disclose oral statements

8    Dennis Mahon allegedly made to Mr. Scott under Local Rule

9    16.1.

14:06:31 10         My view is and has been that Local Rule 16.1 does not

11   expand the disclosure obligations of Federal Rule of Criminal

12   Procedure 16.  And I base that on the first few words of 16.1

13   which say "Consistent with Rule 16(a)(1) there shall be a

14   disclosure."

14:06:52 15         That tells me that Local Rule 16.1 is intended to be

16   consistent with Federal Rule 16.  And therefore, I don't view

17   it as expanding the government's disclosure obligations.

18         It is clear, I believe, that Federal Rule 16 does not

19   require the government to disclose to the defense oral

14:07:15 20   statements a defendant made to a government witness.

21         Rule 16(a)(1)(A) provides that the government must

22   disclose any relevant oral statement a defendant made to a

23   government agent if the defendant made the statement in

24   response to interrogation by a person the defendant knew was a

14:07:39 25   government agent and the government intends to use the

14:07:43  1    statement at trial.

2            The Ninth Circuit has stated in *United States versus*

3    *Hoffman,* which is at 794 F.2d 1429, specifically page 1432,

4    that the government need not disclose any voluntary oral

14:08:03  5    statements made by the defendant, nor is disclosure required

6    unless the defendant knew he was talking to a government agent

7    when the statement was made.

8            Thus, statements voluntarily made to an undercover

9    agent or to another person who is an inmate are not covered by

14:08:22  10    Rule 16(a)(1)(A).

11            In addition to the *Hoffman* case, *United States versus*

12    *Rinn,* R-I-N-N, 586 F.2d 113 and specifically page 120, which

13    is another Ninth Circuit case, stands for the same

14    proposition.

14:08:42  15            Nor do I believe that oral statements a defendant

16    makes to a government witness are subject to disclosure under

17    Rule 16(a)(1)(B).  16(a)(1)(B) addresses written or recorded

18    statements by a defendant.  Subpart 1 of this rule requires

19    disclosure of any written or recorded statement made by the

14:09:11  20    defendant that is within the government's possession, custody,

21    or control.  It includes the kinds of statements that were

22    recorded when they were made to the informant in this case.

23    Clearly recorded statements, clearly subject to this rule.

24    Unwritten and unrecorded conversations between the defendant

14:09:33  25    and a confidential informant don't have to be disclosed under

14:09:37    1    this rule.

2        Subpart 2 of 16(a)(1)(B) is similar to 16(a)(1)(A).

3    It requires the government to disclose the portion of any

4    written record containing the substance of any relevant oral

14:09:55    5    statement if the defendant made the statement in response to

6    interrogation by a person the defendant knew was a government

7    agent.

8        Clearly that is not the case with statements to a

9    cellmate.  And therefore 16(a)(1)(B)(ii) does not require the

14:10:14   10    disclosure of the information.

11        Finally, a defendant's oral statement that is

12    contained in a statement made by a government witness need not

13    be disclosed separately pursuant to Rule 16.  Instead, it must

14    be disclosed in accordance with the *Jencks* Act and that's

14:10:49   15    *Hoffman*, which I've already cited, plus *United States versus*

16    *Walk,* W-A-L-K, which is at 533 F.2d 418 through 420.

17        So statements that Mr. Scott may have made to an

18    agent, such as to Agent Moreland, that then get put into a

19    report do not have to be disclosed under Rule 16 because they

14:11:15   20    report on statements that were made by Mr. Mahon to Mr. Scott.

21    They're covered by *Jencks* and *Jencks* specifically trumps

22    Rule 16 and says that Rule 16 disclosure is not required for

23    material covered by *Jencks*.

24        So my conclusion is that the kinds of statements that

14:11:33   25    Mr. Scott will report that Dennis Mahon made to him simply are

14:11:38 1  not covered by federal Rule 16 and therefore are not covered

2  by Local Rule 16.1.

3      The argument that the result of that thinking should

4  change because the government voluntarily disclosed

14:11:53 5  information in a case before Judge Snow to me is not

6  persuasive.

7      The cases that are cited in the motion, the *Thompson*

8  case and *Shaw* case, are cases where the government changed its

9  theory of the case with respect to two defendants.  In one

14:12:10 10  trial they alleged the murder happened in a particular way and

11  then when they tried the accomplice in a second trial, they

12  completely changed their version of how the murder happened,

13  and the court said the government can't do that.  It can't use

14  two different factual assertions knowing one of them is false.

14:12:28 15  It was essentially the same situation in Shaw.

16      I don't think this is at all comparable.  The fact

17  that the government made a Rule 16.1 disclosure in a case

18  before Judge Snow that contained the kinds of statements that

19  allegedly were made by Mr. Scott in this case is not a change

14:12:53 20  of legal theory in the case.  It's not adopting contradictory

21  assertions of fact as to how a crime occurred.  And I don't

22  think there can be any argument the defense in this case

23  somehow relied to its detriment on the fact that the

24  prosecution in a different case had made a 16.1 disclosure

14:13:11 25  different from what they've made in this case.

14:13:13  1        So I don't think those inconsistent government

2    conduct cases compel a different result than my interpretation

3    of Rule 16 and Local Rule 16.1.

4        The other argument that I think I can rule on today

14:13:29  5    is the assertion that Mr. Scott's testimony will create a

6    *Crawford* or *Bruton* problem.

7        In a fairly recent case out of the Tenth Circuit,

8    *United States versus Smalls, S-M-A-L-L-S,* it's at 605 F.3d

9    page 765, and specifically page 778.  It is a 2010 decision

14:14:06 10    from the Tenth Circuit.

11        The Tenth Circuit held that statements made

12    unwittingly to a government informant or statements from one

13    prisoner to another are clearly nontestimonial.  And that was

14    a case of statements made to a cellmate, and the question was,

14:14:23 15    are those testimonial?

16        In *Smalls* the Tenth Circuit noted that the Supreme

17    Court in *United States versus Davis* characterized such

18    statements as clearly nontestimonial.

19        Smalls also cited cases from the Second Circuit, the

14:14:46 20    Seventh Circuit, the Fourth Circuit, the Eleventh Circuit, and

21    the Third Circuit, all holding that statements made to a

22    confidential informant or cellmate are not testimonial for

23    purposes of the confrontation clause.

24        If the statements are not testimonial for the purpose

14:15:07 25    of the confrontation clause, then there is no *Crawford*

14:15:11  1    problem.

2        And as I indicated in the order that I entered at

3    Docket 1300, if the statements are not testimonial for

4    purposes of the confrontation clause, then there is no *Bruton*

14:15:21  5    problem either because *Bruton* was based on the confrontation

6    clause.

7        The case that is relied upon by the defendants

8    primarily is the *Lilly* case.  And *Lilly* was a pre-*Crawford*

9    case.  *Lilly* applied *Ohio versus Roberts*, which was overruled

14:15:40  10    by *Crawford*.  In fact, the Tenth Circuit in the *Smalls* case

11    said *Lilly* is a dead letter.

12        So I think, given the state of the law today, it

13    cannot be argued that the testimony of Mr. Scott will present

14    a *Crawford* or *Bruton* problem at trial.

14:15:59  15        So that's my ruling on those portions of the motion.

16        The rest of the motion argues that it's a late

17    disclosure, that either I should prevent Mr. Scott from

18    testifying because of the late disclosure or I should postpone

19    the trial to allow additional time for the defense to prepare.

14:16:16  20    I think I need to understand the full scope of the disclosure

21    before I rule on that.  So that's the issue that we'll address

22    after it's been more fully briefed.

23        The next motion that I wanted to talk about is the

24    motion to sever.  I was prepared to rule on that.  I ruled

14:16:39  25    twice before on it, and it's based entirely -- well, let me

14:16:44  1    state this.  I'm going to deny this motion without prejudice

2    to you making the argument again on the 3rd if you want to,

3    Ms. Hull.  But I'm going to deny this motion at Docket 1335

4    because it is based entirely on a violation of confrontation

14:17:00  5    clause rights under *Crawford* and *Bruton*.  And is I've just

6    indicated, the Scott testimony won't present a confrontation

7    clause problem.  And the other arguments I addressed

8    previously in Docket 574 with respect to severance.  So I'm

9    going to deny that motion since it's based on the

14:17:19 10    confrontation clause.

11         Now, if you want to argue it on the 3rd that this

12    additional disclosure somehow warrants severance, I'm not

13    going to preclude you from doing that, Ms. Hull.

14         MS. HULL:  Thank you, sir.

14:17:31 15         THE COURT:  The last motion I want to talk about,

16    which is Docket 1339, is the government's motion in limine

17    regarding some specific defense trial exhibits, and I want to

18    talk about each of the exhibits for a moment.

19         With respect to the first category of exhibits, it

14:17:52 20    is -- it is the document showing Daniel Mahon's resignation

21    from Alaska Airlines, and the government's basis for asking me

22    to preclude it is relevancy.

23         The defense responds that it is directly relevant in

24    light of assertions the government has made that Daniel Mahon

14:18:18 25    unexpectedly left the Phoenix area on March 4th, 2004, two

14:18:26  1    weeks after the Scottsdale bombing, and the defense point is

2    this document shows that that didn't happen; he didn't resign

3    until April and therefore it rebuts that assertion of a hasty

4    departure after the bombing.

14:18:44  5           In light of that, Mr. Boyle, what is the basis for

6    arguing the document is not relevant?

7           MR. BOYLE:  We're not advancing that in trial.  We

8    don't intend to show or even discuss the topic that they

9    hastily left Arizona.  That was in a wiretap affidavit.  So if

14:19:00  10   they want to bring up areas and go down those roads, then I

11   would say -- well, the employee action form might be relevant

12   at that point, so you should defer ruling.

13          I'll just note that if they start going into areas

14   we're not introducing in trial just because it's in an

14:19:20  15   affidavit somewhere, we'll just see where that goes.  I don't

16   know how far down the road we can go on things that aren't

17   relevant necessarily to the trial just to bring up issues that

18   are in the affidavit.

19          But as to the action form, we will withdraw that for

14:19:38  20   now, and I just don't know how this is going to work out in

21   trial, but we'll have to wait.

22          Regarding the records however of his employment --

23          THE COURT:  Let me address that for a minute before

24   you talk about it.

14:19:57  25          With respect to the first issue, then, I'm going to

14:20:00  1    deny the motion in limine on the employee action form.

2    Obviously the denial of a motion in limine doesn't mean an

3    objection cannot be made at trial on either side on these

4    points.

14:20:11  5         The second category was the time sheets.  The

6    government objected to time sheets showing Daniel Mahon's work

7    from August of 2003 to April of 2004.  And in the response

8    that was filed, Ms. Hull, you focused in on February 20th and

9    21st to argue the time sheets are relevant to whether or not

14:20:41  10   the defendant could have delivered the bomb, but you didn't

11   address the relevancy of time sheets going back to August of

12   2003 or forward into April of 2004.  You just focused on that

13   day.

14        MS. HULL:  Judge, I think I also addressed the fact

14:20:58  15   the overt act, first overt act, is from September of 2003, so

16   that timeframe -- if I can --

17        THE COURT:  I don't remember that.  But that's okay,

18   you can make the argument now.

19        MS. HULL:  I'm sorry?

14:21:14  20       THE COURT:  I don't remember you saying anything

21   about that overt act in your response, but if you want to make

22   the argument now, I'm happy to hear what you wish to say about

23   it.  I'm looking at 1343, which was your response.

24        MS. HULL:  Thank you.  Judge, I apologize.  No, I

14:21:53  25   have that in front -- in the very first line, Judge, you'll

14:21:56  1    see number 2 on page 2 of 1343 I informed -- stated the

2    government has indicted Daniel Mahon in a conspiracy alleging

3    that beginning in September of 2003 he was part of that.

4         THE COURT:  You do, but you never explained why the

14:22:12  5    time sheets are relevant to the alleged beginning of the

6    conspiracy.  That's what I'm not understanding.  How are the

7    time records relevant to that?

8         MS. HULL:  Well, Judge, because of the allegations

9    of, for one, the call being made from my client's phone, and

14:22:33 10    I'd have to look at the records again, but my client was

11    either working or likely sleeping at the time.  And then

12    through April when he left, it demonstrates what he was doing.

13         I mean, the government has alleged very specifically,

14    and I believe the indictment must be read against them, and

14:22:59 15    they're against them in the sense that they have made specific

16    allegations and it's part of my client's right to defend those

17    allegations.  These records show not only his specific conduct

18    during the week of February of 2004, but these records and,

19    again, we're not talking character because he worked for

14:23:19 20    Alaska Airline for years, we're just going from the beginning

21    of the indictment to his resignation in April 2004.  We're not

22    talking about character for work.  We're talking about what my

23    client was doing during a very finite timeframe that they put

24    in the indictment.

14:23:39 25         THE COURT:  All right.  I understand.

14:23:41  1          MS. HULL:  Okay.  Thank you.

2          THE COURT:  Mr. Boyle.

3          MR. BOYLE:  What he was doing from September to

4   January has no relevance.  Just to say that shows what he was

14:23:51  5   doing doesn't actually tend to prove any fact at issue.

6          The only time they note is that the phone calls

7   started September 26th, but it's undisputed Dennis Mahon made

8   that call because he says "This is Dennis Mahon of the White

9   Aryan Resistence."  There is just no fact that is proved more

14:24:08  10   or less by September to January.  So all it tends to show is

11   what he was doing was working, and that's character.  So we

12   concede that February is relevant.  March and April are not.

13   September to January are not.

14          THE COURT:  Okay.  I understand the government's

14:24:23  15   argument.

16          For me to grant motion in limine on relevancy grounds

17   before trial, I have to be able to conclude before trial that

18   there are no circumstances during the trial under which the

19   evidence would be relevant.  I cannot make that conclusion

14:24:36  20   with respect to these time sheets.  I frankly don't know if

21   they'll be relevant or not.  It really depends how the

22   evidence is coming out.

23          If the government thinks it is irrelevant at a point

24   when it's going to be used, the government can object and I'll

14:24:48  25   rule on it at that point.  But I can't say today that the

14:24:51  1    activities of Daniel Mahon during the period of the conspiracy

2    are clearly not relevant.

3         The third issue concerns Mr. Mahon's Alaska Airlines

4    uniform.  The response -- the argument from the government is

14:25:10  5    it's not relevant.  The response from the defense is that's

6    what he was wearing during the time when the bomb was

7    allegedly delivered, and that's relevant to whether anybody

8    saw a person in that kind of a uniform delivering the bomb.

9         That seems to me to clear or potentially clear the

14:25:30  10   minimum level of relevancy.

11        Mr. Boyle, can you explain to me why you don't think

12   that's so.

13        MR. BOYLE:  I'll link that with number one again.

14   This becomes relevant only because of a footnote where Special

14:25:41  15   Agent Moreland said in his opinion he believed Daniel

16   delivered the bomb.  We're not introducing that at trial.  I

17   think you're going to see a number of these side issues that

18   the defense may want to go into.  Frankly, we may have

19   hundreds of these, I don't know.

14:25:59  20        But whether Agent Moreland thinks Daniel Mahon

21   delivered the bomb isn't relevant in this case.  But as we

22   stand now, if your criteria is could it be relevant, I think

23   you have to deny our motion at this point and we'll see what

24   the defense goes into.  But I'll tell and you and I'll tell

14:26:15  25   the defense right now we're not intending to introduce

14:26:17  1    evidence that Daniel Mahon delivered the bomb.

2             THE COURT:  All right.  I'm going to deny the motion

3    with respect to issue number 3.

4             Number 4 concerns Daniel Mahon's security clearance.

14:26:51  5    The response says it's an untimely motion in limine.

6             MS. HULL:  I can add to that, Judge.

7             THE COURT:  All right.  Please.

8             MS. HULL:  We -- and it is and I stand by that.  But

9    we don't have anything -- as the Court knows, they filed a

14:27:08 10    motion to quash the TSA subpoena.  We got nothing from TSA, so

11    there are no TSA documents.  So I'm not sure what the motion

12    is talking about as far as his status as to whether or not

13    that can even be mentioned.  I don't know if the Court can

14    determine that either without trial.  Without what it is the

14:27:30 15    government's going to allege.

