**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| **United States of America,** ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. **CR 09-712 PHX-DGC** |
| ) | |
| **Dennis Mahon,** ) | Phoenix, Arizona |
| **Daniel Mahon,** ) | January 24, 2012 |
| ) | 8:33 a.m. |
| Defendants. ) | |

_____ )

**REPORTER'S TRANSCRIPT ON APPEAL**

**(Jury Trial - Day 9)**

**BEFORE THE HONORABLE DAVID G. CAMPBELL**

Court Reporter:          Merilyn A. Sanchez, CRR
                         Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
                         Phoenix, Arizona  85003-2118
                         (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

1642

1 <u>A P P E A R A N C E S</u>

2

3  For the Plaintiff:        **John Zachary Boyle,** Esq.
                            **Michael Morrissey,** Esq.
4                           Assistant U.S. Attorneys
                            Two Renaissance Square
5                           40 N. Central Avenue, Suite 1200
                            Phoenix, Arizona  85004-4408
6

7  For the Defendant        **Milagros Anais Cisneros,** Esq.
   Dennis Mahon:            **Deborah Williams,** Esq.
8                           Assistant Federal Public Defenders
                            850 W. Adams Street, Suite 201
9                           Phoenix, Arizona  85007

10

   For the Defendant        **Barbara Lynn Hull,** Esq.
11 Daniel Mahon:            637 N. Third Avenue, Suite 3
                            Phoenix, Arizona 85003
12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | VD |
|---|---|---|---|---|---|

TRISTAN MORELAND
By Ms. Hull                    1669
By Mr. Boyle                              1748

REBECCA WILLIAMS
By Mr. Boyle         1845


E X H I B I T S

| NO. | DESCRIPTION | ID | EVD |
|---|---|---|---|
| 150 | Audio recording dated 1-5-09 | 1876 | |
| 164 | Copy of Poor Man's James Bond book | 1826 | 1863 |
| 173 | Audio recording dated 11-7-06 | 1871 | 1872 |
| 175 | Audio recording dated 5-4-06 | 1870 | 1871 |
| 177 | Audio recording dated 5-2/3-06 | 1868 | 1869 |
| 200 | Audio recording dated 3-25-05 | 1865 | 1867 |
| 202 | Audio recording dated 11-12-07 | 1872 | 1874 |
| 204 | Audio recording dated 10-16-07 | 1875 | 1875 |
| 245 | Photograph | 1750 | 1751 |
| 599 | ROI dated 6-17-04 | 1723 | |
| 656 | Video clip dated 2-3-05 | 1669 | 1670 |
| 658 | Video clip dated 2-3-05 | 1669 | 1670 |
| 660 | Video clip dated 2-3-05 | 1669 | 1670 |
| 662 | Video clip dated 2-3-05 | 1669 | 1670 |
| 664 | Video clip dated 2-3-05 | 1669 | 1670 |
| 666 | Video clip dated 2-3-05 | 1669 | 1670 |
| 668 | Video clip dated 2-3-05 | 1669 | 1670 |
| 670 | Video clip dated 2-3-05 | 1670 | 1670 |
| 672 | Video clip dated 2-3-05 | 1670 | 1670 |
| 674 | Audio clip dated 2-10-05 | 1670 | 1670 |
| 676 | Audio clip dated 2-10-05 | 1670 | 1670 |
| 680 | Audio clip | 1670 | 1670 |
| 682 | Audio clip | 1670 | 1670 |
| 684 | Audio clip | 1670 | 1670 |
| 686 | Audio clip | 1670 | 1670 |
| 688 | Audio clip | 1670 | 1670 |
| 690 | Audio clip | 1670 | 1670 |
| 692 | Audio clip | 1670 | 1670 |
| 696 | Audio clip | 1670 | 1670 |
| 698 | Audio clip | 1670 | 1670 |

<pre>
1                          E X H I B I T S

2     NO.      DESCRIPTION                              ID    EVD

3     700      Audio clip                             1670   1670
      702      Audio clip                             1670   1670
4     704      Audio clip                             1670   1670
      706      Audio clip                             1670   1670
5     708      Audio clip                             1670   1670
      710      Audio clip                             1670   1670
6     712      Audio clip                             1670   1670
      714      Audio clip                             1670   1670
7     716      Audio clip                             1670   1670
      718      Audio clip                             1670   1670
8     720      Audio clip                             1670   1670
      722      Audio clip                             1670   1670
9     724      Audio clip                             1670   1670
      726      Audio clip                             1670   1670
10    728      Audio clip                             1670   1670
      730      Audio clip                             1670   1670
11    732      Audio clip                             1670   1670
      734      Audio clip                             1670   1670
12    736      Audio clip                             1670   1670
      738      Audio clip                             1670   1670
13    740      Audio clip                             1670   1670
      742      Audio clip                             1670   1670
14    744      Audio clip                             1670   1670
      746      Audio clip                             1670   1670
15    748      Audio clip                             1670   1670
      750      Audio clip                             1670   1670
16    752      Audio clip                             1670   1670
      754      Audio clip                             1670   1670
17    968      ROI dated 7-27-07                      1732
      969      Amended ROI dated 4-27-09             1731
18    1011     ROI dated 3-7-05                       1739
      1205     Audio clip dated 1-5-08               1707
19    1206     Arrest warrants dated 6-17-09          1704   1704

20

21

22                    M I S C E L L A N E O U S

23    Motion for Mistrial by Ms. Hull                       1696
      Motion for Mistrial by Ms. Hull                       1808
24    Motion for Mistrial by Ms. Williams                   1818

25
</pre>

P R O C E E D I N G S

MS. HULL:  Good morning.

THE COURT:  Good morning, everybody.

MS. WILLIAMS:  Good morning, Judge.

MR. BOYLE:  Good morning, Judge.

THE COURT:  Good morning Mr. Mahon and Mr. Mahon.

There's a number of things that were filed over the weekend, and there's several things that have been pending. Let me -- let's tick through and figure out what we need to decide this morning.

Ms. Hull, you have filed a motion in limine regarding the Alaska Airlines records.  Is that an issue that's likely to come up today that we need to decide this morning?

MS. HULL:  No, we don't need to decide it this morning.

THE COURT:  Okay, Mr. Boyle, are you going to be responding to that or talking to Ms. Hull about it?

MR. BOYLE:  Yes, I think we will come to an agreement. We don't have to deal with it right now.

THE COURT:  Okay.  Ms. Cisneros, you filed a motion to preclude the testimony of Grant Bristow.  Is that something that's likely to come up today that we need to address now?

MS. CISNEROS:  I don't think so.

MR. BOYLE:  We agree, Judge.  In fact, just for

1    scheduling purposes, this is a person who is coming in from

2    Canada.  And I talked to the defense.  They cannot see a way

3    that we will finish the Government's case this week, nor do we.

4    We are advising the Court, we are scheduling him for Tuesday

5    morning next week.

6         THE COURT:  So we will have time to come to that

7    issue.

8         And you are going to respond, I assume, Mr. Boyle?

9         MR. BOYLE:  We will.

10        THE COURT:  Okay.  There is still pending Ms. Hull's

11   motion to preclude certain statements under 404(b).

12        Are those statements likely to be introduced by the

13   confidential informant, Mr. Boyle?

14        MR. BOYLE:  No, we don't intend to ask her about it.

15   We intend to introduce those through Agent Bettendorf.

16        THE COURT:  When do you expect that to happen?

17        MR. BOYLE:  He will be the next witness after the

18   informant, and I don't know how long cross will take.  They are

19   saying it will be at least a day of cross.  So we are at least

20   a day away, if not more.

21        THE COURT:  Okay, are you going to respond to this in

22   writing?

23        MR. BOYLE:  Yes.  We will do it tonight.

24        THE COURT:  You don't have to, if you want to just

25   argue instead.  I need to know whether we -- I ought to be

1  looking for something in writing.

2         MR. BOYLE:  We will do so tonight.  It's been

3  litigated before, these same topics.  But we will supply a

4  short answer to that as well.

5         Thank you.

6         THE COURT:  All right.  And the other motion that was

7  filed over the weekend is the motion to dismiss filed by you,

8  Ms. Hull, and the Government's response that was filed last

9  evening.

10        I've read the motion and I've read the response.  And

11  I've read the police report that is attached to the motion.

12        Ms. Hull, do you want to address that motion?

13        MS. HULL:  Yes, Judge.  I would also by way of

14  background, this is the issue that came up on January 9th.  And

15  we moved to continue, the Court denied that, said go ahead and

16  investigate, because the Court didn't see anything in there

17  relevant.

18        I think that we have discovered a great deal of

19  relevance.  And there -- some of which are outlined in the

20  motion.  But some points that the Government's response fails

21  to address is that throughout the pendency of this case, the

22  Government has avowed to this Court that it has managed and

23  logged the ROIs to determine -- to keep clear records of what

24  has been disclosed and what has not been disclosed.

25        This ROI that was disclosed to us the day before trial

1     is the ROI that has no number that is written by Tristan

2     Moreland in an interview of Donald Logan.  In that -- and

3     everyone can correct me if I'm wrong, but my recollection is

4     that this mention of Jack Pappas and Mr. Logan being questioned

5     about that in April of 2004, this is the first we've learned of

6     this.

7              And I think that -- and I think the Government's

8     conceded that it is late Jencks disclosure in any event to

9     produce this the day before trial.  However, Judge, the fact

10    that when the agents on this case -- and we believe that Agent

11    Bettendorf was called in on the Glendale investigation because

12    the Scottsdale bomb was mentioned.

13             That this disclosure -- I will also point out that

14    overnight, we were able to determine by consulting with our

15    bombing expert that the canister of Pyrodex, a smokeless powder

16    that was found in Mr. Pappas' apartment the day of the bombing,

17    is consistent with the powder used in the Scottsdale bomb.

18             We have also determined and seen from the notes and

19    I -- there is some -- there are some dates in my motion that

20    are incorrect.  I said five days.  He had receipts for purchase

21    of items used in the Scottsdale bomb, receipts from January of

22    2004.  Those receipts were found in the search of his apartment

23    in either the day of the bombing, the end of March '04, or

24    shortly thereafter.  His apartment was secured.  I don't know

25    if it was searched and those items were seized that day.

1          But, Your Honor, the point at this juncture is that

2     this information was not disclosed.  Under Bryan, Ninth Circuit

3     case, any agency in possession of reports that's working

4     closely with the Government on the case, those -- defendant is

5     entitled to those records.  And for purposes of -- and I don't

6     recall if Bryan addressed the 16 -- the purposes of Rule 16,

7     Bryan stands for the fact that defense is entitled to reports

8     of law enforcement agencies.  And that includes state and local

9     law enforcement agencies with whom the Government is working

10    and about which the Government was aware.  And that includes

11    through their agents.

12         So I believe that under Brady and 16, Rule 16, this is

13    information that should have been prevented -- provided to us.

14    We have routinely for two years asked for bomb comparisons.  We

15    have been told none have been made.

16         We have just learned since -- and I -- you can tell

17    from the attachment, we didn't even get that report from

18    Glendale P.D. until -- I don't know if it was printed out on

19    January 11th.  But, quite frankly, I didn't even have an

20    opportunity to review it until this weekend.  And that's when I

21    noticed the comment about the Scottsdale bomb.  It was

22    discussed either by -- raised either by Mr. Pappas himself or

23    his sister, Kathy McCormick either the day of the bombing or

24    shortly afterwards she was interviewed.

25         There is a Scottsdale bomb link.  We have in the last

1    24 hours been able to confirm that items found in the Pappas

2    bombing are consistent with the items used in the Scottsdale

3    bomb.

4                My position, Judge, is these records, these reports

5    have been in the possession of the Government through Agent

6    Bettendorf.

7                The Court, for the record, notes that Agent Bettendorf

8    and Agent Moreland have been both involved in the Scottsdale

9    bombing case since the day it exploded.  Both have been

10   designated as investigators in this trial.

11               Agent Bettendorf certainly had knowledge.  Because as

12   you can tell from the reports, he was involved in the Pappas

13   bombing.  Judge, this is critical for time purposes as well

14   because that bomb went off about a month after the Scottsdale

15   bomb.

16               This should have been disclosed to us.  It is Brady

17   material.  It certainly indicates that another individual was

18   clearly -- if he wasn't, he should have been further

19   investigated and excluded somehow from the Scottsdale bombing.

20               We have no information.  I've asked for all reports on

21   that.  The response is they don't have to give -- in their

22   written response, they don't have to give those to us.  This is

23   extremely troubling to me, Judge, particularly for Daniel Mahon

24   because his connection to the Scottsdale bombing is tenuous

25   even in the light most favorable to the Government.

1           And here we find out two and a half years into this

2    investigation that another individual within 30 days of this

3    Scottsdale bombing attempted suicide by pipe bomb using

4    materials consistent with the Scottsdale bomb materials.

5           How this is not Brady material is beyond me.  It's

6    directly linked to this case.  We have no reports from ATF.  We

7    have no follow-up.  We have no information other than what I

8    provided you attached.  That's the sum total of what we have

9    been able to obtain since the disclosure.

10          Again, the link by our bomb expert is that absolutely,

11   there is -- there are consistencies in the physical build

12   structure of the two bombs and certainly of the Scottsdale bomb

13   to the ingredients and components found in Mr. Pappas'

14   apartment.

15          What Glendale and the Government have not provided us

16   is something indicated in Mr. Pappas' report that talks

17   about -- he was antigovernment.  And there was a list of papers

18   that he had listing names of people with whom he disagrees,

19   including local politicians, apparently.  We still don't have

20   that.

21          There were numerous, in fact, I think it was he

22   shipped off 85 or 82 pounds of paperwork to his sister shortly

23   before attempting suicide.  That was confiscated.  And

24   apparently the papers indicate that they -- they have something

25   to do also with the bomb.

1        At a very minimum, Judge, I submit that there's no

2   question that this is something that should have been provided

3   to us.  It's exculpatory.  It's -- it's directly related to

4   this case, under Bryan, Rule 16, documents that should have

5   been provided to us.

6        And at a very minimum, Judge, we are going to ask for

7   an extended continuance once the Government rests.  Because we

8   still need time -- we've had very little time to investigate

9   this.  And it is critical, in my mind, after the Government

10  rests, to have an extended period of time to follow through on

11  this, because we haven't had time with all of the other things

12  trying to prepare this trial, we haven't had time to fully

13  investigate this.

14        THE COURT:  Did you cite the Bryan case in your

15  motion?

16        MS. HULL:  I didn't, Judge, but I did pull the cite.

17  It is 868 F.2d 1032.  It is a Ninth Circuit case and it talked

18  about --

19        THE COURT:  I'll look at Bryan.

20        MS. HULL:  Okay.

21        THE COURT:  Did you have anything else you want to say

22  on that?

23        MS. HULL:  No, sir.

24        THE COURT:  Okay.

25        MS. WILLIAMS:  Your Honor, excuse me, when we first

1    got the materials, we were at the beginning of trial.  I asked

2    for a multi-day continuance so we could further investigate

3    this case.  That request was denied.

4         Based on what limited additional investigation has

5    been done and looking into the import of this matter, we will,

6    on behalf of Dennis Mahon, we will join in the motion.

7         And I believe at the very least we should be allowed

8    to not only look into this matter and do an accurate

9    investigation, which we have not been able to do so far, but

10   also to question Agent Bettendorf about the things -- the

11   things that were found on -- at that bombing scene that are

12   consistent with this case.

13        THE COURT:  You said -- you said, Ms. Williams, at the

14   start that at the beginning of this case, of the trial, you

15   asked for time to investigate this case.  I assume you mean the

16   Pappas case?

17        MS. WILLIAMS:  This case meaning the Pappas case.

18        THE COURT:  But nobody mentioned the Pappas case in

19   that initial request.  All you said was we've got this new

20   memo.  We need to do an investigation.

21        MS. WILLIAMS:  And that is what has grown out of --

22        THE COURT:  I understand.  I just want the record to

23   be clear.

24        MS. WILLIAMS:  Thank you.

25        THE COURT:  No defense attorney said we've learned of

1    a new bombing case that's related that needs to be

2    investigated.  And I recognize you didn't know about it.  But

3    apparently nobody did on the defense side.

4            But the request was there's a new memo that we haven't

5    seen before.  And we want to have a delay in trial to

6    investigate the memo.

7            MS. WILLIAMS:  Right.  Right.

8            MS. HULL:  Your Honor, I wanted to add.  Forgive me.

9    I, at this time, would move for disclosure of all of the

10   reports related to that, including the ATF reports of Agent

11   Bettendorf, Mike Nichols, both ATF agents involved in the

12   Pappas investigation, all records involved in that

13   investigation so our bomb investigator can compare that to the

14   Scottsdale bomb.

15           THE COURT:  All right.  Mr. Boyle and Mr. Morrissey?

16           MR. MORRISSEY:  One sec, Your Honor.

17           MR. BOYLE:  Your Honor, we have no objection to giving

18   over the -- I think there are two ATF ROIs on this.  They have

19   to do with the pipe bomb itself.  Glendale Police did the

20   investigation, as you've seen from the report.

21           Agent Bettendorf was the ATF agent who was responsible

22   for working with Glendale regarding the pipe bombs themselves.

23           We don't see any link between the Pappas case and this

24   case.  There's nothing similar about the incidents.  The

25   Pyrodex is a completely different substance than smokeless gun

1    powder that was used in the pipe bomb.

2            There's no mailed pipe bomb.  The construction is

3    different.  I mean, even read the reports, I don't want to go

4    into this.  But we see no link between a guy who digs a hole so

5    people won't get hurt when he kills himself with a pipe bomb to

6    this case.

7            The only suggestion was the sister who thought that

8    people would blame this guy for the Scottsdale bombing just

9    because he tried to kill himself with a bomb.  There's no other

10   link.

11           There's no even suggestion that this Pappas individual

12   is racist, is connected to Don Logan.  And I think you can see

13   from the ATF side, that they were just asking Don Logan

14   questions about anything just to see if there was any possible

15   connection to even the most remote connected incident.  And he

16   said no, again, showing from Don Logan's side, there's no

17   connection.

18           So we just don't see a connection in any way between a

19   man who tries to kill himself with a pipe bomb and the package

20   that was mailed to Don Logan in Scottsdale.

21           So from our perspective, Mr. Pappas was excluded,

22   because he was never even considered as part of the

23   investigation.  And Pappas survived.  And he never said

24   anything about Scottsdale bombing or anything like that.

25           He said he tried to kill himself because for the past

1    year he had been feeling despondent over finances and his home

2    and he wanted to die.  And that's why he built this bunker and

3    laid over a pipe bomb.  That's all.

4         THE COURT:  What are these two ATF reports that you

5    are referring to, Mr. Boyle?

6         MR. BOYLE:  One is about the construction of the pipe

7    bomb and the other is about a UPS package.  This is the

8    reference to the mailing that Mr. Pappas may have sent out and

9    sent back.  I've never heard of that.

10        But I think the Glendale report reflects that this guy

11   wrote a diary of why he -- about his life.  But that's -- those

12   are the two ROIs.

13        THE COURT:  And are you saying those are the only

14   documents in the Federal Government's possession related to

15   this case?

16        MR. BOYLE:  Yes, that's what the agents are telling me

17   right now.

18        THE COURT:  When are you going to turn over those

19   ROIs?

20        MR. BOYLE:  We can do it by 6:00 p.m. today.

21        THE COURT:  Ms. Hull, briefly.

22        MS. HULL:  Thank you, Judge.

23        Pursuant to Rule 16 and the Bryan case, then I would

24   ask for the Government to be ordered to turn over all of the

25   Glendale reports unredacted.  You can see ours is heavily

1    redacted, an unredacted report and access to all physical

2    evidence post haste.

3            The other issue --

4            THE COURT:  On that point, what you're asking,

5    assuming for a moment it's true that what they have in their

6    possession is two ROIs.  You are asking that they be required

7    to go to Glendale and get the evidence in possession and turn

8    it over to you?

9            MS. HULL:  Absolutely.  Under Bryan and Rule 16.  That

10   investigation, ATF came in, according to the report that I gave

11   you, Mr. Bettendorf indicated that he was -- this was going to

12   be his case from that date.

13           That means that any agencies working with him come

14   under the umbrella of Bryan and that we are entitled, according

15   to Bryan, to those documents, unredacted, documents and

16   evidence.

17           THE COURT:  Okay, your second point?

18           MS. HULL:  The racism issue.  Mr. Boyle said that

19   Mr. Pappas was not a racist.  The Court will recall, the

20   interview of Mr. Logan was in April of 2004.  And we learned

21   from receiving that report that even Mr. Logan believed it was

22   a police officer who wrote the note there, that it sounded like

23   law enforcement.

24           Judge, there was no race issue still in April of 2004,

25   because Mr. Logan indicated his feedback and his suspects of

1    who he thought did this to him after reading the note, and

2    knowing the background of his office, and that Mr. Pappas is

3    clearly -- was clearly antigovernment.  And there's papers to

4    that effect in the -- in the seizures.

5         So it had to become a racial issue by the Government

6    sometime after April of 2004, because as of that time it was

7    still not -- this bombing had nothing to do with this.

8         Thank you.

9         THE COURT:  All right.  You will get the ROIs you

10   referred to to the defendants, Mr. Boyle, by 6:00 p.m. today.

11        MR. BOYLE:  Yes.

12        THE COURT:  I will read the Bryan case.

13        We litigated this issue of what the Federal

14   Government's obligation is to go get documents in possession of

15   state authority in this case earlier with respect to the

16   Scottsdale investigation.  I want to go back and read my order

17   on that.

18        MS. HULL:  And I don't recall if the Bryan case was

19   cited at that time.  I thought of that this morning, but I

20   don't recall.

21        THE COURT:  I don't remember either.

22        What I am going to ask the defense to do, while we

23   consider all of these issues, is prepare as precise a

24   description as you can of what it is you think you need to do

25   that requires a postponement in the trial and how long it will

1    take.

2              MS. HULL:  Requiring what, sir?  I didn't hear that

3    part.

4              THE COURT:  Requiring a postponement in the trial.  If

5    I am going to consider that request, and I haven't decided yet

6    what I am going to do, I want to know exactly what it is you

7    think you need to do that can't be done during trial and how

8    long you think it will take.

9              And part of what I am going to ask you and the

10   Government if we consider that kind of a postponement is the

11   question of how long this trial is going to take overall.  I

12   would like a precise -- as precise an estimate as you can as to

13   when we will be done with the evidence if there is no

14   interruption so that I can keep that in mind when I think of

15   whether there should be an interruption in order to allow an

16   investigation into this.

17             So what I'll -- the Government will get those two ROIs

18   to the defense.  I will read Bryan.  I will read my Scottsdale

19   order.  I want to do additional looking at Brady.

20             And let's plan to revisit this issue tomorrow morning.

21   I've got a hearing at four o'clock today, so we are not going

22   to be able to take it up at the end of the day.

23             And these other motions that we've talked about, I'm

24   assuming you may be able to work something out on the Alaska

25   Airline documents, and I will wait to hear more from the

1    Government on the other two motions in limine, the one related

2    to Bristow and one related to the statement attributable to

3    Daniel Mahon.

4            What else do we need to address before we start this

5    morning?

6            MS. HULL:  Do you want the report from the defense by

7    tomorrow morning?

8            THE COURT:  The report?

9            MS. HULL:  Report -- yes, on what it is we need to --

10           THE COURT:  No.  In the next day or two.

11           MS. HULL:  Okay.

12           THE COURT:  You don't have to do it by tomorrow

13   morning, because I haven't decided for sure that we need to go

14   there.  But if you could do it in the next few days, if I do

15   think we ought to talk about an interruption, I want to have as

16   clear an idea as I can as to what you think needs to be done,

17   how long it will take, and why you think it is important and

18   how it fits into the overall expected length of the trial.  So

19   I would ask both sides to be thinking about those issues.

20           Are there other things we need to take up before we

21   start this morning?

22           MS. WILLIAMS:  Judge, I just wanted to add one thing.

23   I know the Court is very diligent about keeping to our break

24   schedule so that we don't keep the jury waiting unduly.

25   However -- however, it's also common that we work -- we, the

1661

```
 1    lawyers, work substantially through a large portion of the
 2    breaks and lunch.
 3            Judge, I'm very hypoglycemic and I had a very bad
 4    episode last week.  And it took me a couple of days to pull out
 5    of it.  If -- if we could take just slightly longer breaks so
 6    that if we keep working, we can still get five or ten minutes
 7    out so I can run to the office and get -- eat or drink
 8    something, I would really appreciate it.
 9            THE COURT:  What are you suggesting?
10            MS. WILLIAMS:  Well, if -- if we take a 15-minute
11    break in the middle of the day, morning or afternoon, or even
12    lunch, if we work most of it, I would ask for another five or
13    ten minutes.
14            It just -- if we have a 15-minute break and we don't
15    stay in here and talk about motions and other issues, then it's
16    just not a problem.  I can run -- we have an office down on
17    four.  I can run down and take care of that.
18            THE COURT:  So is it just the breaks where I stay in
19    and talk to you about issues that are a problem?
20            MS. WILLIAMS:  Yes.
21            THE COURT:  If -- if I don't say anything and I walk
22    out of the courtroom, 15 minutes is okay, is that what you're
23    saying?
24            MS. WILLIAMS:  15 minutes is fine.
25            THE COURT:  Okay.
```

1              MS. WILLIAMS:  Thank you.

2              THE COURT:  Anything else?

3              MR. BOYLE:  Judge, they have a number of exhibits that

4    are videos from this case they want to admit.  We have no

5    objection to admitting all of the ones that were disclosed.

6    They go through 754.  So that's fine.

7              We are getting -- we were talking just as you walked

8    in, and so we didn't mean to be rude to you.  But they have a

9    number of impeachment tapes that are clipped, but we haven't

10   heard them.  So we are still working through that, because -- I

11   think we are reticent to admit a clip when we haven't heard it

12   even though it does appear to be a clip from the case.

13             But so I'm just telling you unless the parties have a

14   different way of resolving that, we haven't yet resolved that

15   issue.

16             THE COURT:  When is this going to come up?

17             MS. HULL:  It's going to come up right away, Judge.

18   This is something that was raised, something -- some foundation

19   issues that we need to get in while Agent Moreland is on the

20   stand.

21             And my understanding is that through Exhibit 754,

22   perhaps Mr. Boyle can address that.  My understanding is that

23   Agent Moreland stands ready to agree that these are clips of E

24   numbers that he has reviewed.

25             And the only issue remaining on the others is that the

1    Government has confirmed their clips from the E numbers

2    designated on our list.

3              THE COURT:  When do you propose to move them into

4    evidence?

5              MS. HULL:  I was hoping to do that first thing this

6    morning, Judge.

7              THE COURT:  When do you expect to play them?

8              MS. HULL:  Not -- not while Agent Moreland is on the

9    stand.

10             THE COURT:  Well, certainly in terms of the foundation

11   portion, the fact that they are excerpts of recordings, it

12   seems to me that's not the controversy.

13             MR. BOYLE:  I agree.

14             THE COURT:  The question is whether there's something

15   in them that would be objectionable in some way to the

16   Government.  And it seems to me that we don't need to cross

17   that bridge this morning if you are not going to play them.

18             MS. HULL:  Correct.

19             THE COURT:  I think you can lay the foundation with

20   Agent Moreland and I would leave it to you to talk about how

21   the Government can determine whether it has other objections to

22   these clips before they are played.

23             MS. HULL:  My understanding was that Mr. Boyle had a

24   foundation question to the 1000 plus numbers.

25             MR. BOYLE:  We don't object to the foundation of them.

1    Our problem is admitting an exhibit when we have no idea

2    actually what's in there.  The foundation is not a problem.

3          You could admit -- you can just go through 1042 to

4    1064 and say is there foundation for all these, and we can

5    establish that in 30 seconds.  But I think they were intending

6    to move them all into evidence before the jury, and that's

7    where we have an issue because we don't know what's in the --

8          THE COURT:  Let's do this then this morning.  You can

9    lay the foundation through Agent Moreland with them.  I would

10   encourage you to figure out a way for Government to know

11   whether they have a 403 objection or some other objection, a

12   hearsay objection to something in the clip so they can make an

13   objection without us having to do it -- I don't know how we do

14   an exhibit at the time if you are going to play it.  We would

15   have to let them watch it before the jury sees it and we

16   certainly shouldn't keep the jury sitting here before that goes

17   on.

18         There has to be a way for them to get an advance look

19   at these so they know whether they have a 403 or hearsay

20   objection or something like that.

21         MS. WILLIAMS:  Judge, if I may clarify, these clips

22   are part of the list in our case in chief and they've been

23   disclosed with transcripts at the deadlines for both sides to

24   have these -- to be trading transcripts.  The impeachment tapes

25   are more of the same list that we moved in last week that the

1    Government did not object to.  They are small clips, no

2    transcripts directly out of the E numbered tapes.

3              THE COURT:  Well, but it would be accurate to say,

4    would it not, that Government doesn't know what's in these

5    impeachment clips?

6              MS. WILLIAMS:  They don't know --

7              THE COURT:  You haven't disclosed to them the

8    transcript or even before now --

9              MS. WILLIAMS:  No, there are no transcripts.

10             THE COURT:  -- what the --

11             MS. WILLIAMS:  There are no transcripts of those.

12   They are pieces lifted right out of tapes, the larger tapes

13   that they disclosed to us.

14             THE COURT:  But don't you agree that the Government

15   should have an opportunity to decide whether they are -- they

16   have a 403 objection to them or a hearsay objection to them?

17             MS. WILLIAMS:  Well, Judge, yes and no.  They are

18   part -- they are exactly the same as the -- as the list we

19   moved in last week, just the remainder of the list.  And

20   because these are impeachment exhibits, they haven't been

21   disclosed.  But --

22             THE COURT:  But you are not suggesting that because

23   they are impeachment exhibits, the Government doesn't get an

24   opportunity to object ahead of time, right?

25             MS. WILLIAMS:  Actually, I am taking that position,

1    yes.

2              THE COURT:  So impeachment exhibits aren't subject to

3    the Rules of Evidence is what you're saying?

4              MS. WILLIAMS:  Not given the structure of the defense

5    case, Your Honor, where the defense case is impeachment, direct

6    evidence and impeachment all rolled into one.  Our only shot at

7    a rebuttal case, if you were, is frequently wrapped up in that.

8              THE COURT:  But here's my point, Ms. Williams.  Let's

9    say it was a document, not a clip.  You pull it out of the

10   impeachment evidence, you mark it, you give a copy to the

11   Government, you move it into evidence.

12             You're saying the Government could look at it -- could

13   not look at it and say:  Your Honor, we have a relevancy

14   objection; this has nothing to do with the case.  Or, Your

15   Honor, this has hearsay within it.

16             Or there's a -- you're saying they can't do it because

17   it's an impeachment exhibit.

18             MS. WILLIAMS:  Well, Judge, I think there is a --

19   technically the on-the-spot disclosure of impeachment evidence

20   with documents, that would frequently happen.  In this

21   instance, when we are not talking about documents and where the

22   exhibits themselves, the clips are coming right out of the

23   Government's evidence, I think it's a different situation.

24             We did, over the weekend, yesterday morning, early

25   morning, we delivered -- we -- we dropped all of these clips

1    onto one CD and delivered them to the Government.

2              THE COURT:  All right.  Well, I don't agree with the

3    proposition that they can't make objections to the contents of

4    an impeachment exhibit.  So I think the Government has to have

5    an opportunity to look at them before they are moved into

6    evidence.  But the foundation can be laid this morning through

7    Agent Moreland.  So that's taken care of.

8              And then we will hear them before they are played.  If

9    there's any other objections, if so, I will rule on them.

10             But since they are not going to be played this

11   morning, it seems to me we don't have a problem because you can

12   lay the foundation and you will move them -- or you will move

13   them in evidence and see if you can play them after the

14   Government has had a chance to look at them.

15             Am I missing something on that point?

16             MS. HULL:  I don't think so, Judge.  Just so I am --

17   since I'm doing this, as long as we are square on what it is

18   that I can do or allowed to do.

19             THE COURT:  Okay.

20             MS. HULL:  My intention then is to simply ask Agent

21   Moreland from this list, we provided him a list of the numbers,

22   I can read them off, read them into the record, and ask if

23   he's -- lay foundation in that way.  And it should take 30

24   seconds.

25             THE COURT:  Fine.

1           MR. BOYLE:  And for our purposes we have no objection

2    to admitting the nonimpeachment exhibits.  We will admit those

3    now.  The impeachment exhibits, we will lay a foundation and

4    resolve them later.

5           THE COURT:  Okay.  Good enough.  Will you go ahead and

6    bring in the jury.

7           (The jury entered the courtroom.)

8           THE COURT:  Thank you.  Please be seated.

9           Good morning, ladies and gentlemen.  Thank you for

10   being here this morning.

11          We are going to resume with the cross-examination of

12   Agent Moreland by Ms. Hull.

13          Ms. Hull, you may proceed.

14          MS. HULL:  Your Honor, you had an inquiry, typically,

15   after a long weekend?

16          THE COURT:  Oh, thank you.

17          Let me ask the question I asked last Tuesday morning.

18   Were any of you exposed over the weekend to any news reports or

19   other information about this case from any source.

20          I see no hands.  Okay, thank you.

21          Go ahead, Ms. Hull.

22          MS. HULL:  Thank you, sir.

23

24

25

 1                        TRISTAN MORELAND,

 2   called as a witness herein, having been previously duly sworn,

 3   was examined and testified as follows:

 4

 5                    CROSS-EXAMINATION (Continued)

 6   BY MS. HULL:

 7   Q.  Agent Moreland, start off with some bookkeeping issues.  Do

 8   you have a list of exhibits in front of you?

 9   A.  I do not, no.

10          THE COURT:  I think Traci can give it to him.

11          MS. HULL:  May I approach?

12          THE COURT:  You may.

13   BY MS. HULL:

14   Q.  Now you have a list in front of you?

15   A.  I do.

16   Q.  Okay, good.  Agent Moreland, have you had an opportunity,

17   of all the exhibit numbers listed in that document, have you

18   had an opportunity to confirm that these are all recordings

19   that are related to this case and that they are the description

20   as they have been outlined?

21   A.  Yes, they appear to be all from this case, ma'am, yes.

22          MS. HULL:  Defendant moves, or I'm sorry, yes, moves

23   into evidence Exhibit Numbers -- and I will read them, Judge,

24   656, 658, 660, 662, 664, 666, 668.

25          THE COURT:  Just a little slower.

1           MS. HULL:  Sorry.

2           THE COURT:  668.

3           MS. HULL:  670, 672, 674, 676, 680, 682, 684, 686,

4    688, 690, 692, 696, 698, 700, 702, 704, 706, 708, 710, 712,

5    714, 716, 718, 720, 722, 724, 726, 728, 730, 732, 734, 736,

6    738, 740, 742, 744, 746, 748, 750, 752, and 754 into evidence.

7           MR. BOYLE:  No objection.

8           MS. WILLIAMS:  No objection.

9           THE COURT:  All right.  Those exhibits will be

10   admitted.

11   BY MS. HULL:

12   Q.  Further, Agent Moreland, there are additional numbers on

13   that list that you also indicate that you've had an opportunity

14   to confirm that they are in fact recordings from this case from

15   the E numbers designated on each?