16             I know that -- and I think I brought it to the

17    Court's attention that the agent indicated early on in the

18    case that he saw to it that Mr. Daniel Mahon was fired from

19    Alaska Airlines.  And we have tried to subpoena TSA records to

14:27:49 20    that effect.  We got no records.  But at this point we don't

21    intend to go into that at trial.  But if -- I say that only

22    unless it becomes -- the government makes it relevant.

23             THE COURT:  All right.  Well, it seems to me the

24    security clearance probably is more in the nature of character

14:28:07 25    evidence than the other things we've been talking about, so

14:28:11  1    I'm going to grant the motion without prejudice to your

2    raising it, Ms. Hull, if you think it becomes relevant.  And

3    if you think it does, I'll be happy to consider it at the time

4    it becomes relevant during the trial.

14:28:24  5          MS. HULL:  Thank you, sir.

6          THE COURT:  The last area of the motion in limine is

7    Mr. Anderson's 2001 civil suit against the City of Scottsdale.

8    The government moves to preclude exhibits that apparently are

9    documents from that lawsuit.  The government -- pardon me, the

14:28:52  10   defense responds that the lawsuit shows motive on the part of

11   somebody who is a suspect in the bombing and therefore is

12   relevant to the defense argument that somebody else other than

13   the Mahons had a motive to commit the bombing.

14         What is your response to that, Mr. Boyle?

14:29:16  15         MR. BOYLE:  Well, number one, I have to tell you I

16   don't know that I have all the defense exhibits, so I don't

17   know if you need that answer first for me to answer your

18   question, because they still are trying to obtain documents.

19   I think there's still one outstanding that we haven't been

14:29:31  20   given.  I don't know if that's wrong, but they disclosed the

21   fact they want to get another document to give to us.

22         We got the complaint of the Anderson case I think it

23   was yesterday or the day before yesterday from the defense.

24         THE COURT:  I had understood your motion not to be

14:29:44  25   focused on nondisclosure of documents but on the relevancy of

14:29:49  1    the Anderson lawsuit.  Am I wrong about that?

2         MR. BOYLE:  I said at line 10, page 3, that I wanted

3    an extension on this deadline because although I could note it

4    for the Courts review, I can't actually brief it for you

14:30:01  5    because I didn't have the defense exhibits so I couldn't bring

6    this to you with the exhibits that the defense intends to use.

7         Having just been given those, I would ask we just

8    defer this to January 3rd when we come back at 2 p.m. because

9    by then I will have the exhibits and I can tell you what the

14:30:18 10    issue is.

11        In response to your general question, Don Logan is

12    not a defendant in that civil lawsuit.  So the fact that Steve

13    Anderson sued other people at the City of Scottsdale and they

14    want to introduce a complaint by him -- but I have to give you

14:30:34 15    the complaint.  You have to take a look at it.  It's so far

16    afield of what we're actually talking about in this case it

17    will be 403.  That's my problem.

18        They have pleadings from the lawyers, they have

19    orders from the court awarding fees to the City of Scottsdale.

14:30:48 20    You have an entire civil suit.

21        And they're not even calling Steve Anderson as a

22    witness.  So my concern is 403.  That we'll spend three or

23    four days on the civil suit that will have nothing to do with

24    this case, along with a myriad of other objections.

14:31:03 25        So I'm going to ask that we be allowed to brief it

14:31:05    1    and give it to you by the 3rd because we didn't have the

2    objection -- we didn't have the defense exhibits when they

3    were supposed to give it to us.

4            THE COURT:  I don't think there's a need to brief it.

14:31:14    5    I think I understand the issue.  I think what we ought to

6    do -- I'll be happy to address this on the 3rd, but I don't

7    think we need a new motion or new briefing.  If, having looked

8    at whatever else you get, you think there's specific issues of

9    relevancy or 403, then let's talk about them then.  So I'll

14:31:30   10    hold off on ruling on that issue until we get to January 3rd.

11            MS. HULL:  Judge, may I address this?

12            THE COURT:  Yes.

13            MS. HULL:  Because this is -- and this is why I

14    pointed out in my response that it is the wording of the

14:31:48   15    government's motion.  As I put on my page 4, number 5, they

16    put this catch-all "and discussion of."

17            My client has an absolute right to this theory of,

18    you know, to establish that others had motive, and that, I

19    don't believe, is something that needs to be withheld until --

14:32:21   20    I think the Court -- I think it's clear what the resolution of

21    this issue is.  They cannot preclude this.  It's absolutely

22    relevant.

23            Now, as far as specific exhibits, I can see that they

24    would want to delay addressing that.  We did -- I will tell

14:32:41   25    the Court that the information on this came in the Postal --

14:32:46  1  came from the government, and some of the documents we

2  presented came from the government and Postal disclosures of

3  last year because Postal inspectors investigated Steven

4  Anderson at length and some of those pleadings that we

14:33:01  5  disclosed were in -- came from the government.

6         So -- and we have been talking -- we've talked about

7  this before.  So I would ask the Court that this is -- to not

8  postpone this issue, that the issue of discussion of needs to

9  be resolved in favor of the defense.

14:33:25  10        This is not a motion in limine to preclude.  If they

11  have specific objections to specific exhibits, when we get to

12  that point, the Court can rule at that time.  I would ask this

13  issue be resolved at this time as far as discussion of.

14  Because I see them as two totally different issues.

14:33:43  15        THE COURT:  Mr. Boyle, are you arguing that the

16  defendants should be precluded from making any mention of the

17  Anderson lawsuit?

18        MR. BOYLE:  Yes, on two grounds.  The first is I

19  don't see how this is even going to be introduced into trial.

14:34:04  20  For example, all these pleadings are hearsay.  They can

21  certify them under 901, but what a lawyer alleges in a civil

22  lawsuit is -- it's just hearsay.

23        But the second thing is the reason we're asking you

24  to take a look at this is -- or at a minimum just ask that --

14:34:21  25  because this is potentially a very large issue that could be

14:34:25  1    very distracting, that the defense -- that you at least review

2    it, review our updated motions, and not allow them to discuss

3    it in opening statement until we've had a chance -- until

4    you've had a chance to hear more evidence or see how it folds

14:34:39  5    into the case.  I mean, we're very limited on the things we're

6    trying to preclude.

7            Our concern is if all sorts of pieces of information

8    about this lawsuit are mentioned in the opening statement by

9    the defense, the jurors will have heard information that may

14:34:56 10    never come in through any evidence.  So I think you need to

11    see at least some of the items they intend to introduce and

12    then frame what it is the defense can do either at opening or

13    in their case.

14            THE COURT:  Well, okay.  I understand the parties'

14:35:14 15    positions.

16            With respect to this issue, I'm in the same position

17    as I am on the time sheets.  I can't conclude today that there

18    are no circumstances during the trial where the Anderson

19    lawsuit might be relevant.

14:35:30 20            Now, I'll understand the issue probably more fully on

21    January 3rd if there's specific exhibits you want to talk

22    about, but today I do not think I can say it's clear that it

23    will never be relevant during trial.  So I can't grant the

24    motion in limine in that respect.

14:35:47 25            My intent in the trial is to keep both sides of the

14:35:51  1    case focused on the issues at trial and not to run down rabbit

       2    trails, and Rule 403, I think, addresses that concern.

       3         But I certainly can't make a decision at this point

       4    that the Anderson lawsuit would -- mention of it would

14:36:07  5    necessarily be a rabbit trail.  So I think we do need to talk

       6    about it in the context of more documents.

       7         And I understand your position, Ms. Hull, that you

       8    should be able to mention it even if specific documents don't

       9    come in.  I think I need to address that issue when I

14:36:23 10    understand the documents more fully.

      11         So I will reserve that issue for January 3rd.

      12         I think that resolves all the motions that are

      13    pending other than the *Brady* motion we'll be talking about on

      14    the 3rd.  Does anybody disagree with that?

14:36:42 15         MR. BOYLE:  No, Your Honor.

      16         MS. WILLIAMS:  No, Your Honor.

      17         MS. HULL:  No, sir.

      18         THE COURT:  Okay.

      19         MR. BOYLE:  Your Honor, I need to retract one

14:37:04 20    statement just to make it clear because I don't want to feel

      21    like I got bound by the law of the case when making a

      22    statement.  When we were talking about a footnote and Agent

      23    Moreland forming an opinion that Daniel Mahon delivered the

      24    bomb, I then said we won't be introducing evidence, any

14:37:20 25    evidence that Daniel Mahon may have delivered the bomb.

14:37:22  1    That's not -- I want to retract that statement.  There may be

2    a piece of evidence that implicates Daniel Mahon in delivering

3    the bomb.

4         So because we're all here, I want to make it clear I

14:37:32  5    need to retract that statement because there is one exhibit we

6    had marked and given to the defense that may show knowledge by

7    Daniel Mahon that he had awareness of the delivery of the

8    bomb.

9         THE COURT:  All right.  Well, that's -- you can

14:37:44  10   retract that statement.  That's fine.

11        Counsel, there's another motion that I had not seen

12   that Traci called to my attention, which is at 1327.  It is a

13   motion signed by you, Ms. Williams, titled Amended Joint

14   Motion for Leave to Supplement Witness and Exhibit List.  It's

14:38:26  15   about a page-and-a-half motion, and I can't quite tell what it

16   is you're asking.

17        MS. WILLIAMS:  Your Honor, this -- and thank you, I

18   had also forgotten about this motion.  This motion was in

19   reference to Alan Scott and what we believed at the time was

14:38:42  20   yet another undisclosed witness to come.

21        The government has advised us that it will not be

22   using that undisclosed -- still undisclosed witness with

23   possibility still open of using said person in rebuttal.  So

24   we still have no idea who that person is.

14:39:00  25        But as to Alan Scott, because of having just gotten

14:39:05  1    the *Jencks* material, with more hopefully to come, at the same

2    time we were compiling our witness and exhibit lists and

3    putting everything together, we were also trying to read and

4    digest what we were getting on Alan Scott, and we could not do

14:39:25  5    both at the same time.  We couldn't get Alan Scott researched,

6    investigated, pull -- and pull a whole new set of exhibits and

7    potentially witnesses on the issue, specific issue, of Alan

8    Scott, and that's why I decided to just file a motion.

9          We have identified at least one witness that we would

14:39:48 10    like to call with respect to Alan Scott.  That's based on

11    what's been disclosed to us so far.

12          THE COURT:  Well, it seems to me, Ms. Williams, that

13    your ability to supplement the witness and exhibit list will

14    depend on the good cause for adding a particular witness or

14:40:03 15    exhibit and I'll just have to address that when you come

16    forward with it.  So I don't think I can grant the motion.

17          I understand you've called it to our attention.  It

18    seems to me as soon as you find additional witnesses or

19    exhibits that you think are warranted by the Alan Scott

14:40:18 20    disclosure, you ought to raise it with the government and

21    raise it with me.

22          MS. WILLIAMS:  And, actually, I can give one name

23    right now.  I forget the first name but the last name is

24    Felton.  He is a law enforcement agent who was involved in

14:40:34 25    interviewing Alan Scott.  Postal agent.

14:40:40  1          THE COURT:  Well, what I think we need to do is

2      rather than do it orally on the record, Ms. Williams, is there

3      needs to be a written document filed in the docket, but also

4      we need to make sure that the witness list that we're going to

14:40:55  5      use during voir dire is an updated joint list.

6          MS. WILLIAMS:  Right.

7          THE COURT:  Communicate with the prosecution.  If

8      there is a problem with a witness or exhibit I'll be happy to

9      hear.  But it seems to me ruling on it right now is a bit

14:41:09  10     premature.

11         MS. WILLIAMS:  That's fine.

12         MR. MORRISSEY:  Your Honor, with respect to

13     Ms. Williams referred to the other witness that I had filed a

14     motion asking for additional time on this with this Court.

14:41:23  15     The Court ruled upon that motion.

16         I did want to make the record that prior to this date

17     I had informed the defense that at least for the government's

18     case in chief, the government will not be calling that witness

19     and that therefore that issue is no longer active.

14:41:39  20         THE COURT:  All right.  That's fine.

21         By the way, there was, in one of the defense filings

22     in the last two or weeks, and I can't remember if it was in

23     relation to this issue or another, but the defense speculated

24     that there may have been an ex parte hearing with the Court on

14:42:01  25     some issue.  There was no such hearing.

14:42:05  1          MS. WILLIAMS:  And I'm just guessing, too, Judge, but

       2     I'm thinking it was a reference to this undisclosed-witness

       3     issue.

       4          THE COURT:  Yeah.  There was no ex parte hearing.

14:42:15  5          The government did file a motion ex parte saying they

       6     had concerns about the safety of the witness and asking for

       7     some time to disclose it, I think, until December 14th, and I

       8     said fine.  And now you've indicated you're not calling them

       9     during your case in chief.

14:42:37 10          MR. MORRISSEY:  That's accurate.  First there was a

      11     sealed motion that the defense saw, then there was a second

      12     motion that was ex parte.

      13          THE COURT:  And we did not have a hearing on that.  I

      14     just read it and said you can take until the 14th and if

14:42:50 15     you're going to disclose him, disclose him.

      16          All right, let's talk about jury issues.

      17          On Monday I filed an order identifying from the

      18     questionnaires the jurors that I think should be excused for

      19     hardship.  Does the government object to any of those being

14:43:23 20     excused?

      21          MR. MORRISSEY:  No, Your Honor.

      22          THE COURT:  How about counsel for Dennis Mahon?

      23          MS. WILLIAMS:  Your Honor, there was only one person

      24     with whom I took issue, and that was Juror Number 176.

14:43:40 25          THE COURT:  Let me grab that questionnaire.

14:43:59   1           Go ahead, Ms. Williams.

       2           MS. WILLIAMS:  Your Honor, that person had -- and I

       3   think I understand why the Court excused this witness.  Excuse

       4   me, potential juror.  That person indicated that they had a

14:44:16   5   quote, unquote, brother who had been in prison and they

       6   thought the brother -- foster brother, I believe -- had joined

       7   WAR or what they thought was WAR.  The person talked about

       8   their own beliefs, but also identified that they had had brain

       9   surgery and memory issues.  So, honestly, I've gone back and

14:44:40  10   forth on this juror.

      11           THE COURT:  Yeah.  At the top of page 20 of that

      12   questionnaire he said he had brain -- well, he or she said

      13   they had brain surgery and can only hold so much info for a

      14   small amount of time.  It seemed to me if that's true, and I

14:45:01  15   think we need to assume it's true, assimilating the evidence

      16   over the course of a two-month trial could be a real problem.

      17           MS. WILLIAMS:  Right.  And like I said, I went back

      18   and forth on that juror.  So if the Court wants to excuse that

      19   juror, I'm okay with that.

14:45:18  20           THE COURT:  Okay.

      21           MS. WILLIAMS:  That is the only person.  There were a

      22   few the Court did not excuse that I'd like to talk about, but

      23   as far as the people listed in the Court's order, I have no

      24   issues.

14:45:29  25           THE COURT:  All right.

14:45:29    1        Ms. Hull?

2        MS. HULL:  I have nothing to add, sir.  Thank you.

3        THE COURT:  Okay.  Let me mention that since I sent

4    the order out on Monday, we have received two more jury

14:45:47    5    questionnaires.  One is Juror Number 384, who indicated that

6    to be without two months of salary would be a personal

7    financial hardship as the juror is single and supports

8    herself.  And my conclusion was that we ought to excuse that

9    juror for that reason.

14:46:10   10        The other was Juror 461, which is a juror who also

11    said it would be a hardship, indicating that the juror is a

12    teacher.  The school will not -- the teacher apparently works

13    at a private preparatory academy and the school will not pay

14    salary for two months.  The teacher would find it a hardship

14:46:33   15    in the classroom and the teacher has five children at home

16    including one being treated with mental health issues that is

17    putting a strain on the budget and the family, and I thought

18    we ought to excuse that juror as well.