16   A.  Yes.  That's correct.

17          MS. HULL:  And at this point, Judge, I would like to

18   read those numbers for the record.

19          THE COURT:  All right.

20          MS. HULL:  Those numbers are 10- -- I'm sorry, 1042,

21   1043, 1044, 1045, 1046, 1047, 1048, 1049, 1050, 1051, 1052,

22   1054, 1055, 1056, 1058, 1059, 1060, 1061, 1062, 1063, 1064.

23   BY MR. HULL:

24   Q.  Did I read those numbers correctly, Agent Moreland?

25   A.  You did, yes.

 1   Q.  Thank you.

 2            THE COURT:  And what is the question for Agent

 3   Moreland about those?

 4            MS. HULL:  The question was, Judge, that he had an

 5   opportunity to confirm that those exhibits were from the E

 6   clips listed on there that -- listed on his document evidencing

 7   that they are from this case recordings from this case.

 8            THE COURT:  All right, would you just confirm if that

 9   is correct?

10            THE WITNESS:  That is correct, yes.

11            THE COURT:  Thank you.

12            MS. HULL:  Thank you.

13   BY MS. HULL:

14   Q.  Agent Moreland, I'm going to proceed to some follow-up on

15   the questions we had with you last week.

16            During your investigation or through the process of

17   your investigation, you were able to determine what Dennis and

18   Daniel Mahon do for a living, correct?

19   A.  It varied at times, but more or less, I believe so, yes.

20   Q.  In fact, by the time you served your search warrant in June

21   of '09, you knew what type of work and repairs they made; is

22   that a fair statement?

23   A.  Are we just speaking historically or contemporaneous to

24   that time period or just in general their skills with respect

25   to prior employment?

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1672

1    Q.  Let me put it this way:  In your June 23rd, 2009,

2    affidavit, did you write that the Mahons would often require

3    soldering, stripping, and connecting wires and gluing in the

4    process of what kind of work that they do?

5    A.  I'm not sure about the gluing, but I -- I believe you're

6    correct about the soldering and the rest of it.

7    Q.  Do you have Exhibit 589 before you?

8    A.  Possibly, hold on.  I have that now, Counsel.

9    Q.  Okay.  I would ask you to turn to page 14, the last -- of

10   your affidavit, the last three lines of that page.

11          Have you had an opportunity to review that portion of

12   your affidavit?

13   A.  Yes.

14   Q.  Does that refresh your recollection as to what you avowed

15   to the Court on that date?

16   A.  It does.  The gluing was a reference to a hobby that they

17   had that may have been employment, not so much their actual

18   employment, but it does say that in reference to those two

19   subjects.

20   Q.  Work and repairs?

21   A.  Correct.  As well as the models.  I mean that's what it's

22   referencing.  The gluing is referring to the models,

23   constructing models.

24   Q.  You would agree with the statement that these people were

25   really into model airplanes?

1   A.  I would agree with that, yes.

2   Q.  Okay.  And, in fact, the next line of your affidavit

3   addresses the models, doesn't it?

4   A.  Yes.

5   Q.  So your intent for the purposes of that search included

6   that you intended to examine repaired items or constructed

7   models to reveal the specific methods and patterns of the

8   Mahons and the particular glue that they use.  Do you recall

9   that?

10  A.  Yes.

11  Q.  And you did not take any glue or any of the boxes upon

12  boxes of model airplanes or any model airplanes from that

13  search, correct?

14  A.  Yes, ma'am, that's correct.

15  Q.  You talked last week about an ink jet printer.  And we are

16  still talking about the farm.  So you might want to keep that

17  one with you.

18  A.  Okay.

19  Q.  In fact, in part of your affidavit, you were looking for an

20  ink jet printer at the Mahon farm, correct?

21  A.  That's correct.

22  Q.  And you said that it was -- it had -- you were looking for

23  an ink jet printer with unique characteristics.  What did you

24  mean by that?

25  A.  I meant that the -- specifically now we would be talking

1   about the note.  Every other line in the note all the letters

2   that extended below the base -- excuse me, the baseline were

3   cut off.  So when the printer would reverse itself, more than

4   likely it was cutting off the bottom of every other letter,

5   whatever printer made the note.

6          So I was looking specifically for a printer that had

7   that same malfunction to create that type of -- or that same

8   flaw in the printing so it was easy to examine these, because

9   if I could find any documents or simply printed something on

10  the printer, I would know immediately if that printer had that

11  same malfunction.

12  Q.  And, in fact, you determined that there was no such ink

13  jet -- I'm sorry, back up.

14         The ink jet part of that was because of the lab report

15  that came back on the note and label from the Scottsdale bomb,

16  correct?

17  A.  That's correct, yes.

18  Q.  And you didn't find any ink jet printer -- did you find any

19  ink jet printer?

20  A.  I don't believe so, ma'am.  I believe it was just a

21  different type of printer.  So we were able to rule it out

22  based on that.

23  Q.  So the bottom line is you didn't find anything at the Mahon

24  farm consistent with the ink jet printer that made the label

25  and note in the Scottsdale bomb, correct?

1    A.  That's correct, ma'am.

2            MS. HULL:  Could I have one moment, Judge?

3            THE COURT:  You may.

4    BY MS. HULL:

5    Q.  Agent Moreland, do you have Exhibits 35 through 41 in front

6    of you?

7            Sir, those have already been admitted into evidence.

8            MS. HULL:  Am I correct, Ms. Abrahm, 35 through 41?

9            THE COURTROOM DEPUTY CLERK:  Yes, ma'am.

10           MS. HULL:  May I have permission to publish one page?

11           THE COURT:  You may.

12   BY MS. HULL:

13   Q.  This is page 1 of Exhibit 35, Agent Moreland.  Do you see

14   the bottom of this document?

15   A.  I do.

16   Q.  And the date -- that indicates the date it was printed of

17   April 15th, 2009, correct?

18   A.  It appears to be related to that, but I couldn't be sure.

19   Q.  And, in fact, you indicated in your search warrant

20   affidavit, Exhibit 589, that you intended -- or expected to

21   find -- one of the things that you expected to find were papers

22   kept in the Mahon residence from perhaps years prior that had

23   the same kind of printing characteristics found on the

24   Scottsdale bomb label and mailing and note, correct?

25   A.  That may be paraphrasing it or simplifying it, but

1   generally speaking, yes, that would have been something that I

2   would have articulated, yes.

3   Q.  Did you tell the Judge in your sworn affidavit that it is

4   common for persons to use certain printers and typewriters

5   available for periods of time.  Going on, they often tend to

6   keep printers as backups?  Do you recall making that statement?

7   A.  I -- without reading it right in front of me, yes, it does

8   sound familiar, Counselor.

9   Q.  And also as part of that affidavit, that law enforcement

10  personnel could compare the printers and the documents found to

11  the address label and note recovered from the February 2004

12  bombing.  I'm referring to page 17, bottom of the page.

13  A.  Again, that does sound familiar.

14  Q.  Looking again at the first page of Exhibit 35, would you

15  agree that that print does not match what you have described of

16  every other line missing the bottom of the line?

17  A.  I would agree with that, yes.

18  Q.  And that is the same for that entire document through

19  Exhibit 41, correct?

20  A.  That's correct.

21  Q.  Thank you.

22          You also claimed during your search warrant affidavit

23  that the -- based upon your investigation, you learned that --

24  you told the Court that the Mahons use libraries, local

25  libraries.  Do you remember that statement?

1    A.  Yes.

2    Q.  And did you confirm, follow up with local libraries as to

3    what kinds of printers they had in 2004?

4    A.  We did.

5    Q.  And what did you find?

6    A.  We didn't find one that we could connect specifically to

7    them or that matched the note or the label.

8    Q.  Would you agree with the statement that no local libraries,

9    public libraries, had an ink jet printer in 2004?

10   A.  I don't think I would agree with that.  I can't say that I

11   checked every possibility at every library.  I mean, we looked

12   at some that we thought were more likely than others based on

13   location.  But I don't think I would agree with the whole

14   general statement you made.

15   Q.  Did you check Scottsdale public libraries?

16   A.  I did not personally, but I'm fairly confident I remember a

17   conversation with a postal inspector about that, yes.

18   Q.  Did you check Mesa libraries?

19   A.  I cannot recall.

20   Q.  Did you check Tempe libraries?

21   A.  Tempe seems to me we did check one, and one or two in

22   Tulsa, Oklahoma.  Those are the ones I remember.

23   Q.  Would it be safe to say if any of the libraries you checked

24   had an ink jet printer in 2004, that is something you would

25   have indicated in a report?

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1678

1    A.  Had the printer been determined to match the note or the

2    label, I would say, yes, we would have indicated it in a

3    report.

4    Q.  Did you review all of the lab reports that came back on

5    this case comparing evidence gathered either from the farm or

6    the Mahons in an attempt or any attempt to connect them to the

7    Scottsdale bomb?

8    A.  I didn't personally review every lab report in the case.

9    Sometimes I was briefed on the content of the results.  Other

10   times I reviewed the reports.  So --

11   Q.  Based upon your investigation, and reports or briefings in

12   this case, did you come to the conclusion that the lap tip --

13   sorry, laptop computer obtained from the Mahons had no

14   connection to the Scottsdale bomb?

15   A.  I would agree with that statement, yes.

16   Q.  Would you agree -- did you also come to the conclusion that

17   the computer that was -- that eMachine we talked about last

18   week that was seized from the Mahon farm in 2009, that also

19   yielded no connection to the Scottsdale bomb, notes, or label?

20   A.  I would agree with that, yes.

21   Q.  And if I said it incorrectly, the laptop also yielded no

22   connection to the Scottsdale bomb, label or note, correct?

23   A.  I would agree, yes.

24   Q.  You talked last week about the Chandler bomb, as you called

25   it, which was March of 2000, correct?

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1679

1    A.  I believe I was asked some questions about it, yes.

2    Q.  All right.  And you say that that investigation is still

3    ongoing?

4    A.  That's correct.

5    Q.  For 12 years?

6    A.  Yes.

7    Q.  Since March of 2000?

8    A.  Yes.

9    Q.  Isn't it true, Agent Moreland, that that involved a package

10   bomb?

11   A.  Yes.

12   Q.  And it was delivered?

13   A.  Yes.

14   Q.  To a Revlon executive?

15   A.  Yes.

16   Q.  At his home?

17   A.  Yes.

18   Q.  That it was contained in a shoe box?

19   A.  I would rather not get into those details if it's not

20   necessary.  I found no similarities or no indication of that

21   bomb in any way.

22   Q.  I didn't ask the question.  I asked -- the question was, it

23   was found in a shoe box?

24   A.  That's not correct.

25   Q.  It was not?

1   A.  No.

2   Q.  Okay.  When you talked last week about any connection

3   between Scottsdale employees and the Mahons, you indicated that

4   you don't recall a connection or finding a connection between

5   the Mahons and any Scottsdale employees?

6   A.  That's not exactly what I said, but --

7   Q.  Okay.  Well -- bless you -- whatever you did find, if you

8   had found one, you would have noted that; is that a fair

9   statement?

10  A.  Yes.  I believe we did note it.

11  Q.  And the -- did you place in your June 2009 affidavit -- if

12  I could have one moment, please -- that you didn't believe that

13  Mahon, singular, ever met with any Scottsdale officers?

14  A.  I believe that's correct.  Again, you may be paraphrasing

15  the wording, but, yes, I did not find any connection between

16  Dennis Mahon and any Scottsdale police officers.

17  Q.  From June of 2009 to date?

18  A.  Going back ever.

19  Q.  From today all the way back to your first involvement in

20  this investigation?

21  A.  And beyond that.  As far back as I could possibly research,

22  I found no connection to the Mahons and anyone in Scottsdale

23  except for the diversity office.

24  Q.  And the pen and trap, that was part of that?  You used the

25  pen trap information as part of that to confirm the lack of

1  connection, if you will?

2  A.  You're talking about the toll information as a result of

3  the pen and traps and trace?  Yes.  I mean, that is part of the

4  things that I looked at to see if we could make any connections

5  other than with the diversity office, yes.

6  Q.  Did you -- I don't believe we did this.  I apologize if we

7  did.  But can you explain to the jury what a pen and trap is?

8  A.  I can.  It's essentially just a -- a recording or a digital

9  capture of a person's outgoing and incoming phone numbers.  So

10  much like on text messaging or phone calls, if you had

11  Caller ID, essentially a pen and trap allows us, by a court

12  order, to get caller ID information from a particular phone so

13  we know every number it's dialing and every number that dials

14  it, including router numbers and things that are just related

15  to the phone system.

16         Sometimes one might dial a number.  It goes to a

17  separate phone number that you don't even know about.  It's

18  called a router.  And that router number might appear.  And

19  then it goes on to the person you're trying to call.  So it's

20  capturing all of those kind of dial digits, if you will, plus

21  some phone digits that you're not aware of.

22  Q.  So the pen register portion, the pen and trap, the pen

23  register portion is the numbers dialed, correct?

24  A.  Yes.

25  Q.  And when you talk about a router, if you're in an office

1   you have to dial nine first to get an outside line, is it

2   similar?

3   A.  It's similar, yeah.  It has to access another device, which

4   has a phone number to be able to move the call from point A to

5   point C.  It goes through a B that you're not even aware of.

6   Q.  And then the trap portion is the trap and trace, which is

7   basically that portion when calls are coming in, correct?

8   A.  That's correct, ma'am, yes.

9   Q.  So when you talk a pen and trap, you're talking about both,

10  correct?

11  A.  Outgoing and incoming, yes.

12  Q.  Okay.  And you have to get authorization, a court order for

13  that, correct?

14  A.  That's correct, yes.

15  Q.  And you used that in this case?

16  A.  We did, yes.

17  Q.  When did you start using -- when did you use the first pen

18  register?

19  A.  Now are you talking ATF or postal ATF combined or --

20  Q.  As part of your investigation, you know that a pen and trap

21  was used in this case, correct?

22  A.  I do.  I began using them -- I want to say in 2005, 2006.

23  I don't remember the exact first time I got a court order for a

24  specific phone.  I know from meetings and consultation that the

25  postal service had some other applications and may have done

1    some other pens and traps.  But I don't know the dates of those

2    right now.

3    Q.  So when you -- you were consulted on the Mahon pen and trap

4    or you actually sought authorization?

5    A.  I would -- no, I would not have sought application for ones

6    that the postal service applied -- you know, was handling in

7    their investigation.  I would have only concentrated on the

8    ones that ATF applied for.  So I would have been involved in

9    those whether it was myself or another agent in my office that

10   completed the application process.  But consulted, we met

11   regularly.  So I was informed, how's that.  That's probably

12   just a better word, that sometimes I would be informed of other

13   things that were going on.

14   Q.  When you say you were informed, did you take any part in

15   the decision to place a pen and trap on certain Scottsdale

16   employees?

17   A.  I did not.

18   Q.  Were you asked -- do you know if you were consulted for

19   input, or did you just not voice any input?

20   A.  I -- I don't recall being asked.  And to the extent we

21   offered our opinions, we may have from time to time.  However,

22   I don't have, you know, specific recollection of anything other

23   than meetings that somebody would mention we are going to look

24   at this issue.  And I might have said, oh, or okay.  Or, you

25   know, I could have said, hey, I think that's a good use of

1  time, a waste of time, or nothing.  I don't recall every detail

2  like that.

3  Q.  Did there ever come a point in the investigation that you

4  said it was a waste of time and they -- and consulted with them

5  in that fashion?

6  A.  I'm sure there was, yes.

7  Q.  Do you remember when?

8  A.  Specific date and time, no.  General topics, probably yes.

9  Q.  Okay.  When -- at what point in the investigation, what

10  general topic do you recall where you indicated that a pen and

11  trap should not -- or was a waste of time?

12  A.  I can't say it was just about pen and traps.  It would be

13  more about a lead or a pursuit of a particular area that I felt

14  would have been a waste of time.  Not so much the actual

15  investigative technique that would have been deployed.

16  Q.  Do you recall at any time telling postal investigators that

17  you thought any part of their investigation was a waste of

18  time?

19  A.  We had those discussions, yes.

20  Q.  Do you remember when those were?

21  A.  Probably '05, '06 was most of those type of conversations.

22  Q.  And do you remember what types of investigation you were

23  talking about, their investigation, where you said it was a

24  waste of time?

25  A.  Generally speaking, yes.

1  Q.  And did it have anything to do with the pen and trap on a

2  Mr. Olson?

3  A.  Again, not -- not necessarily a pen and trap issue.  It was

4  more about a particular suspect in their mind or a lead or a

5  group of leads, if you will.  Maybe a -- try to put it another

6  way.

7  Q.  Well, did you come to a point in time where you disagreed

8  with postal inspectors as to where they should go in their

9  investigation if at all?  More specifically, you've already

10  said '05, '06.  Do you remember any specific part of the

11  investigation during those years that you told them was a waste

12  of time?

13  A.  I recall having conversations to that effect, yes.

14  Q.  Do you recall a discussion with them as to whether or not

15  to set up a wiretap on individuals other than the Mahons?

16  A.  I don't recall any discussion of wiretaps on anybody but

17  the Mahons, Mr. Metzger.

18  Q.  A Scottsdale employee?

19  A.  No, I don't recall an conversation about a wiretap on any

20  Scottsdale employees.

21  Q.  Would you agree that a pen and trap is typically a

22  precursor, if you will, to establish probable cause to obtain a

23  wiretap?

24  A.  It can be.

25  Q.  It -- in fact, it's one of those tools that you employ

 1  because for purposes of a wiretap, you have to have exhausted

 2  certain investigative tools before going to the extreme measure

 3  of a wiretap.  Would you agree with that?

 4  A.  That is one of the reasons that a pen and trap would be

 5  used prior to wiretap, yes.

 6  Q.  And, in fact, you did that on the Mahons.  You obtained a

 7  pen and trap before obtaining a wiretap, correct?

 8  A.  That's correct, ma'am, yes.

 9          MS. HULL:  One moment, Judge.

10  BY MS. HULL:

11  Q.  Agent Moreland, do you have Exhibit 1068 before you?

12          Agent Moreland --

13          MS. HULL:  Traci, maybe I can skip over this.

14  BY MS. HULL:

15  Q.  Agent Moreland?

16  A.  Yes, ma'am.

17  Q.  Do you recall -- or would you agree with the statement that

18  your first pen and trap on the Mahons was in June of '04?  Does

19  that sound accurate to you?

20          Do you need to refer to your reports, or is that

21  something you recall?

22  A.  It would have been -- that would have been the right

23  general time period for that.  I just -- I don't have a

24  specific memory.  It would have been early.  It would have been

25  probably on one of the first phone numbers.  It could have

1    been, yes.

2    Q.  Okay.  And that -- the exact date would have been reflected

3    in your NForce log; is that correct?

4    A.  It may have been sometime -- you're talking about the

5    management log --

6    Q.  Yes.  Sir.

7    A.  Or are you talking about an actual piece of property that

8    came into our custody?

9    Q.  Well, Exhibit 1068 to be exact.

10   A.  If we listed -- if we listed an actual exhibit going into

11   our custody as a result of a pen and trap, then it definitely

12   would be a marker.  If it was just an indication or a note that

13   we were going to do that, that might have been just a plan as

14   opposed to something that was actually completed.

15   Q.  Is June your recollection close enough that it would have

16   been June of '04?

17   A.  I can't say that, no.

18   Q.  Then I need you to look at 1068, please.  I apologize.

19   A.  Is there a particular place you can point me to, ma'am?

20   Q.  Page 4 of that document, sir.  E-002.

21   A.  It appears to be.  I'm not sure exactly what the content or

22   the medium is here, but it appears to be at least toll

23   information.  I'm not sure if it's mismarked, but --

24   Q.  And it is -- does that refresh your recollection as to when

25   the first pen and trap was placed on the Mahons?

1  A.  It doesn't really, no.

2  Q.  Does it narrow it down to the month of June 2004?  The very

3  top line of the fourth page where it talks -- is E-002 the

4  first pen register information?

5  A.  It very well may be.  My -- I'm only cautious because I

6  didn't make these entries.  And sometimes entries are made that

7  are meant to be toll information as if we subpoenaed tolls and

8  gotten a record in versus it actually coming from a pen

9  register.  And that's why I'm just cautious about saying it's

10  definitely a pen register versus toll information we received.

11  Q.  So even if it says pen register, it's not a pen register?

12  A.  It's possible.  There's little drop-down boxes and somebody

13  could hit the wrong drop down.  It is very possible.  I would

14  know from the pen and trap order itself, if I had that in front

15  of me if we for sure had a pen register going at that time.

16          MS. HULL:  Permission to publish Exhibit 231.  It's

17  already been admitted.

18          THE COURT:  You may.

19  BY MS. HULL:

20  Q.  Agent Moreland, do you recall this exhibit?

21  A.  I do.

22  Q.  And do you recall the video played of the Scottsdale drive

23  of May 1st, 2007, where the paid informant was driving, Dennis

24  Mahon in the middle, Daniel Mahon to the right in the front of

25  that truck?

1    A.  I do.

2    Q.  Do you recall that exhibit videotape?

3    A.  Yes.

4    Q.  And that again was May 1st, 2007?

5    A.  Correct.

6    Q.  And you already testified that this exhibit, Exhibit -- can

7    I be heard?  I can't tell -- thank you -- 231 represents the

8    general area of the Scottsdale, I'll call the Scottsdale drive

9    of May 1st?

10   A.  Yes.

11   Q.  Do you recall that testimony?

12   A.  Yes.

13   Q.  And if you can see my finger here, this is where the truck

14   is at the beginning of that video where they are about to turn

15   left, make a left-hand turn onto 75th from Indian School.  Am I

16   correct?

17   A.  Yes, they are pulling up to that intersection where your

18   finger is in the same direction your finger is pointing, yes.

19   Q.  All right.  And isn't it true that that is the point at --

20   where -- the first point where you see Daniel Mahon point,

21   correct?  Do you recall that?

22   A.  Yes.

23   Q.  And at the angle he was pointing, it was this building

24   right here.  Would you agree?

25   A.  No, not necessarily.

1    Q.  Well, we have already established that what you have

2    characterized here as a city hall complex with the two

3    buildings, that these two buildings have different addresses.

4    Would you agree with that?

5    A.  I wouldn't agree with that.  I don't know for sure if they

6    have two different addresses.

7    Q.  So you don't even know if that is even a city hall

8    building, this larger building on Indian School?

9    A.  I know that the roadway between those two buildings has a

10   sign on it that refers to that street and it at least appears

11   to refer to everything beyond it as city hall.  And I know that

12   the Mahons pointed down that street and said "city hall."

13   Q.  The Mahons, two, pointed down that street?

14   A.  Yes, as you listen carefully as they pass the first street

15   they say "city hall."  Then they go a little further and then

16   they say "city hall" again.

17   Q.  This is over at this point if you can see where I am

18   pointing on the diagram?

19   A.  Yes.  That is the first time they reference and they are

20   looking straight to the right out of the window.  They refer to

21   city hall, because there's a sign right there that says city

22   hall.  And then there's another sign up here that says 3939

23   City Hall.  And they reference that again.

24   Q.  Would you agree with the statement that this building right

25   here is the civic center?

1  A.  I don't know that it's just a civic center.  I think the

2  back part of the building might be the civic center and there

3  are other city offices in the front part of the building.  It

4  appears to be city administration as well as, like you said,

5  part of the building being the civic center.

6  Q.  But you haven't determined that it has anything to do with

7  administration, have you?

8  A.  It says things like that on the front of the building and

9  there's little signs that say something, Office of City of

10 Scottsdale, I think one of them is like parks and rec or

11 something is in that building.  And --

12 Q.  Do you have pictures of that?

13 A.  No.  Well, maybe from a distance.  I'm not sure you can

14 make that out, but --

15 Q.  Isn't it true that the address of this building that I'm

16 pointing to is 7447 East Indian School Road?

17 A.  I don't, ma'am, I told you I don't know the address.

18 Q.  Is it also listed as One Civic Center as an address?

19 A.  I don't know.

20 Q.  Isn't it true, Agent Moreland, that through the course of

21 your investigation, you confirmed at approximately one year

22 prior to the bombing, Mr. Logan's office had moved from city

23 hall?

24 A.  No, I did not.

25 Q.  Did you look into the history of that?

1    A.  No.

2    Q.  Investigate that at all?

3    A.  No.

4    Q.  Through the course of your investigation, did you determine

5    that Mr. Logan regularly received mail directed to city hall?

6    A.  Not at 3939 North 75th Street, ma'am.

7    Q.  I asked you if you confirmed through your investigation

8    that Mr. Logan regularly received communications addressed to

9    city hall.

10   A.  I did not.

11   Q.  Through the course of your investigation, did you confirm

12   that in fact Mr. Logan encouraged others to send him

13   communications at city hall, even in 2004?

14   A.  No.  Never heard of that.

15   Q.  I'm done with that exhibit, thank you.

16          Through the course of your investigation, did you

17   confirm that Mr. Logan -- my apologies.

18          You confirmed through your investigation that

19   Mr. Logan's -- the nature of his employment and what the scope

20   of his employment included?

21   A.  I believe so, yes.

22   Q.  Through the course of your investigation did you confirm

23   that Mr. Logan, as part of his job duties, would authorize

24   and/or sign disciplinary action of other Scottsdale employees?

25   A.  Actually, I don't think that's correct, ma'am.  I don't

1    think -- I think that takes it farther than he explained it and

2    my research indicates.

3    Q.  Are you familiar with one such document that caused a

4    lawsuit?

5    A.  I'm familiar with a particular lawsuit that came up in the

6    investigation and maybe a couple.

7    Q.  You're not aware of Mr. Logan firing any Scottsdale

8    police -- police officers, are you?

9    A.  No, specific -- he did not have that authority at all.

10   Q.  But he did have authority to discipline?

11   A.  No, I don't believe so.

12   Q.  You spoke a moment ago about the addresses on that Exhibit

13   231 and the addresses in the area, and you mentioned the number

14   3939.  Do you remember that?

15   A.  I do, ma'am, yes.

16   Q.  Did you pull the 911 tapes in this case and listen to the

17   addresses provided in that tape?

18   A.  I remember a discussion about -- some of the 911 calls.  I

19   did not pull each and every 911 call and listen to them.

20   Q.  Did you listen to the ones where people got the numbers

21   incorrect?

22   A.  No.

23   Q.  Would it be relevant to your investigation as to the

24   address contained on the note -- or the address label of the

25   Scottsdale bomb to determine whether employees calling in, say,

1  for a 911 call got the address correct?

2  A.  I don't think that I could -- based on my training,

3  experience, ma'am, I don't think that I would attempt to draw a

4  correlation between somebody --

5  Q.  I'm not asking you if you had a correlation.

6          MR. BOYLE:  Objection, the witness did not finish his

7  answer.

8          THE COURT:  Hold on just a minute.  Objection

9  sustained.

10          You may finish the answer, Mr. Moreland.

11          THE WITNESS:  I have never viewed a 911 call in a case

12  like this necessarily relevant to an address on a package or

13  the contents of a package unless absent some other piece of

14  information.

15          Now, if -- unless, of course, it had come to my

16  attention that somebody had identified the exact address in the

17  same manner this one was, being that this was a nonexistent

18  address, for somebody else to come up with that and call 911, I

19  would certainly want to know from them why they referred to

20  that address in the same manner.  But absent that kind of a

21  connection, it wouldn't have any -- any pointer to me or any

22  kind of a -- an indicator of anything.

23  BY MS. HULL:

24  Q.  Would you agree that if a 911 call demonstrated that even

25  people calling from that location got the address wrong, you're

1    saying that would have no relevance to you?

2    A.  I'm saying that people often get addresses wrong when

3    calling 911.  They -- I mean, in my experience, sometimes they

4    can't get the street name right so they are trying to describe,

5    they are getting numbers wrong.  They are doing anything they

6    can to try to guide help to the area.

7          If somebody had called up and said, you know what, the

8    Office of Diversity and Dialogue has been bombed and that

9    address is 3939 North 75th Street, you know, please bring help,

10   that would cause me some concern, because it's very difficult

11   to make that connection.  I couldn't make it.

12         We spent -- I can't tell you how much time, days,

13   weeks, months trying to find a way that you could get that

14   address together and connect it to Don Logan.  And the only way

15   I could find is if you were trying to find Don Logan and you

16   stood at that intersection of 3939 and 75th Street where it

17   meets Main, that is the only way.  We couldn't find Google

18   searching, any possibility.  We couldn't come up with that.

19   But somebody standing at that intersection could do it.

20         And that's why, if I heard that in a 911 call and

21   somebody else did that exact same thing from a block away from

22   where the bomb went off, I would be wondering why somebody

23   would make that connection in their mind.

24   Q.  Conversely then, unless someone says there's 3939 North

25   whatever as on the address label, conversely, then, unless they

1  said that, they likewise have no connection.  Would you agree?

2  A.  Are you asking me if somebody -- can you restate that?  I'm

3  not sure I understand it.

4  Q.  You have just stated that unless somebody says the word,

5  even in a 911 call, reiterates that address verbatim 3939, as

6  you have read it, as it is on the address label, unless they

7  said or wrote those exact same words, there would be no

8  connection to the Scottsdale bomb?

9  A.  Yes.  If you're asking me about the 911 calls.

10  Q.  I'm asking you about any.  You just said, you took a

11  question where I asked you about the 911 calls and you

12  expounded on that.  You'll agree by saying that you would have

13  to stand on that corner and only a person standing on that

14  corner.  So if someone standing on that corner doesn't say 3939

15  as the exact address of the Logan label, conversely, they would

16  not have anything to do with the Scottsdale bomb.  Would you

17  agree?

18  A.  No, I wouldn't agree with that.

19  Q.  Okay.  Because you're trying to prove that the significance

20  of getting that address wrong has no connection, no relevance

21  to you to the Scottsdale bomb investigation?

22  A.  No, I'm saying getting that address wrong in the exact

23  manner that it was wrong on the label would be an indication to

24  me that at least somebody made the same mistake as whoever made

25  the label for this bomb.

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1697

1  Q.  And if they didn't make that same address connection, then

2  there is -- the converse is obviously true.  They are not

3  connected, correct?

4  A.  No.  Because if -- if I had done this and made the label

5  wrong, and maybe at some point indicate -- or learned that I

6  had done that wrong, I would certainly be very careful about

7  ever repeating that mistake to anybody.  So I would purposely

8  never mention that again.

9  Q.  Really, so if you're standing -- you're driving around

10 holding a map and pointing to incorrect things because you've

11 never been there before, that somehow connects that person to

12 the Scottsdale label; is that what you're saying?

13 A.  I'm saying that when I see somebody make the exact same

14 mistake --

15 Q.  The 3939 mistake?

16 A.  Or the North 75th Street, like Daniel Mahon did, yes,

17 that's a good indication that somebody made the same mistake

18 when they made that label and that's what I saw on that truck

19 tape, ma'am.

20 Q.  And you saw him point to a street sign, correct?

21 A.  I saw him turn left at an intersection and reference that

22 he was turning on 75th Street.  I saw him pass over Main

23 Street, where the 3939 sign is, point over his shoulder and say

24 that's 75th Street, the same exact mistake the bomber made.

25 That's what I saw.

1    Q.  Well, that's not 3939 North 75th Street.  Would you agree?

2    That is not that address?

3    A.  That address doesn't exist, ma'am.

4    Q.  So if someone -- you're saying that any mistake of someone

5    who actually works there getting the address wrong is not

6    relevant to you?

7    A.  If somebody in the City of Scottsdale --

8    Q.  That can be a "yes" or "no."

9    A.  Well, I'm sorry, somebody who works where then?

10   Q.  At the Office of Diversity where this bomb went off.

11   A.  If somebody who worked there listed the address there as

12   3939 North 75th Street, I would certainly want to know.

13   Q.  How about 3535?

14   A.  Wouldn't mean anything, no.

15   Q.  That's not close enough?

16   A.  3939 North 75th Street, ma'am, that's what I would be

17   interested in.

18   Q.  Going to Catoosa, sir, didn't you instruct the paid

19   informant to try to get evidence from the Mahons that they knew

20   something about Edmund Burke?

21   A.  Ask me again.  I'm not sure I understood.  Are you

22   saying --

23   Q.  Did you instruct the paid informant to start out what you

24   perceived as an old Edmund Burke quote for evil to prevail.

25   Did you instruct her to say that to the Mahons and see if they

1    finished it?

2    A.  Yes, we talked about that particular quote by Edmund Burke

3    and whether it was in reference to a book that she has, a prop,

4    or just specifically talking about the quote.  I did have

5    discussions with her.  And we -- I did instruct her at some

6    point to try and ascertain their knowledge about Edmund Burke

7    quotes or that topic, yes.

8    Q.  Would you agree that didn't go too well?

9    A.  No, I wouldn't agree with that.

10   Q.  That it's Carlos Santana quote that --

11   A.  I would agree that there were some statements that were

12   less than revealing about Edmund Burke, but then I would agree

13   that there were some statements made that were dead on point to

14   the white supremacist connection to Edmund Burke Society.

15   Q.  Edmund Burke was never mentioned, was he?

16   A.  He was responded to in a manner that connected --

17   Q.  Who's he?

18   A.  The name Edmund Burke, the topic Edmund Burke, there was a

19   response to that topic by Dennis Mahon that identified how

20   Canada was going to be divided into a white Western Canada.

21        MS. WILLIAMS:  Objection, Your Honor, misstating the

22   evidence and there is no evidence of that in this trial.

23        THE COURT:  Sustained.

24   BY MS. HULL:

25   Q.  You testified last week about the Scottsdale delivery time,

1    and you insisted that that bomb was found -- the package was

2    found at the library after ten?

3    A.   Yes, ma'am.

4    Q.   Isn't it true in your investigation there were several

5    conflicting accounts as to that box being found before the

6    library opened or after the library opened?

7    A.   I recall one witness first believing it was around 9:15 or

8    so.

9    Q.   Okay, without zeroing out a witness --

10   A.   Okay.

11   Q.   -- or telling us what they said.

12   A.   Right.

13   Q.   Did you confirm through your investigation that there were

14   different -- that different Scottsdale library employees had

15   different accounts as to when that box was found Saturday

16   morning, the 21st?

17   A.   I only recall one witness accounting for when it was found.

18   Q.   So you didn't interview or review interviews of any other

19   Scottsdale employees that touched or saw that box that morning?

20   A.   No, I recall there being two or three individuals that had

21   recollection of the box that Saturday morning.  I only recall

22   speaking to one who was, quote, unquote, the person that found

23   it initially.

24   Q.   And is that because she's the only one who puts it after

25   10:00 a.m. opening time?

1   A.  No.  No.  That's not it at all.

2   Q.  You determined that when that box was found through your

3   investigation, you confirmed that it actually had a placard

4   laid on top of it.  Do you recall that?

5   A.  I do recall, yes.

6   Q.  And it was a "do not reshelf" placard?

7   A.  Yes, ma'am.

8   Q.  And that's something that the library keeps in stock?

9   A.  Yes.

10  Q.  Would you agree with that?

11  A.  I recall seeing those same placards, yes.

12  Q.  And that you -- did you confirm through your investigation

13  that the type of box used for that package was similar in size

14  and appearance to the boxes used for the books at the Authors

15  and Appetizers the night before?