19        Any objection to those two?

14:46:52   20        MS. WILLIAMS:  No, Your Honor, not on behalf of

21    Dennis Mahon.

22        MR. MORRISSEY:  No, Your Honor.

23        MS. HULL:  No, sir.

24        THE COURT:  All right.  So all of the jurors listed

14:46:59   25    in my order will be excused for hardship, as well as Jurors

384 and 461.

Now, as I had indicated when we adopted the questionnaire approach, I would give you a chance at this hearing to argue challenges for cause that you think are based -- or can be granted strictly on the basis of the questionnaire.  That doesn't foreclose you from making such challenges when we're doing jury selection, but it may trim down the list a bit further if there's some clear examples.

Are there any such challenges for cause from the government?

MR. MORRISSEY:  Yes, Your Honor.

THE COURT:  Okay, why don't you give us -- let's go through them one at a time.

MR. MORRISSEY:  All right.  Your Honor, Juror Number 28.  Question 20.  The juror indicates "Due to ten years of working in a prosecutor's office, I have strong feelings that defendants are guilty."

Question Number 24, the juror states that the legal system favors defendants and answered yes that this could make it difficult for that juror to fairly and impartially decide the facts.

And Question 59, the juror refers to a medical condition, colitis, that would require taking frequent breaks.

I should note Question 20 is also supplemented on the extra page and goes into greater depth about the juror's,

14:48:34   1    frankly, bias regarding inability to judge fairly.

           2           THE COURT:  Is there any objection to that challenge

           3    for cause from defense counsel?

           4           MS. WILLIAMS:  No, Your Honor.

14:48:48   5           MS. HULL:  Can I ask the number again, please, Judge.

           6           THE COURT:  28.

           7           MS. HULL:  Thank you.  No objection.

           8           THE COURT:  All right, I'll grant the challenge for

           9    cause to Juror 28.

14:48:56  10           MR. MORRISSEY:  May I continue?

          11           THE COURT:  Yes.

          12           MR. MORRISSEY:  Juror Number 58 at Question 20 stated

          13    the juror does not trust the government and is not impressed

          14    with the criminal justice system.

14:49:10  15           This answer was also in the context of stating that,

          16    yes, he had strong feelings that would prevent him from giving

          17    either the government or the defendants a fair trial.  I don't

          18    know as to which side he -- well, he says "I don't trust the

          19    government completely," but then he's not -- the juror's not

14:49:29  20    impressed with the criminal justice system in general.  I

          21    think this cuts against potential fairness for both sides.

          22           THE COURT:  Defense response?

          23           MS. WILLIAMS:  May I ask what question that was.

          24           MR. MORRISSEY:  Yes.  That was Question 20 of Juror

14:49:51  25    58.

14:50:25  1          THE COURT:  Ms. Williams?

       2          MS. WILLIAMS:  Your Honor, as I look at this juror at

       3   Question 20, it's not clear to me.  Yes, the person does say

       4   he or she is not impressed by our criminal justice system and

14:50:43  5   doesn't trust the government completely, but I think that's a

       6   pretty common state -- pretty common statement these days.

       7   And I don't think it's absolutely clear that this person means

       8   to say or didn't mean to say -- when they say "I don't trust

       9   government completely," it's not clear whether they're saying

14:51:07 10   "I don't trust prosecutors" or "I don't trust the government

      11   overall," more as a political statement.

      12          THE COURT:  My conclusion is we need follow-up

      13   questions to this juror because I do think it is a bit

      14   ambiguous.  So I'm going to deny the challenge for cause at

14:51:23 15   this point, without prejudice.

      16          MR. MORRISSEY:  Your Honor, Juror Number 60 at

      17   Question 55.  Answered that the Bible tells us that we're not

      18   to judge other people, and she indicated that this religious

      19   belief would make it difficult for her to sit in judgment of

14:51:42 20   another person.

      21          And then at Question 58 when asked, "In light of the

      22   information above is there anything about the nature," stated

      23   "do not know."

      24          Several prospective jurors referred to religious

14:52:01 25   principles, but this is one of the few jurors that was this

14:52:04 1    explicit that the Bible tells us not to judge.  And I don't

2    think this juror can serve on that basis.

3           THE COURT:  Defense response?

4           MS. WILLIAMS:  Your Honor, because of the fact that

14:52:18 5    there are a number of people who talk about I can't or don't

6    want to judge people, I would say that would be a person for

7    more follow up and not to be stricken for cause at this time.

8    That is a fairly common answer we get, for example, when

9    picking juries up in Prescott.  I just think it's just

14:52:42 10   something we should just follow up more.

11          THE COURT:  I think this requires follow-up

12   questioning as well.  I can't tell if she feels she would be

13   unable to follow the Court's instructions if she were put on

14   the jury.  So I'll deny the challenge for cause without

14:52:59 15   prejudice.

16          MR. MORRISSEY:  Your Honor, Juror Number 79.  On

17   Question 1 indicated that he lives two hours away, in Pinal

18   County, and indicated no, that he was not available.

19          There are a couple of categories like this where some

14:53:25 20   jurors, potential jurors, just live very, very far away.  It

21   does not seem practical.

22          THE COURT:  Well, the reason -- there were more than

23   one in that category.  The reason I did not excuse them for

24   hardship, Mr. Morrissey, is that the government will pay for

14:53:41 25   housing in Phoenix during the week of the trial so that they

14:53:45  1    could get a hotel room in town and it would be just driving at

2    the beginning and end of the week.  And I can't tell if that

3    would be a hardship.  I think the juror's assuming they'd have

4    to commute every day.  So I thought the folks that were a ways

14:53:59  5    away, we ought to talk to just like we do with out-of-town

6    jurors in every case.

7              MR. MORRISSEY:  Okay.

8              THE COURT:  So it may become a problem, but let's do

9    some follow-up questioning of Juror 79.

14:54:11  10             MR. MORRISSEY:  So that one's denied for now?

11             THE COURT:  Right.  Without prejudice.

12             MR. MORRISSEY:  Your Honor, Juror Number 113 at

13   Question 17 and 19 indicated that he has a conviction for mail

14   fraud, got a five year probation sentence as well as --

14:54:38  15   appears to be the same conviction at Question 19 for selling

16   counterfeit items.  That juror appears to have a felony

17   conviction, and the investigating agency was ICE.  I don't

18   think that juror should have been in the pool.

19             THE COURT:  Well, I assumed, perhaps incorrectly,

14:55:05  20   that the juror was in the pool because his rights were

21   restored.  I don't know the answer to that.

22             MS. WILLIAMS:  Although, Judge, if that is two

23   separate convictions, I believe they can only, and I'm

24   thinking of the formal expungement process in state court that

14:55:23  25   includes federal convictions.  That, I believe, would only

14:55:25  1   apply to the first conviction.  So if that in deed is two

2   convictions, I would agree with the government that this

3   person probably shouldn't have even gotten a summons.

4            MS. HULL:  On behalf of Daniel Mahon, Judge, I think

14:55:43  5   this requires additional follow up.  I would oppose cause.

6            THE COURT:  I assumed, because of the reference "same

7   as 17C" which he adds to Question 19, that it's the same

8   conviction as the one in 17.  So I think we do need to ask

9   follow-up questions of this, and I'll deny the challenge for

14:56:11 10  cause.

11           MR. MORRISSEY:  Your Honor, Juror 163 at Question 59.

12  It's actually the extra page to the juror questionnaire.

13  States that the juror believes "it will be impossible for

14  me "--

14:56:32 15           THE COURT:  We excused 163 for hardship.

16           MR. MORRISSEY:  Oh.  Then I'm sorry.  Okay.

17           Juror Number 182 at Questions 12 --

18           MS. WILLIAMS:  Excuse me, Mr. Morrissey.

19           Judge, before we move too far away, was it 163 we

14:57:02 20  were just talking about?

21           MR. MORRISSEY:  It was.  Judge, that's not on your

22  order.

23           THE COURT:  That's an error on our part.  It's

24  supposed to be.

14:57:09 25           MR. MORRISSEY:  At any rate, the record is Juror 163

14:57:13  1    is excused?

2            THE COURT:  Yes.  I'll grant the challenge for cause

3    to 163.  I had already concluded he shouldn't be included.

4    That's what the red tab on his questionnaire meant, and

14:57:21  5    apparently it didn't get on the list.

6            Thanks for catching that, Ms. Williams.

7            I'll grant the challenge for cause to Juror 163.

8            MR. MORRISSEY:  Juror 182 --

9            THE COURT:  That is another one that's got a red tab.

14:57:39  10   Is that not on the list?

11           MR. MORRISSEY:  He or she is not on the list.

12           MS. WILLIAMS:  No.

13           THE COURT:  All right.  That's also tabbed as one

14   that I thought we should be excusing.

14:57:50  15           Is there any objection from the defense?

16           MS. WILLIAMS:  No objection.

17           MS. HULL:  No, sir.

18           THE COURT:  All right.  So 182 I'll grant the

19   challenge for cause, too.

14:58:00  20           MR. MORRISSEY:  Your Honor, Juror 191.  At Question

21   26 indicated "may have treated"--

22           THE COURT:  Excuse me, Mr. Morrissey.  Another error

23   on our part.  I've got a red tab on it.

24           MR. MORRISSEY:  On Juror 191?

14:58:23  25           THE COURT:  Right.  This should have been in the

14:58:24  1  order as well.

2            Any objection from the defense?

3            MS. WILLIAMS:  No, Your Honor.

4            MS. HULL:  No, sir.

14:58:30  5            THE COURT:  Okay.  I'll grant the challenge for cause

6  to 191.

7            MR. MORRISSEY:  Your Honor, Juror Number 223 at

8  Question 59 refers to a medical condition that the juror has,

9  attention deficit disorder, and is currently seeking medical

14:58:53  10  help for depression --

11            THE COURT:  It's got a red tab, Mr. Morrissey.

12            I should have double checked the order, obviously.

13            Yeah, 223 I had intended to excuse as well.

14            Any objection from the defense?

14:59:06  15            MS. WILLIAMS:  No, Your Honor.

16            MS. HULL:  No, sir.

17            THE COURT:  All right.  I'll grant the challenge for

18  cause to 223.

19            MR. MORRISSEY:  Your Honor, Juror Number 247 at

14:59:17  20  Question 59 --

21            THE COURT:  Red tab.

22            MS. WILLIAMS:  No objection.

23            MS. HULL:  No objection.

24            THE COURT:  Okay.  I'll grant the challenge for

14:59:28  25  cause.

14:59:28  1                Let's just get the numbers and I'll tell you if

2       they're red tabbed.

3                MR. MORRISSEY:  Your Honor Juror Number 256.

4                THE COURT:  Red tab.  I'll grant the challenge for

14:59:41  5       cause.

6                MS. WILLIAMS:  No objection.

7                MS. HULL:  No objection.

8                MR. MORRISSEY:  Juror Number 274.

9                THE COURT:  I've got a tab.  In red.  I'll grant the

14:59:57  10      challenge for cause.

11               MS. WILLIAMS:  No objection.

12               MS. HULL:  No objection.

13               MR. MORRISSEY:  Juror Number 285.

14               THE COURT:  That one's tabbed as well.  I'll grant

15:00:13  15      the challenge for cause.

16               MR. MORRISSEY:  Okay.

17               Juror Number 301.

18               THE COURT:  I did not include that one in my list.

19      Tell me your thoughts on it.

15:00:32  20               MR. MORRISSEY:  Your Honor, Question Number 1 the

21      juror answered "do not understand."  Question Number 25, juror

22      indicated "understood words only."  This is, I believe, a

23      proficiency with English problem.  And at Questions 38, 44, 49

24      and 58 indicated "do not understand."  And at Question 59,

15:00:59  25      "could not afford to serve" as well.

15:01:04  1    Between the financial hardship and the fact that the

2    juror self-reported a great degree of difficulty with the

3    ability to fill out the questionnaire --

4    THE COURT:  All right.  Is there any objection from

15:01:22  5    the defense?

6    MS. WILLIAMS:  No, Your Honor.

7    MS. HULL:  No, sir.

8    THE COURT:  I'll grant the challenge for cause to

9    301.

15:01:33 10    MR. MORRISSEY:  Juror Number 342.

11    THE COURT:  Go ahead.

12    MR. MORRISSEY:  Your Honor, Question 25, the juror,

13    who appears to be -- well, I won't go into that detail.  But

14    the juror himself identifies their English is not strong and

15:02:08 15    indicates "does not understand words during trial," and at

16    Question 55 indicates that because of religious reasons it is

17    difficult for this juror to judge another person.  And again

18    at 58 and 59, for the third time in this questionnaire,

19    emphasizes a lack of facility with the English language.

15:02:35 20    THE COURT:  All right.  Is there an objection from

21    the defense?

22    MS. WILLIAMS:  Your Honor, I do object to this

23    potential juror.  There were a number of people who wrote "do

24    not understand" all the way down the questionnaire and cited

15:02:50 25    English issues.  That is not the case with this juror.  I

15:02:55  1   agree they did express concern with understanding every word

2   during the trial, but I think it would be more suitable for

3   follow up.

4            THE COURT:  Ms. Hull?

15:03:12  5            MS. HULL:  I'd oppose a motion for cause.

6            THE COURT:  I think we do need to ask follow-up

7   questions, so I'll deny the challenge for cause to Juror 342.

8            MR. MORRISSEY:  Your Honor, Juror 393.  At Question

9   1, simply doesn't drive.  The Court has indicated that

15:03:52  10   provisions for staying locally can be taken care of.  But then

11   the juror also indicated on Question 55 -- well, I'll withdraw

12   that about 55.

13            THE COURT:  I had the same thought on this juror as

14   on the other, which is we can make housing accommodations for

15:04:17  15   her during the course of trial.  So I think we ought to ask

16   her about the hardship that would cause.

17            So I'll deny the challenge for cause to 393.

18            MR. MORRISSEY:  All right.  And then, Your Honor, my

19   final one is Juror Number 432 at Question 59 indicates that he

15:04:42  20   cannot prove that his rights were restored from a previous

21   conviction.  I'll try to find the paragraph.  Ah, there it is.

22   Paragraph 17.  The juror was convicted of a felony in Utah.

23   The juror's claim is no civil rights revocation, but he

24   certainly can't prove that.  The nature of the conviction

15:05:08  25   would certainly indicate that it is a felony.

15:05:14   1              THE COURT:  Ms. Williams?

           2              MS. WILLIAMS:  I agree, Your Honor.

           3              MS. HULL:  No objection.

           4              THE COURT:  All right, I'll grant the challenge for

15:05:25   5    cause to Juror 432.

           6              MR. MORRISSEY:  Nothing further, Your Honor.

           7              THE COURT:  Ms. Williams.

           8              MS. WILLIAMS:  Thank you, Your Honor.  I do have a

           9    few.  Juror 163.

15:05:52  10              MS. HULL:  We already did that one.  It's stricken.

          11              MS. WILLIAMS:  We did that?

          12              Number 145.  Was that person --

          13              THE COURT:  Go ahead.

          14              MS. WILLIAMS:  Okay.  145, Judge, indicated that -- I

15:06:38  15    believe it was a she, but the person indicated that they had a

          16    family member who received a package bomb, ex-daughter-in-law.

          17    It doesn't sound like the ex-daughter-in-law was killed,

          18    however, the person indicated that somebody -- it sounded like

          19    somebody in the vicinity was killed.  The person also made a

15:07:04  20    point of noting that they had lost someone in the 9/11

          21    bombing, and they also indicated some family medical issues in

          22    Number 1.  And I believe for those reasons this person should

          23    be stricken for cause.

          24              MR. MORRISSEY:  Judge, Question 52 is the one where

15:07:31  25    the husband's ex-boss was killed in 9/11, but the juror

15:07:39  1    doesn't indicate any difficulty.  The Question 41 is the

2    question -- opened package -- no objection.

3         THE COURT:  I'll grant the challenge for cause to

4    145.

15:08:19  5         MS. WILLIAMS:  Also 201.  This is a person who

6    mentioned they were very angry about our case already because

7    his wife was a mail carrier.