16  A.  No.

17  Q.  Did you investigate that?

18  A.  No.

19  Q.  You were aware that -- about the Authors and Appetizers

20  event on Friday at that same building, correct?

21  A.  I was, yes.

22  Q.  And what did your investigation determine was the nature of

23  that event?

24  A.  A social gathering for, I don't know if it was just local

25  artists, poets, people to present materials in small settings.

1    It was just a -- I think kind of a promotion of art and

2    literature.

3    Q.  And books?

4    A.  Sure.  Literature.

5    Q.  And did you determine that book boxes were also present at

6    the library on Friday, February 20th?

7    A.  I didn't look into book boxes at that function, ma'am, no.

8    Q.  Did you or anyone at your instruction show a photo lineup

9    of the Mahons or the six-pack, as you described them on cross

10   by Ms. Williams, did you or -- did you -- on your own, or did

11   you instruct anyone to show six-pack photo lineups of Dennis

12   and Daniel Mahon to anyone at the Scottsdale library or at the

13   Authors and Appetizers event?

14   A.  I did not do that and I don't recall it being done.

15   Q.  Agent Moreland, I believe you testified previously that at

16   the Davis Junction search warrant when addressing the videotape

17   of the brothers in the van, do you recall that video?

18   A.  I do, ma'am, yes.

19   Q.  Did you -- I believe you testified that Mahons were not

20   showing -- shown anything referencing the Scottsdale bombing

21   before being placed in the van?

22   A.  I believe my testimony is, which is what my memory is, they

23   were shown copies of the search warrant, which included on it

24   the charges that authorized the search, in other words, the

25   relative violations, and the attachments to the search warrant.

1    I don't recall if they were shown right before they got in the

2    van or as they first got into the van.  But it was very early

3    on.

4    Q.  But you talked to them before they were in the van are

5    these -- no, I apologize, strike that.  That's incorrect.

6           These items were shown to them before they got in the

7    van?

8    A.  Or at least in the first few minutes when they got into the

9    van, yes.

10   Q.  Do you recall an officer, a Special Agent Green showing

11   them a search warrant and the arrest warrant?

12   A.  I recall Special Agent Green being one of the two or three

13   ATF agents who were showing them or giving them copies of the

14   search warrant.  I'm not positive whether the arrest warrant

15   was shown to them or not.  But I'm positive the search warrant

16   was.

17          MS. HULL:  One moment.

18   BY MS. HULL:

19   Q.  Do you have Exhibit 1209 in front of you, sir?  It's the

20   very large van transcript.

21          Sir, can you look at page 14 of that -- I'm sorry,

22   you've already testified that you viewed this entire tape,

23   correct?

24   A.  Yes, ma'am, that's correct.

25   Q.  Okay, I'm going to ask you to look at the bottom of page

1    14.

2    A.  Yes, ma'am.

3    Q.  Starting at line 19.

4    A.  Yes.

5    Q.  Does that refresh your recollection as to whether or not

6    the arrest warrant was shown to the Mahons before they went

7    into the van?

8    A.  It certainly does reflect that, yes.

9    Q.  Okay.  Ask you to look at Exhibit 1206.  Do you recognize

10   that document?

11   A.  I do.

12   Q.  That's the arrest warrant for the Mahons dated in June

13   2009, correct?

14   A.  Yes.

15   Q.  And that's in fact dated -- I'm sorry, strike that.

16        Is that the same arrest warrant that was shown to the

17   Mahons before they were placed inside the van?

18   A.  Yes.  It should be.  I mean, there was only one.  And this

19   appears to be an accurate copy of the one we showed them.

20        MS. HULL:  Defense moves 1206 into evidence.

21        MR. BOYLE:  One second, Your Honor.  No objection.

22        THE COURT:  Ms. Williams?

23        MS. HULL:  No objection.

24        THE COURT:  Admitted.

25        MS. HULL:  Permission to publish.

1       THE COURT:  You may.

2   BY MS. HULL:

3   Q.  Is what I have displayed Exhibit 1206, Agent?

4   A.  Yes, that's part of it.

5   Q.  The first page?

6   A.  Yes, this is the arrest warrant for Dennis Mahon.

7   Q.  And now the third page the same?

8   A.  Yes, it's the arrest warrant for Daniel Mahon from the same

9   exhibit, yes.

10  Q.  And you see where the arrest warrant shows the District of

11  Arizona at the top, correct?

12  A.  Yes.

13  Q.  And it also shows, again, we are looking at page 1 of that

14  exhibit, the arrest warrant of Dennis Mahon, correct?

15  A.  Yes, ma'am.

16  Q.  And it, in addition to indicating the District of Arizona,

17  it also lists the charges, correct?

18  A.  Yes.

19  Q.  So that information would have been provided to Dennis

20  Mahon before he went into the van and was recorded, correct?

21  A.  The charges information?

22  Q.  The charges and the district out of which that search

23  warrant or arrest warrant, I'm sorry, comes or is issued?

24  A.  Yes, either again, right before he got in the van or right

25  when he got in the van.  But in the very early part of the van.

1    Q.  Okay.  Also on the third page, that shows you the same

2    information for Daniel Mahon, District of Arizona is posted,

3    correct?

4    A.  Yes.

5    Q.  As is the charge, correct?

6    A.  Yes.

7    Q.  And so that information and the search warrant and items to

8    be seized, all that information was provided to the Mahons

9    before they got into the van, correct?

10   A.  Yes.

11   Q.  And, in fact, at that time June of 2009, the paid informant

12   had been talking to and sending Dennis Mahon newspaper

13   clippings on the Scottsdale bombings for years, correct?

14   A.  I don't know if that's accurate, your question the way it's

15   phrased, but there were one or two clippings sent fairly early

16   on in their relationship between the two.  I don't recall any

17   pattern going on for years of articles from Scottsdale bombing

18   to them.  I just recall a couple three in the early stages,

19   '05, '06.

20   Q.  And you sent letters about -- drafted by you, but sent from

21   her fictitiously talking about the Scottsdale bombing and

22   Mr. Logan, correct?

23   A.  At least one that I recall.

24           MS. HULL:  One moment, Your Honor.

25           Your Honor, I'm trying to determine if we already laid

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1707

1    the foundation for 1205 and I'm not finding.  If I could have

2    just a moment, please.

3    BY MS. HULL:

4    Q.  Agent Moreland, would you agree that E-219 was a recording

5    that was also captured, not as an exhibit in front of you, but

6    in that long list that we started out with, would you agree

7    that E-219 -- E-219 is also from this investigation?  If you

8    need to look at your notes.

9    A.  I would agree, yes.

10          MS. HULL:  Judge, for the record, that is for purposes

11   of Exhibit 1205.

12   BY MS. HULL:

13   Q.  Agent Moreland, you testified earlier that you appeared

14   before the grand jury in this case, testified previously?

15   A.  I -- I can't remember -- I know I was asked about prior

16   testimony at least in this courtroom on a couple of occasions.

17   And that may have included questions about grand jury

18   testimony, yes.

19   Q.  Let me ask you, do you recall testifying previously about

20   certain descriptions about -- made by Dennis Mahon reference

21   the Scottsdale bomb -- I'm sorry, strike that.  Let me back up.

22          In the course of the investigation, the paid

23   informant, you were instructing her to attempt to elicit

24   certain types of testimony or statements from Dennis Mahon.  Do

25   you recall that?

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1708

1    A.   Yes.

2    Q.   And did you make specific observations as part of this

3    investigation to compare certain statements made by Dennis

4    Mahon, for example, as to, in particular, as to the injuries

5    sustained by Mr. Logan?

6    A.   Yes.

7    Q.   So if Dennis Mahon said that his fingers were blown off,

8    Mr. Logan's fingers were blown off, that would be an incorrect

9    statement?  That didn't happen, did it?

10   A.   No.  Not blown off, no.

11   Q.   And was there any damage to his face, Mr. Logan?

12   A.   I believe he suffered some thermal damage.  I'm not -- I

13   didn't go to the hospital, ma'am.  I didn't look at all of his

14   injuries.  I'm familiar with some of his injuries more so than

15   others.  But, I mean, he would have been exposed to a

16   considerable amount of heat and fire and there probably was

17   some singeing of his hair and other things.

18   Q.   But you would agree that if Dennis Mahon said that he lost

19   three fingers, that would be an incorrect statement?

20   A.   I -- yes, that's inaccurate.

21   Q.   Throughout the investigation also, Agent Moreland, isn't it

22   true that you provided certain props for the paid informant?

23   A.   Yes, ma'am.

24   Q.   And for the investigation?

25   A.   Yes.

1   Q.  Not just her attire and photographs and grenades and the

2   books we've talked about.  Didn't you -- are you the one who

3   provided the rebel flag that's in the informant trailer?

4   A.  Yes.  I believe so.

5   Q.  When did you -- when did you place that there?

6   A.  Prior to us driving it into the trailer park.  I can't

7   remember if I put that stuff into the trailer before we left

8   Arizona or after we arrived in Oklahoma.

9   Q.  Was it your decision to put that same flag or a similar

10  flag behind the informant when you took a photograph of her

11  breasts with a grenade hanging between them?

12  A.  I was responsible for all of that.  Whether that was

13  exactly my idea or not, I approved it, yes.

14  Q.  As part of your investigation, did you interview a Julie

15  Angelica?

16  A.  Yes.

17  Q.  When did you interview her?

18  A.  If I'm getting the name right, I believe I talked to her

19  two times and --

20  Q.  She lived in the same trailer park as the Mahons in '04,

21  correct?

22  A.  I was trying to see if I had the correct name, but yes.

23  Q.  And you were seeking information as to whether the Mahons

24  even had a computer in 2004, weren't you?

25  A.  Well, that may have been one of the questions we asked her,

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1710

1   yes.

2   Q.  And based upon that investigation, you determined that the

3   Mahons did not --

4           MR. BOYLE:  Objection, foundation, hearsay.

5           THE COURT:  Overruled.

6   BY MS. HULL:

7   Q.  Based upon that portion of the investigation, you

8   confirmed -- concluded that the Mahons did not have a computer

9   in 2004?

10  A.  That's incorrect, no.

11  Q.  In their trailer?

12  A.  Yes.  We have at least a witness that was positive they had

13  a computer.

14  Q.  Did you take a printout from the -- from anything in

15  Angelica -- anything in Ms. Angelica's trailer?

16  A.  No.

17  Q.  Did she have a computer?

18  A.  She did.  I'm trying to remember when -- it was much later,

19  probably '07, '08, maybe even '09.  And I think we asked her if

20  the Mahons had ever used her computer or could have ever used

21  her computer in any way.  And she replied no.  So I don't think

22  we went in -- I don't think we then said:  Well, can we look at

23  your computer and take a sample.

24  Q.  So there was nothing of evidentiary value located in her

25  trailer?

1   A.  As far as we knew, yes, that's correct.

2   Q.  Isn't it true that, Agent Moreland, that on June 17th,

3   2004, you searched my client, Daniel Mahon's, work space?

4   A.  I don't recall the date, but I do recall going through the

5   work space at Alaska Airlines, yes.

6   Q.  Would reviewing your search warrant affidavit refresh your

7   recollection as to the day you went to Daniel Mahon's work

8   station?

9   A.  It probably would give me the day, yes.

10  Q.  Then I would ask you to look at Exhibit 589, page 9,

11  paragraph 12.

12  A.  Page 12, paragraph --

13  Q.  I'm sorry, page 9, paragraph 12.  Let me --

14  A.  I just don't see a date.  I see the reference, but I just

15  don't see a date there.

16  Q.  Reviewing that same paragraph do you recall making a

17  statement to the fact that you did not determine in your

18  investigation other than the trailer in Tempe or Daniel Mahon's

19  work station, that these two individuals had control over any

20  other location or residence?

21  A.  Are you asking me at some point if I stated whether Dennis

22  and Daniel Mahon had control over that work space or the

23  residence?

24  Q.  With the exception of the work space of Daniel Mahon and

25  the site -- at the site of his employer, you've identified no

1    other storage area, garage or facility, having been under the

2    control of the Mahons during the time period around the

3    Scottsdale bomb.

4    A.  I would agree with that, yes.

5           THE COURT:  We are going to take a morning break at

6    this point, Ms. Hull.

7           Members of the jury, we will see you in 15 minutes.

8    Please remember the admonition.

9           (The jury left the courtroom.)

10          MS. CISNEROS:  Your Honor, before you leave?

11          THE COURT:  Please be seated.  I was trying to walk

12   out of the courtroom without saying anything, Ms. Cisneros.

13          MS. CISNEROS:  I realize that.

14          MS. HULL:  I was going to mention that for the record,

15   actually for Ms. Williams, Judge.

16          MS. CISNEROS:  I realize that, Your Honor, this is

17   just a one-minute thing.  I wanted to ask the Court to instruct

18   the witness not to mention the Edmund Burke Society, which he

19   already did, until the Court has ruled that the issue of the

20   Edmund Burke Society is admissible.

21          MR. BOYLE:  They already brought this up.  They've

22   asked repeatedly, both counsel, about Edmund Burke and the

23   answer about Edmund Burke Society has come out.  So --

24          THE COURT:  The defendants' attorneys did ask about

25   Edmund Burke.

1          MS. CISNEROS:  Edmund Burke, not the Edmund Burke

2    Society.  They are completely different issues, completely

3    different.  And if the defendants may have had an extremely

4    tenuous connection to an organization that was defunct in 1972

5    is an issue that we are raising.

6          THE COURT:  Well, I have not ruled on that motion yet.

7    I need to rule on it before there is evidence of the Edmund

8    Burke Society presented.  So what I will say is if a defense

9    question does not fairly call for a comment about the Edmund

10   Burke Society, then Agent Moreland should not mention it in

11   response to the question.

12          If you intend to go into that issue on your redirect,

13   Mr. Boyle, then I am going to need to rule on that issue.

14          MR. BOYLE:  I don't agree.  They've asked about Grant

15   Bristow and whether he could have hearsay or foundation

16   problems regarding his testimony.  But the testimony that has

17   already come out through this witness is whether Edmund Burke

18   is a white supremacist.  They asked those questions right out

19   at the beginning.

20          And then today the question was asked about Edmund

21   Burke, and the answer, which the defendants did not object to,

22   and is in the record, is that the Edmund Burke Society dealt

23   with white Western Canada and was a white supremacist

24   organization.  And no one moved to strike that and that has

25   already come out.

1           MS. CISNEROS:  Your Honor --

2           MR. BOYLE:  Let me finish.

3           MS. CISNEROS:  Oh, I'm sorry.

4           MR. BOYLE:  So that is already in the record from the

5    testimony of this witness.  I don't understand why it is I

6    can't follow up and say are we clear that Edmund Burke is

7    different from the Edmund Burke Society.  And you have

8    testified that the Edmund Burke Society is the group that is a

9    white supremacist group advocating for a white Western Canada

10   and end it at that.

11          MS. CISNEROS:  Your Honor, I'm sorry, I did not hear

12   that testimony at all that the Edmund Burke Society has

13   advocated for a white western Canada.

14          THE COURT:  I did.

15          MS. CISNEROS:  That was not.

16          THE COURT:  I did.

17          MS. CISNEROS:  That the Edmund Burke Society has

18   advocated for a white western Canada?

19          THE COURT:  I think so.  I will confirm it on the

20   break online, but I think so.

21          MS. HULL:  My recollection is there was an objection

22   from Ms. Williams and the Court overruled the objection.

23          MS. CISNEROS:  No, no, sustained it.

24          MS. HULL:  Sustained the objection, I apologize.

25          THE COURT:  Well, I'll go back and look at what was

 1    said this morning.  We've got that online now.  So I understand

 2    the objection.  Let me look at it during the break and we will

 3    talk about it when I come back.

 4            MS. HULL:  I have two items, Judge.  One I would move

 5    to strike that testimony.

 6            And second of all, as a general proposition, this is

 7    something that we have come across before, and I'm going to ask

 8    that the witness be instructed only to answer the question.

 9    Because all I asked was about the Edmund Burke quote sending

10    her in to get the Edmund Burke quote, Judge.  And I believe

11    that these gratuitous tangents are outside the scope of the

12    answer.

13            THE COURT:  I feel that Agent Moreland has been

14    confining his answers to the questions for the most part.  I

15    will look at that specific issue and whether there was an

16    objection.  And I'll give you my ruling when I come back in.

17            MR. BOYLE:  And I'll just note that she asked, wasn't

18    it a failure, your attempt to gather information about Edmund

19    Burke, so it wasn't just specifically --

20            THE COURT:  All right.  I'll look at the transcript.

21            Ms. Williams, is ten minutes enough or do we need to

22    extend this break?

23            MS. WILLIAMS:  Ten minutes would be great, Judge.

24            THE COURT:  Okay, see you at a quarter to.

25            (A recess was taken.)

1          THE COURT:  Please be seated.  All right, we need to

2   talk about two matters briefly, counsel.

3          I went -- I looked at the transcript from this

4   morning.  There was one answer that Agent Moreland gave in

5   response to questions about whether he had prompted the

6   informant to use a quote from Edmund Burke and elicit

7   statements about Edmund Burke.  And Ms. Hull asked:  That

8   didn't go too well.

9          Agent Moreland didn't agree.

10         Ms. Hull said:  That's a Carlos Santana quote.

11         And in response, Agent Moreland said:  There were

12   statements that were less than revealing about Edmund Burke,

13   but there were some statements that were dead on and point to a

14   white supremacist connection to Edmund Burke.

15         The next question was:  Edmund Burke was never

16   mentioned.

17         Answer:  He was responded to in a manner that

18   connected --

19         Question:  Who's he?

20         And that's when Agent Moreland talked about the Edmund

21   Burke topic coming up and a response to that topic by Dennis

22   Mahon that identified how Canada was going to be divided into a

23   white western Canada at which point Ms. Williams objected and I

24   sustained the objection.

25         So the only answer that was given that referred to the

1    Edmund Burke Society was that he felt there were statements

2    made that showed a connection to the society.  That statement

3    was made without objection.  There certainly was no explanation

4    of what the Edmund Burke Society was or discussion of that in

5    Agent Moreland's testimony.

6           It seems to me that before the Government presents

7    evidence about the Edmund Burke Society, I ought to rule on a

8    motion in limine.  And since that wasn't a topic of any

9    significant discussion during the cross, I don't think that it

10   would be appropriate on redirect to go into what the Edmund

11   Burke Society is or what it means or its location in Western

12   Canada because I sustained that objection.  Certainly Edmund

13   Burke has been raised by the defense and the individual Edmund

14   Burke can be a subject of questioning on redirect.

15          Okay, we have gotten some e-mails in the last little

16   bit here in the courthouse indicating that a suspicious package

17   has been found on the west end of the building buried in a

18   planter -- partially buried in a planter box.  It looks like a

19   small package with wires going into it.

20          The Phoenix bomb squad has been asked to come and

21   remove it with their robot and the first -- the western end of

22   the first and second floors of the building have been

23   evacuated.  They don't think that the rest of the building

24   needs to be evacuated at this point.  They're apparently going

25   to have it removed and hopefully that will resolve it.

1          But it's distinctly possible in my view that when we

2    get to the noon hour, there will still be Phoenix Police and

3    maybe the bomb squad and maybe somebody outside the western end

4    of this building will be cordoned off.  Obviously the jurors

5    will be going to lunch during the noon hour.

6          I want to raise that with you.  I don't know precisely

7    what's going on outside, whether we need to say anything to the

8    jury at this point.  I just raised that for your consideration

9    and for any comments you have.

10          MS. WILLIAMS:  Judge, I actually, while I was

11   downstairs in our office, I got a similar e-mail saying that

12   the marshals advised our office to tell all the attorneys to

13   stay away from the courthouse because no one was being allowed

14   into the courthouse.  And that came about 10:15.  And they said

15   for a minimum of an hour, maybe longer.

16          So I think that -- if that's still in effect, it might

17   cause yet another wrinkle in lunch if the jury leaves the

18   building, will the jury be able to get back in the building.

19          THE COURT:  Do the marshals know anything about that

20   question?

21          THE MARSHAL:  Yes, sir.  We got an e-mail, too, that

22   we are not letting anyone in or anyone out right now of the

23   building.

24          THE COURT:  So what's the plan at lunch?

25          MS. WILLIAMS:  You will buy lunch.

1           THE MARSHALL:  I have no idea.

2           THE COURT:  Nancy, do you have any information on all

3    of this?

4           THE JUDICIAL ASSISTANT:  I just checked on the jury

5    and some of them had tried to go outside during the break and

6    were informed of the situation.

7           THE COURT:  What were they told?

8           THE LAW CLERK:  That there was a bomb scare in the

9    building and they are not going to leave.

10          MS. HULL:  I move for a mistrial.  I'll follow up when

11   necessary.

12          MS. WILLIAMS:  And I would join in that.

13          MR. MORRISSEY:  Before we get there, our employee was

14   just notified that this our victim-witness advocate indicates

15   that they are now letting people back in.  So maybe we could

16   take a visual and figure that out.

17          But, Judge, at any rate, no matter what this -- where

18   this discussion goes, can you make a record and finding that

19   you have not closed the courtroom if we proceed.  Because there

20   may be some access issues.  But we've not closed this

21   courtroom.  And all of the people who were here as spectators

22   can still be here as spectators.  And we simply have not done

23   that.  So I just want the record to be clear on that.

24          THE COURT:  Well, that's clear, there hasn't been any

25   closing of the courtroom.  All right, this is -- yes.

1       THE MARSHAL:  We just got an e-mail saying that we are

2   all clear to return to the courthouse and normal operations.

3   The package has been removed by the bomb squad and is in --

4       THE COURT:  A little louder.

5       THE MARSHAL:  I'm sorry.

6       That we are all clear to return to the courthouse and

7   normal operations.  The package was removed by the bomb squad

8   and is in a secure container and is being moved for further

9   evaluation.

10      THE COURT:  So the courthouse is open.  People can

11  come and go?

12      THE MARSHAL:  Yes, sir.  From my limited e-mail.

13      THE COURT:  Well, I think what I want to do is this:

14  I think when the jury comes back in the courtroom, I want to

15  tell them that there has been a security issue that has arisen

16  at the courthouse this morning, that some of them may have

17  heard something about that when they sought to leave the

18  building, instruct them not to discuss it among themselves as

19  jurors and tell them that I'll have some additional

20  instructions for them later.

21      And I want to think about what we need to do in light

22  of this situation.  But I would like to make sure that we at

23  least foreclose the possibility they are talking about that

24  issue over the lunch hour.

25      MS. HULL:  Judge, I would also inquire as to whether

1    or not any discussions have been had in the jury room since --

2    over the break.

3            THE COURT:  I think we need to do that at some point.

4    I think I would rather have a sense for where we want to go

5    with instructions before I go into that.  But I agree we do

6    need to ask that question.  I just want to make sure we stop

7    any from this point forward until we revisit the issue.

8            MR. BOYLE:  Judge, we have no objection right now to

9    telling them as well that this is a routine matter and it has

10   no connection to this case.  Because I think even -- at the

11   outset telling them that is no prejudice to anyone.  I think

12   doing it sooner rather than later is helpful.

13           MS. WILLIAMS:  Judge, my -- I would very much disagree

14   with telling them that is routine.  Several jurors have been

15   told there was a bomb scare.  Number one, it's not routine.

16           Number two, a number of the jurors in their

17   questionnaires, I can no longer give you specific juror

18   numbers, said they were afraid of the issues being raised in

19   this trial.  I don't remember whether any of our sitting jurors

20   are any of those people.  But the concerns were out there and

21   were raised.  And now they've been raised on a very real level.

22           And I join Ms. Hull's concern that the group has now

23   been contaminated during the break by that information.

24           THE COURT:  All right.  I understand what everybody is

25   saying.  I am going to tell them that there was a security

1    issue, instruct them not to discuss it, tell them that I'll

2    have more information for them later.  And then we will have

3    time to revisit it.  But at least we will have stopped any

4    further discussions.

5         All right.  Let's bring the jury in.

6         (The jury entered the courtroom.)

7         THE COURT:  Thank you.  Please be seated.  Thanks for

8    your patience, members of the jury.

9         We had a legal issue we discussed.  In addition, we

10   were advised, as we understand some of you might have been, of

11   a security issue here at the courthouse this morning.  I want

12   to say a couple of things about that.

13        One is, that has nothing to do with this case.  You

14   may have been told, if you tried to exit the building during

15   the break, that they weren't letting people in or out.  That's

16   now changed.  Folks are being let in and out of the building,

17   so there shouldn't be any problem going to lunch.

18        I'll give you more information later.  But there's no

19   safety concern, there's nothing that that event has to do with

20   this case.  I am going to instruct you not to talk about it

21   among yourselves.  And we will revisit the issue after I get

22   the additional detail that might be relevant to you.  But it

23   shouldn't have any effect on lunch break.

24        All right, Ms. Hull, you may continue.

25        MS. HULL:  Thank you, Your Honor.

 1    BY MS. HULL:

 2    Q.  Agent Moreland, I believe we were at -- we were still on

 3    Exhibit 589, page 9, paragraph 12.  Do you recall that?

 4    A.  I do.

 5    Q.  Did you have an opportunity to read the entire paragraph

 6    extending on to page 10?

 7    A.  I'm just finishing now.  Yes.

 8    Q.  Do you have Exhibit 599 as well?

 9            THE COURTROOM DEPUTY CLERK:  It may be in the box

10    behind you.  It is one that I haven't pulled yet.

11            THE WITNESS:  I have that now.

12    BY MS. HULL:

13    Q.  And does that exhibit refresh your recollection as to the

14    date you searched Daniel Mahon's work station?

15    A.  Yes, ma'am, it does.

16    Q.  And what date was that?

17    A.  June 17th, 2004.

18    Q.  And where was that work station?

19    A.  At the airport here, Sky Harbor Airport.

20    Q.  And you searched for things such as something to connect

21    Mr. Daniel Mahon to the Scottsdale bomb, correct, such as

22    print -- printers, things of that nature?

23    A.  Yes.  Generally it was the printers that I was interested

24    in there.

25    Q.  And isn't it true that you found nothing of significance at

1    his work station?

2    A.  That is true.

3    Q.  So you eliminated his work space as where a bomb or

4    Scottsdale bomb was constructed or packaged, correct?

5    A.  No, I wouldn't say I eliminated it.  I just found no

6    evidence of it having happened or being constructed there.

7    Q.  Page 10 of Exhibit 589, did you write in your search

8    warrant that "I have eliminated this area as a location where

9    the bomb used in the February 24th bombing was constructed or

10   packaged"?

11   A.  What paragraph, ma'am?

12   Q.  Top of page 10, paragraph 12 still.

13   A.  Yes.

14   Q.  Didn't you also write that you eliminated that location as

15   the origin of the note or label used in the Scottsdale bomb?

16   A.  Yes.

17   Q.  You also determined that that, as part of your

18   investigation, you concluded that that area has 24-hour

19   security?

20   A.  Yes.

21   Q.  And is under tight security, correct?

22   A.  That's correct, ma'am.

23   Q.  And that the only batteries in that -- anywhere near that

24   were large industrial black-type batteries, correct?

25   A.  Yes, that we saw or could find, correct.

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1725

1  Q.  And you checked my client's work schedule, correct?

2  A.  I'm not positive.  I don't recall for sure if we did as a

3  general proposition, or if we actually looked at any of his

4  prior scheduling or so forth.  I think we might have asked

5  questions about his schedule.  I'm not sure if I looked at any

6  time sheets or anything like that.  I don't recall.

7  Q.  You interviewed his direct supervisor?

8  A.  That was my understanding, yes.

9  Q.  A gentleman by the named of Larry Hough?

10  A.  Yes.

11  Q.  When did you interview Mr. Hough?

12  A.  I think it was that same day.

13  Q.  Did you collect any personnel records of Daniel Mahon's?

14  A.  The only thing I remember was a resignation letter that may

15  have been from personnel records.  I'm not sure if we looked at

16  or took anything else that day.

17  Q.  Well, based upon your investigation of my client's work

18  space and co- -- did you talk to any other coworkers other than

19  Mr. Hough?

20  A.  I don't believe any of them were there at the time.  We

21  were there -- my memory is we were there at a time of day when

22  it wasn't the normal time that Daniel Mahon would have worked.

23  So I don't think coworkers were present.  Or at least none were

24  identified as coworkers.

25  Q.  And based upon the interviews, the inspection of the

1    workplace, and whatever records you were able to obtain, did

2    you determine, come to the conclusion that Daniel Mahon had

3    been requesting a transfer for some time?

4    A.  Yes.

5    Q.  There were health issues, correct?

6    A.  I don't remember if it was a combination of things or if it

7    was one thing.  But, yes, I remember that subject coming up,

8    yes.

9    Q.  And it was over health issues.  Do you remember that?

10   A.  I remember something about dry temperatures related to his

11   work environment or his hands or something.

12   Q.  Through your investigation, did you determine Daniel

13   Mahon's whereabouts the week of the time surrounding the

14   Scottsdale bomb?

15   A.  Did I determine his whereabouts?

16   Q.  Yes.

17   A.  Yes.  Generally speaking.

18   Q.  And was he employed at the time?

19   A.  Yes.

20   Q.  And same place that you searched in June of 2004?

21   A.  Yes.

22   Q.  When you searched his workplace, did you determine where he

23   had to park, where employee parking was located at that time?

24   A.  I don't recall if we did or not.

25   Q.  Would you agree that at the time in February of 2004, the

1   employee parking was located a considerable distance from his

2   work station?

3   A.  My understanding or recollection was that it was, you know,

4   you took a shuttle or something to it, but it was generally on

5   the airport property somewhere.  I just don't remember from --

6   his was terminal two is where his work space was.  And I know

7   it's remote from terminal two generally in the airport area.

8   That's what I recall.

9   Q.  And did you determine the amount of time it would have

10  taken him to get from his workplace to his car, say?

11  A.  I was -- I mean, obviously I didn't get on to an employee

12  shuttle, but I'm generally familiar from hundreds of visits

13  there how long it would take to go from his work space to a

14  shuttle.  I'm not aware of the shuttle times, for instance, how

15  often they run, and from there to the parking.  I have a pretty

16  good idea of what that would be.

17  Q.  But you don't know where the parking was at the time?

18  A.  No, just generally in the airport area is what I

19  understand.

20  Q.  So you understood that in February of 2004, the employee

21  parking for Daniel Mahon's work station or his employees or his

22  employment was somewhere on the Phoenix Sky Harbor grounds?

23  A.  Either that or directly adjacent to.  I'm familiar with

24  some of the employee parking areas there.  I don't particularly

25  know which one was his or whether he had some other

1   arrangement.

2   Q.  So you don't -- well, let me ask you this:  Through your

3   investigation, have you determined where Daniel Mahon was

4   February 21st -- the 20th and 21st of 2004?

5   A.  To some degree, I believe, yes.

6   Q.  Did you look at his time sheets?

7   A.  I don't recall looking at his time sheets.

8   Q.  Would you consider that an important part of your

9   investigation, where he was on those dates?

10  A.  Yes, I believe it's important, yes.

11  Q.  Do you know what time or what shift Daniel Mahon worked

12  February 20th and 21st of 2004?

13  A.  I believe I do.

14  Q.  Do you recall which shift?

15  A.  Well, I'm not sure what they call it, but it was like a

16  night shift and then getting off in the morning.

17  Q.  What time in the morning?

18  A.  Just after nine, I believe.

19  Q.  Does 9:18 sound correct?

20  A.  I would have said 9:15, but 9:18, I will accept.

21  Q.  And do you know when he started the shift?

22  A.  My understanding was they would start late in the evening.

23  I -- I recollect 11:00 p.m., somewhere, 10:00 p.m., but it was

24  in the late evening hours.

25  Q.  Does 7:00 p.m. sound correct?

 1   A.  I don't recall 7:00 p.m., ma'am, no.

 2   Q.  Your investigation determined that the Authors and

 3   Appetizers event started at 7:00 p.m. on the 20th, correct?

 4   A.  I don't recall the exact time.

 5   Q.  Would you agree, Agent Moreland, that when you prepare a

 6   report, it is complete and accurate to the best of your

 7   knowledge at the time you prepare the report?

 8   A.  I agree with that general statement, yes.

 9   Q.  Who is Agent Livingston?

10   A.  ATF special agent.

11   Q.  And was he involved -- I believe you testified that he was

12   involved somehow on the May 1, 2007, contact with the Mahons

13   between the Scottsdale drive and the visit to the hotel that

14   day; is that right?

15   A.  He was involved for a few minutes just at the hotel after

16   they've made the drive that the jury saw the videotapes of, the

17   truck drive.

18   Q.  And it was after the drive -- that truck drive?

19   A.  Yes.

20   Q.  And he had direct contact with the Mahons?

21   A.  He did.

22   Q.  Face to face?

23   A.  Yes.

24   Q.  And he reported to you after that direct contact?

25   A.  Yes.

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1730

1    Q.  And isn't it true that on May 1st, 2007, that Agent

2    Livingston confused Dennis and Daniel?

3    A.  I'm not sure if it was on that date that he confused them.

4    Q.  Well, did you -- did you create a report, write a report on

5    the May 1, 2007 event?

6    A.  I did.

7    Q.  And was part of that report based on information that Agent

8    Livingston provided you as a result of his face-to-face contact

9    with the Mahons on May 1, 2007?

10   A.  It was, yes.

11   Q.  And did you in fact go back and correct that report years

12   later?

13   A.  Yes.  I -- I don't remember exactly when.  But it was more

14   than a year, and probably less than four years.

15   Q.  And how often do you go back and correct your reports?

16   A.  When I see something that's substantially wrong, has a

17   material, you know, implication, I mean not necessarily a typo

18   or something like that, but I try to do that.

19   Q.  And you did that for the May 1, 2007 event, correct?

20   A.  At least that part of it.  I can't remember if it was two

21   reports or one.  But there was a segment of a report that I

22   am -- I believe I'm familiar with.

23   Q.  And isn't it true that you corrected that report that the

24   substantial issue, as you've described it, was based upon Agent

25   Livingston confusing Dennis and Daniel?

1   A.  Correct.  In the report, yes.

2   Q.  And so your original report, based on the information from

3   Agent Livingston -- do you have Exhibit 969?

4   A.  I have that now, yes.

5   Q.  And is that your report that corrected the earlier report?

6   A.  It does appear to be, yes.

7   Q.  And the amended report was written on or about April 27th,

8   2009?

9   A.  Yes.

10  Q.  And did you in that report list the corrections that you

11  needed to make to your original report based upon the

12  eyewitness face-to-face communications between Agent Livingston

13  and the Mahons?  Page 4 of 5.

14  A.  Are you asking if I reported in the report that I was

15  making the corrections or did I just simply make the

16  corrections on that page?

17  Q.  Well, did you correct the information from your first

18  report that was based on Agent Livingston's account?

19  A.  Yes, I did.

20  Q.  And is that contained on page 4 of 5 of your amended report

21  of April 9?

22  A.  It is.

23  Q.  And is that the bullet points that you see at the bottom

24  of -- lower portion of page 4?

25  A.  Yes.

1    Q.  And all of those are from Agent Livingston?

2    A.  Yes.

3    Q.  And agree or disagree with the statement that it contains

4    14 entries?

5    A.  I would agree with that.

6    Q.  Would you agree with the statement that Agent Livingston --

7    that you had to go back and correct 13 of those entries?