8         THE COURT:  Which question?

9         MR. MORRISSEY:  26.

15:08:57 10         MS. WILLIAMS:  He said on 26, "The use of the Postal

11   Service made me anxious and angry because my wife could have

12   handled such a parcel."

13         I would ask, based on those sentiments that he be

14   excused.

15:09:18 15         MR. MORRISSEY:  No objection.

16         THE COURT:  I'll grant the challenge for cause to

17   201.

18         MS. WILLIAMS:  Number 242.  This was a person who

19   said they were having surgery in November and they were

15:09:46 20   concerned -- on the Achilles tendon.  They were concerned they

21   would still be on crutches.

22         THE COURT:  When I saw that, I didn't think crutches

23   would be an impediment to serving on the jury and we ought to

24   see how they're doing in January.  So I'll deny the challenge

15:10:01 25   for cause on that basis.

15:10:03  1            MS. WILLIAMS:  Okay.

2            275, Judge, talked about panic attacks and

3       medications.  There were a number of people who talked about

4       this issue.

15:10:25  5            MR. MORRISSEY:  Question 56.  That juror gets

6       migraines.

7            THE COURT:  Your response, Mr. Morrissey?

8            MR. MORRISSEY:  No objection.

9            THE COURT:  I'll grant the challenge for cause to

15:10:41 10      275.

11           MS. WILLIAMS:  285.  Oh, we already excused that

12      person.

13           411.

14           THE COURT:  Yes.

15:11:27 15           MS. WILLIAMS:  This is -- this person indicated that

16      she used to be an associate warden at the Bureau of Prisons.

17      She indicated that she is biased in favor of the government

18      and does not want to sit on the jury.  She also suffers from

19      anxiety attacks.

15:11:46 20           THE COURT:  Mr. Morrissey.

21           MR. MORRISSEY:  No objection.

22           THE COURT:  I'll grant the challenge for cause to

23      411.

24           MS. WILLIAMS:  I believe I have two more, Your Honor,

15:12:15 25      and they're -- they're both touching on pretty much the same

15:12:20  1    issue.  379 -- it's going to be 379 and 376.  And this is an

2    issue I was going to bring up with the Court separately

3    anyway, but it arises from these questionnaires.

4            These jurors, talking first about 379, appears, I

15:12:45  5    believe, is a firefighter, is concerned about their safety by

6    virtue of sitting on this jury, which is the same issue with

7    376 who is uncomfortable with it being a high-profile case.

8            This is an issue raised by not a lot but several

9    prospective jurors.

15:13:09 10    THE COURT:  Well, I'll tell you what my thought is on

11    that, Ms. Williams.  The jurors' identities obviously won't be

12    mentioned on the record.  They'll be referred to by number on

13    the record.  Their names are available to counsel.

14            MR. MORRISSEY:  Your Honor, the government does not

15:13:46 15    agree that this is cause.  This is an issue they may need some

16    reassurance on, may need some information on, but it's not

17    cause.

18            THE COURT:  I guess my point is it seems to me that I

19    can tell them what I tell jurors in every criminal case, which

15:14:03 20    is it's our practice in federal court to protect the

21    identities of the jurors.  Their names won't be on the record.

22    Their names are disclosed to counsel.  And see if that will

23    alleviate the concern.

24            MS. WILLIAMS:  Your Honor, I would -- I have no

15:14:17 25    problem with that, but I would ask there be additional follow

15:14:20  1    up because this sentiment was voiced by a number of the

2    potential jurors, including these two.

3         I think that it is very prejudicial to our clients if

4    they are -- if anybody on the jury is thinking that harm may

15:14:34  5    come to them just because of the nature of the trial, and I

6    would ask the Court to go a little farther with them to

7    reassure them that that's not the case here.  It's not --

8    we're not in New York City dealing with the big high end mafia

9    case.  That's just not an issue here.  Because if they're

15:14:57 10    afraid, I would submit, they're afraid of something, then I

11    think that fear is going to translate over to our clients, to

12    their prejudice.

13         THE COURT:  Well, the concern I have is this:  My

14    concern, Ms. Williams, is the more I talk about it in front of

15:15:10 15    the jury, the more I worry I will cause concerns on the part

16    of jurors who wouldn't have been concerned.  I'm a little

17    concerned about us even raising the issue in front of the jury

18    panel through follow-up questions, so I would probably want to

19    question a witness like this at sidebar for that reason.

15:15:31 20         I wouldn't want that one juror to say, you know, "I'm

21    worried about this group, they're violent, they could hurt

22    me," because then 49 other people in the room as potential

23    jurors at that time hear that.  So it's sort of a fine line to

24    walk to make sure we cover it enough and not creating the

15:15:47 25    problem we're trying to avoid.

15:15:49  1          MS. WILLIAMS:  I agree, Judge.  Normally this has not

       2  even arisen as an issue for me, that I would want to bring up

       3  to a jury, but for the fact several of them have expressed

       4  this.

15:16:03  5          THE COURT:  Well, before we rule on that, show me

       6  where it is in 376, would you.

       7          MS. WILLIAMS:  If the Court would bear with me for

       8  just a second.

       9          MR. MORRISSEY:  Question 48, Your Honor.

15:16:32  10          MS. WILLIAMS:  Thank you.

      11          THE COURT:  48?

      12          MR. MORRISSEY:  Yes.  The explanation --

      13          THE COURT:  On 376?

      14          MR. MORRISSEY:  Yes.

15:16:40  15          MS. WILLIAMS:  Page 18.

      16          MR. MORRISSEY:  18.

      17          MS. WILLIAMS:  Yes.

      18          THE COURT:  Oh.  Okay.  Referring to the high-profile

      19  case, as opposed to any particular entity.

15:16:50  20          MS. WILLIAMS:  Well, and I would suggest those are

      21  the same issue, but I would agree that from the face we can't

      22  determine that.  But those two issues tended to come up a

      23  number of times and I was going to ask the Court separately to

      24  address the issue of safety, high profile, and, for a few of

15:17:08  25  them, even for some of them -- some of them tend to -- seem to

15:17:12  1    be worried this is going to be a capital case.  So I was going

2    to ask the Court anyway to somehow address those issues.

3              THE COURT:  Ms. Hull.

4              MS. HULL:  Thank you, Your Honor.

15:17:22  5              On behalf of Daniel Mahon, my position is that if

6    jurors in a questionnaire are already asserting that they

7    fear -- they have safety concerns on behalf of Daniel Mahon, I

8    believe that that is a basis for cause.  There is not -- I

9    think we all assume from those claims that they're thinking or

15:17:47 10    fearing their safety because of something the defense might

11    do, not the government, and I think that in of itself

12    establishes bias, and I think that is sufficient for a motion

13    for cause.

14              MR. MORRISSEY:  Your Honor, I believe the Court has

15:18:04 15    outlined factual information that it may give to specific

16    jurors which goes to protection of their identity.  I believe

17    that solves that issue, at least for today for purposes of

18    cause.  If a juror wants to raise this and it's a sidebar

19    issue, that's fine.  But as a general matter this should not

15:18:24 20    be cause.

21              Regarding the issue of this being a capital case, the

22    government does not object to the jury being informed that

23    this is not a death penalty case, because several jurors did

24    raise that issue and that should not be on the table.

15:19:26 25              THE COURT:  What I'm going to do is this:  I do think

15:19:30  1    we need to ask some follow-up questions of Jurors 376 and 379.

2    Since it is the lawyers who will be doing the follow-up

3    questions, what I would ask you to do on this issue is when we

4    get to that juror, simply suggest to me that there's an issue

15:19:50  5    we ought to address at sidebar with the juror.  And that way

6    we're not raising a concern on the part of the all the jurors.

7    And we can follow up with individual jurors on whether it's a

8    concern.

9            I will advise the jury that it is not a death penalty

15:20:11 10    case.  And to the extent any attorney wants me to give some

11    additional assurances on juror safety, I would ask you to

12    propose that on January 3rd.

13           My practice is to tell the jury at the beginning of

14    the case we're going to be referring to them by number rather

15:20:31 15    than name; we don't do that to be impersonal but we do that

16    because we don't want the information they're providing about

17    themselves on the record, in the public record, with their

18    name in this day of identity theft.

19           So the jurors know that their name won't be in the

15:20:48 20    record.  If there is something beyond that that you all think

21    I ought to do in this case, let's talk about it on January

22    3rd.

23           MS. WILLIAMS:  So as to 376 and 379, the Court is not

24    excusing them?

15:21:02 25           THE COURT:  Yes.  I'm denying the challenge for cause

15:21:05  1    at this point.

2              Hold on just a minute, Ms. Williams.

3              (The Court and the judicial assistant confer.)

4              THE COURT:  Go ahead, Ms. Williams.

15:21:29  5    MS. WILLIAMS:  I just wanted to go back to Juror 380.

6    This was someone who had asked to be excused based on a 20

7    year medical history of degenerative disk disease that makes

8    it difficult for the person to sit for long periods of time

9    and also to stand.

15:21:55  10   THE COURT:  When I saw that, Ms. Williams, I thought

11   we ought to explain to the juror that they will never be asked

12   to sit for a longer period than an hour and a half without

13   being able to stand and see if that addresses their concerns.

14   I have found for many jurors if they can get up every hour and

15:22:12  15   a half, they're fine.

16             MS. WILLIAMS:  Judge, I was just particularly

17   concerned about this person.  I know sitting is an issue for

18   many of us, myself included, but because the person pointed

19   out that they have degenerative disk disease and also talked

15:22:29  20   about their knees and memory problems, I saw medical issues

21   here that rose above the norm.

22             THE COURT:  Mr. Morrissey.

23             MR. MORRISSEY:  I didn't see it rising to that level,

24   Your Honor.

15:22:40  25   THE COURT:  I think we should ask follow-up questions

15:22:42  1   on Juror 380, so I'll deny the challenge for cause.

2              MS. WILLIAMS:  And that's my last one.

3              THE COURT:  Ms. Hull.

4              MS. HULL:  We join in Dennis Mahon's motion for

15:22:52  5   cause.  We have nothing to add.

6              THE COURT:  Okay.

7              There are a few other matters I want to cover with

8   you, and probably some you want to raise, but we need to take

9   a break for the benefit of the court reporter.  So we'll take

15:23:17  10  a break and resume about 25 minutes to.

11             (Recess taken from 3:23 to 3:36.)

12             THE COURT:  Thank you.  Please be seated.

13             All right.  Counsel, a few other matters I wanted to

14  take up with you.  In terms of the jury selection procedure, I

15:38:34  15  think we ought to talk for a minute so we're all on the same

16  page.  We've got 16 seats in the jury box.  The last three, I

17  think, maybe four, on the front row near the back of the

18  courtroom are not bolted down.  You can move them.  So if you

19  slide them closer together, you can get one more chair in on

15:38:55  20  that bottom row.  They're a little crowded, but we've done it

21  before.

22             The problem we had when we did it before is that that

23  last juror is a long ways away and has pretty full view of the

24  government's counsel table, and we happened to have a juror in

15:39:13  25  that case who leaned and read what was on the government's

table.

I guess the question I have for you is what your thoughts are about crowding in a fifth juror to have extra protection, given the length of the trial, versus having four alternates in the trial.  Do you have any particular views on the issue?

MS. WILLIAMS:  I think -- sorry, I was going to give you time to think.

MR. MORRISSEY:  Go ahead.

MS. WILLIAMS:  I think it would be a good idea to have one more alternate, Judge.  Is there any space at your end of the box?

THE COURT:  No.  There's not enough for a chair. There's about two and a half feet, and these chairs have a wider base than that.

Agent Moreland, would you slide those chairs this way as far as you can just to show everybody what we can do.  Most are bolted down, but there are some that are not.

MS. WILLIAMS:  Could an extra go on our end of the top row without falling off?

THE COURT:  No, the concern there is it's about a two foot drop and it's straight off.

You can see there's room where he's standing to put a fifth chair in.  We wouldn't put them quite that close.  And we have done it before.

15:40:31  1          Obviously, we could instruct them to disregard what's

2      on counsel table, and I think most jurors would follow that.

3          Mr. Morrissey.

4          MR. MORRISSEY:  I think we do want the fifth and it's

15:40:47  5      worth a little bit of discomfort, so, yes.

6          MR. BOYLE:  If I could add, I think the real worry is

7      screens.  The papers, I don't think the juror on the end is

8      any different than a juror here as far as reading a paper.

9      They'll be the same distance.  It's the screens of the

15:41:08  10     computer --

11         THE COURT:  We end up with three on the last screen,

12     but my experience is jurors have to sort of lean forward and

13     squint to see these screens anyway.  So the fact they would do

14     that probably wouldn't be too much different than having two

15:41:23  15     jurors per screen.

16         MS. HULL:  I see room for two more chairs.  Maybe,

17     if -- may be close, but people are wandering around in the

18     jury box and around counsel table and looking around.

19         THE COURT:  I think if we tried it with two, we're

15:42:03  20     really going to crowd it.  Those chairs already in there have

21     no space between them, Ms. Hull.  If we put six inches of

22     space, I think we're left really with room for one more.

23         Any other thoughts?

24         MS. WILLIAMS:  Your Honor, we were just looking at

15:42:19  25     the angle from the standpoint of what the Court said about

15:42:25  1    seeing the government's table, and definitely if my eyes were

2    better, when I sat on that end chair I could -- I had enough

3    of a view of Agent Moreland's papers that if I could see

4    better I probably could see it.

15:42:39  5            If there were some sort of screen that could be put

6    up or even a laptop screen opened or something to create a

7    little bit of a barrier, that might help.

8            MS. HULL:  Can we move the tables?

9            THE COURT:  We can shift them all this way a bit.

15:43:03  10   They are movable.  We narrow down the space between them, but

11   we can move it a foot to my right, which would make it a bit

12   farther away.

13           Mr. Morrissey or Mr. Boyle, any thoughts?

14           MR. MORRISSEY:  Moving the table is absolutely fine.

15:43:19  15   Imposing and obligation to do something like a screen, we're

16   not enthused about.

17           THE COURT:  Let's do this.  Let's plan on five

18   alternates.  We'll move the table about a foot toward the

19   defense table and that will be some added protection during

15:43:57  20   trial.

21           MS. WILLIAMS:  And, Judge, I think that's an

22   especially good idea.  Ms. Cisneros, just raised a good point.

23   If the government wanted to pull up something on their screen

24   on their table and it wasn't admitted, if the tables aren't

15:44:09  25   moved, no matter what's going on on the end, some jurors down

15:44:12   1     here might be able to see it.

2              THE COURT:  They can't put something on that screen

3     themselves, but they can put it on a laptop screen.

4              MS. WILLIAMS:  Well, for example, a laptop.

15:44:22   5     THE COURT:  We'll just be conscious of that, but

6     we'll move it a foot to the side and put in five.

7              Now, that means that we'll have 17 jurors seated.

8     With 17 jurors, the government will have nine peremptory

9     strikes and the defense jointly will have 13 peremptory

15:44:44  10    strikes under Rule 24.

11             My thought is this:  The plan is to bring in 50

12    jurors on the morning of the first day of trial; bring in 50

13    more at 1 p.m. on the afternoon of the first day of trial.

14    And then I had mentioned bringing in 50 more on the second

15:45:11  15    day.

16             Given the thoroughness of our review of the

17    questionnaires, my thought is if we bring in 100 jurors in on

18    the first day, we shouldn't have any difficulty coming up with

19    39, which is the number we need for you all to exercise your

15:45:29  20    peremptory strikes.  That would mean on the basis of follow-up

21    questions we could challenge for cause 61 of the 100 and still

22    have enough for a jury.  I just have real difficulty thinking

23    we won't do that since the hardship issue has been resolved

24    with virtually all of these folks.

15:45:51  25             Do you have thoughts on that, counsel?

15:45:54  1          MR. MORRISSEY:  Judge, I think it's going to be a

2    little more difficult than what you've just anticipated.

3    Administratively I don't know, but I'd feel better if I knew

4    we had at least 25 for the second day.  Because I think we're

15:46:08  5    going to lose more for cause than you might imagine.