8    A.  I don't -- I don't recall how many of them had to be

9    corrected.

10   Q.  Ask you to look at 968, please, Exhibit 968.

11          Do you have 968, sir?

12   A.  I do.

13   Q.  Is that the first report you wrote on the May 1st, 2007?

14   A.  Yes.

15   Q.  Okay.  And that was dated -- when did you write that

16   report?

17   A.  This one was written July 27 of '07 or at least finalized

18   that date.

19   Q.  Okay.  And did you write the report after you had talked to

20   Agent Livingston?

21   A.  Not really.  We may have had a brief conversation, but not

22   really about the report.

23   Q.  Well, about -- you spoke about the events of May 1st?

24   A.  In -- I mean, all I did is I said:  Please prepare what you

25   recall from your recollection of what was said that day.  So he

1  prepared in some Word document and then sent that to me or gave

2  that to me to be inserted into the report as part of the body.

3  Q.  Okay.  And that -- what he provided you is what is

4  contained in paragraph 6 on page 4 of 5 of your report?

5  A.  Yes, the bullets.

6  Q.  I'm sorry?

7  A.  The bulleted points, yes.

8  Q.  And that -- those bullet points, would you agree are the

9  only changes you made to report number 609 -- or 69, when you

10 later, two years later wrote the amended Rule 69 -- ROI 69,

11 which is 969 exhibit?

12 A.  I don't recall if I made any other changes to it at this

13 point.  I -- I could have seen a word wrong here or there, a

14 typo.  I just don't recall.  I don't remember any substantial

15 changes that I made at that time.  I mean, my main purpose was

16 to fix the names.

17 Q.  And how did you come about a decision to fix the names in

18 the second report?

19 A.  Because I'd actually heard the conversation.  And I think

20 the first time when he sent this to me I didn't look at it very

21 carefully to see that he had gotten the two names backwards of

22 the two individuals.  So at some point I looked at it carefully

23 and I went:  Oh, wait a minute, that wasn't Dennis saying that,

24 that was Daniel.

25         And I went back and asked him, I said do you recall

1   which one was which.  And he said yes.  And then he realized

2   that he had made the same mistake that he had gotten --

3           MR. BOYLE:  Objection to the narrative, Your Honor.

4   I'm also going to object for foundation.

5           THE COURT:  Overruled.  This was the answer called

6   for.

7           THE WITNESS:  After I went back and discussed with him

8   he advised that no, it was reversed so what's now attributed to

9   Dennis is correct and what's attributed to Daniel is correct in

10  the amended report.

11  BY MS. HULL:

12  Q.  But he did get -- he did get them wrong on May 1st, 2007,

13  correct?

14  A.  Well, at least when he wrote -- I don't know that he had it

15  wrong on May 2007.  It seemed to me from talking with him he

16  was pretty clear about which one was which.  But when he wrote

17  it, for whatever reason, attributed statements that were

18  Dennis' to Daniel and vice versa.

19  Q.  Did you look at the tapes of that day in order to prepare

20  this amended report?

21  A.  No, I did it -- I did this part of it from my memory of

22  having recalled who was saying what at that time period.

23  Q.  And you would agree that -- well, can you confirm for me

24  that of those bullet points, which I believe are 14, you

25  corrected 13 of them?

1   A.  I'll generally agree.  Do you want me to go through each

2   one of them right now and make sure of that?

3   Q.  Well, does that sound right to you?

4   A.  It does sound right, yes.

5   Q.  Okay.  Would you agree with the statement that all the

6   affidavits that you prepared in this case were prepared after

7   the Catoosa investigation?

8   A.  I would agree if we are talking about any affidavit for a

9   search warrant, an arrest warrant, or anything like that.

10  Q.  Wiretaps, they were all after Catoosa, correct?

11  A.  Yeah, the only exception might have been simple statements

12  for court-ordered pen registers.  And I don't recall those

13  affidavits, but they are somewhat of a statement of fact.

14  Q.  Okay.  And you prepared an affidavit for the pen and trap.

15  A.  It's not really an affidavit.  You need to advise the judge

16  and state a legal reason or at least a set of circumstances as

17  to why you're asking for the approval to go ahead and get that

18  information.

19  Q.  Well, we already established that that was before Catoosa,

20  okay?

21  A.  Correct.

22  Q.  So barring that?

23  A.  Exactly.

24  Q.  Other affidavits?

25  A.  Everything --

1   Q.  Everything was after Catoosa?

2   A.  Yes.

3   Q.  Am I correct?

4          And you already testified that when you write a

5   report, it's correct and accurate and complete?

6   A.  I testified --

7   Q.  To the best of your knowledge?

8   A.  -- that I tried to make all of my reports true, accurate

9   and complete.  I'm not perfect.  I make mistakes, but it is my

10  goal.

11  Q.  And you, if any -- if you witness certainly any pertinent

12  information from the Mahons, for example, that's something that

13  you would reflect in a report?

14  A.  If I recognized it at the time and that sometimes happens,

15  that I've gone back, for instance, in this case and listened to

16  things three or four years ago that at the time I didn't

17  recognize the significance of something that was said on that

18  date.  And I may have missed reporting on it for that reason.

19  And then later it may appear in some other, because now it's

20  more pertinent than it was at that time.

21  Q.  Okay.  And I believe you testified on direct examination

22  that in Catoosa, if the Mahons were in or around that informant

23  trailer, you were not sleeping, and you were monitoring either

24  from the hotel or the cover trailer, correct?

25  A.  That's correct, ma'am.

1   Q.  Okay.  So no exchanges between the Mahons and this

2   informant missed your attention, did they?

3   A.  Unless I stepped into a restroom.  That would be the

4   exception, I think.

5   Q.  I think you testified on direct examination you didn't even

6   go to the bathroom when the Mahons were in or around; is that

7   correct?

8   A.  I believe I said I didn't sleep.  I did go to the bathroom.

9   Q.  In Catoosa, is your recollection that there was -- is this

10  a true statement:  That during the Catoosa investigation, in

11  the informant trailer, that there was only one day that you

12  recall where Daniel Mahon, the undercover, and the paid

13  informant were in the trailer watching a movie?  Dennis Mahon

14  was not there.  Do you remember if there was more than one day

15  or if that was the only day?

16  A.  Where they were specifically and only watching a movie?

17  Q.  Yeah, the one day during the Catoosa event, which was --

18  which spanned, what, a week at most?

19  A.  No, it was, you know, February 25th to February 6th, so --

20  excuse me, January 25th to February 6th.  So --

21  Q.  Okay.  Do you recall?

22  A.  12 days, something like that.

23  Q.  Whatever -- however many days that was, isn't it true that

24  there was only one day that Daniel Mahon was in the trailer

25  watching a movie with only the undercover and the paid

TRISTAN MORELAND - CROSS-EXAMINATION BY MS. HULL    1738

1    informant?

2    A.  I recall at least one.  I cannot say whether there may have

3    been other short segments or this or that.

4    Q.  No, for several hours.  I think it was Apollo 13.  Does

5    that sound right?

6    A.  Boy, I remember several movie titles and times.  I can't

7    say for sure, ma'am.  I mean, my memory is that you're

8    generally asking me a question that I would -- I wanted to say

9    yes to, but I have so many memories of so many days of

10   videotape in my head, that I'm seeing like little images of

11   them being in there sometimes at the table, the couch, the

12   chair.  And I can't say how many times there might have been a

13   movie playing or not.

14   Q.  But do you remember a day where the three of them sat and

15   watched Apollo 13?

16   A.  I do generally remember that, yes.

17   Q.  Okay.  Do you remember any other day where the three of

18   them sat and watched Apollo 13?

19   A.  No, not that movie, no.

20   Q.  Okay.  All right.  And you wrote a report about that day,

21   didn't you?

22   A.  The movie day?  I -- it seems to me that at some point I've

23   written a report about -- or touched on virtually everything.

24   So the probability is yes.  But I do recall that other agents

25   did write some reports from that time period for me and I may

1   have contributed to them or not.

2   Q.  Okay.  But do you recall writing a report about the

3   movie-watching day?

4   A.  I don't specifically recall if I did or did not on that

5   day.

6   Q.  Ask you to look at Exhibit 1011.  Do you recognize that

7   document, sir?

8   A.  Yes.

9   Q.  And when did you prepare that report?

10  A.  Well, I finalized it March 7th of 2005.  I probably started

11  writing it sometime before then.  It's generally my habit to

12  work on reports, unless they are very short, over more than one

13  day or more than one occasion.

14  Q.  And you didn't go back and amend this report, did you?

15  A.  I don't know if I did or not.  I don't recall doing that.

16  But --

17  Q.  Would that have been a numbered report if you had?

18  A.  Would it be a what?

19  Q.  A numbered report, have an ROI number on it if you amended

20  it?

21  A.  Yes.

22  Q.  Like the last one we discussed had an ROI number?

23  A.  It very well could be, it most likely would be the same

24  number, you would just give it the same number whether you

25  amend it or not.

1    Q.  And you said that you supervised the disclosure or

2    participated in the disclosure of reports to the defense in

3    this case?

4    A.  I was part of that, yes.

5    Q.  So if that report had been amended, it would have been

6    provided to the defense?

7    A.  The amended report?

8    Q.  Yes, sir.

9    A.  Yes.

10   Q.  If none was provided to the defense, then your testimony is

11   that none exists, correct?

12   A.  I think what you asked me was, had this report ever been

13   amended.  And what I'm saying is this one may have been amended

14   as it sits here now.  There may have been a version before

15   that.  I'm simply saying I don't recall if after thinking I

16   finalized this report, that I went back and amended it and

17   reissued it.

18   Q.  Okay.  Again, whether it was before or after, if there was

19   another ROI 46, it would have been disclosed?

20   A.  Absolutely.

21   Q.  So if one wasn't provided, one isn't in existence?

22   A.  To my knowledge, that's correct, yes.

23           THE COURT:  Counsel, could you approach for a minute

24   please.

25           (The following discussion was held at the bench

 1   between Court and counsel:)

 2           THE COURT:  Ms. Hull, I want to just raise a concern

 3   about timing.  We spent 15 minutes on whether reports that the

 4   jury will never see were amended or not amended.  I think you

 5   indicated on Friday you thought you had another hour.  We've

 6   now been at this for two.

 7           MS. HULL:  Oh, yes, that I absolutely amended this

 8   morning because over the weekend, we had a lot more

 9   information.

10           THE COURT:  So where are you in wrapping up the cross?

11   It seems to me we are spending a lot of time now on things

12   that, at least I'm not seeing how they are particularly

13   relevant.

14           MS. HULL:  I should be done by noon, certainly.

15           THE COURT:  Okay, thanks.

16           (The discussion at the bench concluded.)

17           THE COURT:  All right, thank you.

18   BY MS. HULL:

19   Q.  All right, Agent, we were talking about your ROI of -- and

20   this ROI actually covered several days, correct?

21   A.  Yes.

22   Q.  Okay.  And can you read paragraph 10 of your report.

23   A.  Yes.  On January 28, 2005 --

24           MR. BOYLE:  Objection, Judge.

25           THE COURT:  You mean read to himself?

1           MS. HULL:  Read to himself.

2           THE COURT:  Right.

3           THE WITNESS:  My apologies.

4    BY MS. HULL:

5    Q.  That's all right.  That was about the one day we talked

6    about with the movie?

7    A.  Yes.

8    Q.  Is that the same day as Apollo 13?

9    A.  I can't say from memory.  I really would have to watch the

10   tape again to see if it was the right movie you are referring

11   to, but, yes, generally speaking, I believe you are correct

12   when you asked me was it Apollo 13 that day.  I remember it

13   being a really long movie.

14   Q.  Right.

15   A.  And I remember the tape running out and so those things go

16   together in my mind.

17   Q.  So whatever date that was, you just indicated that at the

18   end of the tape, that Daniel Mahon left for the evening,

19   correct?

20   A.  Well, no.  That's not exactly what I'm saying.  The tape

21   ended before he left.  So we were still monitoring and viewing.

22   But when going back and looking at the taping, it appears that

23   tape ended prior to his departure.

24   Q.  Okay.  But you were -- you were close by monitoring the

25   whole thing, correct, even when the tape was out?

1    A.  That's correct.

2    Q.  And you noted nothing of -- nothing pertinent.  He just

3    went home after the movie?

4    A.  Right.

5    Q.  Okay.  And that's your recollection as you sit here today,

6    that's all that happened, the movie ended, he went home?

7    Whatever movie it was, Apollo 13 or something else?

8    A.  Generally I remember it being late in the evening and I

9    don't remember any substantial conversation after that movie,

10   no.

11   Q.  No pertinent conversation after the movie ended?

12   A.  Nothing that's coming to mind now, ma'am.

13   Q.  Or anything that day?

14   A.  No, I didn't say that.  I simply said based on my memory

15   right now of the movie time period and after the movie, I don't

16   recall anything substantial.

17   Q.  Well, that's the only entry for that date in that report,

18   correct?

19   A.  In this report, yes.

20   Q.  You testified last week that you only gave the paid

21   informant, I believe your testimony was three elements from the

22   Scottsdale bomb, that it was a black male, a package, and a

23   bomb.  Do you recall that testimony?

24   A.  I generally do.  I mean, I thought the subject that it

25   was -- the person worked in Scottsdale of some kind was part of

1   that discussion.  But, yes, that's generally correct what

2   you're saying.

3   Q.  And is it your testimony that before you handed her this

4   prop box, if you will -- where is that box, by the way?

5   A.  In ATF evidence here in Phoenix.

6   Q.  Prior to giving the paid informant this prop, if you will,

7   that you put together with the box and such, you said -- your

8   testimony was you gave her no information about the components

9   of the Scottsdale bomb?

10  A.  That's correct.

11  Q.  You also testified about the child molester ruse, there was

12  no racial component given to that testimony?

13  A.  Yes.

14  Q.  Okay.  And there was no -- you didn't incorporate WAR

15  anywhere into this ruse, did you?

16  A.  No, I don't recall saying anything about WAR having

17  anything to do with the ruse story.

18  Q.  Okay.

19  A.  Other than --

20  Q.  You didn't -- you didn't say that this was, you know, I

21  mean, based on your testimony, if it was WAR, it would have to

22  be about race, right?

23  A.  Government.  There's other issues that WAR takes exception

24  to.

25  Q.  Did you -- did you say anything in the ruse about him

1   being --

2   A.  I don't recall saying anything about the story having WAR

3   as part of the story.

4   Q.  Or any -- that he was a Government official of any sort?

5   A.  I don't -- no.

6   Q.  Or had any particular political view or political anything?

7   A.  I don't recall that, no.

8   Q.  And who in the trailer had control over the on/off switch

9   of the recording devices?

10  A.  Anybody.

11  Q.  Did the paid informant?

12  A.  Anybody in the trailer.

13  Q.  The paid informant had control over turning on and off the

14  recording device, correct, in Catoosa?

15  A.  It was either her or in the case of Special Agent Kaufman

16  being present, it was their responsibility, between the two of

17  them, to work out who was going to turn it on or off.  But

18  anybody in there had access.

19  Q.  Okay.  And it was concealed like a switch of some sort near

20  the doorway?

21  A.  Yes.

22  Q.  Okay.  And you instructed the informant before she went in

23  that that's where it was and that's what it did, right, that

24  switch turned the recording devices on and off?

25  A.  Yes, she was briefed on that.

1    Q.  And how often did you allow her to take custody -- custody

2    of the tapes from the recording device in the -- inside the

3    informant trailer?

4    A.  What do you mean by "custody"?

5    Q.  Well, how many times did she actually take the tape out of

6    the machine?

7    A.  I can't tell you as I sit here.  Either her or Special

8    Agent Kaufman removed them.  I would literally have to go back

9    and try to figure that out for you as to which one pulled it

10   out of the machine on a given day or given time period.

11   Q.  Did you allow her to take them into custody?

12   A.  If she pulled it out of the machine, she had some custody

13   over it until it was handed over to me.

14   Q.  You talked last week about the redundant recording system,

15   that there wasn't one.  Would you agree with the statement that

16   that would have been fairly simple and inexpensive to set up a

17   redundant recording system in either the cover trailer or the

18   hotel or both?

19   A.  I would agree under certain circumstances it should have

20   been maybe, but it -- practically speaking, it wasn't.

21   Q.  Practically speaking in that it would have covered any

22   conversations and recorded any conversations after the tape

23   inside the informant trailer ran out, correct?

24   A.  A redundant system potentially could have absolutely done

25   that, yes.

1    Q.  Did you inform Mr. Logan that this -- these -- what

2    happened to him had to do with the color of his skin?

3    A.  I'm not positive, ma'am.  I recall talking to Mr. Logan on

4    numerous occasions.

5    Q.  It was sometime after an April interview you had with him.

6    Would you agree?

7    A.  Oh, definitely, yes.

8            MR. BOYLE:  What year was that, please?

9            MS. HULL:  2004.

10           MR. BOYLE:  Thank you.

11           THE WITNESS:  Yes.

12   BY MS. HULL:

13   Q.  2004?

14   A.  I agree that it was considerably after that that -- and I'm

15   not even positive I did say to Mr. Logan, you know, you were

16   victimized because of the color of your skin.  That may have

17   been something one could easily have deduced, inferred from our

18   conversations at some points, but I don't know that I ever said

19   that specifically to him.

20   Q.  But by your April 2004 interview, the end of April, 2004,

21   he had not deduced that, had he?

22   A.  I don't think he had deduced it.  I think that he had some

23   suspicion in his mind that it might be related at least to his

24   work.

25   Q.  His work, yes.

1    A.  Well, but as a -- I mean, you know, again, I'm not trying

2    to speak for him.  But based on my conversations with him, I'm

3    pretty sure that that was something he considered.

4    Q.  Sometime after April '04?

5    A.  No, I think he was considering that from --

6           MS. WILLIAMS:  Objection, speculation.

7           THE COURT:  Overruled.

8           THE WITNESS:  Based on my interview on that day, I

9    believe that he had some suspicion in his mind that -- and I

10   think largely because of the note, that he could at least

11   reasonably suspect that it -- that his work and his skin color

12   could be something that was a factor.

13   BY MS. HULL:

14   Q.  In that interview, he told you:  I thought the note was

15   military or police like?

16           MR. BOYLE:  Objection, hearsay.

17           THE COURT:  Sustained.  Well, actually I'm sorry.  Did

18   you ask him what the note said or what Mr. Logan said about the

19   note?

20           MS. HULL:  No, it was my -- the question, I believe,

21   was asking Agent Moreland if in fact -- I think he just

22   testified if I may clarify.  I think he just testified that he

23   thinks he's trying to think of what Mr. Logan was thinking.

24           THE COURT:  That's because that's what you asked him.

25           MS. HULL:  Correct, however, based upon his interview,

1  Mr. Logan clearly indicated otherwise.  That's what I'm trying

2  to get at.

3          THE COURT:  I'm going to sustain the hearsay objection

4  to the extent that you're asking him to recount what Mr. Logan

5  said.

6          MS. HULL:  Thank you.  One moment.

7          I have no further questions.  May I have a moment?

8          THE COURT:  I'm sorry.

9          MS. HULL:  I just need a moment to clear out.

10         THE COURT:  Oh, certainly.

11         MS. HULL:  It may take two trips, Judge.  Thank you.

12         THE COURT:  All right, redirect, Mr. Boyle.

13         MR. BOYLE:  May I approach, Your Honor?

14         THE COURT:  You may.

15

16                    REDIRECT EXAMINATION

17  BY MR. BOYLE:

18  Q.  Agent Moreland, you were asked questions about the farm

19  search warrant and the events of June 25th, 2009.  Do you

20  remember those questions?

21  A.  I do.

22  Q.  Do you still have defense Exhibit 607 in front of you?

23  A.  I'm sure I do.  Give me a moment.  I have that.

24  Q.  Within that exhibit there are numbers at the bottom that

25  are called Bates numbers.  Can you turn to the ones that have

1   4801 and 4802.

2   A.  Okay.  I have those.

3   Q.  And shown also in front of you is Government's Exhibit 245.

4   Do you see that?

5   A.  I do.

6   Q.  Can you tell me whether Government's Exhibit 245 is a

7   portion of what's in those 607 documents at 4801 and 4802?

8   A.  It is.

9           MR. BOYLE:  Your Honor, permission to publish through

10  the Elmo Exhibit 75, which has been admitted.

11          THE COURT:  75?

12          MR. BOYLE:  Yes, sir.

13          THE COURT:  You may.

14  BY MR. BOYLE:

15  Q.  Agent Moreland, showing you now Exhibit 75 on the screen,

16  do you see that picture?

17  A.  I do.

18  Q.  Do you see the top bookshelf --

19  A.  Yes.

20  Q.  -- row on this 75?

21  A.  Yes.

22  Q.  In Government's Exhibit 245, does that show different

23  angles of that photograph?

24  A.  Yes.

25  Q.  Based on your investigation, are these just a different

TRISTAN MORELAND - REDIRECT EXAMINATION BY MR. BOYLE  1751

1  angle of what's shown in Exhibit 75?

2  A.  They are.

3          MR. BOYLE:  The Government moves to admit Exhibit 245.

4          MS. WILLIAMS:  Objection, foundation as to where this

5  is located.

6          THE COURT:  Overruled.  Well, did you have any

7  objection, Ms. Hull, besides that one?

8          MS. HULL:  Not besides that one, Judge.

9          THE COURT:  Overruled, Exhibit 245 is admitted.

10  BY MR. BOYLE:

11  Q.  Let's start if we can in basic chronological order starting

12  with the scene.  Starting with the scene of the Scottsdale

13  bombing incident, do you have a general reference of how long

14  after the explosion you arrived on the scene?

15  A.  About an hour.

16  Q.  You were asked questions about the switch that was in one

17  of the photographs on the floor.  Do you remember those

18  questions?

19  A.  Yes.

20  Q.  When you arrived at the scene and went to this location,

21  did you see that switch?

22  A.  I did.

23  Q.  Is it accurately depicted in the location it was shown in

24  the photographs you saw here in court?

25  A.  Yes.

1  Q.  Can you tell us where that switch was before you arrived or

2  saw it for the first time?

3          MS. WILLIAMS:  Objection, speculation as to before he

4  arrived.

5          THE COURT:  Overruled, I think.  That's the point of

6  the question.

7          THE WITNESS:  No.

8  BY MR. BOYLE:

9  Q.  You were asked questions about Uline boxes.  Did you

10  attempt to determine specific information about the Uline box

11  used in the bomb?

12  A.  We did.

13  Q.  Did you find any information about the Uline box and who

14  may have purchased that specific box?

15  A.  We could not.

16  Q.  Is Uline a large manufacturer?

17  A.  Yes.

18  Q.  Are they national?

19  A.  Yes, they are.

20  Q.  Did you attempt to try and locate the purchaser of this

21  individual Uline box?

22  A.  We did.

23  Q.  Did you have any luck?

24  A.  None.

25  Q.  You were asked about Rayovac batteries.  Are those a

1   national brand of batteries in your experience?

2           MS. WILLIAMS:  Objection, leading.

3           THE COURT:  Sustained.

4   BY MR. BOYLE:

5   Q.  Can you tell us how commonplace are Rayovac batteries?

6   A.  Very common.

7   Q.  Just to reiterate without going through each component of

8   the bomb again, can you tell us whether or not you had a

9   specific or general or generic research done on the bomb

10  components?  Were you able to identify any of them

11  specifically?

12  A.  We were able to identify what they were.  But we were not

13  able to subsequently trace those back to an individual

14  purchaser or a place of origin other than, for instance, we

15  knew the switch was made for Radio Shack.  But we were not able

16  to make any connection.  But beyond the fact that the switch

17  came out of Radio Shack somewhere.  So other than those Mueller

18  for the pipe, things like that, we never connected a single

19  person or persons to the purchase of -- or acquisition in any

20  way to the things that were in that bomb.

21  Q.  You were asked questions about the defendant's whereabouts,

22  specifically in February of 2004.  Do you remember those

23  questions?

24  A.  I do.

25  Q.  In February of 2004, can you tell us if you determined

1    through your investigation if both Dennis and Daniel Mahon were

2    in the greater Phoenix area during generally that month?

3    A.  Yes, they were.

4    Q.  You were asked questions about the airport?

5    A.  Yes.

6    Q.  Which -- is that the location where Alaska Airlines is at?

7    A.  Yes, sir.

8    Q.  Did you physically drive the distance from the airport to

9    the location of the Scottsdale bombing?

10   A.  I did.

11   Q.  Can you tell us how long it took you to drive that

12   distance?

13          MS. WILLIAMS:  Objection, foundation, Judge.

14          MS. HULL:  Objection, relevance and foundation.

15          THE COURT:  Overruled.

16          THE WITNESS:  It took me 37 minutes from the farthest

17   place on the airport I could find to that location.  And that

18   included going to the Mahons' trailer, stopping there for three

19   or four minutes, then stopping as if I was getting something to

20   eat at fast food and then continuing on to Scottsdale to the

21   library, it was 37 minutes.

22   BY MR. BOYLE:

23   Q.  You were asked questions about the distance between Alaska

24   Airlines and the employee parking.

25   A.  Yes.

1  Q.  Do you remember those questions?

2  A.  Yes.

3  Q.  In your experience are some people picked up by other

4  individuals at work rather than driving themselves?

5          MS. HULL:  Objection, relevance, speculation.

6          THE COURT:  Overruled.

7          THE WITNESS:  Absolutely.

8  BY MR. BOYLE:

9  Q.  Regarding the note, you were asked questions about

10  Operation Archangel.  Let me follow up with some of those

11  questions.  The first being leaving out Dennis or Daniel Mahon,

12  did you find any connection between any Operation Archangel and

13  Edmund Burke?

14  A.  No, none.

15  Q.  You described an Operation Archangel in California?

16  A.  Yes.

17  Q.  Was that a -- what type of just generally was Operation

18  Archangel in California?

19  A.  My recollection is it was some type of a LAPD, Los Angeles

20  Police Department, initiative.  And it had something to do with

21  making the community aware of potential terrorism, things like

22  that.  I don't remember all the details.  But it was some type

23  of a program designed to get people aware of things in their

24  environment related to potential terrorism problems.

25  Q.  Did you find any connection between Don Logan and LAPD in

1   this case?

2   A.  None.

3   Q.  Did the Operation Archangel education terrorism program,

4   whatever it was, did it have anything to do with diversity?

5   A.  None.

6   Q.  Did you find any connection between that Operation

7   Archangel and Don Logan?

8   A.  No.

9   Q.  Did you find any connection between Edmund Burke and Don

10  Logan?

11  A.  No, other than the note and the bomb.  Those are the only

12  two connections I ever made between him and those terms or

13  those names.

14  Q.  You were asked questions about the bomb itself and asked

15  whether it was one of a kind.  Do you remember that question?

16  A.  Yes.

17  Q.  Does that fact that that bomb is one of a kind preclude

18  someone from making a different kind of bomb?

19  A.  Not at all.

20  Q.  Moving next to the informant.  You just told us that at

21  some point in 2004, you began to search for a potential

22  informant who could work with law enforcement.

23  A.  That's correct.

24  Q.  Did you make contact with the informant in this case as

25  part of that?

1   A.  I did, yes.

2   Q.  Let's start with the photographs.  There were three

3   photographs that you were shown that were sent to the

4   defendants.  Do you remember those three photographs?

5   A.  I do.

6   Q.  So that we are clear, the first one is a photograph -- in

7   no particular order, by the way, that shows the side and the

8   rear of the informant.  That's one of them, right?

9   A.  Yes.

10  Q.  And the other one is from the back?

11  A.  Yes.

12  Q.  With fishnet stockings?

13  A.  Yes.

14  Q.  And the third is showing a top with a grenade between the

15  breasts?

16  A.  Yes.

17  Q.  Who made the decision to send those, you or the informant?

18          MS. HULL:  Asked and answered.

19          THE COURT:  Overruled.

20          THE WITNESS:  I did.  It was my decision.

21  BY MR. BOYLE:

22  Q.  The informant was introduced sometime in January 2005?

23  A.  Yes.  January 25th.

24  Q.  Let's -- by the way, describe that.  Tell us the initial

25  contact between defendants and informant in January 2005.  How

1  does it happen?

2  A.  The informant and Special Agent Kaufman pulled up in the

3  undercover truck pulling the trailer that has been the subject

4  of many conversations here.  They pulled across the little,

5  I'll call it a driveway, but it's like a little internal street

6  of the trailer park and began to prepare to get the trailer

7  into its space.  And in about 30 seconds, the Mahons walked

8  over to make introduction.

9  Q.  Within a minute?

10  A.  Oh, yeah.

11  Q.  That was January of '05.  And you described the arrest in

12  June of 2009?

13  A.  Correct.

14  Q.  Almost four and a half years?

15  A.  Yes.  Exactly.

16  Q.  Going back to the photos then.  Over the course of four and

17  a half years, you sent three of these photographs?

18  A.  Yes.

19          MS. HULL:  Objection, leading and foundation.

20          THE COURT:  Overruled.

21  BY MR. BOYLE:

22  Q.  Are these photographs different than you might see in a

23  magazine on a newsstand?

24          MS. WILLIAMS:  Objection, foundation and relevance.

25          THE COURT:  Overruled.

1           THE WITNESS:  No.

2   BY MR. BOYLE:

3   Q.  Were they different than photographs or images you might

4   see on network television?

5   A.  No.

6           MS. WILLIAMS:  Same objection.

7           THE COURT:  Overruled.

8   BY MR. BOYLE:

9   Q.  Were any nude photos sent --

10  A.  No.

11  Q.  -- of the informant?

12  A.  No.

13  Q.  Any nude photos of other people sent to the defendants?

14  A.  No.  Not -- not having anything to do with us.

15  Q.  You described the writing of a letter that was sent to the

16  Mahons.  Do you remember the letter and some words that were

17  used in that letter?

18  A.  I do.

19  Q.  You used the N word in that letter before it was sent,

20  right?

21  A.  Yes.

22  Q.  Why -- do you agree -- do you have an opinion as to whether

23  or not that's an offensive word?

24  A.  Yes, I do.

25  Q.  Is it offensive?

1  A.  Yes.

2  Q.  Why did you put that in the letter?

3  A.  It's the language that we used, meaning the defendants, the

4  associates.  That is their world.  And we had to fit into their

5  world.

6  Q.  You were asked questions about money.  Let's see if we can

7  make this somewhat clear.  Did you testify that the total

8  amount of funds that were sent approximately to the informant

9  were around 45.5 thousand dollars?

10  A.  Yes, sir, I did.

11  Q.  You described some of those payments being reimbursement?

12  A.  Yes, sir.

13  Q.  What was the amount that was not reimbursement that was

14  sent to the informant for payment for her work?

15  A.  Approximately --

16           MS. HULL:  Objection, foundation.

17           THE COURT:  Overruled.

18           THE WITNESS:  Approximately 27,000 of the 45.5.

19  BY MR. BOYLE:

20  Q.  And does that span that time frame of February, '05 --

21  January '05 to at least June of 2009?

22  A.  Yes.  Actually, all the way until roughly a couple of weeks

23  ago.

24  Q.  You needed -- did you know you needed an informant who

25  would have to travel in this case?

1          MS. WILLIAMS:  Objection, leading.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4  BY MR. BOYLE:

5  Q.  How long of an operation did you expect to need an

6  informant for?

7  A.  I anticipated years rather than months.  I wasn't -- I

8  don't know if I came up with a number of years, but I was

9  basing from my experience, I thought we would be into this for

10  years.

11  Q.  How long in days was the Catoosa event?

12  A.  12, roughly.

13  Q.  Was the -- where was the informant living, what state was

14  she living in before the Catoosa event happened?

15  A.  Arizona.

16  Q.  How much success do you think you would have had trying to

17  find a volunteer to travel to Catoosa for 12 days to assist you

18  without paying that person to help law enforcement?

19          MS. WILLIAMS:  Objection, Your Honor, speculation and

20  foundation.

21          THE COURT:  Overruled.

22          MS. HULL:  I object that it's argument, Judge.

23          THE COURT:  Overruled.

24          THE WITNESS:  I don't know based on experience that I

25  would have had any luck at all over that amount of time and the

 1    amount of hours involved and all of the things.  I -- I don't

 2    think we would have found anybody.

 3    BY MR. BOYLE:

 4    Q.  Have you used informants in the past?

 5    A.  A lot, yes.

 6    Q.  Do you work in the law enforcement community that uses

 7    informants?

 8    A.  I do.

 9    Q.  Are there two basic categories in which informants fit

10    into?

11            MS. HULL:  Objection, leading and foundation, outside

12    the scope.

13            THE COURT:  Sustained on leading.

14    BY MR. BOYLE:

15    Q.  Is there -- what's one category of informants that you use?

16    A.  One category is persons that are in trouble with law

17    enforcement in some capacity or the judicial system.  And they

18    are working off charges is a simple term of saying it.  So

19    somebody who's trying to reduce a sentence or something that

20    they are exposed to, that's one category.

21    Q.  Was the informant in that category?

22    A.  No.

23    Q.  Did she have a criminal history she was working off?

24    A.  No.

25    Q.  Did you run her criminal history?

1   A.  I did.

2   Q.  Did she have one?

3   A.  She did not.

4          MS. HULL:  Objection, foundation, outside the scope.

5          THE COURT:  Overruled.

6          THE WITNESS:  She did not have a criminal history, no.

7   BY MR. BOYLE:

8   Q.  What's another category of informants that are used by law

9   enforcement?

10  A.  There's a simple category of people that just call in and

11  want to volunteer information, usually on a very short-term,

12  one-time basis.  I'll call that the neighbor, the ex-wife that,

13  you know, is just informing on somebody in a short period.

14         THE COURT:  Mr. Boyle, we are at the -- we are at the

15  breaking spot for the lunch hour.

16         Members of the jury, we are going to take a lunch at

17  this time.  I would like to mention again what we mentioned

18  after the break, which is please don't talk among yourselves

19  about the security issue that arose this morning.  As you exit

20  or enter the courthouse or outside the courthouse, please avoid

21  exposure to anything that might be related to that security

22  issue.  And please don't let others talk to you about it.

23         And generally please remember the admonition not to

24  discuss this case with anybody.  We plan to see you at

25  one o'clock.  Thank you.

1          (The jury left the courtroom.)

2          THE COURT:  Thank you.  Please be seated.

3          Counsel, we don't have word yet on what the suspicious

4    package was that was removed from the courthouse -- well, the

5    exterior of the courthouse.  Apparently that's being determined

6    now.  Hopefully we will get that information in the next hour.

7          Once we have that information, I want to talk to you

8    all about what we should do in light of the events this

9    morning.  But I think I would like to get that information in

10   hand so that we can decide what we ought to do.

11         Is there anything else we need to address before we

12   break for lunch?

13         MR. BOYLE:  No.

14         MS. WILLIAMS:  Not for me, Judge.

15         MS. HULL:  I don't think so.

16         THE COURT:  Okay, see you at one o'clock.  Thank you.

17         MS. WILLIAMS:  Thank you.

18         (The noon recess was taken.)

19         THE COURT:  All right, counsel, I want to talk to you

20   about what happened this morning and tell you what I propose to

21   do and give you an opportunity to respond.