6          MS. WILLIAMS:  I agree with that, Judge.  Whether or

7    not 25 is enough, I don't know, but I agree that 100 just

8    might not be enough in this case.

9          MS. HULL:  Judge, I believe you need to have 50 for

15:46:32 10    the second day.  I just -- just because of the nature of the

11    questionnaire answers, my sense is that you're going to need

12    that.  And I certainly don't think 100 is enough.

13          THE COURT:  If we do that, we probably cannot start

14    openings and evidence until the 12th.  Unless -- well, I

15:47:19 15    suppose we could get everybody ready to go on the 11th in the

16    event we get the full jury picked on the 10th.  And if we

17    don't, then start on the 12th.  Maybe that's what we ought to

18    do so we don't lose the trial day if we get the jury picked on

19    the 11th.

15:47:35 20          This is what I thought we ought to do.  We'll bring

21    in 50 in the morning.  We'll swear them.  I will ask some voir

22    dire, and I've handed out to you my proposed voir dire.  Look

23    at it.  We can talk about it on January 3rd.  You'll ask

24    follow-up questions.  We will then send the 50 home from the

15:47:57 25    morning and I will hear challenges for cause and we'll address

15:48:00  1    any hardship issues.

2            We'll see how many we have left after that morning.

3    We'll then go into the afternoon and do the same thing.

4            If at the end of the afternoon, or if we're

15:48:12  5    surprised, in the end of the morning, we've got 39 jurors

6    left, then we've got enough to exercise peremptories and we

7    don't have to question more jurors.

8            I doubt we'll be there after the morning, but I think

9    there's a decent chance we'll be there at the end of the first

15:48:29  10   date.  Betsy Tait, our jury administrator who came up a moment

11   ago, told me if we get the 17 jurors picked on the first day,

12   she can put it on the recording that night and we can tell the

13   jurors on that first day, "Call in tonight and you'll be told

14   if you're on the jury.  And if you are, come back tomorrow.

15:48:47  15   Or you will be told to call back tomorrow night."

16           In that event, if we don't get 39 out of the first

17   day, we'll have 50 come in the second day and we'll get 39

18   then and can notify the jurors that night, night of the second

19   day, and start on the third day.

15:49:03  20           But because I think there's a reasonable possibility

21   we'll have 39 at the end of the first day, I think we ought to

22   be prepared to start on the 11th, which is the second day.

23   And if we don't have enough, we'll do more jury selection on

24   the morning of the 11th and notify the jurors that night and

15:49:20  25   start the next morning.

15:49:21  1          Any questions about that?

2          MR. MORRISSEY:  No, Your Honor.

3          MS. WILLIAMS:  No, Your Honor.

4          MS. HULL:  No, sir.

15:49:28  5          THE COURT:  Okay.  Today is the day by which you were

6     going to identify for me any documents that were going to

7     require a *Waters* review.

8          MR. BOYLE:  None from the government.

9          MS. WILLIAMS:  Judge, based on the government's

15:49:50  10    exhibit list, I believe the Court should review the Poor Man's

11    James Bond and the WAR Manual, which have been marked as

12    exhibits.

13          THE COURT:  You have 403 objections to those

14    documents?

15:50:05  15          MS. WILLIAMS:  In their entirety, yes.

16          THE COURT:  Can you tell me specifically what you're

17    concerned about in them?

18          MS. WILLIAMS:  The other content, Judge.  The Poor

19    Man's James Bond generally -- generally speaking contains a

15:50:21  20    lot of -- a mishmash of information about weaponry of various

21    types incendiary devices, bomb devices, all sorts of things

22    like that.  The book is a couple inches thick.  It's a tall

23    book.  It's a sizable book.  And if the government -- the

24    government has marked it.

15:50:48  25          I'm not sure as I stand here whether it's their

intention to introduce the whole book, but I think the Court should review that. There's an awful lot. The majority of that book has nothing to do with our case.

With respect to the WAR Manual, which is a very similar size, the government has marked numerous chapters from, I think, the WAR Manual. I think that is the sourcebook dealing with all sorts of similar information as is contained in the Poor Man's James Bond, except the WAR Manual may have a bit more politics in it. But it's a similar type of book.

I believe the WAR Manual itself is marked as an exhibit. We're going to have some relevancy and other objections to even the chapters, but before we can deal with objections to those two books, I believe the Court should review it for *Waters*.

MR. BOYLE: Your Honor, we marked the portions of the book and gave them the copies of the pages we want to introduce and marked those as exhibits, so I think the defense can just submit the exhibits that we have given them for you to review. We're not introducing whole books. We're not introducing the whole WAR Manual.

So they should -- anyway, I'm not quite sure what it is they're asking, but I just wanted to clarify we're not introducing whole books. We took out the portions that relate to bomb making or other relevant parts, so they have the copy we want to use.

15:52:32  1         When they give that to you, is there anything we

2     should do at that point to tell you why it's relevant?  Or --

3     I mean, you do the *Waters* review, will you in the context of

4     this case make a decision or if you need more information let

15:52:46  5     us know?

6         THE COURT:  Well, I haven't read *Waters* in some

7     months.  My memory of the case was that a judge should not let

8     a voluminous exhibit in to evidence without reviewing it for

9     403 concerns.  Namely, whether there is something unfairly

15:53:05  10    prejudicial in it.

11        MS. WILLIAMS:  Judge, may I ask Mr. Boyle a question?

12        THE COURT:  Sure.

13        (Counsel confer.)

14        MR. BOYLE:  We will confer -- we will confer to make

15:53:47  15   sure the parties know what exhibits are being introduced and

16    then the defense can -- you can give them a deadline to turn

17    in whatever it is they want you to review.

18        In fact, if you want, it can be a joint motion so we

19    can have them add in what we want you to consider when they

15:54:04  20   turn in that joint *Waters* review.  If you have a better

21    suggestion --

22        THE COURT:  My concern was that that's what I was

23    going to do over the next ten days.  When I get back, I don't

24    know that I'm going to have time to review voluminous

15:54:20  25   documents.  I was going to take *Waters* material along as light

15:54:24  1    reading so I could at least get through it.  If I have to try

        2    to read it while handling other cases after I get back, it's

        3    going to be very difficult for me to get through anything

        4    voluminous.

15:54:40  5         MR. BOYLE:  They're not that many.  I'll tell you

        6    there were hundreds and hundreds of pages.  We took out much

        7    of them.  So my guess is there's not more than 100 pages

        8    total.

        9         If you think about the stacks of documents we

15:54:57 10    originally gave them, we really cut them down.

       11         I don't want to speak for the defense.  I don't know

       12    if they can give those things to you tonight, but I'll let you

       13    know we're not talking about a big stack.

       14         THE COURT:  Having conferred, Ms. Williams, does it

15:55:10 15    appear to you the whole book is being offered?

       16         MS. WILLIAMS:  Well, Mr. Boyle is saying no, but --

       17    Should that be another piece?

       18         (Counsel confer.)

       19         MS. WILLIAMS:  Judge, I have -- I don't know how to

15:55:35 20    answer now because I was going on the exhibit list itself, and

       21    with the Poor Man's James Bond --

       22         (Counsel confer.)

       23         MS. WILLIAMS:  So the two books I mentioned are on

       24    the exhibit list, but they're not in the exhibits, so we don't

15:56:34 25    know exactly what is intended by those two exhibits.

15:56:38  1        And there's a third book that Ms. Cisneros reminded

2     me of that that is in our exhibit list called Forgive?  Forget

3     it! Creative Revenge at its Best.  The government, I believe,

4     has marked a piece of that book, I think.  And we may also be

15:57:01  5     using it.  I have my own copy of all three of those books if

6     the government's are not otherwise available.

7        THE COURT:  Well, I'm looking back at the motion you

8     filed on Waters, and this was filed back in October of 2010.

9     What you said is, describing the Waters case, the Ninth

15:57:33 10    Circuit held that the district court abused its discretion by

11    failing to carry out a proper weighing under Rule 403 before

12    admitting into evidence a folder of documents described as

13    anarchist literature.

14        It goes on to say if there's a 403 objection, I have

15:57:56 15    to review the entire document before admitting it.

16        If there's not a 403 objection, I've got to tell you,

17    this wouldn't be at the top of my reading list.  So it seems

18    to me what we ought to do is have you all confer about what

19    exactly the exhibits are that you're going to introduce,

15:58:16 20    decide if you want to make a good faith 403 objection to the

21    introduction of the exhibit as a whole, and, if so, file

22    something next week with the exhibits attached.  I can access

23    it electronically on the court's docket if you attach the

24    exhibits.

15:58:33 25        Now, if it's the whole book one side or the other is

15:58:37  1    attaching, then that won't work.  But it doesn't sound like

2    the government's intending to introduce the entire book.

3         MS. WILLIAMS:  With respect to the Creative Revenge

4    book, we may use other sections of it.  So we may be using

15:58:50  5    more of the whole book.

6         THE COURT:  And the question is will the government

7    have a 403 objection to your doing so?  If they don't, I don't

8    think I need to review the book.  Right?

9         MS. WILLIAMS:  That's correct.

15:59:05 10         THE COURT:  So what I'd like you to do is confer and

11    see if you can agree on which exhibits I need to review, and

12    it should only be those where there is a 403 objection by one

13    side or the other.  And assuming it's not the entire book,

14    attach the exhibits to which there's a 403 objection to your

15:59:27 15    joint memorandum, and I'm going to ask you to file by Tuesday

16    evening, close of business, if you can.  And then I will

17    access it and will be able to read portions of it.

18         Okay.  That will address the *Waters* issue.

19         We have in this case a very long witness list,

15:59:55 20    particularly the defense side is very long.  Obviously we need

21    to ask the jurors if they know potential witnesses.

22         It seems to me what we should do is not have me sit

23    here and read a list of 100 names, or 150, however many are on

24    it, but we should have you jointly prepare a typed list of

16:00:13 25    those names, preferably in alphabetical order, and we should

16:00:19  1    hand those lists out to the jurors, give them a few minutes to

2    review it, and tell us whether they know anybody on it.

3            I think we're likely to get a more accurate response

4    if we do that than if I read the list.

16:00:31  5            So I'm going to ask you by January 3rd to have, not

6    in the form of a witness list you would file, but just put at

7    the top Potential Witnesses and then list in alphabetical

8    order the witnesses from both lists.

9            Have that for us to look at January 3rd and we will

16:00:51  10   print copies for all of the jurors to look at as they come

11   into the courtroom.

12           Is there any objection to our doing it that way?

13           MR. BOYLE:  No, Your Honor.

14           MS. WILLIAMS:  No, Your Honor.

16:00:59  15           MS. HULL:  No, sir.

16           THE COURT:  All right.  With respect to the statement

17   of the case, I'm going to use the same version that's in the

18   questionnaire.  I have added to the voir dire a question about

19   government -- paid government informants and wiretaps so that

16:01:39  20   the jury will be asked about that.  I think it's more logical

21   to do it there than in the statement of the case.  But, again,

22   look at the voir dire.  Let's talk about them on January 3rd

23   if you have concerns about them.

24           We've given you preliminary instructions.  They're

16:01:55  25   very generic.  They're just the Ninth Circuit standard

16:01:58  1    instructions.  If you think something more is needed, be

2    prepared to talk about that on January 3rd, please.

3              MS. CISNEROS:  Your Honor?

4              THE COURT:  Yes.

16:02:08  5              MS. CISNEROS:  With regards to the jury instructions,

6    I think it's important to call attention to the Court -- to

7    call to the Court's attention there are a couple of jury

8    instructions that are nonstandard jury instructions, and

9    specifically regards Count 2 and Count 3.  At least --

16:02:25 10              THE COURT:  You mean in the final jury instructions?

11              MS. CISNEROS:  Yes, final jury instructions.

12         I think that it would be the defense's request -- I

13    don't think it would be the defense's request, it would be the

14    defense's request and strong urging that we resolve those

16:02:40 15    instructions before openings as they will inform both whether

16    we actually pursue an entrapment defense or -- and also will

17    affect the length of the trial for that reason as well.

18              THE COURT:  Okay.  I will do my best to look at those

19    and to have a draft set for you to look at on January 3rd.  I

16:03:12 20    think it does make sense to try to get that resolved.  It will

21    help me in ruling on objections as well.

22              MR. BOYLE:  Well, we need to, as the parties, work on

23    these, then -- the pleading shows you that the defense gave us

24    their 26 earlier this week, but it wasn't in time to file

16:03:29 25    this.  So we have to work on them together.  The reason I say

16:03:32  1    that is we ought to just submit a follow-up nonstandard jury

2    instruction request because we haven't briefed those for you.

3            THE COURT:  That's fine.  Why don't you jointly

4    submit your final instruction proposals, both stipulated and

16:03:51  5    those on which you disagree, by the close of business on

6    December 28th.

7            MR. BOYLE:  Thank you.

8            MS. CISNEROS:  Okay.

9            THE COURT:  And I will look at them before the 30th

16:03:59  10   and be ready to talk to you about them.

11            Couple of other minor housekeeping matters.

12            I assume the rule is going to be invoked.

13            MS. WILLIAMS:  Yes, Your Honor.

14            THE COURT:  I'm going to leave it to both sides to

16:04:11  15   advise your own witnesses of the rule being invoked and what

16   it means.

17            Will the defendants waive their presence at sidebar

18   during trial?

19            MS. WILLIAMS:  Yes, Your Honor.

16:04:21  20            MS. HULL:  Yes, sir.

21            THE COURT:  Okay.

22            All right, that is everything I have.

23            Mr. Boyle, Mr. Morrissey, do you have matters you

24   want to raise?

16:04:41  25            MR. BOYLE:  Regarding the rule being invoked, the

16:04:42  1   government will have Jackie Bell, Renita Linyard, and Donald

2   Logan in the courtroom.

3           THE COURT:  You mean the victims?

4           MR. BOYLE:  Victims, yes.

16:04:53  5           THE COURT:  Who may be witnesses?

6           MR. BOYLE:  Yes.

7           THE COURT:  Any objection from the defense?

8           MS. WILLIAMS:  Yes, Your Honor.

9           THE COURT:  What's the basis for the objection,

16:04:59 10   Ms. Williams?

11           MS. WILLIAMS:  The basis, Your Honor, is that we have

12   invoked the rule and these folks will be witnesses, and I

13   don't think that they should be -- fall outside the scope of

14   the rule.

16:05:17 15           THE COURT:  Does the victim's right statute address

16   that?

17           MR. BOYLE:  Yes.

18           MS. WILLIAMS:  I don't have a copy in front of me,

19   Judge.

16:05:25 20           THE COURT:  Do you know the citation, Mr. Boyle?

21           MR. BOYLE:  3771, I think.

22           THE COURT:  It's 3771(a)(3), which says a crime

23   victim has the following rights, and then 3 is "The right not

24   to be excluded from any such public court proceeding unless

16:06:15 25   the Court, after receiving clear and convincing evidence,

16:06:18  1    determines that testimony by the victim would be materially

2    altered if the victim heard other testimony at that

3    proceeding."

4         So the burden is clear and convincing.  Do you have a

16:06:34  5    basis for arguing that there is clear and convincing evidence

6    that the testimony of these victims would be altered if they

7    sat through the trial?

8         MS. WILLIAMS:  Your Honor, as I was listening to you

9    read the statute and I was continuing to think about where

16:06:49  10   these three witnesses fall within the case, I'll withdraw my

11   objection.

12        THE COURT:  All right.

13        Ms. Hull?

14        MS. HULL:  No objection.

16:06:58  15   THE COURT:  Okay.

16        MR. BOYLE:  We have two case agents, Agent Tristan

17   Moreland and Agent Larry Bettendorf.  And if the defense could

18   advise the Court who theirs would be.

19        THE COURT:  Ms. Williams, Ms. Hull, I assume -- are

16:07:14  20   you going to have investigators in the courtroom?

21        MS. WILLIAMS:  Yes.  I have Carl Brandenberger.

22        MS. HULL:  And Swain Granieri.

23        MS. WILLIAMS:  We will also have three people sitting

24   at counsel table with us who will not be witnesses but they're

16:07:31  25   our two paralegals and our computer assistant.