22         I've been informed by the marshals that a small metal

23   object was spotted in the planter on the outside of the west

24   end of the courthouse.  Because it was an unknown, suspicious

25   object, the marshals took the usual precautions of

1    investigating it and they called in the bomb squad that

2    isolated it and took it to a facility for examination.  And it

3    turned out to be a small metal container full of marijuana that

4    was in the planter.

5         But while that was happening, the west end of the

6    first and second floors of the courthouse were evacuated per

7    standard procedures.  And a large number of people in that area

8    apparently were standing in the atrium waiting for that issue

9    to be resolved.  And they also had limited access into and out

10   of the courthouse.

11        The break that we took this morning occurred while

12   folks were standing in the atrium.  And I asked Nancy over

13   lunch what she heard from the jurors about that in more detail

14   and she explained it to us.  And she told me that Juror

15   Number 4, I think it is, when Nancy walked into the jury room

16   and said something like how was your break or something like

17   that.  And Juror 4 said:  Well, we weren't allowed to go out of

18   the courthouse.  We were told if we left, we wouldn't be

19   allowed to come back in.

20        And that's how Nancy knew that at least one of the

21   jurors had gone downstairs and been told that.  And then I

22   suspect others saw the people standing in the atrium.

23        What I propose to do is this:  I propose to give the

24   jury an explanation of what happened, give them an instruction

25   that it has nothing to do with this case and should not affect

1    the case, and question them one by one with you present to make

2    sure this has not had an adverse effect on any juror.

3            I have prepared a proposed script for this that I want

4    to hand you and give you an opportunity to look at.  Then I'll

5    hear your reactions.  I'll also tell you what I think we ought

6    to ask them one by one to make sure it's not had an effect.

7    But why don't you look first at what Traci is going to hand

8    you.

9            All right, counsel for the Government, do you have

10   comments on the issue or the proposed instruction I've handed

11   out?

12           MR. BOYLE:  No objection.

13           THE COURT:  Ms. Williams?

14           MS. WILLIAMS:  Judge, I would just add one thing, that

15   being an admonition to them that they avoid any and all news or

16   other media exposures tonight as there would be a possibility

17   this will be on the news tonight.

18           THE COURT:  Ms. Hull?

19           MS. HULL:  I join in that and I believe, Judge, that I

20   think that in part, this instruction places focus on the

21   incident because I think that it's pretty clear that by your

22   description, that marshals evacuated because it was a suspected

23   bomb.  Otherwise they would not have evacuated.  I stand on my

24   motion for mistrial.  I don't think that there is any way to

25   repair it.

```
 1          I think that this in fact goes into further detail
 2   putting too fine a point on the fact that evacuation procedures
 3   were utilized.  And there's no other explanation for that other
 4   than it was a suspected bomb.  Whether it was marijuana or not,
 5   the marshals thought it was a bomb and evacuated members of
 6   the -- in the building.
 7          THE COURT:  Well, I don't think it's accurate to say
 8   they thought it was.  They said they didn't know what it was,
 9   so they were following those precautions.
10          I'm not going to grant a mistrial on the basis of this
11   event having occurred.  Obviously, depending on what we hear
12   from the jurors, we may reconsider that issue if we think it's
13   had some effect upon them.
14          But since I'm not going to grant a mistrial at this
15   point, do you have any suggestions for any of the language or
16   instruction beyond what Ms. Williams mentioned?
17          MS. HULL:  Just as a suggestion, the -- and I -- the
18   first page of this would be the sixth line down with the
19   sentence that says:  Those procedures included evacuating -- I
20   don't think they know at this point that there was evacuation
21   procedures.  I think that the same effect can be achieved
22   without that sentence.
23          THE COURT:  Well, I'll tell you why I put it in and we
24   can take it out.  I put it in because I expect that jurors on
25   break saw a crowd of people standing around in the atrium.  And
```

1    I thought that I should provide some explanation for why that

2    happened.

3            What do other counsel think about whether I should

4    mention that or not?

5            MR. MORRISSEY:  We would like you to keep it, Your

6    Honor.  The actual facts here are reassuring.  And this is an

7    actual fact that should help the jury.

8            MS. WILLIAMS:  Judge, I would -- I would like the

9    language in.  I think there's a very high probability that at

10   least some of the jurors saw -- maybe heard that an evacuation

11   was going on but saw people milling about.  I'm also concerned,

12   Judge, and I suspect you're going there next, that the Court

13   ask whether anybody was told that it was a bomb scare, bomb

14   threat, bomb anything.

15           THE COURT:  Right.  All right.  Well, I'm going to add

16   to the end of the third paragraph this statement:  Please also

17   avoid any news coverage about this event.

18           With respect to the questions to ask individual

19   jurors, I was going to ask them what they observed during the

20   break, if they went downstairs and talked to anybody, what they

21   were told, whether they had a discussion with any individual

22   about this, whether they had a discussion with any other jurors

23   about this.  Ask if this has caused them any concern that would

24   affect their ability to be fair, make sure they understand it

25   has nothing to do with the case.

```
 1              Are there other general questions you all think we
 2   should be asking?
 3              MR. BOYLE:  No, Your Honor.
 4              MS. WILLIAMS:  I'm okay with what the Court's
 5   proposing so far.
 6              MS. HULL:  I can't think of anything more.
 7              THE COURT:  Is there anybody who objects to
 8   questioning the jurors one by one on this issue?
 9              MR. BOYLE:  No, Your Honor.
10              MS. WILLIAMS:  No.
11              MS. HULL:  No, sir.
12              THE COURT:  Okay.  Would you bring in the jury,
13   please, Traci.
14              (The jury entered the courtroom.)
15              THE COURT:  Please be seated.
16              Members of the jury, as I mentioned to you after this
17   morning's break, a security issue arose at the courthouse this
18   morning.  A suspicious object was found in a planter outside
19   the west end of the building.  After further investigation, the
20   object was found to be a small metal container with marijuana
21   inside.
22              Because the contents of the object were not initially
23   known, standard security procedures were followed while the
24   matter was investigated.  Those procedures included evacuating
25   a portion of the first and second floors on the west end of the
```

1    building and limiting access to the building while the matter

2    was resolved.

3           As a result, when you took the morning break, you

4    might have noticed a number of people waiting in the atrium,

5    and you might have been told that access to the building was

6    limited.  While this matter was handled pursuant to standard

7    courthouse security precautions, I want to make sure that it

8    had no effect upon your ability to serve as fair and impartial

9    jurors in this case.

10          As a result, I'm going to do two things.  First, I

11   instruct you that the events this morning have no connection to

12   this case or anyone involved in this case.  You should not

13   consider this event in any way when deliberating about or

14   deciding the case.  Please also avoid any news coverage about

15   this morning's event.

16          Second, to make sure that the event has not had an

17   adverse effect on any juror, I am going to take the time to

18   talk to each of you about it one by one.  We will do this here

19   in the courtroom on the record.  I do this to ensure that you

20   as jurors remain able to consider and decide this case fairly

21   and impartially.  Of course, while I am speaking with one of

22   you, the rest of you will have to wait in the jury room.  I

23   appreciate your patience while i take this necessary step.

24          Please do not discuss this case or the event of this

25   morning while you are waiting.  I will try to complete this

1    process as quickly as possible.

2          So what we are going to do is ask the jurors if you

3    would please to return to the jury room.  We are going to ask

4    Juror 1 to remain, and we are going to just run through some

5    questions with each of you fairly quickly.

6          (The jury, with the exception of Juror No. 1, left the

7    courtroom.)

8          THE COURT:  Please be seated.

9          All right, Juror 1, thank you for understanding what

10   we need to do here.  The questions I have for you are whether

11   during the morning break you observed anything related to this

12   incident or spoke with anybody about the incident.

13         JUROR NO. 1:  I didn't go out.  And someone mentioned

14   when they tried to go out, they were told they couldn't come

15   back in.  That's all I know about it.

16         THE COURT:  Was anything else said in your presence

17   about this incident in any way?

18         JUROR NO. 1:  They said that it might be a bomb scare.

19         THE COURT:  Okay.

20         JUROR NO. 1:  And that's all I talked about or heard.

21         THE COURT:  All right.  And who was it that made that

22   comment, do you recall?

23         JUROR NO. 1:  I don't know her juror number.

24         THE COURT:  But it was a fellow juror who said it

25   might be a bomb scare?

1        JUROR NO. 1:  She tried to go out and that's what they

2    told her if she tried -- they wouldn't let her back in.

3        THE COURT:  They told her.

4        JUROR NO. 1:  They couldn't let her back in if she

5    went out.

6        THE COURT:  If she went out.  Okay.

7        Do you remember any other discussion about it in any

8    way?

9        JUROR NO. 1:  No.

10        THE COURT:  Okay, I take it from what you say, you

11    just remained in the jury room?

12        JUROR NO. 1:  Yes.

13        THE COURT:  All right.  Has this event given you cause

14    for any concerns?

15        JUROR NO. 1:  No.

16        THE COURT:  Would it affect your ability to be a fair

17    and impartial juror in this case?

18        JUROR NO. 1:  No.

19        THE COURT:  Do you believe you could disregard it

20    completely during your deliberations?

21        JUROR NO. 1:  Yes, I do.

22        THE COURT:  And you understand it has nothing to do

23    with this case?

24        JUROR NO. 1:  Yes, I do.

25        THE COURT:  Okay, thanks very much.

1          JUROR NO. 1:  Okay.

2          (Juror No. 1 left the courtroom and Juror No. 2

3    entered the courtroom.)

4          THE COURT:  Juror 2, thanks for coming back into the

5    courtroom.

6          Did you, during the break, go out or have any contact

7    with anybody related to the incident this morning?

8          JUROR NO. 2:  I went out to get lunch, but I didn't

9    have any contact with anybody about what had happened.

10          THE COURT:  How about during the morning break?

11          JUROR NO. 2:  No.

12          THE COURT:  Did you hear any discussions about the

13    event?

14          JUROR NO. 2:  Just one of the other jurors came up and

15    said she tried to go out and they told her to stay in because

16    there was a bomb scare.

17          THE COURT:  Okay.  Was there any other discussion

18    about it that you recall?

19          JUROR NO. 2:  Not really.  Not that I recall.

20          THE COURT:  Okay.  And I take it you just were in the

21    jury room during the break?

22          JUROR NO. 2:  Yes.

23          THE COURT:  All right.  Is there anything about this

24    event that has caused you any concern?

25          JUROR NO. 2:  No.

```
 1              THE COURT:  Would it have any effect upon your ability
 2   to be a fair juror in this case?
 3              JUROR NO. 2:  I don't think so, no, not at all.
 4              THE COURT:  You understand it has nothing to do with
 5   this case?
 6              JUROR NO. 2:  Yes.
 7              THE COURT:  All right.  Please, when you go back,
 8   remember not to talk about the case or about -- I'm sorry,
 9   about the case, or this event or what we are doing here in the
10   courtroom.
11              JUROR NO. 2:  Okay.
12              THE COURT:  We will excuse you.  Thanks a lot.
13              (Juror No. 2 left the courtroom and Juror No. 3
14   entered the courtroom.)
15              THE COURT:  Any seat is fine.  Thanks for coming back
16   in, Juror 3.
17              My first question to you is whether you, during the
18   morning break, or during lunch, had any contact with anybody
19   that had anything to do with this event this morning.
20              JUROR NO. 3:  Certainly not.
21              THE COURT:  Could you hold that microphone up.
22              JUROR NO. 3:  No.
23              THE COURT:  Did you see anything during the break or
24   talk to anybody during the break about it?
25              JUROR NO. 3:  No.
```

1          THE COURT:  Did you just stay in the jury room during

2    the break?

3          JUROR NO. 3:  Yes.

4          THE COURT:  Did you hear comments in the jury room

5    about the event this morning?

6          JUROR NO. 3:  People mentioned it.  Somebody tried to

7    go out and they wouldn't let them out.

8          THE COURT:  Okay.

9          MS. HULL:  I'm sorry, Your Honor, I'm having trouble

10   hearing.

11         THE COURT:  Could you just repeat that, holding that

12   mic --

13         JUROR NO. 3:  Somebody tried to go out of the building

14   and they wouldn't go out.

15         THE COURT:  So a juror mentioned that?

16         JUROR NO. 3:  Yeah.

17         THE COURT:  What else do you recall the juror saying?

18         JUROR NO. 3:  That was it.

19         THE COURT:  Do you remember any other comments or

20   discussion among the jurors?

21         JUROR NO. 3:  No.

22         THE COURT:  Okay.  And I take it you didn't have any

23   contact or exposure to this issue over the lunch hour?

24         JUROR NO. 3:  No.

25         THE COURT:  Is there anything about this event that

1  has caused you any concerns?

2           JUROR NO. 3:  No.

3           THE COURT:  Would it have any effect upon your ability

4  to be a fair and impartial juror in this case?

5           JUROR NO. 3:  No.

6           THE COURT:  Do you understand it has nothing at all to

7  do with this case?

8           JUROR NO. 3:  Yes.

9           THE COURT:  Okay.

10          All right, please remember not to talk about this, if

11 you would, and we will excuse you and bring in Juror 4.

12          (Juror No. 3 left the courtroom and Juror No. 4

13 entered the courtroom.)

14          THE COURT:  Juror 4, thanks for coming back into the

15 courtroom.

16          My first question is whether this morning during the

17 break you had any contact with individuals or exposure to this

18 event that occurred in the building.

19          JUROR NO. 4:  Yes.

20          THE COURT:  Tell me what happened, if you would,

21 please.

22          JUROR NO. 4:  I was going to walk outside and the

23 guard said if I went outside, they wouldn't be able to let me

24 back in.

25          THE COURT:  Okay, so where was the guard?  Where was

1   this told to you?

2           JUROR NO. 4:  Right in front of the west door.

3           THE COURT:  Down on the first floor?

4           JUROR NO. 4:  Correct.

5           THE COURT:  And you say the west door, you mean the

6   main door to the courthouse?  I think that's the east door.

7           JUROR NO. 4:  East, east.  I knew that.

8           THE COURT:  Tell me what it was exactly that was said

9   to you.

10          JUROR NO. 4:  Exactly that.  I was going outside.  And

11  he said:  If you go outside, we won't be able to let you back

12  in.

13          THE COURT:  And did he explain why?

14          JUROR NO. 4:  Yes.

15          THE COURT:  What did he say?

16          JUROR NO. 4:  He said there is a possible bomb scare.

17          THE COURT:  Okay.

18          JUROR NO. 4:  And I said:  Then I believe I'll go back

19  up.

20          THE COURT:  Anything else said by him?

21          JUROR NO. 4:  No.

22          THE COURT:  Did you talk to anybody else on that first

23  floor while you were down there about this?

24          JUROR NO. 4:  No.

25          THE COURT:  After you came back to the jury room, did

1    you mention this to other jurors?

2            JUROR NO. 4:  Yes.

3            THE COURT:  Okay.  And tell me what you remember about

4    that discussion among the jurors.

5            JUROR NO. 4:  I -- one of them said that was quick,

6    because I usually stay down a little bit longer.

7            MS. WILLIAMS:  I'm sorry to interrupt, Judge, I can't

8    hear.

9            THE COURT:  If you could speak up a little bit.

10           JUROR NO. 4:  Yeah, I came back in the jury room and

11   one of them said:  Well, that was quick.

12           And I said:  Well, I didn't go outside.  Apparently

13   there was some type of bomb scare on the first floor.

14           THE COURT:  Okay.  Was there any other discussion

15   about it?

16           JUROR NO. 4:  Not that I can recall.

17           THE COURT:  Okay.  Has this event caused you any

18   concerns?

19           JUROR NO. 4:  No.

20           THE COURT:  Would it have any effect upon your ability

21   to be a fair and impartial juror in this case?

22           JUROR NO. 4:  Not at all.

23           THE COURT:  Do you understand that it has nothing to

24   do with this case?

25           JUROR NO. 4:  Yes.

1          THE COURT:  Okay.  If you could please remember not to

2   discuss it any further, we would appreciate that.

3          JUROR NO. 4:  Sure.

4          THE COURT:  Okay, thanks.

5          (Juror No. 4 left the courtroom and Juror No. 5

6   entered the courtroom.)

7          THE COURT:  Juror 5, thanks for coming back in.

8          My first question is whether during the break or

9   during lunch, you had any exposure to this event that occurred

10  this morning.

11         JUROR NO. 5:  I did not.  I was in the jury room the

12  whole time.

13         THE COURT:  Okay.  During the break, you were in the

14  jury room the whole time?

15         JUROR NO. 5:  Yes.

16         THE COURT:  All right.  Did you hear discussion among

17  the jurors about this event?

18         JUROR NO. 5:  One, Juror Number 4, she's the one who

19  came back and said you can't get in or out of the building

20  because she heard of a bomb scare.

21         THE COURT:  Okay.  Do you remember any other

22  discussion among the jurors about that issue?

23         JUROR NO. 5:  I don't really recall anything.  So it

24  was kind of a moot point it seems, or I wasn't paying

25  attention.

1          THE COURT:  And during the lunch hour, did you have

2   any exposure to this event at all?

3          JUROR NO. 5:  Yeah, no, nothing at all.

4          THE COURT:  Has the event caused you any concern?

5          JUROR NO. 5:  No.

6          THE COURT:  Would it have effect on your ability to be

7   a fair and impartial juror in this case?

8          JUROR NO. 5:  Not at all, Your Honor.

9          THE COURT:  Do you understand that it has nothing to

10  do with this case?

11         JUROR NO. 5:  I do.

12         THE COURT:  Okay, please remember not to talk about it

13  any further.  We appreciate you coming in, we will excuse you.

14         (Juror No. 5 left the courtroom and Juror No. 6

15  entered the courtroom.)

16         THE COURT:  Juror 6, thanks for coming back into the

17  courtroom.

18         My first question is whether you had any exposure to

19  the event this morning during -- either during the morning

20  break or during the lunch hour.

21         JUROR NO. 6:  I did not, Your Honor.

22         THE COURT:  Did you actually go out of the jury room

23  during the break?

24         JUROR NO. 6:  I didn't go out, just out in front.

25         THE COURT:  In the front?

1          JUROR NO. 6:  Yes, sir.

2          THE COURT:  And did you have any contact with anybody

3  there or observe anything related to this event?

4          JUROR NO. 6:  The only thing I observed is there were

5  a lot of people in the atrium, like you said.  I didn't know

6  they were from the first and second floor.

7          THE COURT:  Okay.  Do you remember any discussion

8  among the jurors about this event?

9          JUROR NO. 6:  None.  Oh, I take that back.  There was

10 one juror that said she had gone outside -- or she was about to

11 leave the building and she was told that there was a --

12 possibly a bomb scare.

13         THE COURT:  Okay.  Do you remember any other

14 discussion among the jurors about that issue?

15         JUROR NO. 6:  No other discussion.

16         THE COURT:  Has this event caused you any concern?

17         JUROR NO. 6:  No, sir.

18         THE COURT:  Would it have any effect upon your ability

19 to be a fair and impartial juror?

20         JUROR NO. 6:  No, Your Honor.

21         THE COURT:  Do you understand it has nothing to do

22 with this case?

23         JUROR NO. 6:  Absolutely.

24         THE COURT:  All right.  Please don't discuss it any

25 further with the jurors.  And we will excuse you at this time.

1          JUROR NO. 6:  Thank you.

2          THE COURT:  Thanks.

3          (Juror No. 6 left the courtroom and Juror No. 7

4   entered the courtroom).

5          THE COURT:  Juror 7, thanks for coming back into the

6   courtroom.

7          JUROR NO. 7:  Yes, sir.

8          THE COURT:  The first question I wanted to ask you is

9   whether you had any exposure to the events this morning either

10  during the morning break or during the lunch hour.

11         JUROR NO. 7:  No, I didn't.

12         THE COURT:  Did you actually go out of the jury room

13  during the morning break?

14         JUROR NO. 7:  Yes, I did.

15         THE COURT:  Okay, where did you go?

16         JUROR NO. 7:  Just straight out to the hall here to

17  the restroom.

18         THE COURT:  Did you talk to anybody about this event

19  while you were out there or see anything related to this event?

20         JUROR NO. 7:  No, I didn't talk to anyone.  I just saw

21  people down below just standing around like something was going

22  on.  But then I came back inside.

23         THE COURT:  Okay.  Was there any discussion among the

24  jurors about this event at all?

25         JUROR NO. 7:  Not while I was in the room with them.

1          THE COURT:  Okay.  You didn't hear anybody mention
2    anything about it?
3          JUROR NO. 7:  No, I didn't.
4          THE COURT:  Okay.  Is the -- has this event caused you
5    any concern?
6          JUROR NO. 7:  No.
7          THE COURT:  Would it have any effect upon your ability
8    to be a fair and impartial juror in this case?
9          JUROR NO. 7:  No, it won't.
10          THE COURT:  Do you understand that it has absolutely
11    nothing to do with this case?
12          JUROR NO. 7:  Yes, I do.
13          THE COURT:  Okay.  All right.  Please remember not to
14    talk about it.  And we will excuse you.  Thank you.
15          (Juror No. 7 left the courtroom and Juror No. 8
16    entered the courtroom.)
17          THE COURT:  Juror 8, thanks for coming back into the
18    courtroom.
19          JUROR NO. 8:  You're welcome.
20          THE COURT:  The question I wanted to ask you -- I
21    think it's on, if you talk right into it.
22          JUROR NO. 8:  It's on, can you tell?
23          THE COURT:  We can.
24          The question I wanted to ask you is whether during the
25    morning break or during the lunch break you had any exposure to

```
 1   this event --

 2              JUROR NO. 8:  No.

 3              THE COURT: --that occurred at the courthouse this

 4   morning.

 5              JUROR NO. 8:  No, sir, I did not.  No exposure

 6   whatsoever.

 7              THE COURT REPORTER:  I'm sorry, Your Honor --

 8              THE COURT:  A little louder.

 9              JUROR NO. 8:  What?

10              THE COURT:  Can you give that answer a little louder.

11              JUROR NO. 8:  I'm sorry, no exposure --

12              THE COURT:  Okay.

13              JUROR NO. 8:  -- whatsoever.

14              THE COURT:  Did you just stay in the jury room during

15   the break?

16              JUROR NO. 8:  No, I went downstairs to the vending

17   machine and then sat at the tables by the east window.

18              THE COURT:  Okay.  Did you see anything related to

19   this event while you were down there?

20              JUROR NO. 8:  Nope.  No, didn't see a thing, no.

21              THE COURT:  Did you talk to anybody about it?

22              JUROR NO. 8:  Nope.  Nope.

23              THE COURT:  Did you notice people in the atrium?

24              JUROR NO. 8:  Nope, did not.

25              THE COURT:  Okay.  After you came back to the jury
```

1    room, was there any discussion among the jurors about this

2    event?

3              JUROR NO. 8:  Rhonda, I'm sorry I don't know her

4    number, may have said one thing.  But I wasn't really involved

5    in her conversation.

6              THE COURT:  Okay.

7              JUROR NO. 8:  But she sat next to me.

8              THE COURT:  Did you hear what she said?

9              JUROR NO. 8:  It was part of a sentence in response to

10   something someone else said.  So I -- I wasn't really paying

11   too much attention to what she said.

12             THE COURT:  Okay.  What is it that you heard her say?

13             JUROR NO. 8:  Short fuse maybe.

14             THE COURT:  Pardon me?

15             JUROR NO. 8:  Short fuse.

16             THE COURT:  Short fuse?

17             JUROR NO. 8:  Somebody had a short fuse or something.

18   I'm not quite sure.

19             THE COURT:  Okay.  And which -- can you describe

20   Rhonda for us?

21             JUROR NO. 8:  Let's see.  Curly hair with a ponytail.

22             THE COURT:  Black curly hair?

23             JUROR NO. 8:  Yeah, sits over here.

24             THE COURT:  Okay.

25             JUROR NO. 8:  Uh-huh, yes.

1           THE COURT:  All right.  Has the -- well, is there

2    anything else you recall anybody saying?

3           JUROR NO. 8:  No.  Nothing else, no.

4           THE COURT:  Has this event caused you any concern?

5           JUROR NO. 8:  No, sir.

6           THE COURT:  Would it have any effect upon your ability

7    to be a fair juror in this case?

8           JUROR NO. 8:  No negative effects.

9           THE COURT:  Do you understand that this event has

10   nothing to do with this case?

11          JUROR NO. 8:  Yes, sir.

12          THE COURT:  Okay.  Please remember not to talk to the

13   jurors about it.

14          JUROR NO. 8:  Okay.

15          THE COURT:  And we will excuse you.

16          JUROR NO. 8:  All right.  Thank you.

17          THE COURT:  Thanks.

18          (Juror No. 8 left the courtroom.)

19          MS. HULL:  Your Honor, I'm really sorry, I'm having a

20   great deal of trouble hearing any of them.  I don't know if

21   it's the mic or --

22          THE COURT:  Well, we will ask them to speak up.

23          (Juror No. 9 entered the courtroom.)

24          THE COURT:  All right.  Juror 9, thanks for coming

25   back into the courtroom.

1           JUROR NO. 9:  You bet.

2           THE COURT:  My first question is whether during the

3   morning break or during the lunch break you had any exposure to

4   this event in the courthouse this morning.

5           JUROR NO. 9:  Not until you mentioned it to the jury,

6   not at all.

7           THE COURT:  Did you go out of the jury room during the

8   break this morning?

9           JUROR NO. 9:  Went to the restroom.

10          THE COURT:  Did you see anything or hear anything

11  relating to the event?

12          JUROR NO. 9:  Just saw some people in the downstairs

13  area standing around but paid no attention to it.

14          THE COURT:  Okay, did you hear any discussion among

15  the jurors about this event?

16          JUROR NO. 9:  No.

17          THE COURT:  None whatsoever?

18          JUROR NO. 9:  No.

19          THE COURT:  Okay.  And I take it you didn't have any

20  exposure during the lunch hour?

21          JUROR NO. 9:  No.

22          THE COURT:  Okay.

23          JUROR NO. 9:  Not at all.

24          THE COURT:  Is there anything about the event that has

25  caused you any concern?

1          JUROR NO. 9:  No, I think it's totally under control,

2    so I feel perfectly safe.

3          THE COURT:  Would it have any effect upon your ability

4    to be a fair and impartial juror in this case?

5          JUROR NO. 9:  Has no relationship to this case in my

6    mind.

7          THE COURT:  Okay.

8          JUROR NO. 9:  Okay.

9          THE COURT:  All right.  Please remember not to talk to

10    the jurors about this and we will excuse you.  Thanks.

11          JUROR NO. 9:  Thank you.

12          (Juror No. 9 left the courtroom and Juror No. 10

13    entered the courtroom.)

14          THE COURT:  Juror 10, thanks for coming back into the

15    courtroom.  Did you, during the morning break or during the

16    lunch hour, have any exposure to this event that occurred in

17    the courthouse?

18          JUROR NO. 10:  No, I stayed in.

19          THE COURT:  You stayed in the jury room?

20          JUROR NO. 10:  Yes.  Well, not during lunch, but I

21    didn't see anything at lunch.

22          THE COURT:  Okay.  During the morning break, you were

23    in the jury room?

24          JUROR NO. 10:  Yes.

25          THE COURT:  Okay.  Did you hear any discussion among

1    the jurors about this event?

2            JUROR NO. 10:  One of the gals said something about a

3    bomb scare.

4            THE COURT:  Okay.

5            JUROR NO. 10:  That's all I know.

6            THE COURT:  Do you remember any other comments that

7    were made?

8            JUROR NO. 10:  Not really.

9            THE COURT:  Okay.

10           JUROR NO. 10:  No.

11           THE COURT:  Has this event caused you any concern?

12           JUROR NO. 10:  No.

13           THE COURT:  Would it have any effect upon your ability

14   to be a fair and impartial juror in this case?

15           JUROR NO. 10:  No.

16           THE COURT:  You understand that it has nothing to do

17   with this case?

18           JUROR NO. 10:  I do.

19           THE COURT:  Okay.  Please remember not to talk to the

20   other jurors about it.

21           JUROR NO. 10:  Okay.

22           THE COURT:  And I will excuse you.  Thank you.

23           (Juror No. 10 left the courtroom and Juror No. 11

24   entered the courtroom.)

25           THE COURT:  Juror 11, thanks for coming back into the

1    courtroom.

2         My question is whether during the morning break or

3    during the lunch hour you had any exposure to the event that

4    occurred at the courthouse this morning.

5         JUROR NO. 11:  I did not.

6         THE COURT:  Did you even go out of the jury room

7    during the break?

8         JUROR NO. 11:  I did not.

9         THE COURT:  Okay, did you hear any discussion among

10   the jurors about this event?

11        JUROR NO. 11:  Yes.

12        THE COURT:  Tell me what you heard.

13        JUROR NO. 11:  Just that when one went out to try to

14   go for lunch break outside, it was indicated that they couldn't

15   leave at this time because there was like a bomb threat or some

16   security issue.

17        THE COURT:  Okay.  Do you remember any other

18   discussion about that matter?

19        JUROR NO. 11:  No.  No.

20        THE COURT:  Has this event had any -- has this event

21   caused you any concern?

22        JUROR NO. 11:  Just in the fact that I really haven't

23   paid attention to where the emergency exits are until now.  I

24   don't know, I'm glad to hear that you have your policies on how

25   to evacuate a building.

1           THE COURT:  All right.

2           JUROR NO. 11:  But I don't feel comfortable that I

3    would know how to get out if I needed to.

4           THE COURT:  All right.

5           JUROR NO. 11:  That's it.

6           THE COURT:  We take care of that.

7           JUROR NO. 11:  Okay.

8           THE COURT:  We assure jurors if there's a fire alarm

9    or something.

10          JUROR NO. 11:  That's good to know.

11          THE COURT:  Has it caused you any other concern about

12   your service as a juror in this case?

13          JUROR NO. 11:  No, I will be fine.

14          THE COURT:  Will it have any affect on your ability to

15   be a fair and impartial juror?

16          JUROR NO. 11:  No.

17          THE COURT:  You understand that this event has nothing

18   to do with this case?

19          JUROR NO. 11:  Yes.

20          THE COURT:  All right.  Please remember not to talk

21   about this with the other jurors.

22          JUROR NO. 11:  Thank you.

23          THE COURT:  Thank you.

24          (Juror No. 11 left the courtroom and Juror No. 12

25   entered the courtroom.)

1          THE COURT:  All right, Juror 12, thanks for coming

2    back in.

3          My question is, during the morning break or during the

4    lunch break, did you have any exposure at all to this event

5    that occurred at the courthouse today?

6          JUROR NO. 12:  The only thing I heard was one of the

7    other jurors said they couldn't go outside because there was a

8    potential bomb threat outside.

9          THE COURT:  Okay.  And when was it that you heard

10   this?

11         JUROR NO. 12:  When we were finishing up our break.

12         THE COURT:  So in the jury room you heard this?

13         JUROR NO. 12:  Right.

14         THE COURT:  What other discussion of this do you

15   recall among the jurors?

16         JUROR NO. 12:  I think that was it.

17         THE COURT:  Okay.

18         JUROR NO. 12:  As far as I heard.

19         THE COURT:  And did you have any exposure during the

20   lunch hour at all to this?

21         JUROR NO. 12:  No.

22         THE COURT:  Has this event caused you any concern?

23         JUROR NO. 12:  No.

24         THE COURT:  Is there anything about it that would

25   affect your ability to be a fair and impartial juror in this

1    case?

2              JUROR NO. 12:  No.

3              THE COURT:  Do you understand that it has nothing to

4    do with this case?

5              JUROR NO. 12:  Yes.

6              THE COURT:  Okay, please remember not to talk about

7    it.  We will excuse you.  Thanks.

8              (Juror No. 12 left the courtroom and Juror No. 13

9    entered the courtroom.)

10             THE COURT:  Juror 13, thanks for coming back into the

11   courtroom.

12             My question is whether during this morning's break or

13   during the lunch hour you had any exposure to this event that

14   occurred in the courthouse today.

15             JUROR NO. 13:  No, I stayed in the jury room.

16             THE COURT:  Okay.  Did you hear any discussion among

17   fellow jurors about this event?

18             JUROR NO. 13:  No.

19             THE COURT:  Did you even hear any comments at all

20   about it?

21             JUROR NO. 13:  They were just wondering what

22   everything was doing.

23             THE COURT:  Tell me what you remember being said about

24   that.

25             JUROR NO. 13:  They were just wondering why everyone

1    was gathered.  And then someone mentioned that there was a

2    device or someone's looking for something.  But we didn't know

3    anything more than that.

4             THE COURT:  Okay.  Do you recall any other discussion?

5             JUROR NO. 13:  Huh-uh.

6             THE COURT:  Is that a no?

7             JUROR NO. 13:  Oh, no.

8             THE COURT:  That's okay.

9             JUROR NO. 13:  Sorry.

10            THE COURT:  Has this event caused you any concern?

11            JUROR NO. 13:  No.

12            THE COURT:  Would it have any effect upon your ability

13   to be a fair juror in this case?

14            JUROR NO. 13:  No.

15            THE COURT:  Do you understand that it has nothing to

16   do with this case?

17            JUROR NO. 13:  I understand.

18            THE COURT:  Okay.  Please remember not to talk to the

19   other jurors about it.

20            JUROR NO. 13:  Okay.

21            THE COURT:  Thank you.

22            JUROR NO. 13:  Thank you.

23            (Juror No. 13 left the courtroom and Juror No. 14

24   entered the courtroom.)

25            THE COURT:  Juror 14, thanks very much for coming back

1    into the courtroom.

2            My question for you is whether during this morning's

3    break or during the lunch hour you had any exposure to the

4    event that occurred at the courthouse this morning.

5            JUROR NO. 14:  Firsthand?

6            THE COURT:  Of any kind.

7            JUROR NO. 14:  Just that --

8            THE COURT:  Hold that mic up a little higher.

9            JUROR NO. 14:  Only that one of the members of the

10   jury tried to go out of the building, came back and said there

11   was something going on and she couldn't leave the building.

12           THE COURT:  Okay, what do you remember her saying

13   about it?

14           JUROR NO. 14:  That's all I remember her saying about

15   it.

16           THE COURT:  Did you hear any other discussion among

17   the jurors about it?

18           JUROR NO. 14:  No.

19           THE COURT:  And how about during the lunch hour?

20           JUROR NO. 14:  No.

21           THE COURT:  Is there anything about this event that

22   has caused you any concern?

23           JUROR NO. 14:  No.

24           THE COURT:  Would it --

25           JUROR NO. 14:  Just coming to talk to you.

1          THE COURT:  Kind of like being called to the

2    principal's office.

3          JUROR NO. 14:  That's exactly what I said out in the

4    hallway.

5          THE COURT:  I don't know what to do about that.  Would

6    it have any effect upon your ability to be a fair and impartial

7    juror in this case?

8          JUROR NO. 14:  No.

9          THE COURT:  Do you understand that it has nothing to

10   do with this case?

11         JUROR NO. 14:  Yes, I do.

12         THE COURT:  Okay.  Please remember not to talk to the

13   other jurors about it.

14         JUROR NO. 14:  Okay.

15         THE COURT:  Thank you.

16         (Juror No. 14 left the courtroom and Juror No. 15

17   entered the courtroom.)

18         THE COURT:  Thanks for coming back into the courtroom,

19   Juror 15.

20         The question I have for you is whether during this

21   morning's break or during the lunch hour you had any exposure

22   to the event that occurred at the building this morning.