16:07:37  1           THE COURT:  All right.  Those all sound reasonable to

2    me.

3           MR. BOYLE:  No objection.

4           The second point we have --

16:07:45  5           THE COURT:  Hold on just one minute, let me make a

6    note of something before I forget, Mr. Boyle.

7           MS. WILLIAMS:  Your Honor, if I may add, we have had

8    another investigator from my office working with us

9    periodically and when Mr. Brandenberger is called out to work

16:08:06  10    on other cases we may ask Oscar Castillo to step in.

11           THE COURT:  All right.

12           MS. HULL:  On the investigator issue, Judge, my

13    understanding of the law is that the government gets one

14    investigator designated for purposes of avoiding the exclusion

16:08:22  15    of witnesses.  I don't believe the government is entitled to

16    have two investigators designated in the courtroom,

17    particularly when both of them will be testifying and have

18    been listed witnesses.

19           THE COURT:  I'm not familiar with that law, Ms. Hull.

16:08:36  20    Why don't you raise that again on the 3rd if you find law to

21    support it.  I just haven't seen a case that limits it.  I

22    have had cases where there were two case agents in the

23    courtroom.  If you think there's some clear authority on that,

24    let's be prepared to talk about it on the 3rd.

16:08:53  25           Mr. Boyle, do you have other matters?

16:08:56    1          MR. BOYLE:  The next one is the security in the

        2    courtroom was addressed by the Court previously.  The

        3    magnetometer is not outside now.  But the victims have

        4    continuing concerns regarding safety, especially when the

16:09:10    5    trial begins.  And if there's any comments about additional

        6    marshals at the beginning of the trial so that -- because we

        7    don't know what kind of response we're going to get to this

        8    case.  Is there any additional information that the Court,

        9    having removed the magnetometer, or the marshals, will have

16:09:29   10    additional personnel here at the beginning of the trial?

       11          THE COURT:  Well, as I indicated to you before, after

       12    conferring with the marshal, I concluded that we did not need

       13    the magnetometer at the door to the courtroom.  I also think

       14    it would slow down our ability to try the case effectively if

16:09:47   15    everybody had to come back through a magnetometer after every

       16    break.  I think the screening at the front of the courthouse

       17    which everybody will have to go through is sufficient.

       18          I had not anticipated having any more marshals in the

       19    courtroom than we have normally.  Are you making a specific

16:10:05   20    request, Mr. Boyle?

       21          MR. BOYLE:  Yes.  I am advising you the victims in

       22    this case, having been targeted before, are concerned about

       23    their safety.  We do have security downstairs, but we also

       24    have a case that has some, well, a group -- tensions on a lot

16:10:25   25    of sides.  We think at the beginning of the trial the marshal

16:10:28  1    service should give some thought, if they're able to, to

2    having additional security here for at least a few -- the

3    first week of the trial, for example.

4         And then if that's not needed, it can be removed.

16:10:40  5    But it would make the victims feel more secure, and we don't

6    see a down side.  And this is an unusual case.  They will be

7    in the back of the courtroom, so it shouldn't impede any

8    process in the case and it should allay some of the concerns

9    of the victims.

16:10:58 10         MS. WILLIAMS:  And, Your Honor, I will object to that

11    for several reasons.  Number one, I think that places an undue

12    hardship on the marshal's office.  Their personnel are

13    stretched pretty thin on a daily basis serving all of the

14    different courts in this building.

16:11:16 15         Number two, during jury selection, during the

16    majority of trials it's been my experience the court security

17    folks step in just because the courtroom gets so full during

18    those days, and so there are extra people around just to be

19    around.

16:11:33 20         Number three, I would remind the Court and the

21    government that at the beginning of the case, many things were

22    said about our clients and about this case and security and

23    media and so on and so forth, and a big deal was made about

24    it.  In the two and a half years that we have been working on

16:11:58 25    this case and coming into court, this is -- the assembled

16:12:04  1    people in the courtroom has pretty -- within a person or two

2    has never been any bigger than this and, for the most part,

3    has not differed from the group that is here today.

4         There have been absolutely no issues that have

16:12:19  5    arisen.  There has been no trouble.  There has been no hint of

6    trouble.

7         The extreme concerns that were raised, I believe have

8    been completely allayed.  And, also, the media attention after

9    the first couple hearings, maybe the first few months, I don't

16:12:43 10    remember exactly, but early in the case, has completely

11    vanished.  I think both sides have done a very good job of

12    keeping this case off the radar screen with the press, and at

13    least on the defense side we absolutely intend to continue

14    doing that.  I have no interest in trying this case to the

16:13:00 15    media.  And the media tends to ignore federal court anyway.

16    So unless it's brought to their attention, I don't anticipate

17    seeing that.

18         I appreciate their concerns.  I think it's unfounded

19    and I think the past two and a half years has underscored and

16:13:21 20    proven that fact.

21         MR. BOYLE:  Your Honor, Mr. Logan would like to

22    address the Court.  This is a significant event for him.  If

23    he can speak to this?

24         THE COURT:  That's fine.  Go ahead, Mr. Logan.

16:13:40 25         MR. LOGAN:  Your Honor, thank you.

16:13:43  1          As you probably know, I have been here every day, and

2     I would agree with defense counsel that this room isn't

3     crowded with people.  But I can tell you the media is

4     following this case.  And once the trial begins, I guarantee

16:14:03  5     you there will be people here that have an interest in this

6     case.

7          There isn't a day that goes by that I'm not reminded

8     what happened to me in 2004.  And it pains me to hear what I

9     interpret as minimizing what happened.  It did happen.  I live

16:14:26  10    it every day.

11         When I sit on the front of these steps -- these rows

12    and I hear the doors open, I have to look back and wonder

13    about who's coming through the door.  It's not so much the

14    Mahons that concern me, because those who follow their

16:14:48  15    beliefs, those who will be attracted to this case by virtue of

16    the media coverage that will come on the opening day of this

17    trial -- and to think that this cannot happen, I am proof that

18    it did happen.  And every day that I look in the mirror, I'm

19    thankful that because of the way that package was opened I'm

16:15:22  20    here to share my feelings and to defend my cause.

21         So any time anyone minimizes the fact that this is

22    not a high-profile case -- to think that one in 22 billion

23    chances of any of us receiving a bomb, I did.  I opened it.

24    I'm here to talk about it.

16:15:44  25         I don't know how many followers that admire this

racist behavior, but this court and a number of people that

come here will change once this trial begins.

So we can't judge whether or not this case will

generate the same level of attention it has during these

pretrial hearings.  I can guarantee you that changes once the

actual trial begins because people want to see the hate and

those who are being accused, and they want to gather the facts

around this case because this is a local matter that's being

addressed on a federal level.

There are a number of family members, colleagues, and

people generally concerned about what has happened here that

want to get a first-hand experience to observe what happens

here.  So to err on the side of less security -- I mean the

marshal has an obligation to ensure that there is safety.  And

no disrespect to the Court, the marshal makes that decision.

And I'm concerned from day one to today the focus on security

and the concerns the victims have have somewhat diminished, or

appears to have diminished, and that concerns me.  Thank you.

THE COURT:  All right.  Thank you, Mr. Logan.

All right, I'll take this issue under advisement.

Do you have another matter you wish to raise,

Mr. Boyle?

MR. BOYLE:  Your Honor, we never set, I don't think,

a date for the government's expert rebuttal disclosure, and I

don't know that this topic has come up.  We had the

16:17:35  1  government's expert disclosure, we had the defense expert

2  disclosure, and I don't think the government would have been

3  expected to anticipate -- to have -- before the defense gave

4  their experts, give our rebuttal experts.

16:17:52  5          I bring this up because, unless I'm wrong, I think we

6  need to give some kind of date for the government's expert

7  witness rebuttal disclosure.  Am I wrong on that?  If I'm not,

8  I would ask you set one of January 2nd.

9          THE COURT:  For the -- for what?

16:18:13  10         MR. BOYLE:  They have noticed experts that will

11  testify on various topics.

12         THE COURT:  Your rebuttal experts?

13         MR. BOYLE:  Yeah.  I don't want to be in a position

14  where we're in the middle of trial and I'm going to call a

16:18:23  15  rebuttal expert and the defense says "whoa, you should have

16  done that back in December."  Because it hasn't come up, I

17  want to make sure there's a deadline.  I'm not speaking for

18  the defense, I'm just saying I don't know if this ever came

19  up.  Since it hasn't, I'd like to have that set.  And the

16:18:39  20  standard for that, and I think everything else, is absent good

21  cause shown.  And I'm proposing January 2nd.

22         THE COURT:  Any thoughts from defense counsel?

23         MS. WILLIAMS:  That's fine with me, Judge.

24         MS. HULL:  No objection.

16:18:54  25         THE COURT:  All right.  We'll say government expert

16:18:55  1    rebuttal disclosures are due on January 2nd.

        2        MR. BOYLE:  All right.  I have two other issues.  The

        3    second is -- the first is important because there are a lot of

        4    transcripts and the defense has objections to our transcripts.

16:19:08  5    Some sections they believe are 404(b).  We don't think they

        6    are.  And we want these to be resolved before trial starts

        7    because we have people in our office who have to match the

        8    transcript up with the recording and then we have to cut the

        9    recording.  So that's not something we can do during the

16:19:24 10    middle of trial.  And even if we tried to do it in trial, we'd

       11    have numerous sidebars.

       12        Having said that, I don't think we allotted a

       13    deadline for you to be given transcripts to review, for

       14    example, for whether or not you think it's 404(b) and should

16:19:38 15    be excluded.  Or 403 or some other objection.  Therefore, I

       16    think we need to set a timeline for that.

       17        THE COURT:  What do you propose?

       18        MR. BOYLE:  I think that the defense should tell you

       19    when they can accomplish that by, but at the end of the day I

16:19:55 20    think you need to have that briefing by the 3rd.  If you're

       21    not prepared to deal with it on the 3rd, you can tell us when

       22    you are.  But I think we have to have this teed up for you by

       23    the 3rd.  So I leave it to the defense to tell us when they

       24    could have their objections to you by.

16:20:08 25        MS. WILLIAMS:  Your Honor, my understanding, and I'm

16:20:10  1    guessing from the way we're going that that has changed, is we

2    were coming back tomorrow.  Are we no longer coming back

3    tomorrow?

4            THE COURT:  I'm hoping we don't have to.

16:20:20  5            MS. WILLIAMS:  Because it was -- I was going to raise

6    this same issue tomorrow because it is a big issue.

7            We, the defense, are completely objecting to the use

8    of transcripts in this case, period.  If the Court overrules

9    that objection, and we have gone back and forth numerous times

16:20:45 10   about all the individual transcripts, there are four, six,

11   eight, ten, 12, 14 transcripts which -- where there are still

12   issues.

13           The reason we are, especially in this case, objecting

14   to the transcripts is there are a lot of -- there are a lot of

16:21:06 15   videotapes from surveillance that was done in various places.

16           What we have experienced -- when I hit snags in these

17   transcripts and the government tells me they're hearing one

18   thing and I'm hearing something else, and I suspect they might

19   do something similar, I'll start calling people into my office

16:21:25 20   and either put the headphones on them or not, play the piece,

21   the questioned piece, for them, and they will listen.  And

22   what they hear, and I have seen this time and time again,

23   depends on whether they're reading or whether they're

24   watching.

16:21:43 25           Because -- because we are dealing with identical

16:21:49  1    twins who have similar voices and at that time, at that point

2    in time, looked like identical twins, it is very difficult to

3    make out who is saying what, what is being said.

4    You've got the two brothers talking at once, one or

16:22:10  5    two people, for example in Catoosa the CI and the undercover

6    agent.  You've frequently got a videotape playing at the same

7    time, and they're all talking over each other.

8    When you've got a transcript to read, and I've

9    experienced this myself when I'm trying to get through these

16:22:31  10   tapes, when you're reading and listening, you're somewhat

11   listening and you hear what you're reading.

12   When you put the transcript down and you watch and

13   you listen, you hear something else because you're pulling in

14   and assimilating more of the context.  And that context and

16:22:52  15   all of the distractions and interplay substantially affect

16   what you're hearing or what you think you're hearing.

17   I think in this case in particular, it is highly

18   prejudicial to the defense.  For the most part I don't have

19   that many objections to tapes being played for the jury.  It's

16:23:18  20   this whole issue of the transcripts that I have serious

21   problems to.  So I'm objecting to the use of transcripts,

22   period.

23   THE COURT:  Mr. Boyle -- oh.  Ms. Hull.

24   MS. HULL:  I join in that, Judge.  And by way of

16:23:33  25   example, there are some exhibits authored by the government

16:23:36  1    that are video.  And if the Court -- I mean, we could easily

2    prepare an example for you where if the jurors -- I can

3    visualize having video played for these people, and if they

4    aren't watching what's going on and they're only reading the

16:23:56  5    transcript, because I look at these transcripts and if I

6    don't -- if I didn't know it was on the video, I could make a

7    totally different inference from the words than what I was

8    seeing on the screen.

9         The physical demeanor, the physical contact

16:24:19 10    between -- for example, last year you heard about this drive

11    through Scottsdale where the CI grabbed Mr. Mahon's genitals.

12    That's not in the -- they're not going to see these things if

13    they've got a transcript in front of them.  Particularly on

14    these videos, Judge, there is no reason for a transcript.  I

16:24:38 15    think that it misconstrues the evidence, and the best evidence

16    is the video.  Because otherwise you miss out -- that's a

17    perfect example.

18         For example in this -- the same drive where there's a

19    video of the three -- CI, both Mahons -- driving through

16:25:04 20    Scottsdale, there's -- my client is supposedly, according to

21    the government's transcript, saying something, "It says second

22    something.  This is it here."  And then they have in their

23    transcript "This is where Logan's from."

24         Now, we have listened to this.  All of us have

16:25:23 25    listened to this with enhanced audio.  He's mumbling.  You

16:25:28  1    cannot hear those statements.  But if you put this transcript

2    in front of a jury, that's what they're going to hear.  And we

3    object to that, Judge.  That is a perfect example.

4        But they're missing entirely all of the physical and

16:25:48  5    visual part of this where somebody says "Oh, this is spooky,

6    spooky," and it sounds like the government would want the jury

7    to think they're talking about because of where they are,

8    close to where the bombing occurred.  But if you watch the

9    video, they're saying it's spooky because they're coming under

16:26:06  10   a really low clearance of a parking structure.  And you miss

11   that if you're not watching the video.

12        THE COURT:  Let me interrupt you for a minute.  I

13   think the marshals heard a beeping in our technology closet?

14        DEPUTY MARSHAL:  That's right.

16:26:19  15        THE COURT:  We'll call.  We'll call Brian Lalley and

16   have him come up.  Thanks.

17        DEPUTY MARSHAL:  Okay.  Thanks.

18        THE COURT:  Anything else you have to say on that,

19   Ms. Hull?

16:26:28  20        MS. HULL:  Not on that, Judge.

21        THE COURT:  Let me tell you my general view.  I have

22   found in I think every trial where we played an audio or a

23   video that it helped the jury to have a transcript to follow

24   along with, with the understanding and the instruction that it

16:26:40  25   was the audio and the video, not the transcript, that was

16:26:44  1    evidence.  And without the transcripts being marked in

2    evidence or going to the jury room.

3         So my general view is we ought to allow it.

4         If there are specific examples that the defense wants

16:26:58  5    to provide me to suggest that we shouldn't use it, I'll be

6    happy to look at those, but I'm not going to rule out

7    transcripts as a general matter because I have found them

8    helpful in every case where we used them.

9         I think what we need to do is have the defense

16:27:16  10   identify specific transcripts that you object to if you think

11   they're inaccurate.  Or if it's an example where you think

12   it's distracting, identify it so I can review it and make

13   ruling on it.

14        And I'm asking you to be specific.  Not to ask me to

16:27:35  15   review every transcript of every audio or video.  I don't

16   think that will be necessary.

17        So the two examples will be if you think the

18   transcript's inaccurate, or if you think it's distracting.

19   You're free to make those objections.  I will look at the

16:27:51  20   video, I'll follow the transcript, and I'll make a ruling on

21   whether we ought to use a transcript in those instances and

22   whether it's accurate.