23         JUROR NO. 15:  No, I didn't.

24         THE COURT:  Did you even leave the jury room during

25   the break?

1          JUROR NO. 15:  I just went out in the walkway to the

2    bathroom, but I didn't go downstairs or anything.

3          THE COURT:  Did you see anything on the walkway or

4    from the walkway related to this?

5          JUROR NO. 15:  Just all the people down below.

6          THE COURT:  And did you talk to anybody about that?

7          JUROR NO. 15:  No.  No.

8          THE COURT:  When you got back into the jury room, was

9    there any discussion about this event?

10          JUROR NO. 15:  One of the jurors said there was a bomb

11    scare or something in the building.  And that was -- that was

12    it.

13          THE COURT:  Was there any other discussion about it

14    that you recall?

15          JUROR NO. 15:  How come they didn't come tell us or

16    that was it.

17          THE COURT:  Okay.  Tell me what you heard on that last

18    point.

19          JUROR NO. 15:  They just said:  I wonder why they

20    didn't tell us or if the whole building was -- how come we

21    don't know.  But that was it.

22          THE COURT:  Okay.  Has this event caused you any

23    concern?

24          JUROR NO. 15:  No.

25          THE COURT:  Would it have any effect upon your ability

1    to be a fair juror in this case?

2              JUROR NO. 15:  No.

3              THE COURT:  Do you understand that it does not have

4    anything to do with this case?

5              JUROR NO. 15:  Yeah, I understand.

6              THE COURT:  Okay.  Anything else that you want to say

7    about this?

8              JUROR NO. 15:  No.

9              THE COURT:  Okay, please remember not to talk to the

10   other jurors about it.

11             JUROR NO. 15:  Okay.

12             THE COURT:  Thanks very much.

13             (Juror No. 15 left the courtroom and Juror No. 16

14   entered the courtroom.)

15             JUROR NO. 16:  May I stand?

16             THE COURT:  Yeah, you can stand, sure.  Thank you for

17   coming back in, Juror 16.

18             The question I had is whether during this morning's

19   break or this lunch hour you had any exposure to this event

20   that occurred in the courthouse?

21             JUROR NO. 16:  In our break room we did hear a juror

22   say:  Oh, don't go downstairs.  There's something about a bomb

23   threat she said.

24             THE COURT:  Okay.

25             JUROR NO. 16:  And that's when I heard about it, yeah.

1          THE COURT:  Okay, what other discussion about that did

2    you hear in the jury room?

3          JUROR NO. 16:  That's about it, that it was a bomb

4    threat and then they mentioned it to Nancy.  And then Nancy

5    walked away.  And we didn't hear anything more about it.

6          THE COURT:  Okay.  And during the lunch break, did you

7    have any exposure to it at all?

8          JUROR NO. 16:  None.  None at all.

9          THE COURT:  Okay, is there anything about this event

10   that has caused you any concern?

11         JUROR NO. 16:  No.

12         THE COURT:  Would it have -- did you want to say

13   something more on that?

14         JUROR NO. 16:  Because I -- I mean, I feel that that's

15   something that happens in a lot of places.  Our company had

16   something where we had to evacuate last year.  So I mean, I've

17   heard of it happening in different places.

18         THE COURT:  All right.  Would it have any effect upon

19   your ability to be a fair and impartial juror in this case?

20         JUROR NO. 16:  No.

21         THE COURT:  Do you understand that it has nothing to

22   do with this case?

23         JUROR NO. 16:  Exactly, right.

24         THE COURT:  Okay.  All right.  Thanks.

25         JUROR NO. 16:  Okay.

```
 1              THE COURT:  Please remember not to talk to the other
 2     jurors about it.
 3              JUROR NO. 16:  Thank you.
 4              THE COURT:  Thank you.
 5              (Juror No. 16 left the courtroom.)
 6              THE COURT:  Counsel, I think I want to call Juror 4
 7     back in and ask whether she said anything about a short fuse.
 8     Is that all right with you?
 9              MS. WILLIAMS:  Yes.
10              MS. HULL:  Yes, please.
11              THE COURT:  Let's have Juror 4 come in again.
12              (Juror No. 4 entered the courtroom.)
13              THE COURT:  Juror 4, thanks for coming back.
14              I have a follow-up question for you.  When you
15     mentioned to the other jurors that you had gone downstairs and
16     had been told that if you left the building, you couldn't come
17     back, would -- did you make a reference or did you hear any
18     other juror make a reference to the phrase "short fuse"?
19              JUROR NO. 4:  Short fuse.  I remember the word being
20     said, but I don't remember it being said in regards to this
21     subject.  Let me think who might of said that or why it was
22     said.
23              MS. WILLIAMS:  I'm sorry, Your Honor, I can't hear.
24              THE COURT:  Would you repeat that with the mic right
25     up to your mouth so the counsel can hear.
```

1           JUROR NO. 4:  I think the word "short fuse" was used

2     after I got back from lunch, but it didn't have anything to do,

3     I don't believe, with what was happening this morning.  But I

4     don't really listen to everybody.  I just kind of -- I don't

5     know who said it or what exactly was said, what it pertained

6     to.

7           THE COURT:  Do you think it had any connection with

8     the event -- the security event that occurred at the courthouse

9     this morning?

10          JUROR NO. 4:  No, that's what I said because I don't

11    think anything else had been said about it since this morning.

12    And I don't remember what was said after lunch.  But I do

13    remember hearing the word "short fuse."

14          THE COURT:  What you heard the phrase, what were

15    people talking about, the event at the courthouse this morning?

16          JUROR NO. 4:  Not that I recall.  But again, I just

17    kind of have been spaced off today not listening to everybody.

18    So I don't know.

19          THE COURT:  All right.  Other than the brief

20    discussion you described before where you came back and

21    indicated to folks that you hadn't been allowed out of the

22    building because of the possible bomb scare --

23          JUROR NO. 4:  Uh-huh.

24          THE COURT:  -- did you hear any other discussion or

25    did you have any other discussion at all with anybody about the

1    events of this morning?

2              JUROR NO. 4:  I think there might have been smarty

3    comments, just little -- and I couldn't tell you who said it or

4    what was said.

5              THE COURT:  Can you give me an idea what you mean by

6    "smarty comments"?

7              JUROR NO. 4:  Maybe somebody might wonder why we

8    weren't informed or hope we're not the only ones that weren't

9    informed, something to that effect.

10             THE COURT:  Okay.  Anything else you recall?

11             JUROR NO. 4:  No.

12             THE COURT:  Okay.  All right.  Thanks.

13             JUROR NO. 4:  I've been in my own little world today.

14   I haven't really been talking to anybody.

15             THE COURT:  Okay, thank you.

16             JUROR NO. 4:  You're welcome.

17             (Juror No. 4 left the courtroom.)

18             THE COURT:  All right, counsel, your reactions.  Let's

19   start with the Government.

20             MR. MORRISSEY:  Judge, we don't see any issues.  We

21   think that the record is clean, that there's been no influence

22   on the jury, and that all of these jurors can continue to

23   serve.

24             I would note that Juror Number 4 didn't go seeking

25   this information.  It was said to her by a guard.  And so her

1    reaction of mentioning it to the other jurors, I believe, was

2    natural.  It is not an example of difficulty following your

3    instructions.

4            THE COURT:  All right.  Ms. Williams?

5            MS. WILLIAMS:  Judge, I stand on my motion for

6    mistrial and would still urge the Court to declare a mistrial.

7    If my count is accurate, there are only four jurors who didn't

8    hear "bomb scare," "bomb threat," or one or two instances,

9    "short fuse."  I was hoping that perhaps just number four said

10   it and it hasn't spread throughout the jury.  But that is not

11   the case, so it would do nothing at all to just excuse Number

12   4.

13           They've all heard it.  There was speculation among at

14   least several, based on what we've heard, that along the lines

15   of, gee:  Why have they left us here, wonder if we're the only

16   ones.

17           I think that evinces a level of concern.  And while it

18   may be a natural concern, given that we are sitting here doing

19   a rather high-profile bombing case, and the word is out from

20   the guards among our jury that there's a suspected bomb out,

21   nobody can leave or enter the building, they are seeing people.

22   I just have concerns at this point that the jury has been

23   contaminated by this information, that it has -- there has been

24   enough speculation about what was going on, and whether they

25   were safe as far as being informed, getting out.  I have

```
1    concerns about how it will affect our trial.  And I stand on my

2    motion for mistrial.

3            THE COURT:  All right.  Ms. Hull?

4            MS. HULL:  I also stand on my motion for mistrial,

5    Judge.  My concern is between Juror Number 8 talking about for

6    the first time the short fuse, and Juror 4 talking about the

7    smarty comments about how come we're not out there.  And she

8    indicated that that in fact the short fuse comment was after

9    lunch, after you had already instructed them that they are not

10   to discuss or consider this event.  I think that was around

11   eleven o'clock this morning.  And they are still, it sounds

12   like they were joking about it afterwards.

13           I'm very concerned, especially that combined with the

14   concerns of their own safety expressed throughout the break and

15   through lunch, their own safety, that there is a bomb in the

16   building or may have a suspected bomb in the building.  They

17   were not evacuated, why not, concern for their own safety,

18   Judge.  I don't believe that there is any way to -- for this

19   jury to put that out of their mind entirely.

20           I understand the questions the Court posed, but I

21   stand on my motion for mistrial.  We have gone through two

22   weeks.  I think in the interests of justice, a mistrial should

23   be granted, I believe it's manifest error to proceed given this

24   incident and impact on the jury.

25           MR. MORRISSEY:  Your Honor?
```

1          THE COURT:  Yes.

2          MR. MORRISSEY:  No other juror connected the comment

3    "short fuse" to the events of the break this morning.  Juror 8

4    did use that phrase, but no other juror made that connection

5    and said it had anything to do with it.

6          And on juror concerns for safety, not a single juror

7    expressed that concern upon inquiry by the Court.  So there's

8    just no basis in this record.

9          MS. HULL:  Judge, I would just add if the short fuse

10   wasn't about the bombing event of this morning, then they were

11   joking probably about this case.  In either event, I believe

12   that it is a mistrial basis.

13         THE COURT:  All right.  On the basis of the

14   questioning of each of the jurors individually, I want to make

15   the following findings:  I found the 16 jurors as we questioned

16   them to be candid and credible.  It's clear that a mention was

17   made in the jury room near the end of this morning's break

18   about access to the building being limited because of a bomb

19   scare or a bomb threat.  And it appears it's Juror 4 who made

20   that comment after attempting to leave the building.

21         It's also apparent from comments of some of the jurors

22   that there was some comment made as to why were we not informed

23   or why were we not told.  I infer that that was in connection

24   with being told that there was a bomb scare in the building and

25   they were wondering why being in the building they were not

1    informed of it.

2            So I do think the record shows that those things

3    occurred in the jury room.  When Juror 8 answered the question

4    about having heard anything, she initially said "no," as I

5    recall.  And then when I asked whether there was any comment

6    made that she heard, she said that at some point she heard

7    somebody refer to short fuse.  But it was not clear to me from

8    what she said that it was in the context of talking about the

9    security event in the case.

10           Juror 4 seemed to think that there was that phrase

11   mentioned, but not in context of the security event that

12   occurred in the case.

13           Having heard those two, I cannot conclude and have no

14   basis to conclude that the short fuse phrase was mentioned in

15   connection with the security event that occurred in this case.

16           No juror suggested that there was any discussion of

17   this event that was connected to this case.  There was no

18   suggestion or comments made that it had anything to do with

19   this case.  All 16 of the jurors readily expressed their

20   understanding that this security event has nothing to do with

21   this case.  All 16 jurors said that it has not caused them

22   concern.  They all said that they could remain fair and

23   impartial in this case.

24           My conclusion, after having this discussion with the

25   jury, is that there is no reasonable possibility that the

1    events of this morning would affect the jury's deliberation.  I

2    think the jurors have credibly explained exactly what happened

3    in the jury room and have all stated that it will not affect

4    them and hasn't caused them concern.  And they understand that

5    it is unrelated to this case.

6         So I am going to deny the motion for a mistrial.  I

7    think the instruction that I gave to them when we gathered

8    shortly after the noon break is sufficient, but I will ask

9    counsel, in light of my having denied the motion for a

10   mistrial, whether any of you feels any additional instruction

11   is warranted now that we've heard the jurors.

12        MR. MORRISSEY:  Not from the Government.

13        MS. WILLIAMS:  Judge, I believe an additional

14   instruction should be given at least at the end of the day

15   reminding them to stay -- to avoid the press, avoid any mention

16   in any form of media about this case or the events of today.

17        MS. HULL:  Thank you, Judge.  I have some serious

18   concerns about the short fuse comment, especially in light of

19   the Court's finding that it has nothing to do with the events

20   of this morning.  It sounds to me if that is the case, then

21   these people are making jest of this case, discussing it,

22   perhaps not directly, but making comments and jokes of that

23   nature, which may not be in direct violation of the Court's

24   instructions, but if smart comments to that effect are being

25   made in there, I think it's totally inappropriate.

1          I believe that that is -- I'm going to move for a

2     mistrial on that basis, that it appears now that these jurors

3     have been discussing, unrelated to this morning's events, they

4     are discussing it in the fashion such that they are making

5     jokes about short fuses.  I think it's inappropriate.  I move

6     for a mistrial on those grounds.

7          If it is denied, I believe that an instruction needs

8     to be made and renewed with this jury that discussion includes

9     any references to bombs, bombings, any comments such as this

10    short fuse comment.  I think it's totally inappropriate.  And

11    if they are joking about it, they are not taking their jobs

12    seriously.

13         THE COURT:  All right.  I understand what you said,

14    Ms. Hull.  I did not take the phrase "short fuse" to

15    necessarily or even probably mean a reference to this case.

16    That's a phrase that's used to describe people sometimes as

17    having a short fuse.  I don't think there's been any testimony

18    or argument in this case about a short fuse.  There's certainly

19    been testimony about fuses.

20         So I did not infer from that comment that they were

21    jesting about the case.  But I do, and for that reason I am

22    going to deny the motion for mistrial.  But I do understand

23    your request, and I will grant it, that we again instruct them

24    that they should have no discussion about the case at all in

25    detail or in general, and that they avoid any further -- that

1    they avoid any press information about the events in this case.

2            I'll give them those instructions when they come back

3    into the courtroom now just to make sure we touch on that

4    today.

5            We will then resume with the questioning of Agent

6    Moreland.

7            Because we've had a court reporter at work for about

8    an hour, I think what we will do is go until 1:30 -- 2:30 and

9    break.  So we will go a half hour and then take a 15-minute

10   break.  So we will bring the jury in at this time.

11           You can come back to the witness stand, Agent

12   Moreland.

13           (The jury entered the courtroom.)

14           THE COURT:  Please be seated.

15           All right, members of the jury, thanks for your

16   patience while we took care of that issue.

17           Before we resume with Agent Moreland's testimony, let

18   me just reiterate what you heard before.  But I just want to

19   make sure that it's as crystal clear as can be.

20           First the events in the courthouse this morning had

21   nothing to do with this case as you all understand.

22           Second, please remember not to talk about the events

23   of this morning.

24           Third, please remember not to talk among yourselves

25   about this case at all, in detail or in general.  That time

 1    will come when you deliberate.  In the meantime, please

 2    remember there should be no discussion whatsoever related to

 3    the case.

 4            And the final thing I want to mention in addition to

 5    avoiding press coverage of this case, please make sure that

 6    today and the next few days you avoid any press coverage of

 7    this incident at the court.  I don't know if it will be in the

 8    press, it may well not be.  But we just want to make sure that

 9    you avoid any press mention of it in the event that it is

10    reported in some way in the press.

11            All right, Mr. Boyle, you may continue with the

12    redirect examination.

13            MR. BOYLE:  Thank you.

14    BY MR. BOYLE:

15    Q.  Agent Moreland, we left off with categories of informants.

16    I think you ended with the second category being neighbors who

17    provide information.  Is there a third category of informants?

18    A.  Yes, those are paid informants, informants that are working

19    for us and law enforcement in general or other agencies, in a

20    really what would amount to a business relationship or just --

21    they earn money.

22    Q.  Based on your experience, are paid informants used by the

23    FBI?

24    A.  Yes, they are.

25    Q.  Are they used by state and local agencies?

1   A.  Yes.

2           MS. WILLIAMS:  Objection, hearsay.

3           MS. HULL:  And relevance.

4           THE COURT:  Sustained.

5   BY MR. BOYLE:

6   Q.  Who directed the informant to use the fictitious name?

7   A.  I did.

8   Q.  Who directed the informant to play a fictitious role in

9   this case?

10  A.  I did.

11  Q.  As a part of using informants, who typically pays if an

12  informant is flown out of state to conduct a operation outside

13  of Arizona?

14          MS. WILLIAMS:  Objection, Your Honor, relevance as to

15  "typically."

16          THE COURT:  Are you referring to the ATF?

17          MR. BOYLE:  Yes.

18          THE COURT:  All right, with that clarification, the

19  objection is overruled.

20          THE WITNESS:  In this case, ATF would pay for any

21  costs that an informant would incur as part of their work for

22  us.

23  BY MR. BOYLE:

24  Q.  Let's move on to the Catoosa event.  You were asked a

25  number of questions about the movie Apollo 13.

1    A.  Yes.

2    Q.  Was that the only video that was played when Dennis and

3    Daniel were present at that location?

4           MS. HULL:  Objection, outside the scope.

5           THE COURT:  Overruled.

6           THE WITNESS:  No, it was not.

7    BY MR. BOYLE:

8    Q.  Give us one example of a video that was played other than

9    Apollo 13.

10          MS. WILLIAMS:  Your Honor, I'm going to object as to

11   specificity to the extent it goes beyond Daniel and Apollo 13,

12   it goes beyond the scope of cross.

13          THE COURT:  Overruled.

14          THE WITNESS:  There were Tom Metzger videos.

15   BY MR. BOYLE:

16   Q.  I just wanted one example.

17   A.  Okay.

18   Q.  Was -- my point is, were movie videos the only videos that

19   were shown in Catoosa?

20   A.  No, not at all.

21          MS. HULL:  Your Honor, may I voir dire the witness?

22          THE COURT:  On what issue, Ms. Hull?

23          MS. HULL:  When he talks about movie videos I think

24   that that -- I'm going to ask for clarification on that.

25          THE COURT:  I don't think there's a foundational issue

 1   that requires voir dire at this point.

 2           MS. HULL:  Thank you.

 3   BY MR. BOYLE:

 4   Q.  If I might just, let me follow up then.  You were asked

 5   questions about videos that were played and they pertained to

 6   Apollo 13.  You remember that?

 7   A.  Yes, I do.

 8   Q.  My point is, were videos other than Apollo 13 shown?

 9   A.  Yes.

10   Q.  And you described some of them being Tom Metzger videos?

11   A.  Yes.

12   Q.  And who brought those videos?

13   A.  Dennis Mahon or Daniel Mahon.

14   Q.  And were they shown inside the informant trailer at

15   Catoosa?

16   A.  Yes.

17   Q.  You were asked questions about the Creative Revenge book.

18   Do you remember that book?

19   A.  I do, sir, yeah.

20   Q.  In that book, you were directed to a page that described a

21   type of package device that had a tape player in it.  Do you

22   remember that discussion?

23   A.  I do.

24   Q.  You were asked about that book in relation to Catoosa.  I

25   don't want to go into all those questions, but do you remember

1   that line of questioning?

2   A.  Yes, sir, I do.

3   Q.  At Catoosa, was there ever -- can you tell us if the

4   discussion about packages in relation to Creative Revenge

5   focused on tape players?

6   A.  No.  There was no discussion of tape players and packages,

7   no.

8   Q.  What was the discussion in relation to Creative Revenge at

9   Catoosa?

10  A.  Bombs.  Package bombs, mail bombs.

11  Q.  There were questions asked about the videotape recording

12  device at Catoosa.  Do you remember those questions?

13  A.  Yes.  We are talking about the devices in the trailer?

14  Q.  Yes.

15  A.  Yes, sir.

16  Q.  The informant trailer?

17  A.  Yes.

18  Q.  Who had the ability to stop recording at the trailer if you

19  were inside the trailer?

20  A.  Anybody who could flip the switch.  And everybody that was

21  in that trailer was capable of flipping the switch.

22  Q.  I would like you to compare that to what you described

23  earlier as the video feed that is fed to the agent trailer and

24  a hotel room.  Do you remember that type of discussion you had

25  earlier?

1   A.  A little bit of it, yes.

2   Q.  Was that electronic feed to the agent trailer ever

3   interrupted while you were at Catoosa?

4   A.  No.  Not that I'm aware of, no.

5   Q.  And was the agent feed of what was happening ever cut off

6   as it was broadcast to the hotel room?

7   A.  Not that I'm aware of.  I mean, we turned off our receiving

8   kits, but as far as the transmitted signal, I'm not aware of

9   that ever going down.

10  Q.  If the tape ran out in the trailer, were agents able to

11  monitor what was happening even if the recording device had

12  stopped working because the tape ran out?

13  A.  Yes, all the time.

14  Q.  And without telling us what people wrote down, did you see

15  other agents making notes of what was happening during these

16  events at Catoosa?

17  A.  I did.

18          MS. WILLIAMS:  Objection, hearsay.

19          THE COURT:  Overruled.

20          THE WITNESS:  I did, yes.

21  BY MR. BOYLE:

22  Q.  Did you physically see them writing things down?

23  A.  Yes.

24  Q.  And was that after or contemporaneous with what was

25  happening at the scene?

1          MS. HULL:  Objection, Your Honor, foundation.

2          THE COURT:  Overruled.

3          THE WITNESS:  I saw agents primarily in what I'm going

4    to call the cover trailer, which was the location really close

5    in, making contemporaneous notes, I mean literally writing down

6    quotes and time stamps and things like that.

7          MS. HULL:  Objection, move to strike, nonresponsive.

8          THE COURT:  Overruled.

9    BY MR. BOYLE:

10   Q.  You were asked questions about some time stamps regarding

11   February 5th and Catoosa.  For example, you were given a

12   direction of 17:45:32.  Does that type of a reference remind

13   you of your cross-examination questions?

14   A.  It does to some degree, yes.

15   Q.  Do you remember other time stamps being given to you and

16   what you saw on those locations on this February 5th video?

17   A.  I remember discussions with time stamps or questions

18   regarding the night of the 5th and the box that was used as a

19   prop.  That is -- there may have been some other ones.  But

20   that was one I recall for sure.

21   Q.  Do you remember a question as to whether or not you could

22   hear or not hear a statement about glue?

23   A.  Yes.

24   Q.  Was there a reference to something concerning glue during

25   that time stamp on February 5th?

1           MS. HULL:  Objection, hearsay.

2           THE COURT:  Overruled.

3           THE WITNESS:  I don't recall hearing the word "glue."

4    I recall a part of the tape where Dennis lifted up a lid of the

5    box and he pointed to the upper part of the inside of the box

6    with his finger and he said "stick it."  And he's pointing like

7    to the exact location when I showed the mock-up bomb where the

8    switch was in the Scottsdale bomb.

9    BY MR. BOYLE:

10   Q.  And there was a question about the firing train that was

11   asked, I think at the beginning of cross-examination, what a

12   firing train is.  So it was last week.  Let me have you just

13   quickly describe what a fire train is.

14   A.  It's a term that just refers to primarily in the case of an

15   electrically fired bomb, it's the sequence of the circuit.

16   It's the combination of the parts that complete the circuit to

17   make a firing train.  So it's from beginning in this case from

18   the victim's first movement of the bomb to cause it to go off,

19   so that switch closing, and then it's the combination of those

20   parts that close the circuit and deliver that heat that we

21   talked about to the igniter, which sets off the explosive.  So

22   it's that combination of things is what the term firing train

23   is referring to.

24   Q.  Do you recall if you were asked questions about contact,

25   battery, electric match in comparison to contact, electric

1  match and battery?

2  A.  Yes.

3  Q.  I want to ask you in relation to those, do they have a

4  correspondence to February 5th?

5  A.  Yes.

6  Q.  Okay.  What is it about February 5th that those words,

7  "contact, battery, and electric match" that were asked on cross

8  relate to February 5th?

9  A.  Well, at 17:50:37 on the tape, you'll see Dennis or you do

10  see, I see Dennis Mahon moving his fingers like this with the

11  informant.  He says contact to the battery to the electric

12  match, which is exactly the circuit in the Scottsdale bomb.

13  Q.  Regarding the discussion of the interior of the package,

14  can you tell us again if you gave the informant the details of

15  how the bomb was constructed?

16  A.  Nothing.  I mean, other than the fact that it was a bomb,

17  there was no discussion at all with her about the construction

18  of it or the components or anything.

19  Q.  Let me move now to the Scottsdale truck drive that was

20  discussed today.

21       MR. BOYLE:  With the Court's permission, may I publish

22  what's been admitted as Exhibit 231?

23       THE COURT:  You may.

24  BY MR. BOYLE:

25  Q.  Agent Moreland, this morning were you asked questions --

 1  and let me point on this map where my pen is pointing at the

 2  intersection which I believe you testified to was Indian School

 3  and 75th Street.  Do you see that?

 4  A.  That's correct, yes.

 5  Q.  And then you were asked questions about whether individuals

 6  were pointing on this truck drive.  Do you remember those

 7  questions?

 8  A.  Yes.

 9  Q.  Would you tell us by writing on the screen ahead of you if

10  the truck was pointed eastbound?

11  A.  No, it was -- this is pointing westbound.  So it was

12  pointing exactly like the pen is in the turn lane pointing

13  straight to the west or up the picture, if you will.

14  Q.  And then just draw on there.  What direction would a person

15  see -- well, you were asked about the defendant's pointing.  So

16  would you draw for us what direction Daniel Mahon was pointing

17  to?

18  A.  He's pointing out this way like a 45-degree angle across

19  that intersection.  And it is -- I mean not just pointing to,

20  you can see his eyes lining up in that --

21  Q.  That's okay.

22  A.  I'm sorry.

23  Q.  I just wanted to have you describe that.

24  A.  Okay.

25  Q.  You were asked a number of questions about the

1    identification of voices?

2    A.  Yes.

3    Q.  Today you were asked about whether Agent Livingston had

4    difficulty with voices and reports.  Do you remember those

5    questions?

6    A.  There was a lot of discussion of him misidentifying in that

7    report I amended.  Yes, I recall.

8    Q.  When you have listened to the exhibits in this case here in

9    court, have you had any difficulty identifying the voices here

10   in court?

11   A.  No.  The only time, like I say, that I have any difficulty

12   is when people are talking over each other quite a bit and I

13   just can't decipher from word to word.  But I don't have any

14   difficulty from line to line or sentence to sentence at all.

15   Q.  Without going into the quotations from these exhibits, I

16   just want to ask you again regarding Exhibit 50, which was a

17   phone call, and Exhibit 20 -- 220, which was an undercover

18   tape, 50 and 220, were you able to hear the voices on those --

19   on those recordings?

20           MS. HULL:  Objection, outside the scope.

21           THE COURT:  Were those exhibits discussed during

22   cross, Mr. Boyle?  I don't recall them.

23           MR. BOYLE:  Just the topic of voice recognition.

24           THE COURT:  All right.  Objection is sustained.

25   BY MR. BOYLE:

TRISTAN MORELAND - REDIRECT EXAMINATION BY MR. BOYLE   1821

1   Q.  On the general topic of identifying exhibits in court, did

2   you have difficulty?

3   A.  No.

4   Q.  Let's go to the affidavits that you wrote in this case.

5   You were asked questions about whether there was probable cause

6   to support your affidavits in this case.

7   A.  Yes.

8   Q.  Can you tell us, to you there's a difference between

9   probable cause and something that's absolute?

10          MS. WILLIAMS:  Objection, Your Honor, calls for a

11   legal conclusion and beyond the scope.

12          MS. HULL:  And argumentative.

13          THE COURT:  I'm going to overrule the objection on

14   scope and argumentative.  I do think you shouldn't be calling

15   for a legal conclusion, Mr. Boyle, and I can't tell whether

16   this question is going to elicit that kind of a response.  So

17   I'm going to ask you to rephrase it so that it does not.

18   BY MR. BOYLE:

19   Q.  What does probable cause mean to you?

20          MS. WILLIAMS:  Same objection, Your Honor, legal

21   conclusion.

22          THE COURT:  Overruled.

23          THE WITNESS:  It means a tendency for something to

24   occur based on a series of facts, maybe not quite a

25   probability, but something more than just a hunch.

1    BY MR. BOYLE:

2    Q.  To you does that mean that you are personally guaranteeing

3    that what you are searching for will be at a location?

4    A.  No.

5              MS. HULL:  Objection, leading.

6              MS. WILLIAMS:  Objection, vouching, sorry.

7              THE COURT:  Sustained on leading.

8    BY MR. BOYLE:

9    Q.  Can you just give us a description as to how -- as to

10   whether or not what you're searching for will absolutely be

11   there in your own words?

12   A.  Sure.  When we write a probable cause statement, it's based

13   on our experience and our training and prior occurrences in a

14   similar manner.  And then it's based on the facts known to us

15   in a particular series of events.  And it's a statement to the

16   court or to a judge of what our belief is of those things being

17   located or found in a certain location.  However, it's not in

18   any way --

19              MS. HULL:  Objection to the narrative.

20              THE COURT:  Overruled.

21              THE WITNESS:  It's not an assertion that you're

22   absolutely going to find it.  It's just that you think based on

23   the facts you have and all your prior experiences, that those

24   things have a tendency to be in a place.

25              MS. WILLIAMS:  Your Honor, again, I'm going to object

1    based on vouching and move to strike.

2           MS. HULL:  I also move to strike as an incorrect

3    characterization of what probable cause is.

4           THE COURT:  Overruled.  He's asking for this witness'

5    view.

6           THE WITNESS:  So --

7           THE COURT:  I think he's answered the question.  Your

8    next question, Mr. Boyle.

9           MR. BOYLE:  That's fine.

10   BY MR. BOYLE:

11   Q.  What year was the DNA swab warrant served on defendants?

12   A.  2008.

13   Q.  What date of the date -- what year was the warrant served?

14   A.  The warrant served -- oh, the search warrant?

15   Q.  Yeah.

16   A.  Was 2009.

17   Q.  Did you still believe -- did you have an opinion as to

18   whether or not you should still search the defendant's

19   residence even though there was notice by a swab?

20          MS. WILLIAMS:  Objection, relevance, improper opinion,

21   and, Your Honor, calls for what is going to be vouching.

22          THE COURT:  Well, I don't understand the question.  So

23   I -- I think I'll sustain the objection.

24   BY MR. BOYLE:

25   Q.  Agent Moreland, did you decide to serve the search warrant

1   even though a swab had been served earlier in the case?

2   A.  I did.

3   Q.  Let's move to the Rockford event.  We are talking now about

4   January 2008.

5   A.  Yes, sir.

6   Q.  There were questions asked about the sleep over.  Do you

7   remember those questions?

8   A.  I do.

9   Q.  Had there been prior events where the informant met with

10  defendants?

11  A.  Yes.

12  Q.  Was Catoosa one of those events?

13  A.  Yes.

14  Q.  Was Tulsa one of those events?

15  A.  Yes.

16  Q.  On any of those prior events, had either defendant stayed

17  over at the informant's location?

18  A.  No.

19  Q.  Did that happen in Rockford?

20  A.  Just that one night, yes.

21  Q.  What was different about Rockford?

22  A.  Well, Dennis and Daniel showed up that evening.  Dennis was

23  carrying a gun in a case.  And he told the informant he was

24  going to stay the night.

25  Q.  Were you planning for that to happen?

1   A.  No.

2   Q.  What did you have to do when you heard that statement?

3   A.  I had to do several things.  One was consult with my

4   supervision.

5        Two, I had to get hold of the informant and discuss

6   with her several issues regarding the case, her safety,

7   et cetera.

8        And, three, I eventually had to call out agents from

9   Rockford out of bed to get up and come help us because we

10  couldn't stay up all night ourselves to handle the situation.

11  Q.  Did you have the options of pulling the plug on the

12  operation at that point?

13  A.  I did.

14  Q.  Why didn't you?

15       MS. WILLIAMS:  Objection, Your Honor.  It exceeds the

16  scope.

17       THE COURT:  Overruled.

18       THE WITNESS:  Because after making all the

19  consultation and weighing all the ups and downs, I made a

20  decision that it was -- it was acceptable from a safety

21  standpoint.  We had a long relationship with the informant.

22  She understood, you know, the issues at hand.  And I felt that

23  we would still have a -- an opportunity to garner evidence or

24  gather evidence that was worth trying or continuing through

25  with.

1    BY MR. BOYLE:

2    Q.  Did you watch the electronic surveillance from the other

3    room next door?

4    A.  I did.

5    Q.  Was there any sexual conduct?

6    A.  No.

7            MR. BOYLE:  May the witness be shown Exhibit 164.  I

8    don't know if he has that up there.

9            THE COURTROOM DEPUTY CLERK:  I'm not sure.

10            THE WITNESS:  164?

11            MR. BOYLE:  Yes.

12            THE WITNESS:  I have 164.

13    BY MR. BOYLE:

14    Q.  Previously we've had discussion about Poor Man's James

15    Bond?

16    A.  Yes, sir.

17    Q.  Is this -- you may have testified about this before.  I

18    just -- the mailing stream that we discussed in this case, was

19    this a part of that mailing stream?

20    A.  Yes, sir, it was.

21    Q.  Did you testify about this exhibit before?

22    A.  I'm sure I did, yes.

23            MR. BOYLE:  Your Honor, the Government moves to admit

24    164.

25            MS. WILLIAMS:  Objection, Your Honor.  This exceeds

1    the scope of cross.  And foundation.

2             THE COURT:  Let me look at 164.

3             Ms. Hull?

4             MS. HULL:  And 403.

5             THE COURT:  How is this within the scope of cross,

6    Mr. Boyle?

7             MR. BOYLE:  There were numerous questions asked about

8    based on your scope of the case, the mailings that happened in

9    the case, how they were recovered.  We had the Court's 403

10   issues before, so I -- so this is just a follow-up of the

11   general nature.

12            THE COURT:  Why don't we talk about this at side --

13   well, actually, we are -- we are within five minutes of break.

14            Members of the jury, you've only been here for 25

15   minutes but the court reporter has been going since one.  So we

16   are going to go ahead and take our normal 2:30 break.  But

17   let's go to that point, Mr. Boyle, and you can come back to

18   164.

19            MR. BOYLE:  So okay.

20   BY MR. BOYLE:

21   Q.  Do you recall being asked questions about your contacts

22   with Robert Joos?

23   A.  I do.

24   Q.  To be clear, did you describe two different events of

25   making contact with Robert Joos?

1  A.  Yes.  Two different time periods four days, roughly,

2  altogether, something like that, of in person.

3          MS. WILLIAMS:  Your Honor, I'm going to object to this

4  topic.  It exceeds the scope of cross.

5          THE COURT:  Overruled.

6  BY MR. BOYLE:

7  Q.  Do you recall being asked regarding your second visit when

8  you were undercover if you used the moniker Jimmy the Wolf?