23        The question is when can you do that?

24        MS. HULL:  I have a question, Judge, related to the

16:28:04  25   last.  Have you -- I'm just saying this by way of proposal.

16:28:13  1    Is it possible to perhaps structure the evidence in such a way

2    that, for example, a video is played for the jury and then ask

3    the jury if they would prefer a transcript instead of

4    necessarily presenting it to them when -- some of these are --

16:28:37  5    the audio video is perfectly -- perfectly clear and there's no

6    need for a transcript.

7         THE COURT:  I don't know the answer to that,

8    Ms. Hull, without looking at it.  So I think I need to see the

9    specifics that you're objecting to.

16:28:50 10         When is it you can have your focused objections?

11         MS. WILLIAMS:  Your Honor, my last day in the office

12    next week is Wednesday.  We'll have it done by then.  We're

13    going to pull specific clips where I have transcript

14    objections, and there are going to be -- using Scottsdale

16:29:12 15    drive as an example, we'll try to pull large clips of -- to

16    show you what kind of distractions we're talking about.

17         We could identify the entire Scottsdale drive because

18    I think the problems adhere to the whole tape.  But we will

19    try to pull from those, from the distraction standpoint,

16:29:37 20    larger clips for you to look at and listen to.

21         THE COURT:  What is the form in which you'll provide

22    it to me?

23         MS. WILLIAMS:  DVD.

24         THE COURT:  Of a particular excerpt of the tape and

16:29:48 25    then what for the transcript?  How do I match them?

16:29:54 1          MS. WILLIAMS:  Can we create an index on the DVD?

2          THE COURT:  What I want to be sure of is this:  About

3     half, maybe more than half, of the DVDs I get from counsel we

4     can't play on our court computers, and I don't know why that

16:30:12 5     is because people here always tell us the DVD's defective.

6          If whenever you deliver it, if you could just make

7     sure that we can play it in our office, that would be a big

8     help.  But secondly, if you could identify a clip as Clip A,

9     for example, and then have a corresponding transcript that is

16:30:29 10    Transcript A that matches up, then I'll know what to look at

11    as I'm listening.  And it will be a lot easier than if I get

12    the full transcript and I have to find in the transcript what

13    I'm hearing on the tape.

14         MS. WILLIAMS:  Oh.  Right.  What I'd like to do is

16:30:46 15    have a DVD with let's say -- well, with the objectionable

16    transcripts and I will pull out a video/audio clip.  I'll

17    identify it as "this is a clip from E-43."  I'll have a

18    document with that piece of E-43 on it.  If it's a clip where

19    there is a sentence or two, then I'll try -- I'll focus on

16:31:19 20    just those couple sentences.

21         THE COURT:  All right.

22         MS. WILLIAMS:  And we'll provide it, of course, to

23    the government.

24         THE COURT:  Right.

16:31:26 25         Mr. Boyle.

16:31:29  1          MR. BOYLE:  I think you'll have to bifurcate --

       2          THE COURT:  Hold on just a minute, Mr. Boyle.

       3          (The Court and the judicial assistant confer.)

       4          THE COURT:  Okay.  Go ahead.

16:31:42  5          MR. BOYLE:  I think you need to bifurcate that

       6  evidence review into two parts.  Because, as you know, when we

       7  play -- often play our transcripts, for example videotape, we

       8  have the text scrolling underneath so the jurors can watch it

       9  as it's scrolling.  And they make two different points.  The

16:31:59 10  first point they have is the transcript doesn't match the

      11  words.  Well, that's fine.  You can do that yourself by

      12  listening to it and making a ruling.

      13          If their second point is looking at the transcript

      14  distracts from you watching the video, then I think you have

16:32:12 15  to see the synced up version that only plays in a program

      16  called Sanction, and I don't know that the Court has Sanction,

      17  which means we have to play that segment for you.

      18          THE COURT:  Well, Mr. Boyle, I have seen many

      19  Sanctions presentations of scrolling text with video, so I

16:32:27 20  think I'll be able to understand how it will work.

      21          MR. BOYLE:  Okay.

      22          THE COURT:  I think I can make that judgment because

      23  I've seen it many times.

      24          MR. BOYLE:  All right.  Thank you.

16:32:35 25          THE COURT:  And I understood that that's what you

16:32:37  1    were going to use is scrolling text.

2           MR. BOYLE:  All right.

3           THE COURT:  So you'll get it to us Wednesday?

4           MS. WILLIAMS:  By close of business Wednesday.  And

16:32:46  5    I'm also informed if it would be additionally helpful on the

6    tech problem, we could leave an office laptop with the Court

7    to play it on because it's probably -- it's going to be a

8    laptop that we have already played it on.

9           THE COURT:  That's fine.  That would make sure I

16:33:04 10   could see it.  Right?  Okay.  Yes.

11          MS. WILLIAMS:  Okay.

12          THE COURT:  Now, I won't be viewing it until the

13   29th, so if you need that laptop, don't worry about getting it

14   here until the 28th.

16:33:19 15          Okay.  Mr. Boyle, did you have other matters you

16   wanted to raise?

17          MR. BOYLE:  We'll file our response by the 27th?  Is

18   that fine?

19          THE COURT:  Response --

16:33:32 20          MR. BOYLE:  They're going to submit something to you

21   that they think you should view, then I think we should have a

22   chance to say -- I mean, if we have something to add, we will

23   do that by the 27th.

24          THE COURT:  Were you intending to make argument in

16:33:44 25   your written submissions?

16:33:46  1          MS. WILLIAMS:  No.

2          THE COURT:  I had assumed I'm just going to get it

3    and I'm going to ask two questions.  One is, is the transcript

4    accurate?  And, two, does it distract?

16:33:54  5          MS. WILLIAMS:  Right.  Just film clips.

6          THE COURT:  If you see what they've sent and you

7    think you need to file something, fine.  But I don't think I

8    need briefing, I just need to review it.

9          MR. BOYLE:  Fine.  Thank you.

16:34:04 10          THE COURT:  Anything else?

11          MR. BOYLE:  On that issue, no.  I just have one final

12   issue, and that's if the parties are going to use exhibits or

13   PowerPoints for openings, how do you handle that?  Do we have

14   to exchange them?  I presume we do.

16:34:16 15          THE COURT:  Yes.  Absolutely.  We don't want

16   objections during openings on issues I haven't addressed

17   because that obviously interrupts the flow of the opening too

18   much.

19          MR. BOYLE:  I did have a follow up on your witness --

16:34:28 20   beginning trial.  Are you saying you don't know when we're

21   going to start witnesses and openings?  Or did you say the

22   12th will be that day?

23          THE COURT:  No, I said it will be the 11th or 12th.

24          MR. BOYLE:  Thank you.  And do you know yet when you

16:34:44 25   will be taking a one-week break in this trial?

16:34:47  1        THE COURT:  I don't.  But it won't be in the first

2      couple weeks.  I haven't looked at how we have to schedule

3      stuff in late January or early February yet.  And I -- I don't

4      know for sure it will need to be a one-week break.  It really

16:35:00  5      depends how much stuff we've got as we get to the end of

6      December.

7        MR. BOYLE:  Nothing else.  Thank you.

8        THE COURT:  Ms. Williams or Ms. Cisneros?

9        MS. WILLIAMS:  I do have several things, Your Honor.

16:35:13 10      Anticipating that we were going to have a second day

11      with you tomorrow, there were a number of oral motions in

12      limine I was going to raise about topics that I know are

13      coming.  Do you want to wait until the 3rd?  Do you want me to

14      raise it now?  What's the Court's pleasure?

16:35:41 15        THE COURT:  Well, how involved are these oral motions

16      in limine?

17        MS. WILLIAMS:  I don't think they're very involved.

18      Why don't I just tell you what they are and --

19        THE COURT:  That's fine.

16:35:56 20        MS. WILLIAMS:  The first -- there are four.  One and

21      three involve tapes.

22      The first is the government intends -- has listed as

23      an overt act and I believe intends to present evidence about a

24      baggie of M-80s that were found during the Illinois search of

16:36:25 25      the Mahon farm.  We anticipate that that testimony is going to

16:36:34  1    come through Agent Moreland.  Whoever it comes through, we

2    would object to the government or the agent referring to these

3    M-80s as IEDs.  We're moving in limine to preclude the use of

4    the term IED or --

16:36:54  5        THE COURT:  Improvised explosive device.

6        MS. WILLIAMS:  Thank you.  My mind just went blank.

7    I knew what that meant five minutes ago.

8        So that is one thing we wanted to ask the Court to

9    preclude.

16:37:09  10       The other three issues have to do with tapes.  There

11   are tapes designated where my client generally is conversing

12   with, one, Tom Metzger; two, Robert Joos; three, Charles

13   Kountze.

14       Now, the government has -- we previously litigated

16:37:34  15  this and discussed this.  They have told the Court that Robert

16   Joos and Tom Metzger are unindicted coconspirators and I

17   believe they intend to present those statements as

18   coconspirator hearsay.  We still object to that.

19       However, Charles Kountze is neither an unindicted

16:37:59  20  coconspirator nor is he going to be a witness.  Where my

21   client is having phone conversations with Charles Kountze, I'm

22   going to be objecting to those as hearsay.  And that was

23   another issue I wanted to raise.

24       And on the subject of Tom Metzger, there is an

16:38:20  25  additional issue with respect to one particular tape that is

16:38:28   1    going to be offered by the government.  This is a tape that I

2    believe was found, and the government can correct me, I

3    believe it was found during the Metzger search, which occurred

4    the same day as the Illinois search, I think.

16:38:46   5         When we have reviewed -- in the many times we've gone

6    to ATF to review evidence, that section, that specific Metzger

7    search, was a portion of evidence that was somewhat restricted

8    from us.  We did not see all the Metzger evidence.  This tape,

9    and possibly a couple other items, I believe, came from that

16:39:09  10    search and we're going to be objecting to those items, and

11    especially the Metzger tape, for foundational reasons in

12    addition to the fact we've not been allowed to see what else

13    was taken, to see if there was exculpatory -- there were

14    exculpatory materials.

16:39:28  15         Those are the limine issues.

16         THE COURT:  Well, okay.  Let me just see if we can

17    clear up these now.

18         Mr. Boyle, do you intend to use the acronym IED?

19         MR. BOYLE:  We do, yes.

16:39:43  20         THE COURT:  And in what context?

21         MR. BOYLE:  The devices are attached with steel ball

22    bearings glued to them.  We have a videotape of a

23    demonstration that is marked as an exhibit and disclosed where

24    they detonated this thing and it went through a trash can to

16:40:00  25    show lethality.  The relevance is there are recordings with

16:40:05  1    Dennis Mahon where he says -- and with Tom Metzger on a

2    different one where they talk about dropping them into

3    immigration rallies.  In one of the recordings Dennis Mahon

4    says, "Tom Metzger told me not to do it because it would kill

16:40:19  5    them and that it would have sympathy -- cause sympathy for the

6    people holding the rally," so Dennis said he was holding off

7    for a while.  Therefore -- I mean, that's the relevance --

8         THE COURT:  Well, I understand why you're arguing the

9    devices are relevant.  Why is the acronym IED relevant?  And

16:40:36  10   the reason I say that is because I think 99.9 percent of

11   Americans have become familiar with the IED phrase in

12   connection with the Iraq war and the devastating effect IEDs

13   have had on American soldiers.  So that phrase carries baggage

14   with it, and I'm wondering why you think you need to use that

16:40:56  15   specific acronym during the trial.

16        MR. BOYLE:  I mean, would we call it an

17   anti-personnel device?

18        THE COURT:  You could call it a bomb, you could call

19   it a homemade bomb, you could call it an explosive device.  I

16:41:12  20   mean, there's lots of phrases you could use that don't carry

21   the unique Iraq War association that I think IED does.

22        MR. BOYLE:  We'll use the term destructive device,

23   the legal term.

24        MS. WILLIAMS:  Well, Your Honor, I have a problem

16:41:25  25   with that.  These are M-80s.  That's what they're known as.

16:41:29  1          THE COURT:  Do you agree they had ball bearings glued

       2  to them?

       3          MS. WILLIAMS:  I do.

       4          THE COURT:  Then they're much more than M-80s.  M-80s

16:41:36  5  normally don't have ball bearings glued to them.

       6          MS. WILLIAMS:  I agree with that, Your Honor.

       7  However, it has been my experience in other ATF cases that

       8  agents routinely refer to M-80s a IEDs or destructive devices

       9  or bombs or whatever.  That doesn't even get to the issue of

16:41:56  10  ball bearings.

      11          We're also, I believe, going to have a squabble

      12  during trial about, based on what Mr. Boyle just said as their

      13  basis for introducing them, we're going to have issues about

      14  relevance to this case and those M-80s.

16:42:10  15          THE COURT:  Well, the motion in limine that you made

      16  was to IEDs.  The government is not going to use "IED."  And I

      17  think that's the correct call.

      18          I'm not going to grant a motion in limine saying they

      19  can't describe it in some other way.  If they're using a

16:42:25  20  another phrase you think is objectionable, by all means object

      21  when it is used.

      22          Now, I understood from what you said about the tapes,

      23  Ms. Williams, that there were two objections you had.  One was

      24  to the fact that conversations with Charles Kountze are

16:42:44  25  hearsay because he's not a coconspirator, and the other was

16:42:48  1    that there's a particular Metzger tape that you think came

2    from materials you were not given full access to so there's a

3    disclosure concern.

4              MS. WILLIAMS:  Correct.

16:42:57  5              THE COURT:  Did I miss another one?

6              MS. WILLIAMS:  You did not.

7              THE COURT:  Okay.

8              Do you have a thought, Mr. Boyle, on the hearsay

9    nature of the conversation with Charles Kountze?

16:43:13  10             MR. BOYLE:  The law is clear that if it gives context

11   to Dennis Mahon's admissions or statements, then it would come

12   in.

13             You would have to see that statement and, if

14   requested, give a limiting instruction that his statements are

16:43:24  15  not offered for any truthful purpose.

16             And the second half of that is he doesn't actually

17   make any statements that incriminate anyone else.  They're

18   just talking about general topics that are relevant in this

19   case.

16:43:36  20             So if the defense has an objection, they should give

21   you the transcript of that recording.  You should see if

22   there's anything prejudicial about Kountze's statements and

23   then also, you would, if requested, give a limiting

24   instruction that says they're not offer for the truth of the

16:43:55  25  matter.

16:43:55   1          THE COURT:  All right.  If I'm going to rule on the

           2    hearsay objection, it seems to me I need to see specifically

           3    what is being objected to as hearsay.

           4          MS. WILLIAMS:  Okay.

16:44:04   5          THE COURT:  So I think if you just bring the

           6    transcript on January 3rd, we can talk through it.

           7          With respect to the Metzger tape, your response,

           8    Mr. Boyle?

           9          MR. BOYLE:  Agent Moreland informs us the defense has

16:44:17  10    seen all the items from the Metzger search.  Regarding the

          11    question of foundation, it's a recording between Tom Metzger

          12    and Dennis Mahon and there's an agent who was there who -- we

          13    can lay the foundation.  And then we would rely on 901, the

          14    lay witness testimony, that it's Dennis Mahon and Tom Metzger,

16:44:42  15    and I think that will be clear.  I think that's clear to all

          16    the parties.

          17          MS. HULL:  Judge, I can respond to the issue as to

          18    whether or not we're provided.  That is -- that is incorrect.

          19    The office that we went into at ATF, there was a specific

16:44:58  20    corner that we were told we could not look at.  We were

          21    prohibited from even going over there and even looking.  In

          22    fact, Mr. Boyle was uncomfortable with us standing in that

          23    part of the building -- the room.  Because we were told that

          24    was from the Metzger search and we were not entitled access.

16:45:17  25          THE COURT:  Let me interrupt, Ms. Hull.  I obviously

16:45:19  1  can't resolve this disagreement on the basis of what you're

2  saying here.  It seems to me that if you have an objection to

3  a particular tape being used, I need, again, to see the

4  specifics of that tape.  Probably in the form of a transcript.