9  A.  Yes.

10  Q.  Did you use the description of Jimmy the Wolf?

11  A.  I did.

12  Q.  And was that in relation to any topics that you talked

13  about with Robert Joos?

14  A.  Yes.

15  Q.  And without telling us what he said, what was the topic in

16  relation to Jimmy the Wolf?

17          MS. WILLIAMS:  Objection, still calls for hearsay.

18          MS. HULL:  And outside the scope.

19          THE COURT:  Sustained.

20          MR. BOYLE:  On which grounds?

21          THE COURT:  Hearsay.

22  BY MR. BOYLE:

23  Q.  Without telling us what Robert Joos said.

24          THE COURT:  But he can't say what he said either.

25  That's still hearsay.

1              MR. BOYLE:  Okay.

2    BY MR. BOYLE:

3    Q.  Let's go to the search of the farm on June 25th.  You were

4    asked a lot of questions about whether E-6000 was found at the

5    farm.  Do you remember those questions?

6    A.  I do.

7    Q.  If we can just boil this down, can you tell us whether or

8    not you found any glue of relevance in this case at the farm?

9    A.  I did not find any glue of relevance to the Scottsdale

10   bomb.

11   Q.  Did you find any gun powder of relevance at the Mahon farm?

12   A.  I did not.

13   Q.  Did you find gunpowder?  For example, in ammunition or

14   other --

15   A.  Just in ammunition.  There was a lot of ammunition, but

16   that would have been the only gun powder that I knew to be

17   there.

18   Q.  Did you seize all the ammunition?

19   A.  We did not, no.

20   Q.  Were the defendants living at the farm during February,

21   2004?

22   A.  No, they were not.

23   Q.  You were asked questions about the Mahon family, I believe

24   two other siblings.  Do you remember those questions?

25   A.  Yes.

TRISTAN MORELAND - REDIRECT EXAMINATION BY MR. BOYLE  1830

1    Q.  Was one a brother and one a sister?

2    A.  Yes.

3    Q.  Were those individuals living at the house when you were

4    there undercover?

5            MS. WILLIAMS:  Objection, speculation and relevance.

6            MS. HULL:  And foundation.

7            THE COURT:  Overruled.

8            THE WITNESS:  No, they were not.

9    BY MR. BOYLE:

10   Q.  Did you speak with Dennis Mahon?

11   A.  Yes.

12   Q.  You described the upstairs of his house previously?

13   A.  Yes.  Yes.

14   Q.  Those -- how many bedrooms were up there?

15   A.  Three.

16   Q.  Tell us what room Dennis Mahon said was his room?

17           MS. HULL:  Outside the scope, Judge, and asked and

18   answered.

19           MS. WILLIAMS:  And, Your Honor, with respect to his

20   conversation with Dennis Mahon, that's an issue we need to

21   discuss at side bar.

22           THE COURT:  All right.

23           MS. WILLIAMS:  Based on previous ruling.

24           THE COURT:  All right.  Let's talk about that during a

25   break as well.

1          MS. WILLIAMS:  I think that's near the end, so this is

2     the point to have you rule.

3          THE COURT:  Okay.  You're otherwise done, Mr. Boyle?

4          MR. BOYLE:  Yeah.

5          THE COURT:  All right.  Members of the jury, we will

6     go ahead and take our 15-minute break.  We will see you then.

7     Thank you.

8          (The jury left the courtroom.)

9          THE COURT:  Please be seated.  Exhibit 164, which is

10    the Poor Man -- Poor Man's James Bond, I was not understanding,

11    Mr. Boyle, how you think that's within the scope of the cross.

12         MR. BOYLE:  Two reasons.  One is I think I could have

13    admitted it on direct, but we were waiting for your ruling.  So

14    I think I laid the --

15         THE COURT:  You were waiting for my ruling on what?

16         MR. BOYLE:  403.  I thought you told us that you

17    wanted to review this item and make a 403 Waters determination

18    before it was admitted.

19         THE COURT:  Yeah, I told you at the beginning of the

20    trial and I read it that night.

21         MR. BOYLE:  I thought you said you were going to wait

22    until we moved to admit it -- well, maybe I misunderstood.  But

23    I am just telling you we had issues like this when we weren't

24    sure what your rulings were, so I waited.

25         Nevertheless, we got into this whole issue of mailings

1    again on redirect of how the mailing stream happens, et cetera.

2    And I just thought this was a good time to move to introduce

3    something, which I think I've already laid the foundation for.

4         The informant is going to testify as well that she

5    discussed James Bond, too, with the defendants.  But absent

6    even what's on cross, I would move to admit it now because I

7    was still -- it was my understanding, I was waiting for your

8    ruling on 403.  I don't know that we've had it.

9         THE COURT:  I wasn't going to rule until you moved to

10   admit it.

11        MR. BOYLE:  Okay, well fine.  Well, I'm moving to

12   admit it, so --

13        THE COURT:  All right.  What's the 403 objection on

14   Exhibit 164?

15        MS. WILLIAMS:  Your Honor, first of all, I object to

16   introducing this exhibit on redirect.  It's improper.  If the

17   Government wants to try during Rebecca Williams' testimony,

18   they can do so.

19        I'm also objecting to this document in its entirety

20   under 403 as I believe Ms. Hull is as well.  It -- it exceeds

21   the scope of materials relevant to this case.  And it exceeds

22   them to the extent that I believe that it's very prejudicial to

23   Dennis Mahon.  As we've previously discussed with this, it

24   talks about land mines.  It talks about grenades, and complete

25   with pictures and diagrams on every page.  It talks about

1    flexible plate switches, just all sorts of different incendiary

2    or explosive devices.  I think its prejudice far exceeds any

3    probative value in this instance.

4            THE COURT:  Did you want to add anything, Ms. Hull?

5            MS. HULL:  I just stand on the -- it's outside the

6    scope.  These -- we were talking about the mailings, when they

7    occurred -- I don't have anything to add on that, thank you.

8            THE COURT:  All right.  If -- if Mr. Boyle seeks to

9    admit this during the informant's testimony, will there be

10   foundation objections?  It seems to me that I should allow him,

11   particularly if he was waiting for a ruling on 403, at least to

12   lay the foundation with respect to this exhibit while he has

13   Agent Moreland on the stand.  Unless you're not going to assert

14   a foundation objection, which in that event it won't be

15   necessary.

16           MS. WILLIAMS:  Well, my impression, Judge, is that he

17   was -- well, he did move it into evidence.  He was not just

18   laying foundation.

19           THE COURT:  I know.  But you're objecting that it

20   happened on redirect.  So I guess --

21           MS. WILLIAMS:  Yes.

22           THE COURT:  -- my point is if I were to agree with

23   you, would you then object on foundation grounds if he tries to

24   get it in through the informant because he didn't put it in

25   through Agent Moreland?  I think that would be unfair.

1        MS. WILLIAMS:  If he wants to lay a foundation with

2   this witness and then move it in through Rebecca Williams,

3   that's a different matter.

4        THE COURT:  All right.  Mr. Boyle, would you address

5   the 403 issue, please.

6        MR. BOYLE:  Yes.  This is something the defendant

7   mailed to the informant.  This isn't just a book he had in his

8   house.  He mailed this to her.  And they had discussions about

9   it.  And what's relevant about it is that it is -- it's talking

10  about munitions and mines.

11       Now, as you can see, we put the index in there to give

12  you a sense of what's in this.  We didn't copy everything from

13  the book, because we are trying to mitigate the amount of

14  extraneous matters.  But this is relevant because it shows

15  intent.

16       They wanted to show the Creative Revenge book and

17  introduce the topic of a package bomb that had a tape player

18  that says:  Ha, ha, ha, you've been bombed, presumably under

19  the guise of oh, he didn't really mean to send a package bomb,

20  he was just trying to threaten the man so the child molester

21  would stop doing things.  But that was never the intent.

22       The Indictment alleges James Bond, too.  It's direct

23  evidence of the defendant teaching the informant on how to blow

24  things up, which is basically this case.

25       THE COURT:  Well, it is Count 3 of this case, right?

1          MR. BOYLE:  Right, it is Count 3, but it is certainly

2     evidence under Count 1 of the -- it's in Count 1, too, under

3     overt act 10.  I mean, the whole idea of this case is that he

4     was serious in his intent to train her to bomb.  Defense has

5     other evidence they intend to prove perhaps that he was just

6     trying to, you know, scare the other people.

7          But nonetheless, this is what he mailed her.  That's

8     why it's different than a lot of the other cases.  He mailed

9     this to her.  They had discussions about it.  And we've only

10    used the section that refers to bombing and taken out the rest.

11         MS. HULL:  Judge, I don't know the relevance of

12    putting in a table of contents with everything that's in the

13    book and then excising it from there.  I think that also is --

14    bless you -- falls under 403.  It's just an indirect way of

15    getting all the other information.

16         THE COURT:  So you're saying you would like to have

17    the table of contents removed?  I assumed it was there for my

18    benefit when I reviewed it.  Mr. Boyle?

19         MR. BOYLE:  We can take it out.  It was certainly

20    there for your review.  I wanted to make it clear that we had

21    taken a big chunk of this book out of what discovery has been

22    shown.  We think the index has some value in that it's not just

23    a book about bombing.  But if the defense objects to the index,

24    we will take that out.

25         MS. WILLIAMS:  Well, Your Honor, on behalf of Dennis

1  Mahon, my objection goes far beyond that.

2          THE COURT:  I understand that it does.

3          MS. WILLIAMS:  Okay.

4          THE COURT:  I mean, I understand that you're asserting

5  there's much more in here than --

6          MS. WILLIAMS:  Yes.

7          THE COURT:  -- a pipe bomb.

8          MS. WILLIAMS:  There's pictures and discussion that

9  not only exceed the matters -- the pipe bomb being dealt with

10 in this case, but it also far exceeds the matters listed on the

11 one page of the index which is page 282 of the book.

12         THE COURT:  Well, but Count 3, Ms. Williams, alleges

13 that this book was sent to the informant with the intent of

14 teaching and demonstrating the informant in furtherance of an

15 activity that constitutes a federal crime of violence.  That

16 goes well beyond a pipe bomb as well.

17         MS. WILLIAMS:  I understand that, Your Honor, but as

18 to the subject matter listed in this Indictment, there's a

19 limited time to the conspiracy.  There is a limited scope to

20 the conspiracy, despite the fact that the Government has tried

21 to open it far beyond that.  The -- the case, at least as

22 defined in the Indictment, is about blowing up buildings and I

23 would think should somehow match up to the evidence.

24         This is going far beyond anything that Dennis Mahon

25 discussed with her.  And once again, I must return to the fact

1    that the mailing of this bomb or any other between Dennis Mahon

2    and the paid informant falls within the protection of the First

3    Amendment.  These are all legal materials.  They bought and

4    sold every day on the Internet, stores, gun shows, any manner

5    of outlets.

6         MS. HULL:  Judge, I would add that despite Mr. Boyle's

7    representation that Dennis Mahon was discussing these items, I

8    don't see any evidence that he was discussing the specific

9    items copied in that exhibit.  There's been no evidence of

10   that.

11        THE COURT:  All right.  All right.  Here are my

12   rulings.  I am -- I am going to allow you to lay any additional

13   foundation you think you need for 164, but I am going to

14   require that you move 164 in during the informant's testimony,

15   because I believe admission is beyond the scope of the cross.

16        I do believe that 164 clearly has relevancy to what is

17   alleged in the Indictment.  Count 3 specifically alleges that

18   this book was sent to the informant for the purpose of

19   committing a federal crime of violence, namely transporting in

20   interstate commerce an explosive for the purpose of killing,

21   injuring, or intimidating an individual or unlawfully damaging

22   and destroying any building.  That goes beyond destroying

23   buildings through explosives.  I think it is clearly relevant

24   to that count.  I cannot conclude that the danger of unfair

25   prejudice substantially outweighs that relevancy, so I will

1    deny a Rule 403 objection.

2         Now, the other thing I want to ask you, Ms. Williams,

3    you said something about Dennis Mahon testifying about bedrooms

4    upstairs and you referred to a prior ruling.  And I didn't

5    understand what you were referring.

6         MS. WILLIAMS:  Yes.  And before I forget, Judge, I

7    would ask that if the Poor Man's James Bond is going to be

8    admitted, I would ask the Court give the First Amendment

9    limiting instruction when that occurs.

10        THE COURT:  The one that I've previously given?

11        MS. WILLIAMS:  Yes.  Also, Judge, the Court suppressed

12   Dennis Mahon's statements to Agent Moreland.  That's why I

13   wanted to raise that, because I feel that the Government is

14   starting to get into statements my client has made to Agent

15   Moreland that were previously suppressed.

16        THE COURT:  I'm not remembering what you are referring

17   to.

18        MS. WILLIAMS:  When -- and if I am misunderstanding

19   and they are talking about something else, then perhaps they

20   can clear it up for me.  But when Dennis Mahon was arrested, he

21   was Mirandized.  He said:  That will be it for the small talk.

22        Ruled that that was an invocation and suppressed the

23   later conversation that Agent Moreland had with him after he

24   invoked.

25        THE COURT:  So you're talking about at the time of

 1   arrest?

 2          MS. WILLIAMS:  Yes, in June --

 3          THE COURT:  That's not what I understood Mr. Boyle to

 4   be asking about in his question.  I understood you to be asking

 5   about when Agent Moreland went there undercover and was given a

 6   tour of the house.  Is that right, Mr. Boyle?

 7          MR. BOYLE:  Yes.  I thought I asked when he was there

 8   undercover, did he go upstairs.

 9          THE COURT:  So I don't think that is covered by the

10   post-Miranda statements that I've already ruled on.

11          MS. WILLIAMS:  I would agree, and if the Government

12   could clarify that in its question --

13          THE COURT:  Okay.

14          MS. WILLIAMS:  -- I withdraw that particular

15   objection.  I misunderstood or didn't hear the foundation for

16   it.

17          THE COURT:  All right.

18          MS. HULL:  I objected it was outside the scope.  There

19   was nothing discussed on cross-examination about items found in

20   which rooms in the upstairs of that house.  So it's outside the

21   scope, Judge.

22          THE COURT:  Okay, I don't agree with that.  I'll

23   overrule that objection.

24          Okay.  And how much time do we need for a break?  We

25   need at least ten minutes for the court reporter.  Is that

 1   going to be enough time for you, Ms. Williams?

 2            MS. WILLIAMS:  Yes, thank you.

 3            THE COURT:  Is that enough time, Merilyn?

 4            THE COURT REPORTER:  Yes.

 5            THE COURT:  Okay, we will resume at ten minutes to.

 6            MR. BOYLE:  We do have one more issue about Jimmy the

 7   Wolf that they objected and I had to stop about Jimmy the Wolf.

 8   And the reason -- you objected to hearsay.  At some point I

 9   need to have you make a finding regarding Robert Joos.  I just

10   bring this to you because --

11            THE COURT:  I sustained a hearsay objection of what

12   Agent Moreland was saying --

13            MR. BOYLE:  Right.

14            THE COURT:  -- to Jimmy the Wolf.

15            MR. BOYLE:  And I didn't want to have this in front of

16   the jury.  But my point was his statements -- he's going to say

17   they talked about explosives and how to blow things up in

18   relation to Jimmy the Wolf.  Now, the reason that's not hearsay

19   is that that's not offered -- well, I have two -- my main

20   concern is I need to establish to you that this -- that the

21   statements about Robert Joos were in furtherance of the

22   conspiracy so you can make a ruling.  I'm not going to do that

23   until after the informant testifies.

24            THE COURT:  Then let's cross that bridge at that

25   point.

1          MR. BOYLE:  But my offer of proof, so that you

2     can understand -- I'll make at this point would be Agent

3     Moreland would say we talked about explosives or he talked

4     about explosives.

5          THE COURT:  All right.  I'll rule on that when we get

6     to that point and I can hear from defense counsel.

7          MR. BOYLE:  Thank you.

8          THE COURT:  We've gone a little longer.  Let's take

9     until five minutes to the hour so everyone has a break.

10          MS. WILLIAMS:  Thank you, Your Honor.

11          (A recess was taken.)

12          THE COURT:  Thank you, please be seated.

13          Ms. Hull, you wanted to raise something?

14          MS. HULL:  Just a question, Judge.  Right before we

15     broke you made a comment that you disagreed with the line of

16     questioning as to speaking upstairs with Dennis Mahon on the

17     farm while Agent Moreland was undercover.  And I objected that

18     that is outside the scope.  I am trying to find where on cross

19     by either Ms. Williams or myself that that was raised.

20          THE COURT:  Well, you're asking me to explain my

21     decision, right?

22          MS. HULL:  Do you mind?

23          THE COURT:  This is a motion for reconsideration.

24          MS. HULL:  Do you mind?

25          THE COURT:  No, I don't.  Here's the reason.  I

1  understood the line of questioning that Mr. Boyle was following

2  to be addressing who was living in the house.  There were

3  questions during cross about a brother and about a sister and I

4  thought those could have left the jury with the impression that

5  they were living in the farmhouse.  And I understood Mr. Boyle

6  to be establishing through his undercover exposure to Dennis

7  Mahon that he and his brother and the parents were the only

8  ones in the house.  So I thought it was within the cross.

9          Mr. Boyle, is that where you were going with that?

10          MR. BOYLE:  Yes, the two siblings.

11          THE COURT:  So that's why I thought it was not beyond

12  the scope.

13          MS. HULL:  Okay, past that I didn't -- I didn't see

14  that it was within the scope.  That's why I was asking that

15  question.  That's all I have.

16          (The jury entered the courtroom.)

17          THE COURT:  Thank you, please be seated.

18          Mr. Boyle, you may continue.

19  BY MR. BOYLE:

20  Q.  Agent Moreland, I was asking you questions about your

21  undercover visit to the farm.  So I would like to resume that.

22          Did you describe previously that you went undercover

23  to the Mahon farm?

24  A.  Yes, that's correct.

25  Q.  What year was that?

TRISTAN MORELAND - REDIRECT EXAMINATION BY MR. BOYLE  1843

1   A.  That was in 2009.

2   Q.  During that trip, we were -- did you discuss the upstairs

3   of the house?

4   A.  Yes.

5   Q.  Did you go upstairs?

6   A.  Yes.

7   Q.  Who was with you when you went upstairs?

8   A.  Dennis Mahon, the informant, and April Howell, the other

9   ATF special agent.

10  Q.  When you were upstairs, did Dennis Mahon describe for you

11  the rooms that were upstairs?

12          MS. WILLIAMS:  Objection, exceeds the scope.

13          MS. HULL:  Same.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes.

16  BY MR. BOYLE:

17  Q.  Did he take you on a tour of those rooms?

18  A.  Yes.

19  Q.  What did he say about the green room?

20  A.  He said that was his room.

21  Q.  What did he say about the bedspread room?

22          MS. HULL:  Objection, outside the scope, Judge.

23          THE COURT:  Sustained.

24  BY MR. BOYLE:

25  Q.  Did he describe a third room?

1   A.  A second and third or just --

2   Q.  There's a green room, a bedspread room, and another room

3   upstairs?

4   A.  Yes, sir.

5           MS. HULL:  Outside the scope, Judge.

6           THE COURT:  Overruled.

7   BY MR. BOYLE:

8   Q.  Who did he say that room was?

9   A.  There was a middle room, and he described that as his dad's

10  room.

11  Q.  And who were the four residents of the house at that time?

12  A.  The mother, the father, Dennis and Daniel.

13          MR. BOYLE:  No other questions, thank you.

14          THE COURT:  All right.  Thanks, Agent Moreland, you

15  may step down.

16          MR. BOYLE:  The Government calls Rebecca Williams,

17  Your Honor.

18          THE COURT:  All right.

19          THE COURTROOM DEPUTY CLERK:  Ms. Williams, if you

20  would please come forward.  If you will stand right here and

21  raise your right hand.

22          (The witness, Rebecca Williams, was duly sworn.)

23          THE COURTROOM DEPUTY CLERK:  Please come have a seat.

24  Please speak into the microphone, and there's water here if you

25  need.  Go ahead and have a seat.

1          THE WITNESS:  Thank you.

2

3                    REBECCA WILLIAMS,

4    called as a witness herein, having been first duly sworn, was

5    examined and testified as follows:

6

7                    DIRECT EXAMINATION

8    BY MR. BOYLE:

9    Q.  Good afternoon.  Would you please tell us your name.

10   A.  Rebecca Williams.

11   Q.  And thank you for speaking into the microphone so we can

12   all hear you.

13   A.  Okay.

14   Q.  Would you please tell us how old you are.

15   A.  41.

16   Q.  Would you tell us, please, what types of activities or

17   occupations you've had where you've earned a living in the

18   past?

19   A.  I've raised birds and reptiles and wholesaled them.  I've

20   waitressed, bartended, cashiered, done drywall.  I've had my

21   own house cleaning business for over 15 years.

22   Q.  If you don't understand a question, would you please just

23   let me know so I can rephrase it?

24   A.  Yes.

25   Q.  And if you need to, I believe there's water and there may

1   be a cup up there if you need to take a drink of water.

2   A.  Okay, thank you.

3   Q.  Was there a point where you were contacted by ATF agents to

4   ask you if you would work on a case?

5   A.  Yes, sir.

6   Q.  Do you remember if one of those individuals was Agent

7   Tristan Moreland?

8   A.  Yes.

9   Q.  Did you have -- without telling us what you talked about,

10  did you have a discussion with him about potentially working on

11  a case?

12  A.  Yes.

13  Q.  Did you agree or disagree that you would start working with

14  ATF on a case?

15  A.  I agreed.

16  Q.  When you agreed, did you do so for any particular reason?

17  Was money one of the reasons?  Money?

18  A.  Money was one of the reasons.

19  Q.  What was your understanding regarding being paid for

20  working with ATF or other agencies?

21  A.  My understanding was that I went and -- I'm not sure what

22  you're --

23  Q.  Did you think you would be paid?

24  A.  Yes.

25  Q.  And over the course of your work with law enforcement, did

REBECCA WILLIAMS - DIRECT EXAMINATION BY MR. BOYLE   1847

1   you receive payments?

2   A.  Yes, sir.

3   Q.  I would like to ask you about your first contact with

4   Dennis or Daniel Mahon.  Do you know what part of the country

5   that occurred in?

6   A.  In Oklahoma.

7   Q.  Had you ever met them before?

8   A.  No, sir.

9   Q.  Did you know that you would be traveling to Oklahoma at

10   some point?

11   A.  Yes.

12   Q.  Did you agree to do that?

13   A.  Yes, I did.

14   Q.  Again, without going into your conversations with other

15   people, did you agree to perform part of an investigation with

16   ATF?

17            MS. WILLIAMS:  Objection, leading.

18            THE COURT:  Sustained.

19   BY MR. BOYLE:

20   Q.  Did you agree to work with agents in Oklahoma?

21   A.  Yes.

22            MS. WILLIAMS:  Objection, leading, Your Honor.

23            THE COURT:  Overruled.

24   BY MR. BOYLE:

25   Q.  What was -- were you going to use your real name?

1   A.  I used my first real name.  My -- my name -- my first name

2   was real.

3   Q.  So you would use that.  What about your last name?

4   A.  No, sir.

5   Q.  Did you come up with a different last name?

6   A.  Yes.

7   Q.  What was that last name?

8   A.  Stevens.

9   Q.  And did you use that name, Rebecca Stevens, in Oklahoma?

10  A.  Becka Stevens, yes.

11  Q.  Where did you go in Oklahoma before you made contact with

12  Dennis or Daniel Mahon?

13  A.  I'm not sure of the place.  We met at a hotel.

14  Q.  When you say "we"?

15  A.  ATF agents and different agents that were on the case met

16  at a hotel.

17  Q.  At some point was there a trailer, a mobile trailer?

18  A.  Yes.

19  Q.  Did you know that -- if you would be staying in a trailer?

20  A.  Yes.

21  Q.  Where was the trailer parked?  I mean describe the area.

22  A.  When I -- at what point?

23  Q.  When it first started.

24  A.  It was in a parking lot.

25  Q.  Were there other trailers around?

1    A.   No.  We drove it into the KOA campground.

2    Q.   And at that location, were there other trailers?

3    A.   Yes, sir.

4    Q.   As a part of the investigation, what was your job at that

5    KOA campground?

6    A.   To meet Dennis and Daniel and talk to them.

7    Q.   What name were you using when you made contact with them?

8    A.   Becka Stevens.

9    Q.   Did you have any type of a story you used when you made

10   contact with them?

11   A.   Yes.

12   Q.   What was your story that you used?

13   A.   That I was running -- on the run and had a warrant out for

14   my arrest.

15   Q.   Was that an actual true story?

16   A.   It was a fictitious made-up story for my part and this

17   investigation.

18   Q.   During the events that were captured on videotape, have you

19   had a chance to see those since the event happened?

20   A.   A few of them.

21   Q.   Are you the person in the videos from that campground?

22   A.   Yes, sir.

23   Q.   I want to ask you questions about your memory of some of

24   those events and ask you if you were there first with another

25   undercover agent.

1   A.  Yes, I was.

2   Q.  Was it a male or a female?

3   A.  A female.

4   Q.  Did that individual stay with you at the location at the

5   campground?

6   A.  Yes.

7   Q.  Where did you sleep when you were at that location?

8   A.  In a bed in the front of the fifth wheel.

9   Q.  And by "fifth wheel," do you mean trailer?

10  A.  Yes.

11  Q.  Where did the other agent sleep?

12  A.  In another bed in the back of the trailer.

13  Q.  Did you at some point make contact with Dennis or Daniel

14  Mahon?

15  A.  Yes.

16  Q.  Was that at the campground?

17  A.  Yes.

18  Q.  Did you relay the story that you've described for us to

19  them, that you were on the run and you had a warrant for your

20  arrest?

21  A.  Yes.

22  Q.  During your contact with him, did you have any idea you

23  were being recorded?

24  A.  Yes.

25  Q.  How did you know that?

1   A.  Well, it was discussed before I even met them.  And we had

2   set up -- I was instructed where the video cameras were set up

3   and I knew that we were being recorded.

4   Q.  Was there a recording device in the trailer?

5   A.  Yes.

6   Q.  What type of device was it?  What did it use to record on?

7   A.  Videotapes.

8   Q.  Did you have access to the videotapes?

9   A.  Yes.

10  Q.  Did you in this case keep any videotapes after the whole

11  Oklahoma event was over?

12  A.  No.

13  Q.  Any videotapes that you had, what did you do with them?

14  A.  They were all turned in on a daily basis.

15  Q.  To whom?

16  A.  To the agent in charge.

17  Q.  We have -- strike that.

18         Was there a point at which you met on a daily basis

19  with either Dennis or Daniel Mahon?

20  A.  Yes.

21  Q.  During those meetings how did you portray yourself

22  regarding any sympathies you had in relation to the

23  conversation you had with Dennis and Daniel Mahon?

24  A.  That I was a separatist, that we were interested in White

25  Aryan Resistance, we were interested in just learning as much

1   as I could.

2   Q.  Did you bring up the topic of the White Aryan Resistance or

3   did someone else bring that up first?

4   A.  Someone else brought it up first.

5   Q.  Who brought up the topic of the White Aryan Resistance

6   first?

7   A.  Dennis.

8           MS. WILLIAMS:  Objection, foundation.

9           THE COURT:  Overruled.

10  BY MR. BOYLE:

11  Q.  Who brought up the topic of the White Aryan Resistance

12  first?

13  A.  Dennis Mahon.

14  Q.  Was that at the campground?

15  A.  Yes, sir.

16  Q.  At any point during your interactions with Dennis or Daniel

17  Mahon, did you -- and let's -- I'm going to be very specific so

18  follow my questions.

19          Did you watch things that were on TV?

20  A.  Yes.

21  Q.  Did you ever watch any movies?

22  A.  Yes.

23  Q.  Do you remember any of the movies?

24  A.  Yes.  A few of them.

25  Q.  What types of movies were watched?  I'm talking about like

1    Cinemax movies.  I'll get on to other issues.  But Cinemax

2    movies so we are clear.

3    A.  I don't remember what Cinemax movies we watched.

4    Q.  Did you watch other types of videos?

5    A.  Yes.

6    Q.  What was the general topic of those videos?  Let me be more

7    clear.  Let me have the --

8            MS. WILLIAMS:  Objection.

9            THE COURT:  Come to side bar.

10           (The following discussion was held at the bench

11    between Court and counsel:)

12           MR. BOYLE:  Judge, I want to ask her if she watched

13    any WAR videos.  And I'm worried that if I asked her an

14    open-ended question, did she watch any videos, she might say

15    something like KKK related or some other topic that we are not

16    discussing.  So I just intend to ask her a "yes" or "no"

17    question as to whether or not she watched videos relating to

18    Tom Metzger or WAR.  That's why I asked her.

19           MS. WILLIAMS:  Your Honor, I think on behalf of

20    Dennis, I agree that's a legitimate concern and as to this

21    question, I have no objection.  But I would like some

22    foundation as to date.

23           MR. BOYLE:  That's fine.  That's fair.

24           MS. HULL:  Yes, date as well, Judge, including the

25    movies.

1          THE COURT:  What do you mean "including the movies"?

2  She said she didn't remember what movies.

3          MS. HULL:  She said a movie.  She said I don't

4  remember what movie it was.

5          THE COURT:  Well, I heard it differently.  But I think

6  he asked what movies.  And she said I don't remember or movies.

7  And she said I don't remember either one.  So I think that's

8  been covered.

9          All right, you can lead on the question of her

10  watching a WAR video.

11          MR. BOYLE:  Thank you.

12          (The discussion at the bench concluded.)

13  BY MR. BOYLE:

14  Q.  Ms. Williams, regarding videos, did you watch any videos?

15  And I'll get to the times and the dates basically that you

16  watched them, but did you watch any videos related to WAR, the

17  White Aryan Resistance?

18  A.  Yes.

19  Q.  Can you tell us if that was in the first two days, in the

20  middle part, or toward the end of your event at Catoosa?  And

21  if you don't know, then just tell us you don't know.

22  A.  I don't recall at what point.

23  Q.  Who was present when you watched those videos about WAR?

24  A.  I believe the other -- the female agent, myself, Dennis and

25  Daniel.

1   Q.  At any point during your contact at this location, was the

2   name Robert Joos mentioned by anybody?

3   A.  Yes.

4   Q.  Who was it that mentioned Robert Joos?

5   A.  Dennis Mahon.

6   Q.  At any point during your contact in Catoosa did anyone

7   mention the name Tom Metzger?

8   A.  Yes.

9   Q.  Who mentioned the name Tom Metzger?

10  A.  Dennis.

11  Q.  Was there a point at which anyone directed you regarding a

12  phone call with Robert Joos?

13  A.  Yes.

14        MS. WILLIAMS:  Your Honor, I'm going to object to the

15  use of the word "directed."

16        THE COURT:  Overruled.

17  BY MR. BOYLE:

18  Q.  Can you describe for us how it is that someone mentioned

19  Robert Joos regarding a phone call?

20  A.  Dennis called Robert and --

21  Q.  First of all, when -- do you remember when this was?

22  A.  It was the first week we were in Catoosa.

23  Q.  Where were you when this happened?  Do you remember?

24  A.  In the campground, at the KOA campground.

25  Q.  Do you know if you were inside the trailer or outside?

1    A.  I don't recall.

2    Q.  And you are now telling us that there's something

3    concerning -- relating to a phone call and Robert Joos?

4    A.  Yes.

5    Q.  What was it that was said by either Dennis or Daniel Mahon?

6          MS. WILLIAMS:  Objection, hearsay and foundation.

7          MS. HULL:  And leading.

8          THE COURT:  Overruled.

9          THE WITNESS:  Dennis said that Robert was a big

10   supporter of the White Aryan Resistance and that he had a

11   200-acre facility that we could go train at.

12   BY MR. BOYLE:

13   Q.  In relation to a phone call, is there some correlation

14   between a discussion about Robert Joos and a phone call?

15   A.  Yes, Dennis called Robert and put me on the phone with him

16   for a few minutes.

17   Q.  Had you ever spoken with a Robert Joos in your life before

18   that?

19   A.  No, sir.

20   Q.  I'm going to ask you some other questions and we will come

21   back to that, because I'm kind of going in time order.

22          MS. WILLIAMS:  Excuse me, Your Honor.  Before we shift

23   topics, I would make a Jencks request at this time as to the

24   subject the Government's moving off of.

25          MR. BOYLE:  I didn't understand that.

REBECCA WILLIAMS - DIRECT EXAMINATION BY MR. BOYLE    1857

1          THE COURT:  Do you want to say again, please,

2    Ms. Williams.

3          MS. WILLIAMS:  On behalf of Dennis Mahon I'm making a

4    Jencks request on the topic the Government is moving off of for

5    the moment.

6          MR. BOYLE:  Oh, okay.

7    BY MR. BOYLE:

8    Q.  Sticking with Catoosa, Oklahoma, was there a point at which

9    you introduced some type of a story regarding a person in

10   California?

11   A.  Yes.

12   Q.  Would you tell us the story that was introduced.

13   A.  That I was on the run because there was a child molester --

14   that basically that there was a child molester and that I was

15   upset with the situation that was going on and I wanted to do

16   something to him.  So --

17   Q.  Okay.  In your life, without getting too specific, is that

18   something that's completely made up or does it have some part

19   of it that's true?

20   A.  There's a part of it that's true.

21   Q.  Was the story about doing something to a child molester in

22   California true?

23   A.  No.

24   Q.  Was it, however, discussed by you in Oklahoma?

25   A.  Yes.

1    Q.  What was the purpose of that for you?

2    A.  To invite conversation.

3    Q.  During the events in Oklahoma, did there come times when

4    you acted as you were someone who was more than just a friend

5    with anyone as a part of your role?

6    A.  No.

7    Q.  Were there times when other individuals made comments about

8    things that were more than just friendship?

9    A.  Yes.

10         MS. HULL:  Objection, hearsay.

11         THE COURT:  Overruled.

12   BY MR. BOYLE:

13   Q.  Can you describe for us what kind of comments were made

14   that were more than just friendship?

15   A.  There were lots of comments made.

16   Q.  Just generally.

17   A.  About having Dennis wanting me to have his baby.  I mean,

18   I'm not sure exactly.  There was a lot of conversation that

19   went on, so --.

20   Q.  Was that conversation sexual?

21   A.  There were at times some sexual conversation.

22   Q.  Were all of the times that there were sexual conversations

23   serious?

24   A.  No.

25   Q.  If they weren't serious, what were they?

REBECCA WILLIAMS - DIRECT EXAMINATION BY MR. BOYLE    1859

1    A.    Joking.

2    Q.    When the topic of sex and sexual jokes came up, how did you

3    handle them?

4    A.    I laughed them off most of the time.

5    Q.    In relation to the events in Oklahoma, did you have a

6    discussion at any time regarding any books?

7    A.    Yes.

8    Q.    Do you remember a conversation as to the titles of any of

9    those books?

10   A.    Yes.

11   Q.    Can you give us an example of a book that was discussed?

12              MS. WILLIAMS:  Objection, foundation -- excuse me,

13   foundation as to time.

14              MS. HULL:  Foundation as to speaker.

15              THE COURT:  Go ahead, Mr. Boyle.

16   BY MR. BOYLE:

17   Q.    Tell us the book, and then we will talk about those

18   secondary questions.

19   A.    Poor Man's -- Poor Man's James Bond.

20   Q.    Who was it that you discussed Poor Man's James Bond with?

21   A.    Dennis Mahon.

22   Q.    Was there a point in this case when you actually saw a Poor

23   Man's James Bond book?

24   A.    Yes, sir.

25   Q.    Who gave that book to you?

1   A.  Dennis did.

2   Q.  How was it given to you?

3   A.  Mailed to me.

4   Q.  Did you look at the book?

5   A.  Yes, I did.

6   Q.  And did you have phone discussions, without talking about

7   what was said right now, did you have phone discussions about

8   that James Bond book?

9          MS. WILLIAMS:  Your Honor, I'm going to object as to

10   foundation as to time.

11          THE COURT:  Please lay some foundation as to time.

12   BY MR. BOYLE:

13   Q.  First of all, did you have conversations about the book?

14   A.  Yes.

15   Q.  Starting with Oklahoma, were there discussions in Oklahoma

16   about Poor Man's James Bond?

17   A.  Yes, there was.

18   Q.  Were there conversations after Oklahoma about Poor Man's

19   James Bond?

20   A.  Yes, there was.

21          MS. HULL:  Objection, foundation, Your Honor, as to

22   the speaker.

23          THE COURT:  Overruled.

24   BY MR. BOYLE:

25   Q.  And are all of these conversations with Dennis Mahon, the

1    Poor Man's James Bond?

2    A.  Yes.

3    Q.  Have you had a chance prior to coming to court today to

4    look at Exhibit 164?  And it might be in front of you

5    somewhere.

6    A.  Yes.  Yes, sir.

7    Q.  These are pages, photocopies?

8    A.  Yes, they are.

9    Q.  Is this how this item was sent to you?

10   A.  No.

11   Q.  How was the item sent to you?

12   A.  In the -- it was in the book, the actual book was sent to

13   me.

14   Q.  Is this a smaller portion of that book?

15   A.  Yes.

16        MR. BOYLE:  The Government moves to admit 164.

17        MS. WILLIAMS:  Your Honor, objection, foundation as to

18   how it got to her.

19        MS. HULL:  Objection as to relevance as to Daniel

20   Mahon.

21        THE COURT:  The relevancy objection is overruled.  I

22   do think you should establish foundation as to how she received

23   the book, Mr. Boyle.

24   BY MR. BOYLE:

25   Q.  Did you have a personal mail box that was used for you,

1   Rebecca Williams, during this investigation?

2   A.  No.  No, sir, not for this investigation.

3   Q.  But did you have your own personal mail box somewhere?

4   A.  I had a Rebecca -- Becka Stevens box and a Rebecca Williams

5   box.

6   Q.  So they are different?

7   A.  Yes, sir.

8   Q.  Did you receive mail from the Becka Stevens box in this

9   case?

10  A.  Yes, I did.

11  Q.  How would you receive that mail?

12  A.  Usually it was sent to me through Fed Ex.

13  Q.  And when mail went to that Becka Stevens box, who would

14  give it to you?

15  A.  It would be delivered through Fed Ex from ATF.

16  Q.  So the agents would send you --

17  A.  Yes, sir.

18  Q.  -- those items?

19          When you received this Exhibit 164, did you recognize

20  it from your conversations?

21  A.  Yes.

22  Q.  And from whom were you expecting this book?

23  A.  From Dennis.

24          MR. BOYLE:  The Government moves to admit 164.

25          MS. WILLIAMS:  Foundation, Your Honor.  We still have

 1   no testimony as to date, time.

 2          MS. HULL:  Same, Judge.

 3          THE COURT:  Overruled.  Exhibit 164 is admitted.

 4   BY MR. BOYLE:

 5   Q.  During this case, did the agents give you a recording

 6   device?

 7   A.  Yes.

 8   Q.  What type of recording device did they give you?

 9   A.  A little hand recorder.  It's mostly for phone recording.

10   Q.  When you were working in this case, did you use that

11   recorder?

12   A.  Yes, sir.

13   Q.  Generally how -- how is it that you used that recorder in

14   relation to this case?

15   A.  To record phone conversations and voice mails.

16   Q.  Can you tell us how it worked?  I mean, how did this

17   recorder capture conversations?

18   A.  Put a little tape in it and hook up the microphone -- the

19   plug and there's a plug that went into my ear.  And then I just

20   turned it on when I was recording the conversations.

21   Q.  Were you able to hear the conversations while you recorded

22   them?

23   A.  Yes.

24   Q.  Did you have instructions regarding placing any dates on

25   recordings?

1    A.  Yes.

2    Q.  What were your instructions?

3            MS. WILLIAMS:  Objection, hearsay, foundation.

4            MR. BOYLE:  I'll withdraw that.

5    BY MR. BOYLE:

6    Q.  What did you do before you made a recording?

7    A.  I would note the time and date of -- the time and date and

8    then make the call or take the voice mail.

9    Q.  Prior to coming to court today, did you listen to

10   recordings that have been marked in evidence?

11   A.  Yes, sir.

12   Q.  Where did you do that?

13   A.  In your office.

14   Q.  Did you go through the trial exhibit numbers in this case?

15   A.  Yes.

16   Q.  Did you make a little list as you were shown exhibits?

17   A.  Yes.

18   Q.  So you could follow along?

19   A.  Yes, sir.

20   Q.  And do you have that with you?

21   A.  I do.

22           MR. BOYLE:  And for the record, Judge, we made a copy

23   for all counsel.

24   BY MR. BOYLE:

25   Q.  First of all, for each of the trial exhibits in this case,

REBECCA WILLIAMS - DIRECT EXAMINATION BY MR. BOYLE    1865

1    did you listen to the recordings on the exhibits?

2    A.  I did, yes.

3    Q.  Did you recognize your voice on the exhibits?

4    A.  Yes.

5    Q.  For each recording, could you tell if there was a

6    transcript?

7    A.  Yes.

8    Q.  And did you follow along with the transcript and the

9    exhibit as you were watching it?

10   A.  Yes, I did.

11   Q.  Let me start first with Exhibit Number 200.  Do you recall

12   if that's one of the exhibits that you reviewed prior to coming

13   here today?

14   A.  Yes, sir.

15   Q.  Can you tell us who was in the conversation with you?

16   A.  I don't remember which exactly one that you're referring

17   to.  I don't remember in my head which one Number 200 was.

18   Q.  That's fine.  Do you recall if -- well, let me tell you

19   when you listened to these calls, who was the -- who was

20   primarily the individual for these exhibits that you listened

21   to?

22   A.  Myself and Dennis Mahon.

23   Q.  Who did you have most of your conversations on recordings

24   with in this case?

25   A.  Dennis.

1    Q.  Is Exhibit 200 one of the ones you listened to?

2    A.  Yes, it is.

3            MR. BOYLE:  Your Honor, the Government moves to admit

4    Number 200.

5            MS. WILLIAMS:  No objection.

6            MS. HULL:  Objection as to foundation.

7            MS. WILLIAMS:  Actually, Your Honor, I'm sorry, I

8    would like to add a foundation as to date, as I look at the top

9    line.

10           THE COURT:  The top line of what are you looking at?

11           MS. WILLIAMS:  Of Exhibit 201.

12           THE COURT:  Well, in terms of foundation, Mr. Boyle, I

13   do not think you have elicited any evidence that this is a true

14   and accurate reflection of an actual conversation, and I do

15   think to the extent you can, you should lay a foundation as to

16   time.

17   BY MR. BOYLE:

18   Q.  Did you indicate on these recordings, typically, the date

19   and time?

20   A.  Yes, sir.

21   Q.  Did you do that on the date and time you made the

22   recordings?

23   A.  Yes.

24   Q.  If there is a date and time on a recording, is that a

25   present sense impression of you of what the date was on that

1    date?

2    A.  Yes, it was.

3    Q.  The recordings that you heard, all the trial exhibits that

4    you went through, were they fair and accurate representations

5    of your recordings with subjects in this case?

6    A.  Yes.

7         MR. BOYLE:  And regarding foundation, I think Agent

8    Moreland has testified regarding 200 as well.

9         MS. WILLIAMS:  Your Honor, I'm sorry, there's still no

10   date.  There's still no indication of year.

11        THE COURT:  Can you narrow it to a range?

12        MR. BOYLE:  I believe Agent Moreland testified that

13   this tape was impounded in 2005.  And the speaker identifies

14   the date on the recording.

15        THE COURT:  The Exhibit 201 transcript doesn't show a

16   year.  That's why I think Ms. Williams is objecting.

17        MR. BOYLE:  My point is that Agent Moreland identified

18   this tape as being taken into custody in 2005, sir.

19        THE COURT:  The foundation objection is overruled.

20   Exhibit 200 is admitted.

21        MR. BOYLE:  Permission to publish.

22        THE COURT:  You may.

23        MR. BOYLE:  Do you want --

24        THE COURT:  Now, is this going to be with a

25   transcript?

1              MR. BOYLE:  It is.

2              THE COURT:  All right.  Let me remind the jury of the

3     same instruction.  The evidence is the tape, not the

4     transcript.  The transcript is only provided to assist you in

5     understanding a tape if you find the transcript helpful.

6              MR. BOYLE:  Your Honor, as well, since we are now

7     going to be playing tapes, do they want to have you reurge the

8     instruction, the other instruction regarding --

9              THE COURT:  I think that was specifically with respect

10    to Exhibit 164.  So if you're going to display that at some

11    point, I'll give the instruction at some point.

12             MR. BOYLE:  Well, starting with Exhibit 200.

13             (Exhibit Number 200, an audio tape, was played.)

14    BY MR. BOYLE:

15    Q.  Ms.  Williams, as part of the case, were you given

16    materials to mail to Dennis Mahon or have mailed on your

17    behalf?

18    A.  Yes.

19    Q.  Who made the decision as to whether or not something would

20    be mailed to Dennis or Daniel Mahon?

21    A.  I believe Tristan Moreland.

22    Q.  Moving now to Exhibit 177, can you tell us if you reviewed

23    that exhibit prior to coming to court?

24    A.  Yes, sir.

25    Q.  When you listened to that exhibit, was it a fair and

1   accurate representation of the recording you made in this case?

2   A.  Yes, it was.

3   Q.  Did you recognize your voice on that recording?

4   A.  Yes, I did.

5   Q.  And did you review Exhibit 177 from beginning to end?

6   A.  Yes.

7           MR. BOYLE:  Your Honor, the Government moves to admit

8   177.

9           MS. HULL:  Objection, foundation, time, date.

10          MS. WILLIAMS:  No objection.

11          THE COURT:  The objection is overruled.  Exhibit 177

12  is admitted.

13          MR. BOYLE:  Permission to publish.

14          THE COURT:  You may.

15          (Exhibit Number 177, an audio tape, was played.)

16          MS. HULL:  Your Honor, I am going to renew my

17  objection as to foundation as to date.  I think it's relevant

18  for the jury to be -- not be misled as to the timing of these

19  things in particular as to mailings.

20          THE COURT:  Well, what is the objection to the

21  evidence that has been admitted?

22          MS. HULL:  The foundation, Judge.  It has not been

23  established the time in conjunction with the mailings received

24  or sent.  I think that that's important.  I don't think that's

25  been established.

1          THE COURT:  You are talking about mailings.  So

2    something other than this exhibit that was just played?

3          MS. HULL:  For -- the date, yes, of these.

4          THE COURT:  Of these?

5          MS. HULL:  Specifically.

6          THE COURT:  Of the recordings?  You said mailings, you

7    meant recordings?

8          MS. HULL:  Yes.

9          THE COURT:  I think it would help, it's mentioned

10   briefly, but without a year on the tape if you can lay a

11   foundation for that, Mr. Boyle.

12         MR. BOYLE:  Okay, I will.

13         THE COURT:  I don't know that that's a requirement,

14   but I agree that I think that would help clarify the evidence.

15         MS. HULL:  Thank you.

16   BY MR. BOYLE:

17   Q.  Starting with Exhibit 175, is this one of the exhibits that

18   you reviewed?

19   A.  Yes, sir.

20   Q.  Does it have your voice on the recording?

21   A.  Yes.

22   Q.  Was it a fair and accurate representation of a phone call

23   that you recorded?

24   A.  Yes.

25   Q.  Again, if there's a date reference at the beginning of this

1    recording, you believe that that would be an accurate

2    reflection of the date in which you made the recordings?

3    A.  Yes.

4            MR. BOYLE:  The Government moves to admit Exhibit 175.

5            MS. WILLIAMS:  Objection, Your Honor.  Foundation.

6    Foundation for this was not previously laid.

7            THE COURT:  Overruled.  Exhibit 175 is admitted.

8            MR. BOYLE:  Permission to publish.

9            THE COURT:  You may.

10           MR. BOYLE:  I'll move on to 173.

11           THE COURT:  Was there a problem with that one?

12           MR. BOYLE:  Yeah, Your Honor, before I had to reboot

13   the computer on some recordings.  It's unclear why.  But I have

14   more than 20 minutes of recordings, so I may as well continue.

15           THE COURT:  All right.

16   BY MR. BOYLE:

17   Q.  Moving to Exhibit 173, Ms. Stevens or Ms. Williams, was

18   that one of the recordings you reviewed in this case?

19   A.  Yes, sir.

20   Q.  Did you listen to it from beginning to end?

21   A.  Yes.

22   Q.  Did you recognize your voice on that recording?

23   A.  Yes, I did.

24   Q.  Was the recording a fair and accurate recording of what you

25   recorded in this case?

1    A.  Yes.

2    Q.  And if you made a time and date reference on the recording,

3    would that have been an accurate recording of what you thought

4    the date was on that date?

5    A.  Yes, it was.

6            MR. BOYLE:  The Government moves to admit 173.

7            MS. WILLIAMS:  Objection, foundation.  The foundation

8    was not previously laid by Agent Moreland.

9            THE COURT:  Overruled.  Exhibit 173 is admitted.

10           MR. BOYLE:  Permission to publish, Your Honor.

11           THE COURT:  You may.

12           (Exhibit Number 173, an audio tape, was played.)

13   BY MR. BOYLE:

14   Q.  Ms. Williams, moving now to Exhibit 202, was this one of

15   the trial exhibits you reviewed prior to coming to court today?

16   A.  Yes, it is.

17   Q.  Did you listen to it from beginning to end?

18   A.  Yes.

19   Q.  Did you recognize a voice on that recording?

20   A.  Yes.

21   Q.  Was it your voice?

22   A.  Yes.

23   Q.  You made a reference to a date and time on the beginning of

24   this recording.  Would that have been an accurate

25   representation of what you thought the date was when you made

1    the recording?

2    A.  Yes, sir.

3            MR. BOYLE:  The Government moves to admit 202.

4            MS. WILLIAMS:  Objection, Your Honor, foundation has

5    not been previously laid.

6            MS. HULL:  Relevance as to Daniel Mahon.

7            THE COURT:  Sustained.  You didn't establish that this

8    was a fair and accurate recording.

9    BY MR. BOYLE:

10   Q.  Ms. Williams, when you listened to this recording, could

11   you hear your voice?

12   A.  Yes.

13   Q.  Was this recording a fair and accurate recording of what

14   you recorded during this investigation?

15   A.  Yes.

16   Q.  And as a general rule on this case, for these recordings,

17   you told us that you made -- you got a little tape recorder and

18   you made recordings?

19   A.  Yes.

20   Q.  What did you do with the cassette tapes when you were done

21   with them?

22   A.  I put them in a Fed Ex package and Fed Ex'd them to ATF.

23   Q.  Regarding 202 then, was that a portion of one of the

24   recordings you made?

25   A.  Yes.

1    MR. BOYLE:  The Government moves to admit 202.

2    MS. WILLIAMS:  Same objection, Your Honor, foundation

3 as to the -- a foundation was not laid through the agent.

4    MS. HULL:  Relevance as to Daniel Mahon.

5    THE COURT:  Overruled.  Exhibit 202 is admitted.

6    MR. BOYLE:  Your Honor, this one does not have a

7 transcript with the audio.  Permission to publish?

8    THE COURT:  You may.

9    (Exhibit Number 202, an audio tape, was played.)

10 BY MR. BOYLE:

11 Q.  Ms. Williams, I'm stopping in the middle of this recording

12 to cover a point, which is did you have conversations with

13 Dennis Mahon that lasted more than a minute or two?

14 A.  Yes.

15 Q.  On this exhibit, for example, did you always talk about

16 specific topics when you were talking with Dennis Mahon?

17 A.  Not always.

18 Q.  Did you talk about general topics like the weather or other

19 things?

20 A.  Yes.

21 Q.  Do these recordings have portions of your recordings that

22 were made by you concerning your conversations?

23 A.  Yes.

24 Q.  But did you impound the whole tape and give that to ATF or

25 did you change the tapes at all before you gave it to ATF?

1          MS. WILLIAMS:  Objection, leading.

2          THE COURT:  Overruled.

3          THE WITNESS:  The whole tape was sent to ATF.

4          MR. BOYLE:  Continuing on.

5          (Exhibit Number 202, an audio tape, continued to

6   play.)

7   BY MR. BOYLE:

8   Q.  Moving now to Exhibit 204.  Was this one of the trial

9   exhibits that you reviewed prior to coming to court?

10  A.  Yes.

11  Q.  Did you recognize the voice on that recording?

12  A.  Yes.

13  Q.  Were you on the recording?

14  A.  Yes.

15  Q.  Was this recording a fair and accurate recording --

16  representation of what you recorded in your investigation?

17  A.  Yes, it was.

18  Q.  If there's a time and date stamp on the recording, was that

19  an accurate impression by you at the time of what you thought

20  the date was?

21  A.  Yes.

22          MR. BOYLE:  The Government moves to admit 204.

23          MS. WILLIAMS:  Objection, foundation, Your Honor.

24          MS. HULL:  Relevance as to Daniel Mahon.

25          THE COURT:  Overruled.  Exhibit 204 is admitted.

1          MR. BOYLE:  Permission to publish.

2          THE COURT:  You may.

3          (Exhibit Number 204, an audio tape, was played.)

4  BY MR. BOYLE:

5  Q.  Moving to Exhibit 150.  Did you have the time to review 150

6  prior to coming to court?

7  A.  Yes.

8  Q.  Was this one of the trial exhibits you reviewed from

9  beginning to end?

10  A.  Yes.

11  Q.  Did you recognize a voice on the recording?

12  A.  Yes.

13  Q.  And were you on the recording?

14  A.  Yes.

15  Q.  Was this recording a fair and accurate representation of a

16  recording you made in this case?

17  A.  Yes.

18  Q.  If there's a time and date stamp on this recording, would

19  that have been your understanding of the date and the time that

20  you made the recording?

21  A.  Yes.

22          MR. BOYLE:  The Government moves to admit 150.

23          MS. WILLIAMS:  Objection, foundation not previously

24  laid.

25          MS. HULL:  Foundation, can we establish who she was

1    speaking with?

2            THE COURT:  I don't think that foundation was laid.

3            MR. BOYLE:  In this recording, if you -- well, she

4    will have to -- the Government will admit -- well, I can't

5    admit.  I'll have to take the witness and show her each tape

6    and have her write down the name of each individual for the

7    tape, Your Honor.

8            I'm going to move on to a couple of items before we

9    are done for the day.  We will come back to some of these

10   tapes.

11   BY MR. BOYLE:

12   Q.  Do you have a memory of Rockford, Illinois, where you were

13   in a hotel room?

14   A.  I do, yes.

15   Q.  Were you there as yourself or were you role playing?

16   A.  Role playing.

17   Q.  Who were you going to meet at that location?

18   A.  Dennis.

19   Q.  What was the location?

20   A.  A hotel.

21   Q.  Were you shown whether or not there were recording devices

22   at this hotel?

23   A.  Yes, I was.

24   Q.  Were there?

25   A.  Yes, there was.

1    Q.  Was this your room or someone else's hotel room?

2    A.  I believe --

3    Q.  As part of the story?

4    A.  The ATF -- as part of the story?

5    Q.  Yeah, as part of the story.

6    A.  It was my room.

7    Q.  And at the location, do you remember what year it was?

8    A.  I do not remember what year it was.

9    Q.  Do you remember the event?

10   A.  I do.

11   Q.  Can you describe for us who you made contact with in

12   Rockford at this hotel?

13   A.  Dennis and Daniel Mahon.

14   Q.  Were you there with any other undercover agents?

15   A.  No.

16   Q.  When you made contact with Dennis and Daniel Mahon, was

17   there a point at which you went back to your hotel room?

18   A.  Yes.

19   Q.  Did you have a plan that day as to whether or not you would

20   be having any guests overnight?

21   A.  No, sir.

22   Q.  Were you expecting anyone to stay overnight?

23   A.  No.

24   Q.  Did that change?

25   A.  Yes.

1   Q.  What happened?

2   A.  Daniel said he was leaving his -- leaving Dennis there.

3          MS. HULL:  Objection.  Objection as to foundation,

4   hearsay.

5          THE COURT:  Overruled.

6   BY MR. BOYLE:

7   Q.  Go ahead, Daniel said?

8   A.  Daniel said he was going to leave his brother for the night

9   because he had to go home and take care of his mother.

10  Q.  Prior to this event, had Dennis or Daniel Mahon ever stayed

11  overnight where you were at?

12  A.  No.

13  Q.  Was this expected by you or was it a surprise as to whether

14  or not Dennis would stay over?

15  A.  It was a surprise.

16  Q.  Did you have a choice as to whether or not you could

17  refuse?

18  A.  Yes.

19  Q.  What was the choice you made?

20  A.  I chose to continue.

21  Q.  That night when you were at the hotel, did Dennis Mahon

22  stay overnight?

23  A.  Yes, he did.

24  Q.  Where did he stay?

25  A.  He slept in the bed.

REBECCA WILLIAMS - DIRECT EXAMINATION BY MR. BOYLE    1880

1  Q.  What were you wearing?

2  A.  I was wearing full-length pajamas.

3  Q.  Top and bottom?

4  A.  Yes, and bra and underwear.

5  Q.  And did anything happen that night of a sexual -- in a

6  sexual nature?

7  A.  No.

8  Q.  Was this one bed or two?

9  A.  One bed.

10  Q.  Describe where you were and describe where he was in the

11  bed.

12  A.  I was on the very far edge of the bed all night.  Dennis,

13  I'm not sure where he was.  Moved around.  But -- he was on one

14  side, I was on the other.

15  Q.  Were there any advances made by either of you as a sexual

16  nature that night?

17  A.  Yes.

18  Q.  Who made them?

19  A.  Dennis.

20  Q.  How did he do that?

21  A.  By talking, flirting, trying to touch me.

22  Q.  And what did you do in reaction?

23  A.  I objected and pushed him away.

24  Q.  Did you fall asleep that night?

25  A.  No, sir.

1    Q.  At all?

2    A.  No, I did not.

3    Q.  And where did you stay on the bed that evening?

4           MS. HULL:  Asked and answered.

5           THE COURT:  Overruled.

6           THE WITNESS:  On the very edge of the bed.

7    BY MR. BOYLE:

8    Q.  After you are out of bed, do you recall if you left the

9    hotel at some point?

10   A.  Yes.

11   Q.  Did you go with agents to another state?

12   A.  Yes.

13   Q.  What state did you go to?

14   A.  Missouri.

15          THE COURT:  All right, we are at four o'clock.

16   Mr. Boyle.

17          Members of the jury, thanks for your attention today.

18   We are going to break for the day.  We will plan to get started

19   tomorrow morning at nine o'clock.  Please remember the

20   admonitions that you received today and we will see you

21   tomorrow.

22          (The jury left the courtroom.)

23          THE COURT:  Please be seated.

24          THE WITNESS:  Sir, just go out?

25          THE COURT:  No, you can go out this way, that's fine.

1          Quick question, Ms. Hull, that I have for you.  You

2   listed a long number of exhibits today that were admitted into

3   evidence.  Is it your intention to actually play all of those?

4   There must have been 30 of them that you listed that were

5   admitted.  And I'm not understanding what the jury is expected

6   to do with them.

7          MS. WILLIAMS:  Judge, those are all potential

8   impeachment clips.  Most are fairly short.  They are all for

9   Ms. Williams.  And it depends on how -- how she testifies.  My

10  hope is that they will not all be necessary.

11         THE COURT:  All right.  Here's the concern I have that

12  we all ought to just think about.  If you admit 30 of them, and

13  you play 10, is the jury going to be thinking they have to go

14  back and listen to the other 20 since they were admitted?

15  That's my concern.  We are marking a lot of exhibits and

16  admitting exhibits that aren't being shown to the jury now.  I

17  assume some will be addressed with later witnesses and maybe

18  some in closings.  But I worry about the jury being exposed to,

19  you know, 150 exhibits and going back to the jury room with 250

20  to 300 and thinking they've got to, on their own, go through

21  all of those others.

22         MS. WILLIAMS:  And, Your Honor, I think that's

23  absolutely a fair concern.  And when we get to the end of her

24  testimony, as I did last week when I sit down with the official

25  exhibit list and start comparing to make sure my list is up to

1    date, I would have, on behalf of Dennis, no problem, after her

2    testimony is finished, withdrawing the exhibits that were not

3    used.

4         THE COURT:  All right.  I think that's a sensible way

5    to do it.  Let's just keep that in mind so that we don't burden

6    the jury with stuff that we don't need to look at.

7         MR. BOYLE:  Does Daniel Mahon agree to that?

8         MS. HULL:  Yes.

9         MR. BOYLE:  Oh, I didn't hear it.  Thank you.

10        THE COURT:  Does the Government agree to that?

11        MR. BOYLE:  We do, thank you.

12        MS. HULL:  I didn't hear them.

13        THE COURT:  Let's plan to get started at 8:30 in the

14   morning.

15        MS. WILLIAMS:  Your Honor, I have a couple of concerns

16   I wanted to raise.  As to Exhibit --

17        MS. HULL:  Judge, did you say you have a four o'clock

18   again?

19        THE COURT:  Well, it's a four o'clock I'm doing in

20   chambers so you won't have to hurry and clear out as fast.

21        MS. WILLIAMS:  There was a tape that was played, 204,

22   that dealt with, I believe, the witness testified we went down

23   to the border with our guns and hung our nooses.  We previously

24   discussed, I believe, a noose campaign via a motion in limine.

25        As to this, and subsequent discussions that I'm sure

1    are coming, I would move under 403 to preclude reference to

2    nooses.  I believe they are outside the scope of the Indictment

3    and unfairly prejudicial.  So I move to strike as to that

4    exhibit.

5            THE COURT:  Well, that objection was not made before

6    204 was admitted or before it was played.  It's now been

7    played.  What is it you think you -- I should do now that it's

8    been played?

9            MS. WILLIAMS:  Your Honor, we ask that it be -- when

10   that tape -- if the Court were to strike it, the Court could

11   instruct the jury that it was stricken and when it is

12   transcribed for the record, that could be stricken.

13           THE COURT:  Well, you want me to do with the word

14   "nooses" in Exhibit 204 what I did with the word "lynchings" in

15   Exhibit 3; is that correct?

16           MS. WILLIAMS:  Yes.

17           THE COURT:  Ms. Hull?

18           MS. HULL:  Nothing to add.

19           THE COURT:  Mr. Boyle?

20           MR. BOYLE:  Judge, we are not going to discuss nooses

21   in this case.  We would have advised you if we were going to

22   talk about that noose campaign.  Regarding the tape, it gives

23   the context of what she said her cell was doing.  But it has no

24   reference to what Dennis Mahon did.  It just gives a context of

25   the conversation.  So we don't think we get into any issue

1    regarding nooses because it doesn't implicate Dennis.  It talks

2    about what her cell did.

3            And my second problem is I don't know why, given that

4    we've had these tapes since December 2nd and the transcripts

5    since November 18, that it's now becoming an issue regarding

6    nooses when it's already in evidence.  I'm concerned that we

7    are now going to start parsing things that have been admitted

8    when there's really no reason in this case.

9            THE COURT:  Are there other references to nooses in

10   any of the exhibits you intend to use?

11           MR. BOYLE:  I don't think so.  But they may have them.

12   I don't think so.  This is the one where -- this is it, I

13   think.

14           THE COURT:  Let me think about that.

15           MS. WILLIAMS:  Your Honor, there were two other

16   matters.  One is at the beginning of her testimony, this

17   witness said that my client told her that Robert Joos was a big

18   supporter of WAR and that my client telephoned Robert Joos in

19   the early days of Catoosa.  There is no discovery, there are no

20   statements or tapes that reflect such a phone call.  That was

21   the nature -- the basis of my Jencks request.

22           Furthermore, the Government told the jury in opening

23   that Robert Joos was not a supporter of WAR.  They've just

24   presented contrary testimony on both those bases.  At such time

25   as the Government asks the Court to make a finding that Robert

1    Joos is a co-conspirator, I would object to that and I would

2    object to that evidence being considered.

3              THE COURT:  You're making a record now; is that right?

4              MS. WILLIAMS:  I am making a record and I am making a

5    Jencks request.

6              THE COURT:  Well, I understood that you made the

7    Jencks request, and obviously Government will respond to that.

8    You are not making a motion; is that right?

9              MS. WILLIAMS:  I think based on the fact that the

10   Government took one position in opening and then put this

11   witness up and immediately presented contrary testimony, I will

12   move for a mistrial and at the very least, ask that that

13   testimony be stricken.

14             THE COURT:  On what basis?

15             MS. WILLIAMS:  Well, Your Honor, I think that there --

16   they are testifying what they believe the evidence will be.

17   And Robert Joos is not -- number one, he's not a witness.  But

18   number two, he is not a bit player, if you will, in this case.

19   They are claiming that he was a co-conspirator.

20             So first the jury and we hear he is not a supporter of

21   WAR.  Then we hear this witness get up and say, oh, Dennis said

22   he was a big supporter of WAR.  And the Government is

23   flip-flopping in its position.  And I think it's prejudicial to

24   the defense.

25             We are going to be revisiting this in -- when they ask

```
 1   you to find -- make a finding of him being a co-conspirator.
 2   And now that we've heard yes and we've heard no, and it appears
 3   that we are moving back to yes, I think that places us in a
 4   very unfair position.
 5          MS. HULL:  And I think the record reflects, Judge,
 6   that in the argument of the co-conspirators, the Government
 7   said that while he was not a supporter, and we addressed his
 8   opening statement saying he was not a supporter as a basis for
 9   arguing the co-conspirator statements early on in the trial.
10   And now we have testimony that he was a supporter of it.  This
11   is -- I think that they need to state a position as their -- as
12   to what they think the facts are and be held to it.
13          THE COURT:  Mr. Boyle?
14          MR. BOYLE:  An opening is not evidence.  If we produce
15   evidence that's greater than what we say in our opening, that
16   shouldn't be a prejudice to anyone.  And I think I disagree
17   with the idea that we have -- we have said that Robert Joos
18   isn't a supporter.  I mean, at best I think I was trying to
19   convey the point that we are not proving that he was someone
20   who subscribed to the WAR newspaper.  But I think we've always
21   maintained for years in this case that he was someone that
22   Dennis sent her to for training on behalf of WAR.
23          I don't think that's ever changed.  I think when they
24   say he wasn't a supporter, I don't think I used those words.  I
25   think I said he wasn't like a member or a follower of WAR.  But
```

1    I think we've always said that he is someone who has supported

2    Dennis in his WAR activities.

3              But and I just disagree with the idea that in opening,

4    if we produce more evidence than is in opening, that somehow

5    prejudices defense.

6              Secondly, there are recordings that have been

7    disclosed that were marked where we haven't gotten to where

8    Dennis says go down to Joos, he will teach you how to make

9    timers and explosives and how to blow things up.  So it's clear

10   that we always had that evidence of her sending Joos -- or

11   sending the informant down to Joos.

12             The reason the phone call was made was just to

13   establish how it is that she would show up out of the blue.  I

14   mean, I know there are recordings that have her and Dennis

15   talking about Joos, but the topic of Joos is throughout the

16   whole case.  There's no other Jencks material.  We just

17   introduced it to show that without introducing any of the tape

18   recording, because I don't know that there is one, just that

19   she had a -- she physically made -- or had phone contact with

20   someone named Robert Joos to prove introduction.  But it is her

21   visit down there that we would introduce.  That's all.

22             MS. WILLIAMS:  The problem is in all the tapes,

23   hundreds of tapes we have received, and even more reports,

24   ROIs, notes, et cetera, et cetera, there is no suggestion that

25   this phone call exists.  The first time we've heard about it is

1  today.  Given that, and what I believe is a patent Jencks

2  violation, I believe that when it comes time for the Court to

3  decide whether Joos is a co-conspirator that this should not

4  and cannot be considered because of this violation.

5          THE COURT:  Ms. Hull?

6          MS. HULL:  And, Judge, Mr. Boyle said that the

7  evidence -- that they proved more evidence.  They have proven

8  contrary.  That's why it's a mistrial.  If they get in front of

9  the jury and they say this is a fact and then the evidence that

10 they've presented proves contrary, I think there's a basis for

11 mistrial.

12         I would also raise another issue that I have cited

13 several times, because Mr. Boyle just again referred to his

14 opening PowerPoint.  We still don't have that on record and

15 that's something that I said -- it keeps coming up.  And I am

16 going to ask that he --

17         THE COURT:  Your motion is in the docket.  It hasn't

18 been denied until the Government gets the PowerPoint in the

19 docket.

20         MS. HULL:  Because it would assist in my argument

21 today because it is exactly way they put in their PowerPoint.

22         THE COURT:  Are you saying if they put it in the

23 docket, you would have in your hand today?

24         MS. HULL:  I would do that, too.  I could point it to

25 you, Judge, and say this is what was in their opening.

1          THE COURT:  All right.  I understand that point.  I am

2    going to deny the motion for mistrial.  We've many times in

3    this case covered the ground that the Government has no Rule 16

4    obligation to disclose to the defense evidence that it believes

5    witnesses will say in oral testimony.  Rule 16 applies to

6    written documents or statements of the witnesses or Brady or

7    Jencks.

8          I'm aware of no law that says that if an opening

9    statement is inconsistent in some respect with evidence that

10   comes out during the trial, that's a grounds for a mistrial.

11   If that were true, we would probably have a mistrial in

12   virtually every case, because there's always something in the

13   evidence that's somewhat different than what's in the opening.

14         I do not believe that the testimony of the agent --

15   I'm sorry, the informant concerning the phone call with Joos

16   has been unfairly prejudicial in some way.  So I will deny the

17   motion for mistrial.

18         Obviously, the defense can make whatever arguments it

19   chooses when we get to the issue of a co-conspirator exception

20   to the hearsay rule.

21         I think I covered everything that was raised.

22   Anything else we need to talk about?

23         MR. BOYLE:  No, Your Honor.

24         THE COURT:  Okay.  We will see you all at 8:30.  Thank

25   you.

1891

1    MS. WILLIAMS:  Thank you, Judge.

2    (The court stood in recess.)

3                    *      *      *

1                    C E R T I F I C A T E

2

3

4

5

6        I, MERILYN A. SANCHEZ, do hereby certify that I am

7   duly appointed and qualified to act as Official Court Reporter

8   for the United States District Court for the District of

9   Arizona.

10       I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17       DATED at Phoenix, Arizona, this 24th day of July,

18  2012.

19

20

21                         S/Merilyn A. Sanchez

22                         MERILYN A. SANCHEZ, CRR

23

24

25