16:45:32  5  But some other more precise basis than just "we think this was

6  in the corner; we weren't allowed to look at it."  I'm not

7  trying to minimize your argument, but on the basis of those

8  generalities, I can't decide who's right and who's wrong on

9  that issue.

16:45:48  10      So I think in terms of that oral motion, there's

11  going to need to be more foundation for the motion itself, as

12  well as the one we just talked about on hearsay grounds.

13      Ms. Williams, do you have other matters you want to

14  raise?

16:46:01  15      MS. WILLIAMS:  Yes, Judge.  One is -- this was

16  mentioned in passing, and hopefully we'll be coming back to

17  it, the matter of additional disclosures and *Giglio* on Alan

18  Scott.

19      THE COURT:  Well, yeah, there's nothing I can do with

16:46:21  20  that today, it seems.  You need have to have additional

21  discussions.

22      MS. WILLIAMS:  Okay.  Also, with respect to Agent

23  Moreland's testimony, he is going to be, I believe, testifying

24  about a wide range of subjects.  There's a specific topic that

16:46:40  25  I believe he will be testifying about, and that is matters

16:46:45   1   relating to the wiretap and the pen trap and trace.  That

2   specific subject area we have an expert who has been

3   disclosed.  Ms. Cisneros has been working with that expert and

4   has been working on that specific issue.

16:47:07   5        I would request, Judge, that when Agent Metz -- when

6   Agent Moreland testifies that we be allowed to carve out that

7   piece of his testimony.  He will be my witness.  I would ask

8   that Ms. Cisneros be allowed to do cross on that specific

9   issue only.

16:47:24  10            THE COURT:  Any objection from the government?

11            MR. BOYLE:  No, Your Honor.

12            THE COURT:  All right.

13            MS. WILLIAMS:  The last remaining issue, Your Honor,

14   has to do with 404(b) disclosure.  We got a letter from the

16:47:56  15   government December 13th and it is a lengthy and extremely

16   all-encompassing letter dealing with many, many topics that we

17   have discussed during motions arguments, motions in limine,

18   motion to suppress.  The Court has ruled many of those items

19   are not coming in -- some of those items are not coming in.

16:48:18  20   The government has now noticed them as coming in any way.

21        This issue may be better held for January 3rd because

22   it's somewhat linked to the issue of jury instructions.  As

23   Ms. Cisneros mentioned, we'd like to take up the count

24   instructions with the Court, and the government still needs

16:48:47  25   time to do their own research.  It's going to affect many

16:48:51  1    things, including the length of the trial and whether we do

2    present an entrapment case, and that ties directly back into

3    their disclosure.

4            THE COURT:  What is the issue?  When you say "this

16:49:04  5    issue is better" --

6            MS. WILLIAMS:  The issue of the government's 404(b)

7    impeachments and rebuttal disclosure.  Sorry.

8            THE COURT:  But what is the issue?  Are you saying

9    it's insufficient?  It's late?  It includes stuff that isn't

16:49:20 10    404(b)?

11            MS. WILLIAMS:  No, the issue is it lists 14,

12    approximately 14, different areas of topics dating back

13    decades in some subjects that we have previously discussed

14    with the Court and the Court has previously precluded.  It now

16:49:44 15    tells us it would want to go into those areas anyway.

16            We have a big problem on this 404(b) impeachment and

17    rebuttal, and perhaps it would be better addressed on the 3rd

18    when we are also resolving the jury instruction issues and

19    have a better handle on where we're going as a result.  I'm

16:50:08 20    just throwing that out there.

21            THE COURT:  Well, I don't have any idea if it would

22    be better resolved then because I don't know its connection to

23    jury instructions or -- I really don't know the specific

24    nature of what the objection will be.

16:50:20 25            If you're saying you don't want to raise today, you

16:50:22 1    just want to flag it and you want to bring it up on the 3rd,

2    that's fine.  But I don't think it should be my decision as to

3    whether you raise it today or on the 3rd.

4            MS. WILLIAMS:  I think we're going to -- what time

16:50:32 5    are we coming in?  Two o'clock?

6            THE COURT:  Two.

7            MS. WILLIAMS:  Two o'clock.  And --

8            THE COURT:  Why don't we make it one.

9            MS. WILLIAMS:  If we have a big enough block of time,

16:50:44 10   I'd like to flag it for discussion.

11           THE COURT:  Let's make it one.  But what I would ask

12   you to do, Ms. Williams, is talk to Mr. Morrissey and Mr.

13   Boyle about that issue.  What I don't want to have happen is

14   have us be here on the 3rd and you make arguments and them

16:51:01 15   say, "Well, we weren't aware of this, we need to think about

16   it or we need to research it."  We want to get those issues

17   resolved, so please discuss that before then.

18           MS. WILLIAMS:  Your Honor, the Court will no doubt

19   recall that we had many discussions before on 404(b) and the

16:51:16 20   Court made a ruling that statements that talk about other acts

21   are 404(b), and much of the government's disclosure falls

22   squarely into that.  Prior claims of prior actions, dating

23   back decades that -- of which there is no proof that we have

24   ever seen.  So we can discuss that more on the 3rd.

16:51:44 25           THE COURT:  And talk to them before the 3rd about it,

16:51:47  1    please.  You all right with that?

2              MS. WILLIAMS:  It will be difficult; we will try.

3              THE COURT:  All right.

4              Ms. Hull.

16:51:54  5              MS. HULL:  Along that line, Judge, and I want to

6    raise it today because in light of this letter that

7    Ms. Williams was just talking about, I am going to move in

8    limine to preclude the government from arguing that my

9    client's unrecorded statement to the effect that "If I knew

16:52:14 10    you better and the statute of limitations was up" was about

11    the Logan bombing.  They put this in a pleading saying that

12    that is going to be their argument, that that's what my client

13    was talking about.

14              The problem is, is that, Judge, if you listen to all

16:52:31 15    of the tapes from Catoosa, which is where this occurred, if

16    you listen to all of the tapes, you listen to the prior two

17    days prior to this, you listen to the recording, my client is

18    clearly talking about, and he tells the CI and UC, "we haven't

19    done anything like that in 20 years.  Haven't been active in

16:52:53 20    any of that in like 20 years."

21              The problem is, Judge, especially in light of this

22    last disclosure where they're saying again they want to go

23    into 404(b), I take this letter as a threat that if you open

24    the door, any door even close to this, we're going to bring

16:53:14 25    this up.

16:53:14  1        Here's the problem with that:  If they're permitted

2    to argue that that statement is about the Logan bombing when

3    there is nothing in the statement about Logan, about bombs, if

4    they're allowed to make that argument, then I would be forced

16:53:34  5    to play -- to defend that, to play the tape where my client

6    says "we haven't done that in 20 years."  And then we get into

7    their list of things that they're threatening on rebuttal if

8    we open up the door.

9        We're talking KKK things that you have specifically

16:53:52  10   prohibited in this case and you have said 404(b) time and time

11   again.  They're now saying that they're going to use that on

12   rebuttal.

13       And the problem with that is if they're allowed to

14   make that argument, they're forcing me to open a door to

16:54:08  15   404(b) to these other assertions that the Court has already

16   precluded.  So my client is placed in an impossible situation

17   where I'm basically -- either I follow the Court's order and I

18   cannot defend my client, or I defend my client and violate the

19   Court's order or invite violation of the Court's order.  That

16:54:35  20   is unfair, Judge.

21       I think they should be prohibited because they know

22   that if they've listened to all of the tapes, that's not what

23   my client was talking about.  And it's clear from the all of

24   the tapes when taken as a whole it's not what he was talking

16:54:51  25   about.

16:54:51  1          My fear is this is basically setting up the defense.

2     If we defend this allegation and their argument that my client

3     was talking about the Logan bombing when there is nothing,

4     even assuming the facts in the best light to the government

16:55:07  5     that all of this happened and all of this pretext occurred,

6     they still don't have any relation to the Logan bombing.  So

7     I'm going to move to preclude that as unfair, Judge.

8          THE COURT:  You're moving now?

9          MS. HULL:  I am now.  And if the Court would like me

16:55:24 10     to provide something in writing, I can do that, and we can

11     argue it on the 3rd.  I was just prepared here, Judge, when we

12     got prepared for these --

13          THE COURT:  That's fine.

14          MS. HULL:  -- we had a day and a half set aside.

16:55:34 15          THE COURT:  Mr. Boyle.

16          MR. BOYLE:  We're talking about things -- I guess

17     this is now a motion, but you already ruled on this and you

18     said you can't rule on this right now until you see the trial

19     evidence.  That is part of your order.

16:55:45 20          THE COURT:  On what?  My order --

21          MR. BOYLE:  On the issue of Daniel Mahon's unrecorded

22     statements and some statements he may have made in Catoosa,

23     and they made objections.  Your order says "I can't rule on

24     this in the abstract about whether or not it's relevant or

16:56:00 25     prejudicial, I have to see in the context of the trial."

16:56:03  1    So I understood that order to be, government, if you

2    want to go into this, we need to advise you.  I mean we're

3    going to have some steps where, for example, the admission of

4    coconspirator statements.  If we want to do that, we have to

16:56:14  5    stop the trial and tell you, Judge, you need to make these

6    certain findings to go forward.

7    We have done trials before.  We know what the issues

8    are, we know what your rulings are.

9    We will tell the defense the day before what our

16:56:25  10   trial exhibits and testimony will be.  So we can tee this up

11   again, but I'm certain your order will be as it was before,

12   which is, "You're asking me to take one statement and not hear

13   anything else and to make a ruling before trial," and you said

14   you can't really do that in the abstract, so, "Government,

16:56:42  15   come back to me basically during trial," which is what we'll

16   do.

17   THE COURT:  So you're saying you won't make the

18   assertion she worries about until you've raised it with me

19   during trial?

16:56:55  20   MR. BOYLE:  Correct.  Because your order says --

21   they've implicated -- they say it's 404(b) you say you can't

22   decide.  We will, yes, tell you before we do that.

23   THE COURT:  Doesn't that protect you, Ms. Hull?

24   MS. HULL:  Judge, in response to that, you gave an

16:57:06  25   order on this.  You've already ruled on this and specifically

16:57:07 1  laid out which of those unrecorded statements would be

2  admissible --

3          THE COURT:  If I've ruled on it, I've ruled on it.  I

4  don't need to say I really mean it.  If I ruled --

16:57:17 5          MS. HULL:  That's what I'm hoping.

6          THE COURT:  If I ruled on it, I ruled on it.  And you

7  all can follow the orders.  If what I've said in my order, and

8  I don't have this on my hand drive either, but if I said I

9  can't rule on that statement but if you're going to assert it,

16:57:30 10  raise it first, then that's what they'll do.  And I did it for

11  the purpose of protecting the other side from it being thrown

12  out in front of the jury.

13          So it seems to me if I've covered this ground, we

14  don't need to recover it.  We'll address it at trial in light

16:57:44 15  of rulings I've already made.

16          MS. HULL:  Thank you, Judge.  I would still ask to be

17  able to file a motion in this regard to cover that.  If the

18  Court wishes, I would like to address it -- because I think

19  they're going to make this argument and we will be -- that's

16:57:57 20  going to be something in closing, Judge.

21          THE COURT:  Can you keep it to three pages or less?

22          MS. HULL:  I can.

23          THE COURT:  All right.  You can file it, then.

24          MR. BOYLE:  And I've been asked to make it clear that

16:58:11 25  we'll try, when possible, to advise them of our next day's

16:58:17   1    witnesses.  I'm not making an overt promise we will always do

2    that, but we will try --

3         THE COURT:  I think we ought to always do it.  What's

4    the concern you've got, Mr. Boyle?

16:58:27   5         MR. BOYLE:  Well, if something comes up the next

6    morning and there's a reason why we have to call somebody out

7    of order --

8         THE COURT:  Well, that's always true.  But it seems

9    to me both sides need to give the other side 24 hours notice

16:58:38  10    of who the witnesses are.

11         MS. WILLIAMS:  I think you ordered that already,

12    Judge.

13         THE COURT:  I think we all agreed on that.  I

14    recognize there may be an unexpected development, but --

16:58:45  15    Ms. Hull, did you have anything else?

16         MR. BOYLE:  Thank you.

17         MS. HULL:  For clarification sake, Judge, when we

18    talked earlier about giving the government an opportunity to

19    respond to the issue of -- on this -- on my motion to dismiss,

16:59:02  20    the first motion to dismiss from a couple days ago, you had

21    talked -- you gave the government an opportunity to talk by

22    the 27th I believe was the response, to further address the

23    issues raised there.

24         THE COURT:  Are you talking about the *Brady* motion?

16:59:19  25         MS. HULL:  Yes.  Talking about the *Brady* motion.

16:59:22  1          THE COURT:  Okay.

2          MS. HULL:  I'm just going to ask that because I

3  placed -- I put in my response on one of these -- I know what

4  it was.  It was to the -- I take it back, not the *Brady* issue.

16:59:38  5  It was the government's motion to exclude certain exhibits and

6  we were talking about the Anderson issue, Steve Anderson

7  issue, and I made the distinction between exhibits and the

8  discussion.  And you gave the government an opportunity to

9  respond or provide additional information, I believe by the

16:59:55  10 27th.

11         What I'm asking is that for once and for all this

12 request, which is that's what they basically -- I put in my

13 response this is another attempt to -- for a third-party

14 defense.  For disclosure of third-party defense.  I would ask

17:00:11  15 once and for all that since the Court has ruled, I believe

16 three times, that they are not entitled to this, that this not

17 be rehashed.

18         THE COURT:  They filed a motion in limine.  I can

19 certainly address their motion in limine.  And it seems to me

17:00:26  20 if they've identified something specific they want to move in

21 limine, in order for me to decide if I'm going to move in

22 limine, I need to understand what the issue is.

23         MS. HULL:  Yes, sir, I understand that.

24         THE COURT:  So what are you -- I thought you were

17:00:39  25 suggesting I shouldn't rule on that.

17:00:41  1          MS. HULL:  Oh, no, no, no, no, no.  I'm just saying

2     in the government's response, when they prepare this document

3     for you, I'm just asking that we not again have to rehash.

4     Because it sounds to me by some of the statements Mr. Boyle

17:00:54  5     was making this is -- in fact, he put it -- no, it's not -- he

6     put in his motion --

7          THE COURT:  We'll specifically focus on the Anderson

8     lawsuit.  That's the issue.  I think you all can present your

9     arguments and I'll make a ruling.

17:01:09  10         MS. HULL:  All right.  Thank you.

11         THE COURT:  I'm not opening the door to relitigating

12    whether you have to give notice of 404(b).

13         MS. HULL:  Thank you.  That's all I have, Judge.

14         THE COURT:  Okay.  I think we're done.

17:01:27  15         Oh, yes.  A reminder, please.  When we're done with

16    jury selection, you need to return to court the disks that

17    have jury questionnaires on them because we told the jurors

18    that the questionnaires would be destroyed.

19         All right.  Have a nice holiday.  We'll see you on

17:01:43  20    the 3rd.

21         MR. MORRISSEY:  Your Honor?

22         THE COURT:  Yes, sir?

23         MR. MORRISSEY:  No problem returning the disk.  I

24    made hard copies.  Is it okay if counsel independently shred

17:01:52  25    those?  I don't think you want us to dump all of our hard

17:01:56  1  copies back to the court to shred.  I will avow once the jury

2  is selected, the government will shred them all.

3          THE COURT:  Yes, Please.  If you will make sure,

4  Mr. Morrissey, those get shredded.

17:02:08  5          MS. HULL:  We will, too, Judge.

6          THE COURT:  Did you make hard copies?  All right,

7  I'll make it your responsibility, Ms. Hull, to make sure those

8  get shredded.

9          MS. HULL:  I will.  Thank you, Judge.  Have a good

17:02:20  10  holiday.

11          MR. MORRISSEY:  And, Your Honor, we're vacated for

12  tomorrow?

13          THE COURT:  Right.  I will not see you tomorrow.

14          (End of transcript.)

17:02:26  15                    *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 23rd day of December, 2011.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter